## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA KELLY SLAUGHTER, in her official and personal capacities, and ALVARO M. BEDOYA, in his official and personal capacities,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, ANDREW N. FERGUSON, in his official capacity as Chair of the Federal Trade Commission, MELISSA HOLYOAK, in her official capacity as Commissioner of the Federal Trade Commission, and DAVID B. ROBBINS, in his official capacity as the Executive Director of the Federal Trade Commission,<br><br>*Defendants*. | Case No. 25 Civ. 909<br><br>Judge Loren L. AliKhan |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR EXPEDITED SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

BACKGROUND ................................................................................................................2

Statutory Background ....................................................................................................2

A. The FTC ..............................................................................................................2

B. *Humphrey's Executor* ........................................................................................4

Factual Background ......................................................................................................5

Procedural History ........................................................................................................9

ARGUMENT ....................................................................................................................9

I.    Legal Standard ...................................................................................................10

II.   *Humphrey's Executor* Controls and Requires Judgment for Plaintiffs ................10

III.  The President Fails to Justify His Attempt to Terminate Plaintiffs .......................14

A. The Supreme Court Has Not Implicitly Overruled *Humphrey's Executor* ..................14

B. The FTC Remains Protected by *Humphrey's Executor* ..............................................17

C. "History" and " Our Constitutional Structure" Support the FTC Act's Removal Protections ...........................................................................................................18

D. This Court's Obligation to Apply *Humphrey's Executor* Remains ............................22

IV.  Plaintiffs Are Entitled to Declaratory Judgment and a Permanent Injunction .....................23

A. The Court Should Declare that Plaintiffs' Purported Termination Was Unlawful .......24

B. The Court Should Enjoin the Non-Presidential Defendants from Interfering With Plaintiffs' Continued Service as FTC Commissioners ...............................................27

i.    *Plaintiffs have suffered irreparable harm for which no legal remedy is available* ...........................................................................................................28

ii.   *The balance of hardships and public interest favor granting Plaintiff injunctive relief* ..........................................................................................29

iii.  *Injunctive relief against subordinate officials is the appropriate remedy* .....30

C. In the Alternative, the Court Should Issue a Writ of Mandamus Requiring Compliance with Non-Discretionary Duties Under the FTC Act .................................................32

CONCLUSION .................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berry v. Reagan*,
No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983)................................................28, 29, 32

*Clinton v. City of New York*,
524 U.S. 417 (1998) ...........................................................................................................27

*Clinton v. Jones*,
520 U.S. 681 (1997) .............................................................................................................7

*Collins v. Yellen*,
594 U.S. 220 (2021) .....................................................................................................12, 16

*Consumers' Research v. CPSC*,
91 F.4th 342 (5th Cir. 2024) ..............................................................................................13

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .............................................................................................................1

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .......................................................................................12, 16, 17, 21

*FTC v. Beech-Nut Packing Co.*,
257 U.S. 441 (1922) .............................................................................................................2

*FTC v. Am. Nat'l Cellular, Inc.*,
810 F.2d 1511 (9th Cir. 1987) ............................................................................................18

*FTC v. Precision Patient Outcomes, Inc.*,
No. 22 Civ. 7307, 2023 WL 3242835 (N.D. Cal. May 3, 2023) ...........................................13

*Grundmann v. Trump*,
No. CV 25-425, 2025 WL 782665 (D.D.C. Mar. 12, 2025) .................................................27

*Harris v. Bessent*,
No. CV 25-412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ..................................................29

*Harris v. Bessent*,
No. CV 25-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025) .............................................27, 31

*Harris v. Bessent*,
No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) .............................................13, 23

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006)............................................................................................10

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935) ...................................................................................................*passim*

*Illinois v. Ferriero*,
   60 F.4th 704 (D.C. Cir. 2023)...........................................................................................33

*Illumina, Inc. v. FTC*,
   88 F.4th 1036 (5th Cir. 2023) ...........................................................................................13

*Leachco, Inc. v. CPSC*,
   103 F.4th 748 (10th Cir. 2024) ..........................................................................12, 15, 21, 22

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)...............................................................................................29

*Mackie v. Bush*,
   809 F. Supp. 144 (D.D.C. 1993)............................................................................28, 32, 33

*Magnetsafety.org v. CPSC*,
   129 F.4th 1253 (10th Cir. 2025) ........................................................................................22

*Mallory v. Norfolk S. Ry. Co.*,
   600 U.S. 122 (2023) ........................................................................................................22

*Marbury v. Madison*,
   5 U.S. 137 (1803) ................................................................................................20, 27, 28

*McPherson v. Blacker*,
   146 U.S. 1 (1892) ...........................................................................................................21

*Meta Platforms, Inc. v. FTC*,
   No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024)...........................................13, 22

*Miller v. Clinton*,
   687 F.3d 1332 (D.C. Cir. 2012).........................................................................................32

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................................................27

*Morrison v. Olson*,
   487 U.S. 654 (1988) ...................................................................................................12, 16

*In re Nat'l Nurses United*,
   47 F.4th 746 (D.C. Cir. 2022)......................................................................................33, 34

*Nat'l Petroleum Refiners Ass'n v. FTC*,
   482 F.2d 672 (D.C. Cir. 1973)..........................................................................................18

*Nat'l Sec. Archive v. CIA*,
   104 F.4th 267 (D.C. Cir. 2024).........................................................................................23

*New York v. Biden*,
   636 F. Supp. 3d 1 (D.D.C. 2022) ............................................................................24

*Noel Canning v. NLRB*,
   573 U.S. 513 (2014) ...............................................................................................21

*Paroczay v. Hodges*,
   219 F. Supp. 89 (D.D.C. 1963) ..............................................................................32

*Printing Packaging & Prod. Workers Union of N. Am. v. Int'l Bhd. of Teamsters*,
   No. CV 23-1872, 2024 WL 3835353 (D.D.C. Aug. 15, 2024) ...............................24

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ..........................................................................30

*Sampson v. Murray*,
   415 U.S. 61 (1974) ................................................................................................31

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ........................................................................................*passim*

*Service v. Dulles*,
   354 U.S. 363 (1957) ...............................................................................................32

*Severino v. Biden*,
   71 F.4th 1038 (D.C. Cir. 2023) .........................................................................31, 32

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2023) ..................................................................................27

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ....................................................................31, 32, 33

*Wiener v. United States*,
   357 U.S. 349 (1958) .........................................................................................12, 13

*Wilcox v. Trump*,
   No. CV 25-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) ........................27, 28, 30

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .........................................................................................22, 31

## **STATUTES**

5 U.S.C. § 109 .............................................................................................................4

5 U.S.C. § 1202(d) .....................................................................................................20

10 U.S.C. § 8083(c) ...................................................................................................21

10 U.S.C. § 8084(c) .................................................................................21

10 U.S.C. § 9038(c) .................................................................................21

10 U.S.C. § 10506(D) ..............................................................................21

12 U.S.C. § 242 .......................................................................................20

14 U.S.C. § 309(c)(1) ..............................................................................21

15 U.S.C. § 1 .............................................................................................2

15 U.S.C. § 2 .............................................................................................2

15 U.S.C. § 41 ....................................................................................passim

15 U.S.C. §§ 41–58 ..................................................................................2

15 U.S.C. § 46 .........................................................................................17

15 U.S.C. § 2053(a) .................................................................................20

28 U.S.C. § 991(a) ...................................................................................21

28 U.S.C. § 2201(a) .................................................................................24

29 U.S.C. § 153(a) ...................................................................................20

30 U.S.C. § 823(b)(1) ..............................................................................21

31 U.S.C. § 1105(a)(21)(B) .....................................................................16

31 U.S.C. § 1108 .....................................................................................16

39 U.S.C. § 202(a)(1) ..............................................................................21

42 U.S.C. § 902(a)(3) ..............................................................................20

42 U.S.C. § 1975(e) .................................................................................20

42 U.S.C. § 5841(e) .................................................................................20

42 U.S.C. § 7171(b)(1) ............................................................................20

42 U.S.C. § 7412(r)(6)(B) ........................................................................21

44 U.S.C. § 3502 .....................................................................................20

49 U.S.C. § 1111(c) .................................................................................20

## LEGISLATIVE MATERIALS

Act to Amend the Federal Trade Commission Act,
Pub. L. No. 75-447, 52 Stat. 111, 111 (1938) ......................................................... 18

Clayton Act, Pub. L. No. 63-212, 38 Stat. 730 (1914) ............................................ 2, 18

Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 717 (1914) ...........................*passim*

Interstate Commerce Act, Pub. L. No. 49-104, 24 Stat. 379, 383 (1887) ..................................... 19

Reorganization Act, Pub. L. No. 109, 63 Stat. 203 (1949).............................................. 4

115 Cong. Rec. 1836 (1969)......................................................................... 16

## EXECUTIVE MATERIALS

Exec. Order No. 14,215, 90 Fed. Reg. 10447 (2025) .................................................... 26

Letter from Sarah M. Harris, Acting Solicitor General to the Hon. Richard J. Durbin
(Feb. 12, 2025)................................................................................... 23

## ADMINISTRATIVE MATERIALS

16 C.F.R. § 0.8.................................................................................. 4, 15

Reorganization Plan No. 8 of 1950, 15 Fed. Reg. 3175 (May 24, 1950)........................................ 4

*In the Matter of Caremark Rx, LLC, et al.*,
221 0114, F.T.C., 9437 (Apr. 1, 2025) ................................................................ 25

Statement of Chairman Andrew N. Ferguson, Federal Trade Commission (Apr. 3,
2025)........................................................................................... 25

## RULES

Fed. R. Civ. P. 56............................................................................... 10

## OTHER AUTHORITIES

Marshall J. Breger & Gary J. Edles,
*Established by Practice: The Theory and Operation of Independent Federal
Agencies*, 52 Admin. L. Rev. 1111 (2000) ............................................................. 19

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist
Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1 (2020) ................................. 19

Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and
Executive Agencies)*, 98 Cornell L. Rev. 769 ........................................................ 16

Lauren Feiner, *FTC chair says he'd 'obey lawful orders' if Trump asked to drop an antitrust case like Meta's*, The Verge (Apr. 2, 2025) .............................................. 26

Jonathan Gienapp, *Removal and the Changing Debate over Executive Power at the Founding*, 63 Am. J. Legal Hist. 229 (2023) ..................................................... 20

Mike Isaac & David McCabe, *Mark Zuckerberg Lobbies Trump to Settle Antitrust Suit Against Meta*, N.Y. Times (Apr. 2, 2025) ..................................................... 26

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021) ........................ 20

Jerry L. Mashaw, *Recovering American Administrative Law: Federalist Foundations, 1787-1801*, 115 Yale L.J. 1256 (2006) .......................................... 19

Morton Rosenberg, *Presidential Control of Agency Rulemaking: An Analysis of Constitutional Issues That May Be Raised by Executive Order 12,291*, 23 Ariz. L. Rev. 1199 (1981) .......................................................................... 16

Jed Handelsman Shugerman, *Venality: A Strangely Practical History of Unremovable Offices and Limited Executive Power*, 100 Notre Dame L. Rev. 213 (2024) .............................................................................................. 20

## PRELIMINARY STATEMENT

Plaintiffs Rebecca Kelly Slaughter and Alvaro M. Bedoya are Commissioners of the Federal Trade Commission.  President Trump's recent attempt to remove them from office without cause violates a federal statute that has stood for 111 years and defies ninety years of Supreme Court precedent.  Plaintiffs respectfully request that this Court act expeditiously to declare the President's action unlawful and enjoin his subordinates from carrying out his illegal order.

Since it was passed in 1914, the FTC Act has provided that Commissioners cannot be removed except for "inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41.  Ninety years ago, in *Humphrey's Executor v. United States*, a unanimous Supreme Court confirmed that this statute is constitutional and that no FTC Commissioner can be removed "except for one or more of the causes named in the applicable statute."  295 U.S. 602, 632 (1935).  This remains the law today: the Supreme Court has repeatedly refused to overrule or revisit *Humphrey's Executor*, and lower courts—including the D.C. Circuit—have uniformly held that any challenge to the FTC Act's removal protections remains squarely foreclosed by that decision.

Nevertheless, on March 18, 2025, Plaintiffs received identical emails containing a message from President Trump: "I am writing to inform you that you have been removed from the Federal Trade Commission, effective immediately."  (Declaration of Rebecca Kelly Slaughter ("Slaughter Decl."), Ex. A; *see* Plaintiffs' Statement of Material Facts Not in Dispute ("SMF") ¶ 16.)  The President did not claim that Plaintiffs were inefficient, neglectful of their duties, or engaged in malfeasance, but instead stated simply that their "continued service on the FTC is inconsistent with my Administration's priorities."  (*Id.*)  The President claimed that this illegal action was taken "pursuant to my authority under Article II of the Constitution" (*id.*), but the core holding of *Humphrey's Executor* is that Article II does *not* grant Presidents the right to ignore the statutory removal protections granted to FTC Commissioners.

There are no factual disputes here, the law is well settled, and Plaintiffs are entitled to immediate summary judgment. Both the FTC Act and Supreme Court precedent compel the conclusion that the President's attempt to terminate Plaintiffs is unlawful. The justifications offered in the President's March 18 message are unconvincing and, in any event, cannot carry the day in this Court, which is duty-bound to apply the binding precedent that has protected FTC Commissioners for nearly a century.

Accordingly, and for the reasons stated more fully below, Plaintiffs ask this Court to grant them summary judgment on an expedited basis, declare that the President's attempt to remove them from office is unlawful, and enjoin FTC Chair Ferguson, Commissioner Holyoak, and Executive Director Robbins from implementing the President's improper order.

## BACKGROUND

### Statutory Background

#### A.    The FTC

In 1914, Congress passed, and President Wilson signed, the FTC Act, Pub. L. No. 63-203, ch. 11, 38 Stat. 717-724 (1914) (current version 15 U.S.C. §§ 41–58), which created the Federal Trade Commission and directed it to prevent "unfair methods of competition in commerce," *id.* § 5, 38 Stat. 717, 719. The FTC Act was passed to "supplement" the Sherman Antitrust Act of 1890, *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 453 (1922), which had outlawed "every contract, combination . . . , or conspiracy . . . in restraint of trade," and any attempts to "monopolize" or "combine or conspire . . . to monopolize," 15 U.S.C. §§ 1, 2. At the same time as the FTC Act, Congress also passed the Clayton Act and empowered the Commission to enforce several of its provisions. Act of Oct. 15, 1914, Pub. L. No. 63-212, ch. 323, § 11, 38 Stat. 730, 734. These included prohibitions on price discrimination, exclusive dealing and tying arrangements, anticompetitive mergers, and interlocking directorates. *Id.*; *see id.* §§ 2, 3, 7, 8.

From the beginning, Congress gave the FTC a variety of powers to achieve these statutes' ends.  Specifically, Congress empowered the FTC to issue "complaint[s] stating . . . charges" and giving notice of a hearing, Pub. L. No. 63-203, ch. 311, § 5, 38 Stat. 717, 719; to hold hearings with written records, *id.*; and, after such hearings, to issue reports with cease-and-desist orders, *id.* § 5, 38 Stat. 719-20, which could be enforced in the federal Courts of Appeals, *id.* § 5, 38 Stat. 720.  The Commission's findings of fact, if supported by testimony, would be deemed conclusive in that enforcement proceeding, *id.* § 5, 38 Stat. 721, giving the FTC's findings significant force.  Congress also gave the FTC rulemaking authority, *id.* § 6(g), 38 Stat. 722, and authorized the Commission to perform investigations into business practices and issue subpoenas, *id.* § 9, 38 Stat. 722; *see also id.* § 6(b), 38 Stat. 721.  The Commission was also empowered to assist courts in drafting decrees for antitrust cases, *id.* § 7, 38 Stat. 722, and to help the Attorney General assure compliance with antitrust orders by performing investigations and reporting findings, *id.* § 6(c), 38 Stat 721.

Congress saw the Commission's structure as a key feature and asset to its mission.  Then, as now, the FTC Act provided that the FTC "shall be composed of five Commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate . . . for terms of seven years" and that Commissioners are removable by the President only for "inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41.  As the Senate Report for the FTC Act further explained, "it is [also] essential that [the Commission] should not be open to the suspicion of partisan direction," and thus no more than three members of the Commission may be of the same party, *id.*, a restriction that remains today, 15 U.S.C. § 41.  These arrangements were intended to give the Commission "greater prestige and independence,"

with the hope that "its decisions, coming from a board of several persons, will be more readily accepted as impartial and well considered."  S. Rep. No. 63-597 at 11 (1914).

The FTC Act's core provisions regarding the appointment and removal of Commissioners have remained intact since 1914, with one notable exception, which substantially increased the President's control over the Commission's leadership.  In the Reorganization Act of 1949, Congress created a four-year window during which the President could create plans to restructure federal agencies that would take effect unless a majority of one house of Congress disapproved within 60 days.  *See* Pub. L. No. 109, 63 Stat. 203 (codified then at 5 U.S.C. § 109, since amended).  The primary purpose of this statute was "to promote the better execution of the laws" and "the more effective management of the executive branch of the Government and of its agencies."  *Id.* 63 Stat. at 203.  Pursuant to this legislation, President Harry Truman transmitted to Congress "Reorganization Plan No. 8 of 1950," which, *inter alia*, (1) gave the FTC Chair administrative authority over the Commission, and (2) empowered the President to select the Chair from among the Commission's members.  Reorganization Plan No. 8 of 1950, 15 Fed. Reg. 3175 (May 24, 1950).  Neither house of Congress vetoed the proposal, and it became law.

As a result of this 1950 restructuring, today, the President's chosen Chair presides at Commission meetings and hearings, controls its expenditures, and is responsible for all personnel decisions.  *See* 15 U.S.C. § 41; 16 C.F.R. § 0.8.  To ensure alignment with his agenda, the President is free at any time to change his designation of Chair to any of the other sitting Commissioners.

### B.    *Humphrey's Executor*

In 1925, William Humphrey was nominated to the Commission by President Coolidge and confirmed by the Senate, and, in 1931, President Herbert Hoover re-appointed him for a second seven-year term, expiring in 1938.  *See Humphrey's Executor*, 295 U.S. at 612.

4

On July 25, 1933, newly elected President Franklin D. Roosevelt asked Humphrey for his resignation, explaining that "the aims and purposes of the Administration with respect to the work of the Commission [could] be carried out most effectively with personnel of my own selection." *Id.* at 618 (internal quotation marks omitted). Humphrey replied, saying he would consult his friends and think about it. *Id.* at 618–19. On August 31, 1933, President Roosevelt wrote Humphrey again to ask for his resignation, reiterating that "I do not feel that your mind and my mind go along together on either the policies or the administering of the [FTC]," but Humphrey declined to resign. *Id.* at 619. On October 7, 1933, President Roosevelt wrote Humphrey a final letter, stating: "Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." *Id.*

Humphrey "never acquiesced in this action," but died several months later. *Id.* at 618, 619. His executor ultimately challenged his termination, presenting to the Supreme Court the "question[] . . . of the power of the President to make the removal." *Id.* at 612. In the resulting decision, a unanimous Supreme Court held that President Roosevelt's attempted removal was unlawful, and affirmed that, "as to officers of the kind here under consideration," *i.e.*, Commissioners of the FTC, "we hold that no removal can be made during the prescribed term for which the officer is appointed, except for one or more of the causes named in the applicable statute." *Id.* at 632.

Despite repeated challenges, *Humphrey's Executor* has stood for ninety years and remains binding law. *See infra* Part II.

**Factual Background**

In 2018, the Senate had the opportunity to consider a full slate of five FTC Commissioner nominations from President Trump, including three Republicans (Joseph Simons, Noah Phillips, and Christine Wilson) and two Democrats (Rohit Chopra and Plaintiff Rebecca Kelly Slaughter).

(SMF ¶ 1.)  The U.S. Senate confirmed Commissioner Slaughter on April 26, 2018, and she was

sworn in on May 2, 2018.  (SMF ¶ 2.)  President Trump exercised his authority to designate

Simons as the Chair, replacing Acting Chair Maureen K. Ohlhausen, whom President Trump had

designated as Acting Chair upon taking office in January 2017.  (SMF ¶ 3.)

When President Biden took office in January 2021, he named Commissioner Slaughter as

the Acting Chair of the FTC, a role she held until Lina Khan was confirmed by the Senate and

designated as the Chair by President Biden several months later.  (SMF ¶ 4.)  On February 13,

2023, Commissioner Slaughter was renominated by President Biden to serve a second term on

the Commission.  (SMF ¶ 5.)  The Senate confirmed her again on March 7, 2024, approving

another bipartisan slate that included two Republican Commissioners, Defendants Andrew

Ferguson and Melissa Holyoak.  (SMF ¶ 6.)  Commissioner Slaughter's current term expires on

September 25, 2029.  (SMF ¶ 7.)

On September 12, 2021, President Biden announced his nomination of Plaintiff Alvaro

M. Bedoya, a Democrat, to serve as an FTC Commissioner.  (SMF ¶ 8.)  He was confirmed by

the Senate on May 11, 2022.  (SMF ¶ 9.)  He was sworn in on May 16, 2022, to a term that

expires on September 25, 2026.  (SMF ¶ 10.)

During the tenure of Commissioners Slaughter and Bedoya, the FTC took significant

actions in service of the Commission's statutory mission.  For example:

- In May 2021, the FTC issued a report to Congress detailing how repair

restrictions imposed by manufacturers hurt small businesses and consumers.  (SMF ¶ 17a.)

- On May 31, 2023, the FTC charged Amazon with violating the Children's Online

Privacy Protection Act Rule by keeping Alexa voice recordings in perpetuity and ignoring

parents' deletion requests, ordering Amazon to delete the children's data and implement

new privacy safeguards.  (SMF ¶ 17b.)

- On July 9, 2024, the FTC issued a staff report detailing how the six largest pharmacy benefit managers (PBMs) artificially boosted their profits by systematically steering customers to higher priced insulin products.  (SMF ¶ 17c.)

- On September 19, 2024, the FTC issued a report detailing how some of the largest social media and streaming companies—including Amazon.com, Inc.; ByteDance Ltd. (which owns TikTok); Discord Inc.; Meta Platforms, Inc.; YouTube LLC; and X Corp.— have surveilled consumers, monetizing the personal information of their users, especially children and teenagers.  (SMF ¶ 17d.)

- On January 14, 2025, the FTC issued another staff report detailing how the three major PBMs charge markups for medications treating cancer, HIV, and other critical diseases.  (SMF ¶ 17e.)

- On April 14, 2025, the FTC is scheduled to go to trial against Meta Platforms, Inc., in a suit that alleges Meta accumulated and maintained illegal monopoly power over social networking through its acquisitions of Instagram and WhatsApp.  (SMF ¶ 17f.)

On July 11, 2023, President Biden nominated Defendant Andrew Ferguson, a Republican, to serve as FTC Commissioner.  (SMF ¶ 12.)  Ferguson testified in connection with his nomination before the Senate Committee on Commerce, Science, and Transportation.  When asked about *Humphrey's Executor* and the independence of the FTC, he explained:

> If confirmed as an FTC Commissioner, I will abide by binding Supreme Court precedent.  The Supreme Court has held that the FTC's removal provisions are consistent with Article II of the Constitution.  Although subsequent decisions have drawn *Humphrey's Executor* into question, the Supreme Court has instructed time and again that it is [the Supreme] Court's prerogative alone to overrule one of its precedents.  The Supreme Court's decisions remain *binding precedent* until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing validity.

(SMF ¶ 13 (citations and quotations omitted, alterations and emphasis original).)  Immediately following President Trump's inauguration on January 20, 2025, he designated Commissioner Ferguson as Chair of the FTC.  (SMF ¶ 14.)

On March 17, 2025, Defendant Ferguson appeared on the Bloomberg.com podcast *Odd Lots*.  He commented on the "benefits in certain circumstances to having multi-member agencies with people from both parties" and continued:

> I mean, look, if you have an agency that is exceeding the law, abusing the companies that it purports to regulate, it's helpful for markets, for Courts, for litigants, for government transparency, to have people on the other party pointing this out and saying it in dissents.  You know, I wrote 400 plus pages of dissents during my time as a minority commissioner, I think that that adds value.

(SMF ¶ 15.)

The following day, on March 18, 2025, Commissioners Slaughter and Bedoya each received identical emails from Deputy Director of Presidential Personnel Trent Morse, conveying a message from President Trump: "I am writing to inform you that you have been removed from the Federal Trade Commission, effective immediately." (SMF ¶ 16; Slaughter Decl. Ex. A.)

Despite the FTC Act's clear requirement that Commissioners can be removed only for "inefficiency, neglect of duty, or malfeasance in office," 15 U.S.C. § 41, President Trump's message did not identify any such cause for their purported termination.  (Slaughter Decl. Ex. A.)  Instead, tracking President Roosevelt's message to William Humphrey in 1933, President Trump's message asserted, without explanation: "Your continued service on the FTC is inconsistent with my Administration's priorities.  Accordingly, I am removing you from office pursuant to my authority under Article II of the Constitution."  (*Id.*)  Although President Trump's message did not explain why Commissioners Slaughter and Bedoya's service is "inconsistent"

with his priorities, the email sought to excuse his disregard of governing law by implying, incorrectly, that the Supreme Court has abandoned *Humphrey's Executor*. *See infra* Part II.

Shortly after the March 18 email that purported to fire them, Commissioners Slaughter and Bedoya were cut off from their email access and asked to return their technology equipment. (SMF ¶ 18.)  They have been denied access to their files; their staff members have all been placed on administrative leave or reassigned to other posts in the agency; and they are now listed as "Former Commissioners" on the FTC website, indicating their "time in office" ended on March 18, 2025.  (SMF ¶ 19.)  As a result of these actions, Plaintiffs Slaughter and Bedoya have been unable to fulfill their duties as duly appointed FTC Commissioners.  (SMF ¶ 20.)  These actions can have been taken only at the direction of Defendants Ferguson and Robbins.  (SMF ¶ 21.)  Defendant Holyoak has also acquiesced in these actions.  (*Id*.)

Since the purported firing of Commissioners Slaughter and Bedoya, only two FTC Commissioners—Republican Commissioners Ferguson and Holyoak—have been able to perform their duties.  (SMF ¶ 23.)  President Trump recently nominated a third Republican, Mark Meador, to serve as Commissioner.  (SMF ¶ 24.)  Mr. Meador was confirmed by the Senate on April 10, 2025.  (*Id*.)

## Procedural History

Plaintiffs filed this action on March 27, 2025, seeking declaratory, injunctive, and related relief.  (*See generally* Dkt. 1, Compl.)  Plaintiffs now file the instant motion, seeking expedited summary judgment and the entry of a permanent injunction.

## ARGUMENT

There are no factual disputes here and the law could not be more clear.  The FTC Act and Supreme Court precedent compel the conclusion that the President's attempt to terminate Plaintiffs is unlawful.  *See infra* Part II.  To the extent the President attempted to justify his

unlawful act in his message to Plaintiffs, he misstated the law and ignored centuries of U.S. history. And, in any event, his justifications cannot carry the day in this Court, which is duty-bound to apply the binding precedent that has protected FTC Commissioners for nearly a century. *See infra* Part III. Accordingly, Plaintiffs respectfully request that this Court grant them summary judgment; declare that the President's attempt to remove them from office is unlawful; and enjoin FTC Chair Ferguson, Commissioner Holyoak, and Executive Director Robbins from implementing the President's illegal order or otherwise preventing Plaintiffs from performing their statutory duties. *See infra* Part IV.

## I.    <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is only "'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The dispute is "genuine" only if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

## II.    <u>*Humphrey's Executor* Controls and Requires Judgment for Plaintiffs</u>

There are no material facts in dispute here, and it is difficult to imagine a more obvious violation of governing law than the President's attempt to remove, without cause, Plaintiffs as Commissioners of the FTC. Plaintiffs are entitled to summary judgment and, as discussed further below, to declaratory and injunctive relief confirming their continued status as FTC Commissioners, *see infra* Part IV.

The FTC Act provides that the FTC's five Commissioners will serve staggered seven-

year terms, but that "[a]ny Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. It is undisputed that Commissioners Slaughter and Bedoya were duly nominated and confirmed to serve terms as Commissioners of the FTC, and that their terms do not expire until September 25, 2029, and September 25, 2026, respectively. (SMF ¶¶ 1–10.) And it is undisputed that, on March 18, 2025, President Trump purported to "remove[]" Plaintiffs "from the Federal Trade Commission, effective immediately" in a message that cited none of the causes listed in 15 U.S.C. § 41. (SMF ¶¶ 16, 25; Slaughter Decl. Ex. A.)

Thus, that the President failed to comply with the FTC Act is clear. That he was required to comply is equally clear. In 1933, President Roosevelt attempted precisely what President Trump attempted here, namely, to remove an FTC Commissioner because his continued service was in tension with the unspecified "aims and purposes of the [then-present] Administration." *Humphrey's Executor*, 295 U.S. at 612; *cf.* SMF ¶ 16 & Slaughter Decl. Ex. A ("Your continued service on the FTC is inconsistent with my Administration's priorities."). And, just as President Roosevelt asserted that the FTC Act's removal protections are "an unconstitutional interference with the executive power of the President," placing "chief reliance [on] *Myers v. United States*," *Humphrey's Executor*, 295 U.S. at 626, President Trump now likewise claims the power to "remov[e]" Plaintiffs "from office pursuant to [his] authority under Article II of the Constitution," leading with a citation to *Myers*, *see* Slaughter Decl. Ex. A. A unanimous Supreme Court rejected President Roosevelt's removal attempt and held that "no removal" of an FTC Commissioner "can be made during the prescribed term for which the officer is appointed, except for one or more of the causes named in the applicable statute." *Humphrey's Executor*, 295 U.S. at 632.

This remains the law today.  Over the ninety years since the Supreme Court decided *Humphrey's Executor*, the Supreme Court has repeatedly adhered to it and expressly declined all invitations to revisit it.  *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (noting that, "[i]n *Humphrey's Executor* . . . we held that Congress could create expert agencies led by a group of principal officers removable by the President only for good cause," and that "we . . . do not revisit our prior decisions allowing certain limitations on the President's removal power"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010) ("This Court has determined, however, that [the President's removal] authority is not without limit.  In *Humphrey's Executor v. United States*, . . . we held that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause. . . . The parties do not ask us to reexamine any of these precedents, and we do not do so."); *see also Collins v. Yellen*, 594 U.S. 220, 250–51 (2021) (recognizing that *Seila Law* did "not revisit our prior decisions" limiting President's removal powers, but declining to extend those decisions to "novel context"); *Morrison v. Olson*, 487 U.S. 654, 687–93 (1988) (upholding restrictions on removal of independent counsel and discussing *Humphrey's Executor*); *id.* at 724–25 (Scalia, J., dissenting) ("Since our 1935 decision in *Humphrey's Executor* . . . removal restrictions have been generally regarded as lawful for so-called 'independent regulatory agencies,' such as the Federal Trade Commission . . . ." (citing 15 U.S.C. § 41)); *Wiener v. United States*, 357 U.S. 349, 356 (1958) (rejecting President Truman's attempt to terminate member of War Claims Commission under "[t]he philosophy of *Humphrey's Executor*, in its explicit language as well as its implications").

Recognizing this unbroken line of authority, Circuit and District Courts have uniformly held that any challenge to the FTC's removal protections remains squarely foreclosed by

*Humphrey's Executor*. *See, e.g.*, *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (*per curiam*) (Millett, Pillard, and Wilkins, J.J.) ("Meta claims that the Federal Trade Commission Act likely violates Article II by limiting the President's power to remove the Commissioners.  The Supreme Court already answered this question adversely to Meta.  *See Humphrey's Executor v. United States*, 295 U.S. 602, 629–32 (1935). . . . The Supreme Court has not disturbed that precedent."); *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023) (holding that under *Humphrey's Executor*, "FTC's enabling act did not run afoul of Article II" and that Supreme Court "has expressly declined to overrule" *Humphrey's Executor*); *FTC v. Precision Patient Outcomes, Inc.,* No. 22 Civ. 7307, 2023 WL 3242835, at *1 (N.D. Cal. May 3, 2023) (holding that defendant's argument that FTC removal protections preclude FTC from constitutionally bringing court action for civil penalties is "clearly foreclosed by Supreme Court precedent," citing *Humphrey's Executor*).

Likewise, contemporary courts uniformly apply *Humphrey's Executor* to rebuff challenges to removal protections concerning traditional multimember agencies—including an *en banc* panel of the D.C. Circuit just this week.  *See Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *1 (D.C. Cir. Apr. 7, 2025) (noting that "the Supreme Court has repeatedly stated that it was not overturning the precedent established in *Humphrey's Executor* and *Wiener* for multimember adjudicatory bodies" and denying stay of judgment in favor of wrongfully terminated members of the NLRB and MSPB); *see also Consumers' Research v. CPSC*, 91 F.4th 342, 346, 352  (5th Cir. 2024) (finding that CPSC's structure is "mirror image of the [FTC]" and thus "[t]he holding from *Humphrey's* controls"), *rehearing en banc denied by* 98 F.4th 646, 648 (5th Cir. 2024) (observing the Supreme Court "has twice declined to overrule *Humphrey's Executor*, "going out of its way to declare—recently and conspicuously—that it would 'not

revisit' the decision but leave it 'in place.'") (Willet, J. concurring); *Leachco, Inc. v. CPSC*, 103
F.4th 748 (10th Cir. 2024) ("*Humphrey's Executor* remains binding precedent and controls in
cases challenging removal protections"), *cert. denied*, No. 24-156, 2025 WL 76435 (U.S. Jan.
13, 2025).

In short, *Humphrey's Executor* remains good law and controls here.  It follows that the
result must be the same for President Trump as it was for President Roosevelt: this Court should
hold that his attempt to terminate Plaintiffs as FTC Commissioners without cause is unlawful.

## III.    The President Fails to Justify His Attempt to Terminate Plaintiffs

In truth, nothing more is required to demonstrate that this Court should grant Plaintiffs
summary judgment.  The governing statute unambiguously provides that a Commissioner can be
terminated only on certain specified grounds, *see* 15 U.S.C. § 41; binding Supreme Court
precedent confirms that the President cannot terminate FTC Commissioners "except for one or
more of the causes named in the applicable statute," *Humphrey's Executor*, 295 U.S. at 632; *see
supra* Part II; and yet the President has attempted to terminate Plaintiffs without cause in the
midst of their unexpired terms as FTC Commissioners (*see* SMF ¶¶ 16, 25).  However, to the
extent the President attempted to justify his unlawful action (*see* Slaughter Decl. Ex. A), the
President's brief message to Plaintiffs does not and cannot support a different result here.

### A.    The Supreme Court Has Not Implicitly Overruled *Humphrey's Executor*

The inherent premise of the President's message is that he can simply ignore *Humphrey's
Executor*; that the Supreme Court's recent decisions have either silently overturned it or so
thoroughly undermined it that it no longer protects even those serving as FTC Commissioners—
the subject of that seminal case.  However, to the extent Defendants ask this Court to hold that
the Supreme Court has *sub silentio* abandoned *Humprey's Executor*, this Court cannot turn a
blind eye to the Court's repeated and express declarations to the contrary.  *See supra* Part II; *see*

14

*also infra* Section III.D.

The only post-*Humphrey's Executor* case cited in the President's message is *Seila Law*, (*see* Slaughter Decl. Ex. A), but it does not support him here. Just the opposite. Not only did *Seila Law* expressly declare that *Humphrey's Executor* remains good law, *see* 591 U.S. at 204, but the Court also reached its holding by repeatedly contrasting the CFPB's structure with the FTC's structure, *id.* at 218–19; *see also, e.g.*, *Leachco*, 103 F.4th at 761–62 (rejecting *Seila Law* challenge to CPSC because it is "structured similarly to the FTC," unlike the CFPB that was the subject of *Seila Law*). Specifically, the *Seila Law* court held that the "CFPB's leadership by a single independent Director violates the separation of powers," 591 U.S. at 232, largely because it was unlike the FTC, "a traditional independent agenc[y] headed by [a] multimember . . . commission[]," comprised of a "body of experts" that is "non-partisan" and who serve "staggered terms" that allow Commissioners to "accrue[] significant expertise," *id.* at 207, 218.

The Court also emphasized: "Because the CFPB is headed by a single Director with a five-year term, some Presidents may not have any opportunity to shape its leadership and thereby influence its activities." *Id.* at 225. Nor would any "President . . . have the opportunity to appoint . . . a chair or fellow members of a Commission or Board . . . who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id*. Again, the contrasts with the FTC are stark: the FTC's staggered terms ensure that Presidents can regularly appoint Commissioners, *see* 15 U.S.C. § 41, and the President designates the FTC Chair, *id.*, who serves as the "executive and administrative head of the agency," controls the agency's expenditures, and selects the heads of its major policy-making divisions, 16 C.F.R. § 0.8. Indeed, President Trump was able to appoint all *five* FTC Commissioners in his first term and, in just the first three months of his second term, has

elevated Andrew Ferguson to the Chair of the FTC and nominated yet another Commissioner, whom the Senate has already confirmed.  (*See* SMF ¶¶ 1, 2, 24.)

In addition, *Seila Law* emphasized that the CFPB was not funded through the regular appropriations process, which gives "Presidents . . . [the] budgetary tools to influence the policies of independent agencies."  591 U.S. at 266 (citations and quotations omitted).  Again, the FTC is a counterexample: the FTC's budget requests are controlled by the President directly via the Office of Management and Budget (OMB).  *See* 31 U.S.C. §§ 1105(a)(21)(B), 1108.  And while Congress makes the final appropriation, the budgetary process has historically been a significant means of Presidential influence over agency policies and priorities.[1]

In sum, while the Supreme Court has in recent years recognized constitutional defects in removal provisions for "novel" single-director-led agencies, *see Seila Law*, 591 U.S. at 204; *Collins*, 594 U.S.at 251, or in the "the unusual situation . . . of two layers of for-cause" removal protection, *Free Enter. Fund*, 561 U.S. at 501, the Court has *never* struck down such protections for a "traditional independent agency headed by a multimember board or commission" like the FTC or the Federal Reserve, *Seila Law*, 591 U.S. at 207.  Even if *Seila Law* "declined to *extend* Congress's authority to limit the President's removal power to a new situation," *id.* at 238 (emphasis added), it most certainly did not *eliminate* that authority, as the President's message implies.

---

[1] *See, e.g.*, Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 806 (May 2013) ("[T]he relationship between independence from the President and OMB budget control is clear: '[I]t cannot be denied that there is a direct relation between budget control and policymaking.'" (quoting Morton Rosenberg, *Presidential Control of Agency Rulemaking: An Analysis of Constitutional Issues That May Be Raised by Executive Order 12,291*, 23 Ariz. L. Rev. 1199, 1219 (1981)); *see also id.* (citing 115 Cong. Rec. 1836 (1969) (statement of FTC Commissioner Everette MacIntyre) ("What was intended as a purely housekeeping measure not infrequently has become an instrument of control over policy.")).

B.    **The FTC Remains Protected by *Humphrey's Executor***

The President's message next asserts that *Humphrey's Executor* "appears to have misapprehended the powers" of the FTC, and goes on to list various regulatory actions that can be taken by "the FTC today." (Slaughter Decl. Ex. A.) Again, however, these assertions cannot justify the President's decision to disregard the FTC Act's removal protections.

To begin, the Court acknowledged as far back as *Morrison* that the "powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree," 487 U.S. at 686–91, 689 n.28, a notion that *Seila Law* echoed, *see* 591 U.S. 197 at 216 n.2; *id.* at 286 n.10 (Kagan, J., concurring in part). Yet both decisions stood by *Humphrey's Executor*. *See supra* Part II. In fact, despite finding that the CFPB was "vested with significant executive power," 591 U.S. at 220, seven Justices on the *Seila Law* Court concurred that Congress could "pursu[e] alternative responses to" any constitutional defect, "for example, [by] converting the CFPB into a multimember agency" like the FTC, *id.* at 237; *see id.* at 298 (Kagan, J., concurring in part).[2]

Moreover, while the President asserts that the FTC now "exercises substantial executive power," he goes on to cite powers the FTC has had *from its founding*—long before *Humphrey's Executor*. (Slaughter Decl. Ex. A.) From its inception, the FTC could "issue subpoenas," *see* Pub. L. No. 63-203, ch. 311, § 6, 38 Stat. 717, 722 (codified today at 15 U.S.C. § 46), perform "administrative adjudications," *see id.* § 5, 38 Stat. 717, 719 (codified today at 15 U.S.C. § 45),

---

[2] Likewise, in *Free Enterprise Fund*, the Court left in place the Securities and Exchange Commission's own single-layer removal protections—"[SEC] Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office'"—noting approvingly that the President "could then hold the Commission to account for its supervision of the Board, to the same extent that he may hold the Commission to account for everything else it does." 561 U.S. at 495–96.

and "promulgate binding rules," *see id.* § 6, 38 Stat. 717, 722; *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693–94 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 951 (1974).  Likewise, as courts recognized decades ago, the FTC's current power to "impose injunctions on private parties" is simply an outgrowth of its original power to issue cease and desist orders.  *See FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987) ("We conclude that the FTC's current power to seek injunctive relief pursuant to section 13(b) does not so materially differ from the power to seek cease and desist orders as to render *Humphrey's Executor* inapposite.") Finally, while the President cites the FTC's mandate to enforce prohibitions on "unfair methods of competition" and enforce "portions of the Clayton Act" (Slaughter Decl. Ex. A), those mandates were at the heart of the original FTC Act, *Nat'l Petroleum Refiners Ass'n*, 482 F.2d at 702 n.10 (explaining Clayton Act was passed "a few weeks after the Trade Commission Act" and "gave the FTC the power to enforce its substantive provisions").[3]

## C.    **"History" and " Our Constitutional Structure" Support the FTC Act's Removal Protections**

The President's termination letter concludes with the assertion that "[a]n independent agency of this kind," *i.e.*, the FTC, has "'no basis in history and no place in our constitutional structure.'"  (Slaughter Decl. Ex. A (quoting *Seila Law*, 591 U.S. at 220).)  This is flatly false.

*First*, and most glaringly, far from a criticism of agencies like the FTC, the passage quoted from *Seila Law* is a criticism of the CFPB for not being *more like the FTC*.  As noted above, *see supra* Section III.B, the Court was highly skeptical of the CFPB's "single-Director structure" specifically because it was "an innovation with no foothold in history or tradition,"

---

[3] The FTC's further mandate to prevent "deceptive acts or practices in or affecting commerce" was added shortly after *Humphrey's Executor*, Pub. L. No. 75-447, 52 Stat. 111, 111 (1938), but decades before the Supreme Court repeatedly reaffirmed *Humphrey's Executor*'s validity.  *See supra* Part I.

591 U.S. at 222, in direct contrast to the FTC and similarly structured agencies, which the Court referred to as "*traditional* independent agenc[ies] headed by a multimember board or commission," *id.* at 207 (emphasis added). Thus, rather than casting doubt on the constitutionality of the FTC's structure, *Seila Law* reaffirms it.

*Second*, the contention that the FTC Act's removal protection for Commissioners has "no basis in history" is absurd. The FTC was created, and granted the core powers it still exercises today, 111 years ago. *See* Pub. L. No. 63-203, ch. 311, 38 Stat. 717, 719 (1914). The prohibition on removing Commissioners without cause, *see id.* § 1, 38 Stat. 717 (*codified at* 15 U.S.C. § 41), traces its direct lineage even further back, to 1887, when Congress established the Interstate Commerce Commission (ICC) to regulate the railroads and granted its commissioners the very same protection. *See* An Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887).

More broadly, "the concept of [agency] independence did not originate with the ICC," but runs right back to the Founding. Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1117 (2000). For example, "[w]hen Congress established the Department of the Treasury in 1789, the department possessed indicia of independence from the executive . . . and Congress restricted the President's power to remove the comptroller of the department." *Id.*; *see id.* 1117–19; Jerry L. Mashaw, *Recovering American Administrative Law: Federalist Foundations*, 1787–1801, 115 Yale L.J. 1256, 1291 (2006) (describing various early "commissions and boards" as "'independent commissions' in an even stronger sense than those we recognize today"); Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1 (2020) (reviewing "independent" officers and

commissions created by the First Congress, such as the Sinking Fund Commission).  And, of course, the basic notion that certain officials, once "appointed to an office" for a statutorily defined term, are "not removable[] at the will of the executive," is front and center in the decision on which our system of judicial review rests: *Marbury v. Madison*, 5 U.S. 137, 162–73 (1803).  A more deeply rooted "history" is hard to imagine.[4]

*Third*, the history of independent agencies stretches well beyond the ICC, FTC, and *Humphrey's Executor*: Congresses and Presidents have woven these entities into the fabric of our government over the last 150 years.  The U.S. Code identifies nearly two-dozen "independent regulatory agenc[ies]," 44 U.S.C. § 3502, and many of these entities—and others tasked with sensitive regulatory responsibilities—are led by members, commissioners, or other officials enjoying the same or similar removal protection as the FTC Act provides Plaintiffs.  *See, e.g.*, 12 U.S.C. § 242 (Federal Reserve Board); 42 U.S.C. § 7171(b)(1) (Federal Energy Regulatory Commission); 5 U.S.C. § 1202(d) (Merit Systems Protection Board); 29 U.S.C. § 153(a) (National Labor Relations Board);  49 U.S.C. § 1111(c) (National Transportation Safety Board); 42 U.S.C. § 5841(e) (Nuclear Regulatory Commission); 15 U.S.C. § 2053(a) (Consumer Product Safety Commission); 42 U.S.C. § 902(a)(3) (Social Security Administration); 42 U.S.C. §

---

[4] While a full review is beyond the scope of this submission, the last several years have spawned a renewed and robust literature regarding intertwined histories of agency independence and removal protections.  For just a few examples, *see* Jed Handelsman Shugerman, *Venality: A Strangely Practical History of Unremovable Offices and Limited Executive Power*, 100 Notre Dame L. Rev. 213 (2024); Jonathan Gienapp, *Removal and the Changing Debate over Executive Power at the Founding*, 63 Am. J. Legal Hist. 229 (2023); and Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021).  To the extent the Supreme Court ever decides to revisit *Humphrey's Executor* and consider anew the validity of 15 U.S.C. § 41, these (and other) sources provide further independent confirmation that granting certain officials the statutory protection of a fixed term while permitting the President to remove them, if necessary, for "inefficiency," "neglect of duty," or "malfeasance," has a deep and well-established historical pedigree and is in harmony with the President's own constitutional duties.

1975(e) (U.S. Commission on Civil Rights); 28 U.S.C. § 991(a) (U.S. Sentencing Commission);

42 U.S.C. § 7412(r)(6)(B) (Chemical Safety and Hazard Investigation Board); 30 U.S.C. §

823(b)(1) (Federal Mine Safety and Health Review Commission); 10 U.S.C. §§ 8083(c),

8084(c), 9038(c), 10506(D), 14 U.S.C. § 309(c)(1) (Marine, Navy, Air Force, Coast Guard,

National Guard and Air Force Reserves); 39 U.S.C. § 202(a)(1) (U.S. Postal Service).  Likewise,

the need for multi-member financial regulators to have some form of protection from pure at-will

removal is so clear and well-established that courts have implied these protections even in the

absence of express statutory requirements.  *See Free Enter. Fund*, 561 U.S. at 496 (2010)

(discussing SEC).

  While not all of the entities noted above are "traditional independent agenc[ies] headed

by a multimember board or commission," *Seila Law*, 591 U.S. at 207, the extent of this list

underscores the burden Defendants bear in justifying their attack on the basic notion of agency

independence.  "[L]ong settled and established practice is a consideration of great weight in a

proper interpretation of constitutional provisions regulating the relationship between Congress

and the President."  *Noel Canning v. NLRB*, 573 U.S. 513, 524 (2014); *see id.* at 572 (Scalia, J.,

concurring) ("governmental . . . practice should guide our interpretation of an ambiguous

constitutional provision").  It is difficult to conceive of a practice more well-established than the

"Congress and the President" choosing to adopt the structure of a "relatively independent agency

as a means of addressing specialized disputes with specialized expertise and providing at least a

temporal degree of some independence for the agency from short-term political pressures that

may not always have been welcome, even by the President."  *Leachco*, 103 F.4th at760.  This

"practical construction" of the commands of the Constitution cannot be lightly disregarded, as

Defendants seek to do here—rather, it "is entitled to the greatest weight." *McPherson v. Blacker*,

146 U.S. 1, 27 (1892).[5]

### D.    This Court's Obligation to Apply *Humphrey's Executor* Remains

Finally, even if the reasoning the President offered held any appeal—and it does not—it could not change the result in this Court.  As a motions panel of the D.C. Circuit noted last year, to the extent the President "claims that the Federal Trade Commission Act likely violates Article II by limiting [his] power to remove . . . Commissioners," the fact remains that "[t]he Supreme Court already answered this question adversely to [him]."  *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (citing *Humphrey's Executor,* 295 U.S. at 629–32); *see also supra* Part II.  And, as the Tenth Circuit noted just last month, after being informed by the current Administration that it no longer endorsed the constitutionality of removal protections, "[e]ven if the government had developed an argument to support its new position, we are bound by our precedent to affirm the constitutionality of the Commission's structure."  *Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1266 n.10 (10th Cir. 2025).

Thus, this Court's duty is clear: "'If a precedent of [the Supreme Court] has direct application in a case' . . . a lower court 'should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.'"  *Mallory v. Norfolk S. Ry.*

---

[5] Indeed, despite the position taken by the present Administration, it is critical to recall that "the statutory removal protections with which" the President now "takes issue here were accepted and signed into law by a President, the head of the Executive Branch.  They were not restrictions imposed upon an unwilling Executive Branch.  Rather, the Executive Branch affirmatively chose to accept some insulation for its agencies and commissions from short term political control to ensure the good and faithful execution of its executive duties."  *Leachco*, 103 F.4th at 760 n.11.  That a nearly unbroken line of Presidents has made a similar choice, running back centuries, is significant in this context.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–611 (1952) (Frankfurter, J., concurring) ("[S]ystematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'executive Power' vested in the President by § 1 of Art. II.").

*Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). "This is true even if the lower court thinks the precedent is in tension with 'some other line of decisions.'" *Id.* (quoting *Rodriguez*, 490 U.S. at 484). In short, "[t]his Court is charged with following case law that directly controls a particular issue," *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024), and thus no exegesis of *Seila Law* or any other decision the Defendants offer here could permit this Court to ignore *Humphrey's Executor*. *See Harris*, 2025 WL 1021435, at *1.

The Department of Justice publicly declared, even before the President attempted to terminate Plaintiffs, that it "intends to urge the Supreme Court to overrule" *Humphrey's Executor*.[6] If it does, Plaintiffs will meet it there to urge the contrary result. But whatever could happen in the Supreme Court, the fact remains that any request to disregard *Humphrey's Executor* can be directed only to that body, not to this Court.[7]

## IV. Plaintiffs Are Entitled to Declaratory Judgment and a Permanent Injunction

For the reasons stated above, Plaintiffs are entitled to summary judgment on each of their causes of action. As a remedy, for the reasons stated below, Plaintiffs are entitled to declaratory

---

[6] Letter from Sarah M. Harris, Acting Solicitor General of the United States, to Hon. Richard J. Durbin (Feb. 12, 2025), *available at* https://fingfx.thomsonreuters.com/gfx/legaldocs/movawxboava/2025.02.12-OUT-Durbin-530D.pdf.

[7] To the extent this case does progress further and the holding of *Humphrey's Executor* is ever deemed insufficient to confirm the constitutionality of the FTC Act's removal protections, Plaintiffs expressly reserve the right to raise the additional arguments that support the constitutional validity of this statute, including, but not limited to, further analysis of centuries-long history of removal protections, a further consideration of Congress's powers under Article I, and an interpretation of the "'inefficiency, neglect of duty, or malfeasance in office'" standard that is in harmony with any reasonable understanding of the President's duties under the Take Care and Vesting Clauses. Likewise, were any court to identify a constitutional flaw in the FTC's structure, complex remedial questions would arise that would also require further consideration.

and injunctive relief.

**A.    The Court Should Declare that Plaintiffs' Purported Termination Was Unlawful**

Subject to certain exceptions not applicable here, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  In assessing the propriety of granting a declaratory judgment, courts consider a non-exclusive list of factors, focusing on "whether the judgment will serve a useful purpose in clarifying the legal relations at issue" or, similarly, "whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Printing Packaging & Prod. Workers Union of N. Am. v. Int'l Bhd. of Teamsters*, No. CV 23-1872, 2024 WL 3835353, at *9 (D.D.C. Aug. 15, 2024); *see also New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (same).  A declaration that Plaintiffs' purported termination was unlawful, and that any termination must comply with the FTC Act, would serve these ends here.

Until recently, there was no confusion that FTC Commissioners could not be terminated without cause: a statute says so, *see* 15 U.S.C. § 41, the Supreme Court said so, *see Humphrey's Executor*, 295 U.S. 602, and it has refused every invitation to say otherwise, *see supra* Part II. Thus, as recently as 2023, the current FTC Chair, Defendant Ferguson, appeared to have a settled view on this matter: "The Supreme Court has held that the FTC's removal provisions are consistent with Article II of the Constitution. . . . The Supreme Court's 'decisions remain *binding precedent* until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing validity.'"  (SMF ¶ 13 (emphasis in original).)  Plaintiffs agree.  *See supra* Part II.

Yet the President has now asserted that he can do precisely what the U.S. Code and the Supreme Court says he cannot—fire Commissioners of the FTC whenever he chooses (*see* Slaughter Decl. Ex. A)—and this action has apparently unsettled Defendant Ferguson's resolve to follow the law.  Despite his prior declaration, Defendant Ferguson has complied with the President's new position (SMF ¶¶ 18–21), and the remaining Defendants likewise have complied and implemented the President's illegal action, preventing Plaintiffs from performing their duties as Commissioners of the FTC by, *e.g.*, barring their access to their files and emails; putting their staff on leave (or reassigning them); and notifying the public that Plaintiffs are now purportedly "former Commissioners."  (*See* SMF ¶¶ 18, 19.)  As a result, although Plaintiffs, like Commissioner Humphrey, have "never acquiesced in this action," *Humphrey's Executor*, 295 U.S. at 619, they are most certainly in a state of uncertainty and insecurity about their status as FTC Commissioners (*see* SMF ¶¶ 18–20).

Plaintiffs' concern and uncertainty regarding their status—and, as a result, the ability of the FTC and its Commissioners to function effectively—is no doubt shared by the businesses regulated, and the citizens served, by the FTC.  To take one recent example, Plaintiffs were the only active Commissioners eligible to adjudicate the FTC's case reviewing the practices of PBMs, as both Chairman Ferguson and Commissioner Holyoak were conflicted out of the case. After Plaintiffs were purportedly removed, the FTC initially announced that the case would be stayed.  *See In the Matter of Caremark Rx, LLC, et al.*, *Federal Trade Commission*, 221 0114, F.T.C., 9437 (Apr. 1, 2025) (stay order).  Defendant Ferguson has now attempted to resolve this issue by un-recusing himself.  *See* Statement of Chairman Andrew N. Ferguson, Federal Trade Commission (Apr. 3, 2025) *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-

pbm-statement.pdf.  Whether or not that action was appropriate, there is certainly confusion

regarding which Commissioners are or should be handling this important matter.

Likewise, to take another example, given the President's assertion that FTC

Commissioners are subject to his direct control on all substantive issues—both *de facto*, through

the threat of termination, and purportedly *de jure*, by Executive Order[8]—public speculation has

been rampant that the President will direct Defendant Ferguson to drop the FTC's antitrust action

against Meta.[9] When asked about this possibility, Defendant Ferguson sowed further confusion,

asserting, on the one hand, that "the President [is the] head of the executive branch, and I think

it's important for me to obey lawful orders," while adding, on the other, "I think that the

President recognizes that we've got to enforce the laws, so I'd be very surprised if anything like

that ever happened."[10]  Even if the Meta action proceeds, as long as the President's implicit and

explicit assertion that the FTC can exercise no independent judgment whatsoever persists, *every*

action and *every* adjudication undertaken by the Commission will be subject to the same

uncertainty.

---

[8] *See* Exec. Order No. 14,215, 90 Fed. Reg. 10447 (2025) (Ensuring Accountability for All Agencies) (purporting to require all "independent agencies" to submit "significant regulatory actions" for the President's approval and forbidding all "employee[s] of the executive branch acting in their official capacity" from "advanc[ing] an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General").

[9] Mike Isaac & David McCabe, *Mark Zuckerberg Lobbies Trump to Settle Antitrust Suit Against Meta*, N.Y. Times, Apr. 2, 2025, *available at* https://www.nytimes.com/2025/04/02/technology/mark-zuckerberg-trump-meta-antitrust.html.

[10] Lauren Feiner, *FTC chair says he'd 'obey lawful orders' if Trump asked to drop an antitrust case like Meta's*, The Verge, Apr. 2, 2025, *available at* https://www.theverge.com/news/642068/ftc-chair-andrew-ferguson-trump-drop-meta-lawsuit-hypothetical.

In short, although the FTC Act and the Supreme Court have spoken clearly, Defendants appear to believe that they are not required to comply with the law. This controversy and uncertainty can and should be resolved by this Court exercising its "duty . . . to say what the law is." *Marbury*, 5 U.S. at 177. Indeed, the Supreme Court has "long held" that federal courts "ha[ve] the authority to determine whether [the President] has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). This Court should declare the President's attempted firing unlawful and that FTC Commissioners can be removed only for "inefficiency, neglect of duty, or malfeasance." *See Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that President's actions under Line Item Veto Act were invalid). Courts in this District asked to review this President's recent efforts to terminate agency leaders in violation of governing law have not hesitated to issue such declarations. *See Grundmann v. Trump*, No. CV 25-425 (SLS), 2025 WL 782665 (D.D.C. Mar. 12, 2025); *Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at *16–17 (D.D.C. Mar. 6, 2025); *Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025).

## B.     The Court Should Enjoin the Non-Presidential Defendants from Interfering With Plaintiffs' Continued Service as FTC Commissioners

A plaintiff seeking a permanent injunction must demonstrate that: (1) he or she has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). The first two factors "are often considered together," *Grundmann,* 2025 WL 782665, at *16, and the latter two merge when the defendant is the government, *see Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2023). All four factors decisively support issuing the

requested permanent injunction against Defendants Ferguson, Holyoak, and Robbins (the "Non-Presidential Defendants").

> ### i.    _Plaintiffs have suffered irreparable harm for which no legal remedy is available_

Where, as here, Plaintiffs have a "statutory right" to serve as officers on a multi-member commission created by Congress, "the deprivation" of that right is an "irreparable" injury.  *See Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983).  That injury has "obvious[]," *see id.*, and "irrevocably disruptive" effects on Plaintiffs, who cannot presently perform the official duties that they are statutorily directed to perform, *see Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C. 1993), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993).  Improper deprivation of Plaintiffs' "ability to carry out their congressional mandate" clearly "cannot be repaired in the absence of an injunction"—for example, it "cannot be retroactively cured by monetary damages."  *Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at *15 (D.D.C. Mar. 6, 2025).  Indeed, monetary damages would not give Plaintiffs full relief because the injury is more than just the loss of a salary; it is the loss of a "statutory right to function" in a position directly related to a federal agency's "ability to fulfill its mandate." *Berry*, 1983 WL 538, at *5.

Moreover, any argument that mere monetary damages are sufficient here would make a mockery of the FTC Act, *Humphrey's Executor*, and the protection provided by the dozens of statutes that follow their example, *see supra* Section III.D.  If illegally terminated officials are entitled solely to monetary relief, then the President can fire all of them with impunity and simply demand that the taxpayers pick up the bill.  Such a scheme is obviously not "adequate" under the circumstances and would render all of these laws a nullity.  *See Marbury*, 5 U.S. at 163 ("The government of the United States has been emphatically termed a government of laws, and

not of men.  It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.").

Accordingly, the first two factors are satisfied and support Plaintiffs' request for injunctive relief.

> ii.    *The balance of hardships and public interest favor granting Plaintiffs injunctive relief*

A balancing of the equities also supports issuance of the requested injunction.  Perhaps most critically, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  That commonsense principle applies to laws providing for-cause removal protections, *see, e.g.*, *Harris*, 2025 WL 679303, at *14, which effectuate important public policies, *see Humphrey's Executor*, 295 U.S. at 624–26, 629.

An injunction would also put an end to the "obviously disruptive effect" of Defendants' ongoing interference with the day-to-day activities of the FTC.  *See Berry*, 1983 WL 538, at *5.  Defendants' efforts to bar Plaintiffs from doing their jobs and their direct interference with agency decision making are already causing public confusion and uncertainty about the work of the FTC.  *See supra* Section IV.A.

An injunction effectuating Congress's for-cause removal protection would also respect the intentions of the numerous Congresses and Presidents that have shaped the FTC over the last century.  *See Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18, 2025) ("Harris was appointed to and confirmed as a member of an agency charged with acting with a degree of independence from the President.  By vindicating their rights to occupy those offices, these plaintiffs act as much in their own interests as those of their agencies.").

Maintaining "a less partisan" commission, "insulated from at-will removal, is less likely to whipsaw the public by taking completely disparate approaches every four years, which has concomitant public benefits in greater stability and predictability in administration of the law." *Id.* at \*17 n.23. This is precisely what Congress had in mind when it—along with President Wilson—granted FTC Commissioners removal protection in the first place: "We want traditions; we want a fixed policy; we want trained experts; we want precedents; we want a body of administrative law built up," and these goals can be achieved only by a "nonpartisan" group that can exercise its own "powers of judgment and powers of discretion," S. Rep. No. 63-597, at 22 (statement of Sen. Newlands).

By contrast, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). The requested injunction would do just that: it would end the Non-Presidential Defendants' efforts to implement Plaintiffs' unlawful purported terminations, and it would read the FTC Act to mean what it says—that FTC Commissioners "shall be appointed for terms of seven years" and "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." *See* 15 U.S.C. § 41; *Humphrey's Executor*, 295 U.S. at 623 ("The words of the act are definite and unambiguous.").

### iii. <u>Injunctive relief against subordinate officials is the appropriate remedy</u>

Finally, in recent actions concerning the improper termination of agency leaders, the President and his co-defendants have taken the position that (a) injunctive relief cannot be entered because it would run against the President, and (b) any injunction requested to combat an illegal termination improperly seeks "reinstatement." Courts in this District have uniformly rejected these arguments. *See Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at

*16–17 (D.D.C. Mar. 6, 2025); *Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 679303, at

*13 (D.D.C. Mar. 4, 2025).  This Court should do the same.

 *First*, Plaintiffs do not seek injunctive relief against the President.  Rather, the proposed

order seeks an injunction only against the Non-Presidential Defendants: Ferguson, Holyoak, and

Robbins.  (*See* Dkt. 1, Compl. at 20.)  The Supreme Court has repeatedly affirmed the ability of

courts to enjoin subordinate officials carrying out unlawful orders.  *See, e.g.*, *Youngstown Sheet

& Tube Co. v. Sawyer*, 343 U.S. 579, 583, 589 (1952) (holding presidential act unconstitutional

and affirming district court order restraining Secretary of Commerce); *see also Franklin v.

Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring in the

judgment) ("[r]eview of the legality of Presidential action can ordinarily be obtained in a suit

seeking to enjoin the officers who attempt to enforce the President's directive").  Under these

precedents, this Circuit has held that injunctive relief is available against subordinate federal

officials where plaintiffs are challenging their removal from federal office.  *See Severino v.

Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *Swan v. Clinton*, 100 F.3d 973, 976–81 (D.C.

Cir. 1996).

 *Second*, "reinstatement" is not the appropriate label for what Plaintiffs seek, as the

President's attempt to remove them as Commissioners of the FTC is, and has always been, a

legal nullity.  Whatever term is used, however, the Supreme Court has repeatedly held that

injunctive relief is the appropriate remedy when an individual has been wrongly deprived of her

federal position.  In *Sampson v. Murray*, 415 U.S. 61, 71–72, 92 n.68 (1974), the Court

explained that a federal court may "review the claim of a discharged governmental employee"

and employ its "injunctive power" to remedy the injury.  Similarly, in *Vitarelli v. Seaton*, a

federal employee sought "a declaration that his dismissal had been illegal and ineffective and an

injunction requiring his reinstatement," and the Court held that he was "entitled to the reinstatement which he seeks." 359 U.S. 535, 537, 546 (1959); *see also Service v. Dulles*, 354 U.S. 363, 370, 389 (1957) (holding termination unlawful; federal employee obtained injunctive and declaratory relief on remand).

In accordance with these principles, lower courts have long recognized their power to issue injunctions to remedy illegal removals, even when they flow from orders by the President. *See Severino*, 71 F.4th at 1042–43; *Swan*, 100 F.3d at 976–81; *see also Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) ("Courts have long held that citizens facing unconstitutional conduct can seek equitable relief—for an employee facing unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination."); *Mackie*, 809 F. Supp. at 148 (enjoining termination of Postal Service Board of Governors members); *Berry*, 1983 WL 538, at *6 (enjoining "prevent[ion] or interfer[ence] with plaintiffs['] service as members of the U.S. Commission on Civil Rights"); *Paroczay v. Hodges*, 219 F. Supp. 89, 95 (D.D.C. 1963) (ordering that Department of Commerce official was "entitled to be reinstated to his position" and retaining jurisdiction to issue "a mandatory injunction" to enforce that judgment).

In sum, Plaintiffs satisfy the requirements for the issuance of the permanent injunction they request, and there is no barrier to this Court's entry of that injunction.

## C.    In the Alternative, the Court Should Issue a Writ of Mandamus Requiring Compliance with Non-Discretionary Duties Under the FTC Act

This Court can and should grant Plaintiffs the injunctive relief necessary for them to complete their statutorily protected terms as Commissioners of the FTC.  *See supra* Part IV.B.  However, if this Court were to conclude that such relief is not available here, in the alternative, this Court should issue a writ of mandamus prohibiting their removal from office.

(*See* Compl. ¶¶ 52–54.)

A district court has "original jurisdiction of any action in the nature of mandamus" where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)). A court "can analyze the clear right to relief and clear duty to act requirements for mandamus 'concurrently,'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (quoting *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020)), and those requirements are met where "'[t]he law . . . not only authorize[s] the demanded action, but require[s] it; the duty must be clear and indisputable,'" *Ferriero*, 60 F.4th at 715 (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)). Mandamus may be used "to preserve the status quo" by telling governmental defendants "what . . . not to do." *In re Nat'l Nurses United*, 47 F.4th at 755 n.5.

Assuming arguendo that injunctive relief against the Non-Presidential Defendants is not available, relief by way of mandamus would be proper. For the reasons outlined above, federal law gives Plaintiffs a "clear and indisputable" right to serve as FTC Commissioners until their terms expire or they are lawfully removed for cause. *See supra* Part II. If that is so, Defendants have a clear and indisputable duty to treat Plaintiffs as FTC Commissioners—and not to interfere with their tenure in office absent removal for inefficiency, neglect of duty, or malfeasance in office. *See Swan*, 100 F.3d at 977 (explaining that "a duty to comply with [statutory] removal restrictions . . . if it exists, is ministerial and not discretionary," because the executive branch "is bound to abide by the requirements of duly enacted and otherwise constitutional statutes"); *see also Mackie*, 809 F. Supp. at 147 n.1 (D.D.C.) ("It seems likely . . . that an injunction could issue

to bar unlawful removal and that the President or an appropriate subordinate could be required

by mandamus to reinstate an unlawfully removed officer.") (quoting Laurence H. Tribe,

*American Constitutional Law* § 4–10 at 250 n. 20 (2d ed. 1988)).

Thus, in the event this Court were to determine that Plaintiffs did not have a separate,

"adequate remedy" in the form of an injunction, *In re Nat'l Nurses United*, 47 F.4th at 752 n.4,

the Court should "vigilantly enforce federal law" and "award[] necessary relief" through a writ

of mandamus as an alternative remedy, *DL v. D.C.*, 860 F.3d 713, 726 (D.C. Cir. 2017).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' motion on an expedited

basis, enter declaratory relief for Plaintiffs, and enter an order permanently enjoining the Non-

Presidential Defendants from interfering with Plaintiffs' continued service as FTC

Commissioners (or, in the alternative, issue a writ of mandamus).

Dated: April 11, 2025                       Respectfully submitted,

CLARICK GUERON REISBAUM LLP

By: /s/ Aaron Crowell
Aaron Crowell (*admitted pro hac vice*)
Gregory A. Clarick (*admitted pro hac vice*)
David Kimball-Stanley (*admitted pro hac vice*)
41 Madison Avenue, 23rd Floor
New York, NY 10010
Tel.: (212) 633-4310
acrowell@cgr-law.com
gclarick@cgr-law.com
dkimballstanley@cgr-law.com

PROTECT DEMOCRACY PROJECT, INC.

Benjamin L. Berwick (D.D.C. Bar No.
MA0004) 15 Main Street, Suite 312
Watertown, MA 02472
Tel.: (202) 579-4582
ben.berwick@protectdemocracy.org

Amit Agarwal (D.C. Bar No. 90002013)
Beau Tremitiere (*admitted pro hac vice*)
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Tel.: (202) 579-4582
amit.agarwal@protectdemocracy.org
beau.tremitiere@protectdemocracy.org

Jared F. Davidson (*admitted pro hac vice*)
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel.: (202) 579-4582
jared.davidson@protectdemocracy.org

*Attorneys for Plaintiffs Rebecca Kelly Slaughter
and Alvaro M. Bedoya*