**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REBECCA KELLY SLAUGHTER, in her
official and personal capacities,

and

ALVARO M. BEDOYA, in his official and
personal capacities,

                          Plaintiffs,

        v.

DONALD J. TRUMP, et al.,

                          Defendants.

Case No. 25-cv-909-LLA

**BRIEF OF MEMBERS OF CONGRESS
AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION FOR EXPEDITED SUMMARY JUDGMENT**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Smita Ghosh (DC Bar No. 1767180)
Margaret Hassel (DC Bar No. 90029057)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF CONTENTS ....................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF *AMICI CURIAE* .......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT ........................................................................................................ 6

    I.    Binding Precedent Affirms the Legitimacy of Multimember Independent Agencies Like the FTC ................................................. 6

    II.    Established Practice Confirms the Validity of Multimember Independent Agencies ............................................................... 13

    III.    Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies ...................... 19

CONCLUSION .................................................................................................... 24

APPENDIX ........................................................................................................ 1A

## TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) ........................................................................... 15

*Collins v. Yellen,*
    594 U.S. 220 (2021) ........................................................................... 8

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n,*
    91 F.4th 342 (5th Cir. 2024).............................................................. 6

*E. Griffiths Hughes, Inc. v. FTC,*
    63 F.2d 362 (D.C. Cir. 1933) ............................................................ 16

*E.I. du Pont de Nemours & Co. v. FTC,*
    729 F.2d 128 (2d Cir. 1984).............................................................. 12

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) .................................................... 3, 6, 8, 17, 21, 23

*Harris v. Bessent,*
    No. 25-5037 (D.C. Cir. Mar. 28, 2025)............................................. 19

*Humphrey's Ex'r v. United States,*
    295 U.S. 602 (1935) ........................................... 2-4, 6-7, 9, 13, 16-17, 23

*Illumina, Inc. v. FTC,*
    88 F.4th 1036 (5th Cir. 2023)............................................................ 6, 13

*In re Hennen,*
    38 U.S. 230 (1839) ........................................................................ 5, 19-21

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023) .......................................................................... 6, 13

*Marbury v. Madison,*
    5 U.S. 137 (1803) .............................................................................. 22

*McPherson v. Blacker,*
    146 U.S. 1 (1892) .............................................................................. 13, 15

## TABLE OF AUTHORITIES – cont'd

Page(s)

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) ...................................................................................... 5

*Meta Platforms, Inc. v. FTC*,
    No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024)................................. 13

*Mistretta v. United States*,
    488 U.S. 361 (1989) .......................................................................... 13, 18

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................ 16-18

*Myers v. United States*,
    272 U.S. 52 (1926) ...................................................................... 20, 21, 23

*Nat'l Petrol. Refiners Ass'n v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973) ................................................................. 12

*Nat'l Sec. Archive v. CIA*,
    104 F.4th 267 (D.C. Cir. 2024) ................................................................ 6

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ...................................................................... 4, 13, 15

*PHH Corp. v. CFPB*,
    881 F.3d 75 (D.C. Cir. 2018) .................................................................. 15

*Proctor & Gamble Co. v. FTC*,
    11 F.2d 47 (6th Cir. 1926)...................................................................... 16

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ................................................ 3-13, 15, 17-18, 22-23

*Stuart v. Laird*,
    5 U.S. 299 (1803) ................................................................................ 18

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ............................................................................ 15

*Wiener v. United States*,
    357 U.S. 349 (1958) .......................................................................... 3, 17

**TABLE OF AUTHORITIES – cont'd**

Page(s)

*W. Sugar Refinery Co. v. FTC*,
  275 F. 725 (9th Cir. 1921)............................................................................. 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .................................................................................... 13, 18

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) .......................................................................................... 4, 13

Constitutional Provisions, Statutes, and Legislative Materials

Act of July 27, 1789, ch. 4, 1 Stat. 28.................................................................. 21

Act of May 15, 1820, ch. 102, 3 Stat. 582 ........................................................... 23

Act of Mar. 2, 1889, ch. 382, 25 Stat. 855........................................................... 14

Act of June 29, 1906, ch. 3591, 34 Stat. 584 ....................................................... 9, 14

Act of Oct. 15, 1914, ch. 323, 38 Stat. 730........................................................... 16

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717 ...................... 16

An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, 24 Stat. 379 (1887) ...... 2, 9, 14

1 Annals of Cong. (1789).................................................................................... 21, 22

15 Fed. Reg. 3175 (May 25, 1950) ..................................................................... 11

S. Rep. No. 63-597 (1914) .................................................................................. 11-12

15 U.S.C. §§ 12-16 ............................................................................................ 14

15 U.S.C. § 20................................................................................................... 14

15 U.S.C. § 41 ................................................................................................... 2, 10, 14

15 U.S.C. § 42 ................................................................................................... 10

U.S. Const. art. I, § 8, cl. 18............................................................................... 5, 20

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

U.S. Const. art. II, § 2 ................................................................................ 5, 20

U.S. Const. art. II, § 4 ................................................................................ 19

<u>Books, Articles, and Other Authorities</u>

Appellants Br., *Harris v. Bessent*, Nos. 25-5037, 25-5055, 25-5057 (D.C. Cir. filed Mar. 27, 2025).................................................................................................... 3

Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175 (2021)........................................................................................... 19

Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111 (2000) ........................ 14, 15

Br. for Court-Appointed *Amicus Curiae*, *Seila Law LLC v. CFPB*, 591 U.S. 197 (No. 19-7) ................................................................................................... 10

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev 1 (2020).................................... 9, 14

Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353 (1927).................................................................... 21-23

David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161 (1995) ........................ 20

*The Documentary History of the First Federal Congress of the United States of America* (Charlene Bangs Bickford et al. eds., 2019).............................................. 22

*The Federalist No. 39* (Clinton Rossiter ed., 1961).................................................... 20

*The Federalist No. 70* (Clinton Rossiter ed., 1961).................................................... 19

*The Federalist No. 77* (Clinton Rossiter ed., 1961).................................................... 19

FTC, Annual Report (1934)........................................................................... 16

Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725 (1996) ............. 19

Meg Jacobs, *Pocketbook Politics: Economic Citizenship in Twentieth-Century America* (2005) .......................................................................................................... 16

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021)................. 14

Jerry L. Mashaw, *Recovering American Administrative Law: Federalist Foundations, 1787-1801*, 115 Yale L.J. 1256 (2006) ..................................................................... 14

2 Op. O.L.C. 120 (1978) ............................................................................................... 18

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021 (2006) ....................................................................................................................... 21, 22

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ................... 20

Stay Mot., *Wilcox v. Trump*, No. 25-5057 (D.C. Cir. filed Mar. 10, 2025)................... 16

Joseph Story, *Commentaries on the Constitution of the United States* (1833).............. 19

*When Was Electricity First Installed at the White House?*, White House Hist. Ass'n, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house ........................................................................................................... 2

# INTEREST OF *AMICI CURIAE*[1]

*Amici* are members of Congress who are familiar with the Federal Trade Commission (FTC), the critical work that it does on behalf of the American people, and the ways in which its structure as a multimember independent agency enables it to do that work most effectively. Indeed, as *amici* well understand, the Constitution gives Congress great flexibility in determining how best to shape the federal government.  While the Constitution anticipated the creation of "Departments" and "Officers," it gave Congress the authority to determine what exactly those departments and officers would be and how they would be organized.

Consistent with that authority, Congress created the FTC as a multimember expert body. In doing so, Congress provided that no more than three of the FTC's five Commissioners could be of the same political party, that Commissioners would serve staggered seven-year terms, and that Commissioners could only be removed from office for "inefficiency, neglect of duty, or malfeasance in office."  These aspects of the FTC's structure protect it from the vicissitudes of day-to-day politics and ensure the quality of the agency's expert decision-making as it protects the public from deceptive or unfair business practices and unfair methods of competition.

Many *amici* are Senators who participated in the "Advice and Consent" process that resulted in Commissioners Alvaro Bedoya's and Rebecca Slaughter's confirmations as FTC Commissioners.  Senate *amici* consented to their appointments because they believed that Commissioners Bedoya and Slaughter would be able to fulfill the requirements of those offices, and that they would do so for the full terms to which they were appointed.  Because the attempt to terminate the Commissioners contravenes the FTC's governing statute—and would unlawfully

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission.  All parties have consented to the filing of this brief.

1

result in the removal of individuals many *amici* confirmed to their positions—*amici* have a strong interest in this case.

A full listing of *amici* appears in the Appendix.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

Congress has been creating multimember independent agencies for most of the nation's history—they have existed for at least as long as the light bulb.[2]  One of the oldest multimember independent agencies, created over a century ago, is the Federal Trade Commission.  Created by Congress to protect the public from unfair methods of competition, the FTC's governing statute has always directed that the agency be led by "five Commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate."  15 U.S.C. § 41.  Congress further provided that "[n]ot more than three of the Commissioners shall be members of the same political party," and that "[a]ny Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."  *Id.*

Nearly a century ago, the Supreme Court upheld these statutory removal protections for the FTC Commissioners, concluding that "[t]he authority of Congress . . . to require [the Commissioners] to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime."  *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935).  In the years since, the Supreme

---

[2] *Compare* An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, § 11, 24 Stat. 379, 383 (1887) (establishing Interstate Commerce Commission), *with* White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house (electricity installed at White House and at State, War, and Navy Building in 1891).

Court has repeatedly reaffirmed the holding of *Humphrey's Executor* and the constitutional legitimacy of multimember expert independent agencies. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 205-06 (2020) (affirming the legitimacy of "a traditional independent agency, run by a multimember board"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010) (multimember board with single level of for-cause protection would be adequately "subject . . . to Presidential oversight"); *Wiener v. United States*, 357 U.S. 349 (1958) (upholding removal protection for multimember board). Notwithstanding this clear statutory text and Supreme Court precedent, President Trump has attempted to fire duly confirmed FTC Commissioners Alvaro Bedoya and Rebecca Slaughter. The President's action flies in the face of binding Supreme Court precedent, established practice, and the Constitution's text and history.

In claiming that the President has the authority to ignore statutory tenure protections, Defendants rely heavily on *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), and suggest that only a very narrow reading of *Humphrey's Executor* survives that decision. Appellants Br. 17-18, *Harris v. Bessent*, Nos. 25-5037, 25-5055, 25-5057 (D.C. Cir. filed Mar. 27, 2025). But this misunderstands *Seila Law* entirely. *Seila Law* did not call into question *Humphrey's Executor*. To the contrary, it reiterated that case's continuing validity.

*Seila Law* addressed "a new situation" involving the "almost wholly unprecedented" creation of an independent agency led "by a single individual." *Id.* at 238, 220, 204, 213. Making clear that it was not "revisit[ing] [its] prior decisions," the Court found "compelling reasons not to *extend* those precedents to the novel context of an independent agency led by a single Director." *Id.* at 204 (emphasis added).

Notably, in explaining why *Humphrey's Executor* did not resolve whether the Consumer Financial Protection Bureau (CFPB) Director's insulation from removal was constitutional, the

Court began with what it viewed as the key distinction between the CFPB and the FTC: "[u]nlike the New Deal-era FTC upheld there, the CFPB is led by a single Director who cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle." *Id.* at 218 (quoting *Humphrey's Ex'r*, 295 U.S. at 624). *Seila Law* distinguished the CFPB, a single-director independent agency, from "traditional independent agenc[ies]" run by "multimember board[s]," like those considered in *Humphrey's Executor*, in three respects. *Id.* at 205-06. First, the Court wrote, single-director agencies are "an innovation with no foothold in history or tradition." *Id.* at 222. Second, the Court concluded that a single-director structure is a greater imposition on presidential oversight, "foreclos[ing] certain indirect methods of Presidential control." *Id.* at 225. Third, the Court concluded that empowering a single director with "no colleagues to persuade" impermissibly "clashes with constitutional structure by concentrating power in a unilateral actor." *Id.* at 225, 204.

    None of those features describes the FTC, which is a prototypical independent agency of the kind that has existed for 150 years. Like other longstanding agencies, the FTC has multiple members with staggered terms, avoiding the concentration of power that so troubled the Court in *Seila Law* while allowing every President to influence the Commission's composition.

    Even if *Seila Law* were not so definitive about what made the CFPB Director's removal protection unconstitutional, established practice has long settled the constitutional legitimacy of multimember independent agencies like the FTC. In separation-of-powers cases, the judiciary places "significant weight upon historical practice," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks omitted), including practice that "began after the founding

era," because it embodies "the compromises and working arrangements that the elected branches of Government themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 525-26 (2014).

Multimember independent agencies, including the FTC itself, have exercised significant executive functions and undertaken adjudications for generations. And the Supreme Court has consistently affirmed their constitutionality—right up to its recognition in *Seila Law* that Congress could eliminate the constitutional defects of the CFPB, "an independent agency that wields significant executive power," by "converting [it] into a multimember agency." 591 U.S. at 204, 237 (opinion of Roberts, C.J.) (three Justices); *id.* at 298 (Kagan, J., concurring in part and dissenting in part) (four additional Justices suggesting the same).

Multimember independent agencies like the FTC are also fully consonant with the Constitution's original meaning. The Constitution's text broadly empowers Congress to shape the federal government, anticipating that Congress would "by Law" create "Departments" and "Officers," U.S. Const. art. II, § 2, cl. 2, while specifying little about their relationship to the President. *Cf. id.* art. II, § 2, cl. 1 (authorizing the President to require the opinions of principal officers). The Constitution also empowers Congress to enact laws necessary and proper "for carrying into Execution . . . *all . . . Powers* vested by this Constitution in the Government of the United States," *id.* art. I, § 8, cl. 18 (emphasis added), thus giving Congress the flexibility to structure the Executive Branch as it "adapt[s] to the various crises of human affairs," *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819) (emphasis omitted). Consistent with that authority, the very first Congresses began exercising that flexibility when they structured various components of the executive branch. *See* SJ Br. 19-20.

The constitutional text is also "silent with respect to the power of removal," *In re Hennen*, 38 U.S. 230, 258 (1839), leaving unspecified the exact boundary between the

President's removal authority and Congress's authority to shape the federal government. And nothing in Founding-era history suggests that there is a constitutional problem with Congress imposing limits on the President's removal authority so long as those limits do not interfere with the President's ability to fulfill his duty to Take Care that the laws are faithfully executed. Indeed, the Supreme Court has consistently acknowledged that conditioning removal on good cause in the context of multimember expert bodies imposes no such interference.

In *Seila Law*, as in *Free Enterprise Fund*, the Supreme Court confronted a "new situation," *Free Enter. Fund*, 561 U.S. at 483, and prohibited "*additional* restrictions on the President's removal authority" that have "no foothold in history or tradition," *Seila Law*, 591 U.S. at 228, 222 (emphasis added). It did not license lower courts to strike down a time-honored structure that the Supreme Court has consistently upheld as a valid "exception[]" to any presidential power of removal, *id.* at 204—that of a "traditional independent agency headed by a multimember board or commission," *id.* at 207. This Court must abide by the "directly control[ling]" precedent of *Humphrey's Executor*. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quotation marks omitted); *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024) (declining to read *Seila Law* as overruling *Humphrey's Executor*); *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023) (the Supreme Court "has expressly declined to overrule" *Humphrey's Executor*).

## ARGUMENT

### I.    Binding Precedent Affirms the Legitimacy of Multimember Independent Agencies Like the FTC.

In *Humphrey's Executor*, the Court considered a near-identical fact pattern: the President had attempted to fire an FTC Commissioner, in defiance of the FTC Act's removal protections.

295 U.S. at 619-20.  The Court thought it "plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of [the FTC]." *Id.* at 629.  That decision applies to today's FTC just as it applied to the FTC of 1935.

Defendants may suggest that *Seila Law* narrowed the holding of *Humphrey's Executor*, but *Seila Law* was clear about its limited scope: "We hold that the CFPB's leadership *by a single individual* removable only for inefficiency, neglect, or malfeasance violates the separation of powers."  591 U.S. at 213 (emphasis added).  *Seila Law* clarified that the holding of *Humphrey's Executor* hinged not on the scope and nature of an agency's powers, but on the structure of the agency exercising those powers.  "Instead of placing the agency under the leadership of a board with multiple members," Congress "deviated from the structure of nearly every other independent administrative agency in our history" in creating the CFPB.  *Id.* at 203.  "The question before us," the Court said, "is whether *this arrangement* violates the Constitution's separation of powers."  *Id.* (emphasis added).  The Court concluded that *that arrangement* violated the Constitution's separation of powers, and at the same time reaffirmed that a multimember expert agency did not.

A.    ***Seila Law* Addressed Only the Innovation of an Independent Agency Led by a Single Director.**

As the Court explained on the second page of its opinion in *Seila Law*, *Humphrey's Executor* recognized the longstanding qualification to the President's removal authority that Congress may "create expert agencies led by a *group* of principal officers removable by the President only for good cause."  *Id.* at 204 (emphasis in original).  In *Seila Law*, the Court was "asked to extend these precedents to a new configuration: an independent agency that wields significant executive power *and is run by a single individual*."  *Id.* (emphasis added).

In refusing to broaden its precedent, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power."  *Id.* Rather, the Court declined "to extend those precedents to the 'new situation' before [it]," *id.* at 220 (quoting *Free Enter. Fund*, 561 U.S. at 483), which introduced a "novel impediment" to presidential authority, *id.* at 215; *accord Free Enter. Fund*, 561 U.S. at 483-84 (striking down "new situation" of "multilevel protection from removal," but declining "to reexamine any . . . precedents").  In short, the Court in *Seila Law* was clear that it addressed only the new phenomenon of removal protections for "principal officers who, *acting alone*, wield significant executive power." 591 U.S. at 238 (emphasis added).

The Court's subsequent decision in *Collins v. Yellen* confirmed the scope of *Seila Law*'s holding.  In that challenge to the single-director Federal Housing Finance Agency (FHFA), the Court concluded that "[a] straightforward application of our reasoning in *Seila Law* dictates the result." 594 U.S. 220, 251 (2021).  That straightforward application was simple: "The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power." *Id.*  And the Court reiterated that in *Seila Law*, "[w]e did not revisit our prior decisions allowing certain limitations on the President's removal power, but we found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 250-51 (quotation marks omitted).

**B.    *Seila Law* Rested on Three Features Specific to Single-Director Independent Agencies, None of Which Characterize the FTC.**

After concluding that precedent did not resolve the legitimacy of removal protection for agency leaders serving alone, *Seila Law* discussed three aspects of single-director leadership that the Court concluded made removal limits untenable in that context: it was a historical anomaly,

591 U.S. at 220-23; it introduced new barriers to presidential oversight, *id.* at 204; and it concentrated power in the hands of one person, *id.*  None of those concerns applies to the FTC.

### 1.  *Historical Anomaly*

*Seila Law* stressed that "[t]he CFPB's single-Director structure is an innovation with no foothold in history or tradition" that was "almost wholly unprecedented."  *Id.* at 220-22.  In "only a handful of isolated incidents" had Congress elsewhere "provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission."  *Id.* at 220 (quotation marks omitted).  And nearly all of those "isolated examples" were also "comparatively recent and controversial."  *Id.* at 222, 221.  This "lack of historical precedent" for the Bureau's single-director structure suggested a "constitutional problem."  *Id.* at 220 (quotation marks omitted).

But multimember independent agencies are not novel.  Congress has exercised flexibility in how it structures the various components of the executive branch since the Founding, *see* Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev 1, 39-43 (2020), and members of expert boards have enjoyed removal protection since at least the establishment of the Interstate Commerce Commission (ICC) in 1887, *see* Act to Regulate Commerce, § 11, 24 Stat. at 383.  As the Supreme Court recognized in *Humphrey's Executor*, the FTC bears the hallmarks of these traditional agencies.  295 U.S. at 629; *see infra* at 16-17.  The FTC's functions were also similar to those of the ICC: like the FTC, the ICC could enforce its orders in court, *see* Act to Regulate Commerce, § 16, 24 Stat. at 384-85, and promulgate regulations, *see* Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589.  The Court in *Humphrey's Executor* understood these similarities between these two agencies; indeed, it viewed them as indistinguishable from a

constitutional perspective. *Humphrey's Ex'r*, 295 U.S. at 629 (a "view in respect of the removability of members of the Federal Trade Commission necessitate[s] a like view in respect of the Interstate Commerce Commission"). In short, the FTC's structure and powers are not "novel" or "innovative" at all. *Seila Law*, 591 U.S. at 215, 228.

### 2. Greater Encroachment on Presidential Oversight

*Seila Law* also concluded that removal protections for agency heads who serve alone intrude on presidential authority more than protections for members of boards or commissions. This rendered the CFPB's structure a "novel impediment to the President's oversight of the Executive Branch." *Id.* at 215. Although the CFPB's defenders argued that a single-director independent agency is just as accountable to the President as a multimember agency, *see, e.g.*, Br. for Court-Appointed *Amicus Curiae* 44-46, *Seila Law*, 591 U.S. 197 (No. 19-7), the Court disagreed, holding that a single-director structure "forecloses certain indirect methods of Presidential control" available to influence multimember bodies. *Seila Law*, 591 U.S. at 225.

"Because the CFPB is headed by a single Director with a five-year term," a President might "*never*" be able to appoint a director and could be unable to remove a director holding diametrically opposed views. *Id.* And "the agency's single-Director structure means the President will not have the opportunity to appoint any other leaders [of the agency] . . . who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.*

None of these concerns applies to the FTC. Because there are five Commissioners serving staggered terms, and because the President also appoints the Commission's chairperson, every President will have at least some ability to shape the agency's leadership and agenda. *See* 15 U.S.C. § 41. Unlike the CFPB, the FTC receives funding through the annual appropriations

process, *id.* § 42, allowing Presidents to exercise control through their involvement in that process as well, *Seila Law*, 591 U.S. at 226 ("The President normally has the opportunity to recommend or veto spending bills that affect the operation of administrative agencies").  And the President has even greater control over the FTC now than he did in 1935.  The Reorganization Act of 1949 allowed the President to restructure parts of the executive branch, a power that President Truman exercised to make the FTC's Chair appointed by the President.  15 Fed. Reg. 3175, 3175 (May 25, 1950).  Since then, every President has appointed the Commission's Chair, who oversees all "executive and administrative functions of the Commission," as well as "the use and expenditure of funds."  *Id.*

In short, the FTC's structure involves no "novel impediment to the President's oversight of the Executive Branch."  *Seila Law*, 591 U.S. at 215.

### 3.  Concentration of Power in a Single Person

The third feature of the CFPB's structure on which *Seila Law* rested was its consolidation of power in "a unilateral actor insulated from Presidential control."  *Id.* at 204.  According to the Court, this configuration has "no place in our constitutional structure."  *Id.* at 220.  With "the sole exception of the Presidency, that structure scrupulously avoids concentrating power in the hands of any single individual."  *Id.* at 222-23.  The CFPB, however, "contravene[d] this carefully calibrated system by vesting significant governmental power in the hands of a single individual."  *Id.* at 224.  "With no colleagues to persuade," this individual could "unilaterally" wield a range of enforcement, adjudicative, and rulemaking authorities.  *Id.* at 225.

The Court found this arrangement a far cry from the "multimember body of experts" it previously had approved.  *Id.* at 216.  But, unlike the CFPB, the FTC matches that traditional profile.  Congress created the FTC after it grew concerned that the Sherman Act, the nation's

foundational antitrust legislation, was being underenforced.  S. Rep. No. 63-597, at 9 (1914).  It designed the FTC to "bring both to the Attorney General and to the court the aid of special expert experience and training in matters regarding which neither the Department of Justice nor the courts can be expected to be proficient."  *Id.* at 12.  The new agency would be able to "cope with new threats to competition as they ar[o]se," *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 137 (2d Cir. 1984), and "adapt[] to the variety of business practices with anticompetitive effects," *Nat'l Petrol. Refiners Ass'n v. FTC*, 482 F.2d 672, 702 (D.C. Cir. 1973).  As one Senator put it: "We want traditions; we want a fixed policy; we want trained experts; we want precedents; we want a body of administrative law built up."  S. Rep. No. 63-597, at 22 (statement of Sen. Newlands).

Congress recognized that a multimember board with members removable only for cause would serve these goals well.  Multiple expert members would be especially well-positioned to exercise the "powers of judgment and powers of discretion" needed for successful enforcement of the nation's antitrust laws.  *Id.*  Moreover, a board of multiple Commissioners with staggered terms could achieve expertise and impartiality better than a single officer "subject to constant changes," making the Commission "nonpartisan" and not "purely executive."  *Id.*  And the Commission's "decisions, coming from a board of several persons, w[ould] be more readily accepted as impartial and well considered [than those of the FTC's single-member predecessor]." *Id.* at 11.  Congress therefore modeled the FTC on the ICC and diffused its power among several Commissioners.  *Id.* at 6, 9.  This structure facilitates consensus-based decision-making and is thus a far cry from the CFPB's structure, which allowed a single director to act "*unilaterally*." *Seila Law*, 591 U.S at 225 (emphasis in original).

* * *

12

In sum, *Seila Law* held that the CFPB's unique structure could not find support in *Humphrey's Executor*.  But the Supreme Court was explicit that "we do not revisit *Humphrey's Executor* or any other precedent."  *Id.* at 228; *see Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam) ("[t]he Supreme Court has not disturbed" *Humphrey's Executor*).  And lower courts must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Mallory*, 600 U.S. at 136 (quotation marks omitted); *cf. Illumina*, 88 F.4th at 1047 ("although the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer").  The Supreme Court has already considered and upheld the constitutionality of the FTC Commissioners' removal protections. This Court should not deviate from that decision.

## II.    Established Practice Confirms the Validity of Multimember Independent Agencies.

The flip side of the Supreme Court's suspicion of "novel governmental structures," *Seila Law*, 591 U.S. at 231, is that "'traditional ways of conducting government . . . give meaning' to the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).  For that reason, the Court "put[s] significant weight upon historical practice" in separation-of-powers cases.  *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted); *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("where there is ambiguity or doubt" in constitutional interpretation, "subsequent practical construction is entitled to the greatest weight").  When construing the Constitution's broadly phrased divisions among the branches, judges "must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached,"

*Noel Canning*, 573 U.S. at 526, "even when that practice began after the founding era," *id.* at 525; *see id.* at 528-29 (relying on history of intra-session recess appointments that began after the Civil War).

Significantly, the very first Congresses exercised flexibility in how they structured various components of the executive branch, *see* SJ Br. 19-20; *see also* Chabot, *supra*, at 39-43; Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 23-24 (2021); Jerry L. Mashaw, *Recovering American Administrative Law: Federalist Foundations, 1787-1801*, 115 Yale L.J. 1256, 1302 (2006), and Congress began establishing agencies with essentially the same structure as the FTC nearly 150 years ago with the creation of the ICC. *See* Act to Regulate Commerce, § 11, 24 Stat. at 383; *compare id.* (ICC has five Commissioners, serving six-year terms, removable for cause), *with* 15 U.S.C. § 41 (FTC has five Commissioners, serving seven-year terms, removable for cause). The ICC had investigative and enforcement authority over the monumentally important railroad industry, including the power to issue cease-and-desist orders, to require payment of reparations, and to enforce its orders in court. *See id.* §§ 12-16, 20.

Although the Interior Secretary initially had some authority over the ICC, *see* Act to Regulate Commerce, §§ 18, 21, 24 Stat. at 386-87, Congress eliminated that authority two years later, *see* Act of Mar. 2, 1889, ch. 382, §§ 7-8, 25 Stat. 855, 861-62. And in 1906, Congress empowered the ICC to prescribe "fair" and "reasonable" practices, as well as maximum railroad rates—in other words, to promulgate regulations, *see* Act of June 29, 1906, § 4, 34 Stat. at 589, cementing its status as "a very powerful agency," Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1130 (2000).

In the early twentieth century, Congress established "a multitude of new agencies . . . using the ICC as their prototype," including "the Federal Reserve Board (1913), Federal Trade Commission (1914), Federal Radio Commission (1927), Federal Power Commission (1930), Securities and Exchange Commission (1934), Federal Communications Commission (1934), National Labor Relations Board (1935), Bituminous Coal Commission (1935), and Federal Maritime Commission (1936)." *Id.* at 1116 & n.14. And the "critical element of independence" for these agencies was "protection . . . against removal except 'for cause.'" *Id.* at 1138; *see PHH Corp. v. CFPB*, 881 F.3d 75, 174 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (noting the "deeply rooted historical practice of independent agencies as multimember agencies").

This long pedigree of removal protections for the heads of multimember independent agencies is all but dispositive of their legitimacy. "A legislative practice . . . marked by the movement of a steady stream for a century and a half of time" indicates "the presence of unassailable ground for the constitutionality of the practice." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327-28 (1936); *accord McPherson*, 146 U.S. at 27; *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring) ("governmental . . . practice should guide our interpretation of an ambiguous constitutional provision").

For generations, these agencies have wielded power that could be seen as executive. Although the Supreme Court initially conceived of some of their powers as "quasi-legislative or quasi-judicial," rather than as executive, *Seila Law*, 591 U.S. at 216 & n.2 (quotation marks omitted), the Court in more recent cases has at times characterized the functions long exercised by many independent agencies—enforcement, rulemaking, adjudications—as "exercises of . . . the 'executive Power'" under the Constitution, *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4

(2013), at least to "some degree," *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988); *see* Stay

Mot. 14, *Wilcox v. Trump*, No. 25-5057 (D.C. Cir. filed Mar. 10, 2025).

And at the time of *Humphrey's Executor*, the FTC wielded authority comparable to that

of modern independent agencies, whatever the label applied to that authority.  As the Court

recognized, the agency could charge private parties with statutory violations, adjudicate those

charges in administrative hearings, issue cease-and-desist orders, and seek enforcement of those

orders in court.  *See Humphrey's Ex'r*, 295 U.S. at 620-21; An Act to Create a Federal Trade

Commission, ch. 311, § 5, 38 Stat. 717, 719-20 (1914); *see also E. Griffiths Hughes, Inc. v. FTC*,

63 F.2d 362, 363 (D.C. Cir. 1933) ("we have uniformly held that a regulation adopted under [the

FTC Act] has the force of law").  The FTC could also order an antitrust violator to "divest itself

of the stock held or rid itself of the directors chosen contrary to the provisions of sections seven

and eight of this Act," Act of Oct. 15, 1914, ch. 323, § 11, 38 Stat. 730, 734-35, and, until 1934,

it could seek temporary restraining orders preventing violations of securities laws, *see* FTC,

Annual Report 42 (1934).  And it used its authority to "make executive policy," *id.* at 45,

condemning certain "practices" as "unfair methods of competition," *id.* at 69-72, and presiding

over the adoption of "trade-practice rules" outlining industry-wide standards, *id.* at 92-94, 54-55.

The Justices who decided *Humphrey's Executor* were surely aware of these powers.

After all, the FTC engaged in these actions across the American economy, reining in companies

that, a hundred years later, are still household names.  *See, e.g.*, *W. Sugar Refinery Co. v. FTC*,

275 F. 725 (9th Cir. 1921); *Proctor & Gamble Co. v. FTC*, 11 F.2d 47 (6th Cir. 1926); *cf.* Meg

Jacobs, *Pocketbook Politics: Economic Citizenship in Twentieth-Century America* 69-72 (2005)

(describing how the FTC's investigation of the meat-packing industry provoked charges of

"treason and conspiracy" in the 1920s).  Perhaps this is why the Supreme Court has described its

characterization of the FTC as "non-executive" in *Humphrey's Executor* as a product of "several organizational features" of the FTC, including its reliance on a "body of experts" and use of staggered terms, rather than the agency's precise powers.  *Seila Law*, 591 U.S. at 216.

Beginning with *Humphrey's Executor*, therefore, the Supreme Court has consistently upheld removal protections for multimember agencies with powers that "at the present time" are "considered executive."  *Morrison*, 487 U.S. at 699 n.28 (quotation marks omitted).  For example, referring to agencies that exercise some "executive function," the Court described it as "plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers" who serve on multimember boards "created by Congress to carry into effect legislative policies embodied in [a] statute in accordance with the legislative standard therein prescribed."  *Humphrey's Ex'r*, 295 U.S. at 628, 629.  In *Wiener v. United States*, the Court confronted "a variant of the constitutional issue decided in *Humphrey's Executor*" and reached the same result, clarifying that *Humphrey's Executor* had "explicitly 'disapproved'" any implication in *Myers* that Congress could not protect "members of a body" who were not "'purely executive'" from removal.  357 U.S. at 351-53 (quoting *Humphrey's Ex'r*, 295 U.S. at 626-28).  By the time of *Morrison*, it had been established for half a century that "the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies."  487 U.S. at 687 (quoting *Humphrey's Ex'r*, 295 U.S. at 630).

Two decades later, the Court again confirmed the validity of removal protections for multimember bodies wielding significant executive power.  Article II was satisfied when the members of the Public Company Accounting Oversight Board were shielded from removal by "a single level of good-cause tenure" making them adequately "subject . . . to Presidential oversight."  *Free Enter. Fund*, 561 U.S. at 509.  *Seila Law* again reinforced these principles.  Not

only did the Court emphatically base its holding on the "new situation" of an independent officer wielding power "alone," but it explained that Congress could cure the constitutional defect while preserving removal limits by "converting the CFPB into a multimember agency."  591 U.S. at 237.

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure pioneered another half-century earlier.  Over the generations, Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections.  *Id.* at 230.  This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken."  *Stuart v. Laird*, 5 U.S. 299, 309 (1803).

Whether courts conceive of modern independent agencies' powers as "quasi-legislative or quasi-judicial," *Seila Law*, 591 U.S. at 216 & n.2, or "consider[s] [those powers] 'executive,' at least to some degree," *Morrison*, 487 U.S. at 689 n.28, the important point is that independent agencies, including the FTC, have been exercising those same powers dating back to the 1880s with the approval of all three branches of government.  *See* 2 Op. O.L.C. 120, 121 (1978) (executive branch approving the structure of the MSPB).

Thus, the FTC is not the CFPB (created in 2010; removal protection struck down ten years later based on its novel single-director structure) or the Public Company Accounting Oversight Board (created in 2002; removal protection struck down eight years later based on its novel dual layers of protection).  Invalidating the FTC's removal protections would discard nearly a century and a half of history and interfere with what is now firmly established as a "traditional way[] of conducting government."  *Mistretta*, 488 U.S. at 401 (quoting *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring)).

### III.    Constitutional Text and History Further Underscore the Legitimacy of Multimember Independent Agencies.

In addition to being validated by precedent and established practice, multimember independent agencies like the FTC are fully consonant with the Constitution's original meaning, which supports Congress's authority to temper the President's exercise of removal authority.

While the Founders surely desired an "energetic Executive," *Harris v. Bessent*, No. 25-5037 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring), slip op. at 4, and thus settled on a "single" President rather than "a plurality of magistrates with equal dignity and authority," *The Federalist No. 70*, at 423, 425 (Alexander Hamilton) (Clinton Rossiter ed., 1961), that decision did not speak to the scope of the President's removal authority or the scope of Congress's authority to place modest limits on that authority.  Indeed, at the Founding, there was no consensus that "executive" power entailed removal authority at all.  *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 Yale L.J. 1725, 1790 (1996).  Removal authority was not "an inherent attribute of the 'executive power' as it was understood in England," where Parliament "exercised significant control over the tenure of officers appointed to execute the laws, including officers appointed by the King."  Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175, 182, 220 (2021).

The Constitution itself "is silent with respect to the power of removal," *Hennen*, 38 U.S. at 258; *see* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1833) ("the Constitution makes no mention of any power of removal by the executive of any officers whatsoever"), apart from Congress's power to impeach, U.S. Const. art. II, § 4.  Presidential removal authority was not discussed at the Constitutional Convention, and Alexander Hamilton soon after asserted that the Senate's consent would be required.  *See The Federalist No. 77*, *supra*, at 459.

Notably, the Framers rejected a plan to delineate in the Constitution the duties of specific department heads who would serve "during pleasure."  2 *The Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911).  Instead, the text broadly empowers Congress to shape the federal government.  It anticipates that Congress would "by Law" create "Departments" and "Officers," U.S. Const. art. II, § 2, cl. 2, while specifying little about their relationship to the President.  *Cf. id*. art. II, § 2, cl. 1 (authorizing the President to require the opinions of principal officers).  The Constitution also empowers Congress to enact laws necessary and proper "for carrying into Execution . . . *all . . . Powers* vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  *Id.* art. I, § 8, cl. 18 (emphasis added).  James Madison explained that "[t]he tenure of the ministerial offices generally will be a subject of legal regulation."  *The Federalist No. 39*, *supra*, at 242.

Because of the Constitution's silence on removal, the question came to the fore when Congress created the federal government's first departments.  But the ensuing "Decision of 1789" addressed only who, if anyone, possesses inherent removal power—not the extent to which Congress may condition that power.

Specifically, the "real point which was considered and decided" in 1789 was whether the Senate's role in approving appointments also gave it "part of the removing power."  *Myers v. United States,* 272 U.S. 52, 119 (1926); *see Hennen*, 38 U.S. at 259.  As Congress considered legislation establishing a Foreign Affairs Secretary, disagreement arose about whether to declare that the President could remove the Secretary from office.  *See* David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 196-201 (1995).  Reflecting the absence of authoritative constitutional text, views differed about whether the Constitution gave inherent removal power to the President, the

20

Senate, both jointly, or neither. *Id.*; *see Hennen*, 38 U.S. at 233. The final legislation obliquely signaled that the President could remove the Secretary, without specifying whether this power was statutory or constitutional. *See* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29.

Despite its ambiguities, the Decision of 1789 was taken as establishing that "the constitution vested the power of removal in the President alone," rather than jointly with the Senate. 1 Annals of Cong. 398 (Rep. Vining) (1789). But the degree to which Congress could limit the President's inherent removal authority was not addressed, because the debate focused on where the removal power was lodged, not on Congress's authority to modify or abridge it. Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1072 (2006).

And many historical sources suggest that any "executive" power of removal recognized in that debate was limited to certain particularly executive officers. Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 366 (1927) (describing the belief that "the character of the office, as determined by its primary duties and functions, suffices to mark certain officers as inherently removable [and others] . . . within the protective power of Congress"). When Congress debated the creation of a Comptroller within the proposed Treasury Department, one week after debating the removability of the Foreign Affairs Secretary, James Madison—one of the most ardent champions of presidential removal authority, see *Myers*, 272 U.S. at 131—suggested that, because the Comptroller's duties partook "of a judiciary quality as well as executive," there were "strong reasons why an officer of this kind should not hold his office at the pleasure of the executive," 1 Annals of Cong. 636 (1789). Although Madison's eventual proposal made the Comptroller removable by the President, *Free Enter. Fund*, 561 U.S. at 500 n.6, his remarks suggested that "the Decision of 1789 did not encompass the conclusion that the President had the power to remove *all* officers of the United

States," Prakash, *supra*, at 1071; 1 Annals of Cong. 638 (1789) (Madison noting that he

"endeavored to show that the nature of this office differed from the others which the House had

decided; and, consequently, that a modification might take place"); *cf.* 13 *The Documentary*

*History of the First Federal Congress of the United States of America* 1533, 1524 (Charlene

Bangs Bickford et al. eds., 2019) [hereinafter *Documentary History*] (Madison dismissing an

Appointments Clause objection to the creation of a Board of Commissioners who would

"provide for rules" for the resolution of claims, because its duties "part[ook] more of legislative

than any other quality").

Indeed, if anything is to be gleaned from the Decision of 1789, it is support for *Seila*

*Law*'s distinction between single-director agencies and multimember "bod[ies] of experts." 591

U.S. at 216 (quotation marks omitted). After all, the Decision of 1789 concerned the

removability of department secretaries, officials who shared an "intimate political relation" with

the President. Corwin, *supra*, at 392-93 n.103 (quoting *Marbury v. Madison*, 5 U.S. 137, 169

(1803)). As Madison explained, the discussions addressed the "executive department so far as it

may be described by the heads of departments," who exercised a "species of power" that was

intimately related to the President's Take Care duties. 11 *Documentary History*, *supra*, at 922-

23 (Madison); 15 *id.* at 665 (Madison) (objecting that a contrary resolution would have made the

"*heads of departments* dependant on the Senate" (emphasis added)).

Significantly, in the following decades, inherent presidential removal authority was

viewed as compatible with legislative modification. *Marbury v. Madison* observed that Congress

could make certain officers "not removable at the will of the executive," in which case "the

appointment is not revocable, and cannot be annulled." 5 U.S. at 162. Removal authority "was

not regarded . . . as embracing officers with fixed term[s]," except perhaps for certain officers

who implemented inherent presidential authority.  Corwin, *supra*, at 379.  Consistent with that understanding, when Congress set fixed terms for various federal officers, Congress deemed it necessary to specify that they "shall be removable from office at pleasure," Act of May 15, 1820, ch. 102, § 1, 3 Stat. 582, 582, a caveat that would have been unnecessary if the Constitution already mandated unlimited presidential removal.

Not until *Myers* did the Supreme Court establish the President's constitutional power of removal.  But that decision rejected a requirement of Senate approval that could inhibit removals entirely—making it "impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed."  272 U.S. at 164.  In contrast, a requirement of good cause to remove the leaders of multimember expert agencies was soon upheld as consistent with the President's constitutional authority.  *Humphrey's Ex'r*, 295 U.S. at 626.  That rule has prevailed ever since.  *See Free Enter. Fund*, 561 U.S. at 509 (curing constitutional defect by subjecting multimember body to "a single level of good-cause tenure"); *Seila Law*, 591 U.S. at 237 (inviting Congress to preserve removal limits by "converting the CFPB into a multimember agency").  Constitutional text and history, therefore, do not support Defendants' assertion that good-cause tenure for FTC Commissioners violates President Trump's Article II authority.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motion for expedited

summary judgment.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Smita Ghosh (DC Bar No. 1767180)
Margaret Hassel (DC Bar No. 90029057)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

Dated: April 14, 2025

**APPENDIX**

LIST OF *AMICI*

**41 U.S. Senators**

Sen. Cory A. Booker

Democratic Leader Charles E. Schumer

Sen. Richard J. Durbin

Sen. Maria Cantwell

Sen. Elizabeth Warren

Sen. Amy Klobuchar

| | |
|---|---|
| Sen. Angela Alsobrooks | Sen. Patty Murray |
| Sen. Tammy Baldwin | Sen. Alex Padilla |
| Sen. Michael F. Bennet | Sen. Gary C. Peters |
| Sen. Richard Blumenthal | Sen. Jack Reed |
| Sen. Lisa Blunt Rochester | Sen. Jacky Rosen |
| Sen. Christopher A. Coons | Sen. Bernard Sanders |
| Sen. Catherine Cortez Masto | Sen. Brian Schatz |
| Sen. Tammy Duckworth | Sen. Adam B. Schiff |
| Sen. John Fetterman | Sen. Jeanne Shaheen |
| Sen. Kirsten Gillibrand | Sen. Elissa Slotkin |
| Sen. Margaret Wood Hassan | Sen. Tina Smith |
| Sen. John W. Hickenlooper | Sen. Chris Van Hollen |
| Sen. Mazie K. Hirono | Sen. Mark Warner |
| Sen. Tim Kaine | Sen. Raphael Warnock |
| Sen. Andy Kim | Sen. Peter Welch |
| Sen. Ben Ray Luján | Sen. Sheldon Whitehouse |
| Sen. Edward J. Markey | Sen. Ron Wyden |
| Sen. Jeffrey A. Merkley | |

**210 Members of the U.S. House of Representatives**

Rep. Jamie Raskin

Rep. Frank Pallone, Jr.

Rep. Hakeem Jeffries

Rep. Katherine Clark

Rep. Pete Aguilar

Rep. Joe Neguse

Rep. Rosa L. DeLauro

Rep. Gerald E. Connolly

| | |
|---|---|
| Rep. Gabe Amo | Rep. Salud O. Carbajal |
| Rep. Yassamin Ansari | Rep. André Carson |
| Rep. Jake Auchincloss | Rep. Troy A. Carter, Sr. |
| Rep. Becca Balint | Rep. Greg Casar |
| Rep. Nanette Barragán | Rep. Ed Case |
| Rep. Joyce Beatty | Rep. Sean Casten |
| Rep. Wesley Bell | Rep. Kathy Castor |
| Rep. Ami Bera, M.D. | Rep. Joaquin Castro |
| Rep. Donald S. Beyer Jr. | Rep. Sheila Cherfilus-McCormick |
| Rep. Sanford D. Bishop, Jr. | Rep. Judy Chu |
| Rep. Suzanne Bonamici | Rep. Gilbert R. Cisneros, Jr. |
| Rep. Brendan F. Boyle | Rep. Yvette Clarke |
| Rep. Shontel Brown | Rep. Emanuel Cleaver, II |
| Rep. Julia Brownley | Rep. James E. Clyburn |
| Rep. Nikki Budzinski | Rep. Steve Cohen |
| Rep. Janelle Bynum | Rep. Herbert C. Conaway, Jr. |

| | |
|---|---|
| Rep. J. Luis Correa | Rep. Valerie P. Foushee |
| Rep. Jim Costa | Rep. Lois Frankel |
| Rep. Joe Courtney | Rep. Laura Friedman |
| Rep. Angie Craig | Rep. Maxwell Alejandro Frost |
| Rep. Jasmine Crockett | Rep. John Garamendi |
| Rep. Jason Crow | Rep. Jesús G. "Chuy" García |
| Rep. Sharice Davids | Rep. Robert Garcia |
| Rep. Danny K. Davis | Rep. Sylvia Garcia |
| Rep. Donald G. Davis | Rep. Dan Goldman |
| Rep. Madeleine Dean | Rep. Jimmy Gomez |
| Rep. Diana DeGette | Rep. Vicente Gonzalez |
| Rep. Suzan K. DelBene | Rep. Maggie Goodlander |
| Rep. Chris Deluzio | Rep. Josh Gottheimer |
| Rep. Mark DeSaulnier | Rep. Adam Gray |
| Rep. Maxine Dexter | Rep. Al Green |
| Rep. Debbie Dingell | Rep. Josh Harder |
| Rep. Lloyd Doggett | Rep. Jahana Hayes |
| Rep. Sarah Elfreth | Rep. Pablo José Hernández |
| Rep. Veronica Escobar | Rep. Jim Himes |
| Rep. Adriano Espaillat | Rep. Steven Horsford |
| Rep. Dwight Evans | Rep. Chrissy Houlahan |
| Rep. Cleo Fields | Rep. Steny H. Hoyer |
| Rep. Shomari C. Figures | Rep. Val Hoyle |
| Rep. Lizzie Fletcher | Rep. Jared Huffman |
| Rep. Bill Foster | Rep. Glenn F. Ivey |

Rep. Jonathan L. Jackson

Rep. Sara Jacobs

Rep. Pramila Jayapal

Rep. Henry C. "Hank" Johnson, Jr.

Rep. Julie Johnson

Rep. Sydney Kamlager-Dove

Rep. Marcy Kaptur

Rep. William Keating

Rep. Robin L. Kelly

Rep. Timothy M. Kennedy

Rep. Ro Khanna

Rep. Raja Krishnamoorthi

Rep. Greg Landsman

Rep. John B. Larson

Rep. George Latimer

Rep. Summer L. Lee

Rep. Susie Lee

Rep. Teresa Leger Fernández

Rep. Mike Levin

Rep. Sam T. Liccardo

Rep. Ted W. Lieu

Rep. Zoe Lofgren

Rep. Stephen F. Lynch

Rep. Seth Magaziner

Rep. John W. Mannion

Rep. Doris Matsui

Rep. Lucy McBath

Rep. Sarah McBride

Rep. April McClain Delaney

Rep. Jennifer L. McClellan

Rep. Betty McCollum

Rep. Kristen McDonald Rivet

Rep. Morgan McGarvey

Rep. James P. McGovern

Rep. LaMonica McIver

Rep. Gregory W. Meeks

Rep. Robert J. Menendez

Rep. Grace Meng

Rep. Kweisi Mfume

Rep. Dave Min

Rep. Gwen S. Moore

Rep. Joseph D. Morelle

Rep. Kelly Morrison

Rep. Jared Moskowitz

Rep. Seth Moulton

Rep. Frank J. Mrvan

Rep. Kevin Mullin

Rep. Jerrold Nadler

Rep. Richard E. Neal

Rep. Donald Norcross

| | |
|---|---|
| Rep. Eleanor Holmes Norton | Rep. Jan Schakowsky |
| Rep. Alexandria Ocasio-Cortez | Rep. Bradley Scott Schneider |
| Rep. Johnny Olszewski | Rep. Hillary J. Scholten |
| Rep. Ilhan Omar | Rep. Kim Schrier, M.D. |
| Rep. Jimmy Panetta | Rep. David Scott |
| Rep. Chris Pappas | Rep. Robert C. "Bobby" Scott |
| Rep. Nancy Pelosi | Rep. Terri A. Sewell |
| Rep. Scott H. Peters | Rep. Brad Sherman |
| Rep. Brittany Pettersen | Rep. Mikie Sherrill |
| Rep. Chellie Pingree | Rep. Lateefah Simon |
| Rep. Stacey E. Plaskett | Rep. Adam Smith |
| Rep. Mark Pocan | Rep. Eric Sorensen |
| Rep. Nellie Pou | Rep. Darren Soto |
| Rep. Ayanna Pressley | Rep. Melanie A. Stansbury |
| Rep. Mike Quigley | Rep. Greg Stanton |
| Rep. Delia C. Ramirez | Rep. Haley Stevens |
| Rep. Emily Randall | Rep. Marilyn Strickland |
| Rep. Josh Riley | Rep. Suhas Subramanyam |
| Rep. Luz M. Rivas | Rep. Thomas R. Suozzi |
| Rep. Deborah K. Ross | Rep. Eric Swalwell |
| Rep. Raul Ruiz | Rep. Emilia Strong Sykes |
| Rep. Patrick K. Ryan | Rep. Mark Takano |
| Rep. Andrea Salinas | Rep. Shri Thanedar |
| Rep. Linda T. Sánchez | Rep. Bennie G. Thompson |
| Rep. Mary Gay Scanlon | Rep. Mike Thompson |

Rep. Dina Titus

Rep. Rashida Tlaib

Rep. Jill Tokuda

Rep. Paul D. Tonko

Rep. Norma J. Torres

Rep. Ritchie Torres

Rep. Lori Trahan

Rep. Derek T. Tran

Rep. Lauren Underwood

Rep. Juan Vargas

Rep. Gabe Vasquez

Rep. Marc Veasey

Rep. Nydia M. Velázquez

Rep. Eugene Vindman

Rep. Debbie Wasserman Schultz

Rep. Maxine Waters

Rep. Bonnie Watson Coleman

Rep. George T. Whitesides

Rep. Nikema Williams

Rep. Frederica S. Wilson