## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REBECCA KELLY SLAUGHTER, in her
official and personal capacities, and
ALVARO BEDOYA, in his official and
personal capacities,

               *Plaintiffs*,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
ANDREW N. FERGUSON, in his official
capacity as Chair of the Federal Trade
Commission, MELISSA HOLYOAK, in her
official capacity as Commissioner of the
Federal Trade Commission, DAVID B.
ROBBINS, in his official capacity as
Executive Director of the Federal Trade
Commission,

               *Defendants*.

Case No. 1:25-cv-00909

Judge Loren L. AliKhan

**BRIEF OF COLORADO, HAWAI'I,
ILLINOIS, MINNESOTA,
WASHINGTON, ARIZONA,
CALIFORNIA, CONNECTICUT,
DELAWARE, DISTRICT OF
COLUMBIA, MAINE, MARYLAND,
MASSACHUSETTS, MICHIGAN,
NEVADA, NEW JERSEY, NEW
YORK, OREGON, RHODE ISLAND,
VERMONT, AND WISCONSIN AS
AMICI CURIAE IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED SUMMARY
JUDGMENT**

**PHILIP J. WEISER**
Attorney General
State of Colorado

David Moskowitz (DC Bar No. 994469)
Deputy Solicitor General
Arthur Biller
Senior Assistant Attorney General
Zach W. Fitzgerald
Ian Papendick
Assistant Attorneys General

Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
David.Moskowitz@coag.gov

**KWAME RAOUL**
Attorney General
State of Illinois

Alex Hemmer
Deputy Solicitor General
R. Sam Horan
Assistant Attorney General

Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
alex.hemmer@ilag.gov
(312) 814-5526

**KEITH ELLISON**
Attorney General
State of Minnesota

Liz Kramer
Solicitor General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010

**NICHOLAS W. BROWN**
Attorney General
State of Washington

Jonathan A. Mark
Senior Assistant Attorney General
Antitrust Division Chief
Tyler W. Arnold
Helen M. Lubetkin
Miriam R. Stiefel
Assistant Attorneys General

800 Fifth Ave., Suite 2000
Seattle, WA 98104-3188
jonathan.mark@atg.wa.gov

*(additional counsel on signature page)*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE .................................................................. 1

ARGUMENT ............................................................................................. 2

I.  The Purported Firing of the Commissioners Violates the Federal Trade
    Commission Act and Binding Supreme Court Precedent and Is Contrary to
    the Rule of Law. ................................................................................ 2

II. Congress's Creation of an Expert and Bipartisan FTC Serves Important
    Antitrust and Consumer Protection Policy Objectives. ........................ 3

    A.  Amici States Have a Strong Interest in the FTC's Mission to Protect
        Consumers and Protect Competition. ........................................... 3

    B.  The FTC's Structure Fosters Expertise and Improves and Stabilizes
        Decision-Making. ....................................................................... 6

    C.  Eliminating the Removal Restrictions Would Destroy the FTC's
        Carefully Devised Structure and Harm its Mission. ...................... 11

III. Federal Courts Can Award Relief Necessary to Remedy the Unlawful
     Conduct and Vindicate the Statutory Scheme. ................................. 13

CONCLUSION ......................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*California v. Amazon.com, Inc.* (S.F. Super. Ct. Sept. 15, 2022) .................................6

*Colorado v. Kroger Co.*, No. 2024CV30459 (Denver Cnty. Dist. Ct. 2024)..................6

*FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC (W.D. Wa.) ...................................6

*FTC v. Fred Meyer, Inc.*, 390 U.S. 341 (1968)..................................................................9

*FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024) ..........................3

*FTC v. Kroger Co.*, No. 3:24-cv-00347-AN, 2024 WL 5053016 (D. Or. Dec. 10, 2024) 4

*FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386 (S.D.N.Y. 2024).......................................3

*Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303 (D.D.C. Mar. 4, 2024) ......... 13, 14

*Hastings Mfg. Co. v. FTC*, 153 F.2d 253 (6th Cir. 1946)..............................................7

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ............................. 2, 7, 14

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) ....................................................3

*Mallory v. Norfolk S. Ry.* Co., 600 U.S. 122 (2023) ......................................................2

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)......................................................2

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)...............................................................15

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) ........... 9, 10

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023)......................................................15

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ................................................. 14, 15

*United States v. Dish Network, LLC*, No. 3:09-cv-03073 (C.D. Ill. Dec. 4, 2020)........5

*Washington v. Kroger Co.*, No. 24-2-00977-SEA (King Cnty. Super. Ct. 2024)...........6

*Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914 (D. D.C. Mar. 6, 2025) ......... 13, 14

**Statutes**

15 U.S.C. § 16 (2024) ...................................................................................................13

15 U.S.C. § 41 (2024) ....................................................................................... 2, 11, 14

15 U.S.C. § 45(c) (2024) ..............................................................................................11

**Other Authorities**

119 Cong. Rec. 24,598 (1973).....................................................................................13

51 Cong. Rec. 10,376 (1914) ........................................................................................7

Concurring Statement of Commissioner Andrew N. Ferguson, *In the Matter of Amendments to the Premerger Notification and Report Form and Instructions, and the Hart-Scott-Rodino Rule 16 C.F.R. Parts 801 and 803*, Matter Number P239300 (FTC Oct. 10, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-final-hsr-rule-statement.pdf ............................................................................................. 8

Edith Ramirez, *The FTC: A Framework for Promoting Competition and Protecting Consumers*, 83 Geo. Wash. L. Rev. 2049 (2015) ........................................................ 7

Irving L. Janis, *Groupthink: Psychological Studies of Policy Decision and Fiascoes* (2d ed. 1982)............................................................................................................. 8

James C. Cooper, Paul A. Pautler & Todd J. Zywicki, *Theory and Practice of Competition Advocacy at the FTC*, 72 Antitrust L.J. 1091 (2005).......................... 10

Leah Nylen, John Hendel & Betsy Woodruff Swan, *Trump Pressures Head of Consumer Agency to Bend on Social Media Crackdown*, Politico (Aug. 21, 2020), https://www.politico.com/news/2020/08/21/trump-ftc-chair-social-media-400104 ... 9

Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control, and Competition*, 71 Antitrust L.J. 1 (2003).................................................................... 6

Press Release, Connecticut Attorney General, *State Joins $125 Million Multistate Antitrust Settlement with Cephalon for Efforts to Delay Provigil Competition* (Aug. 4, 2016), https://portal.ct.gov/ag/press-releases-archived/2016-press-releases/state-joins-125-million-multistate-antitrust-settlement-with-cephalon-for-efforts-to-delay-provigil ............................................................................................................ 5

Press Release, FTC, *Equifax to Pay $575 Million as Part of Settlement with FTC, CFPB, and States Related to 2017 Data Breach* (July 22, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/equifax-pay-575-million-part-settlement-ftc-cfpb-states-related-2017-data-breach........................... 5

Press Release, FTC, *Federal Trade Commission Announces Bipartisan Rule Banning Junk Ticket and Hotel Fees* (Dec. 17, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/12/federal-trade-commission-announces-bipartisan-rule-banning-junk-ticket-hotel-fees........................................................ 8

Press Release, FTC, *Fortnite Video Game Maker Epic Games to Pay More Than Half a Billion Dollars over FTC Allegations of Privacy Violations and Unwanted Charges* (Dec. 19, 2022),https://www.ftc.gov/news-events/news/press-releases/2022/12/fortnite-video-game-maker-epic-games-pay-more-half-billion-dollars-over-ftc-allegations ....................................................................................... 3

Press release, FTC, *FTC Settlement of Cephalon Pay for Delay Case Ensures $1.2 Billion in Ill-Gotten Gains Relinquished; Refunds Will Go to Purchasers Affected By Anticompetitive Tactics* (May 28, 2015), https://www.ftc.gov/news-events/news/press-releases/2015/05/ftc-settlement-cephalon-pay-delay-case-ensures-12-billion-ill-gotten-gains-relinquished-refunds-will .................................. 5

Press Release, FTC, *FTC Sues Facebook for Illegal Monopolization* (Dec. 9, 2020),https://www.ftc.gov/news-events/news/press-releases/2020/12/ftc-sues-facebook-illegal-monopolization .................................................................................. 9

Press Release, FTC, *FTC Takes Action Against Publishers Clearing House for Misleading Consumers About Sweepstakes Entries* (June 27, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-takes-action-against-publishers-clearing-house-misleading-consumers-about-sweepstakes-entries ............................................................................................................... 4

Press Release, FTC, *FTC to Ramp Up Law Enforcement Against Illegal Repair Restrictions* (July 21, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/07/ftc-ramp-law-enforcement-against-illegal-repair-restrictions...... 8

Press Release, FTC, *Working Together to Protect Consumers*, at 6-9 (April 10, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p238400_ftc_collaboration_act_report.pdf.................................................................................................................... 9

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 24 (2010).................................................................. 7, 9

S. Rep. No. 63-597 (1914) ...................................................................................... 6, 7

## Regulations

16 C.F.R. § 4.14(b) (2024) ......................................................................................... 11

**Constitutional Provisions**

U.S. Const. art. III, § 1 ................................................................................................ 14

## INTEREST OF AMICI CURIAE[1]

For more than 100 years, the Federal Trade Commission ("FTC") has played a vital role in strengthening the American economy and safeguarding American consumers by preventing and remedying unfair competition and trade practices. The agency's longstanding success flows in no small part from Congress's considered decision to structure the FTC as an expert, bipartisan agency led by five commissioners with tenured terms. The President's purported firing without cause of both commissioners from the opposing political party is plainly unlawful, destroys the agency's carefully devised structure, and harms its critical mission.

Amici States have a unique interest in ensuring the FTC continues to operate as a bipartisan expert agency. Amici States regularly work with the FTC to pool resources on investigations and litigation to protect consumers and maintain competition in the American economy. States rely on, and benefit from, the expertise and bipartisan nature of the FTC to protect their consumers. Indeed, the FTC's structure is essential in facilitating bipartisan partnership with states to protect consumers. Amici States are currently partnered with the FTC on several litigation matters of great importance to their citizens, as well as investigations that could result in further action. Undoing the FTC's independent, bipartisan expert structure would cause disruption and hamper coordination efforts.

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than Amici Curiae or their counsel made a monetary contribution to the preparation or submission of this brief.

**ARGUMENT**

**I.     The Purported Firing of the Commissioners Violates the Federal Trade Commission Act and Binding Supreme Court Precedent and Is Contrary to the Rule of Law.**

The President's purported firing of the Commissioners without cause violates the Federal Trade Commission Act (the "Act") and binding Supreme Court precedent. Since its passage in 1914, the Act has prohibited the removal of FTC Commissioners except for "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. In *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court directly held: (1) the President may only remove FTC commissioners for the reasons stated in the Act, and (2) this removal limitation is constitutionally valid. Because *Humphrey's Executor* has "direct application," this Court is bound to follow it unless and until the Supreme Court itself overrules it. *Mallory v. Norfolk S. Ry.* Co., 600 U.S. 122, 136 (2023). Accordingly, the purported firing is plainly unlawful. This is the beginning and the end of the legal analysis.

For more than 200 years, it has been a foundational principle of our republic that it is the province of the Judiciary to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The rule of law demands that when the Supreme Court rules, the Executive Branch will obey. The President's extraordinary action in purportedly firing the Commissioners—in clear contravention of direct Supreme Court precedent—is an affront to the rule of law. The Executive Branch may not disobey Supreme Court precedents that it dislikes. Amici States have a strong interest in upholding the rule of law and urge the Court to remedy the President's lawless action.

## II.    Congress's Creation of an Expert and Bipartisan FTC Serves Important Antitrust and Consumer Protection Policy Objectives.

Congress intentionally created a bipartisan, expert FTC led by five commissioners with tenured terms. For over a century, that structure has benefited the public and safeguarded competition, fostering regulatory stability and expert decision-making based on sound professional judgment. The tenure protections for commissioners are a fundamental and essential part of that structure and the agency's longstanding success.

### A.    Amici States Have a Strong Interest in the FTC's Mission to Protect Consumers and Protect Competition.

Amici States, as co-enforcers of federal and state antitrust and consumer protection laws, have a strong interest in the FTC's mission to protect competition and consumers. For decades, the FTC has brought countless actions to safeguard and preserve a fair marketplace and to vindicate consumers. The FTC has secured rulings blocking anticompetitive mergers in an array of industries that touch the daily lives of consumers across the country.[2] It has brought actions yielding billions of dollars for consumers harmed by unfair and deceptive practices.[3] In addition, the FTC also

---

[2] For example, the FTC recently secured court orders blocking mergers in: (a) the market for certain advertising in the prescription drug sector, *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024); (b) the market for research, development, and commercialization of multi-cancer early detection tests, *Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023); and (c) the market for accessible-luxury handbags, *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386 (S.D.N.Y. 2024).

[3] In coordination with the DOJ, the FTC filed an action resulting in securing over $500 million from Epic Games for privacy law violations and unfair billing practices. Press Release, FTC, *Fortnite Video Game Maker Epic Games to Pay More Than Half a Billion Dollars over FTC Allegations of Privacy Violations and Unwanted Charges* (Dec. 19, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/12/

promulgates rules, adjudicates matters in its own administrative tribunal, and conducts comprehensive market studies to inform itself, Congress, and the public. This unique set of activities—handled with a bipartisan leadership structure—all furthers its antitrust and consumer protection mission and advances the law, giving businesses valuable guidance on what conduct is or is not acceptable. That vision of advancing the law through expert, independent, and bipartisan leadership was exactly the one that the agency's congressional founders had in mind for it.

The Amici States routinely work with the FTC to protect competition and consumers, through joint or complementary actions. In the antitrust arena, a bipartisan group of eight states and the District of Columbia recently joined with the FTC to enjoin a merger between two of the largest supermarkets in the country, which would have resulted in significantly higher grocery prices for consumers. *FTC v. Kroger Co.*, No. 3:24-cv-00347-AN, 2024 WL 5053016 (D. Or. Dec. 10, 2024). In another matter, a coalition of 49 states obtained a $125 million antitrust settlement against biopharmaceutical company Cephalon, facilitated by an FTC lawsuit and

---

fortnite-video-game-maker-epic-games-pay-more-half-billion-dollars-over-ftc-allegations. The FTC also filed an action against Publishers Clearing House for alleged deceptive practices regarding sweepstakes processes and obtained a court order requiring injured consumers be repaid $18.5 million. Press Release, FTC, *FTC Takes Action Against Publishers Clearing House for Misleading Consumers About Sweepstakes Entries* (June 27, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-takes-action-against-publishers-clearing-house-misleading-consumers-about-sweepstakes-entries.

settlement stemming from Cephalon's alleged illegal blocking of generic competition to its sleep-disorder drug Provigil.[4]

Examples of state partnership with the FTC in consumer protection also abound. For example, the FTC and a bipartisan coalition of all 50 states obtained a settlement with Equifax, Inc., requiring Equifax to pay at least $575 million, and up to $700 million, and strengthen its security practices arising out of a massive data breach and alleged violation of privacy laws.[5] Similarly, the FTC and a bipartisan group of states won a lawsuit against Dish Network alleging millions of illegal telemarketing calls by Dish, obtaining injunctive relief and then a settlement of $210 million. *See United States v. Dish Network, LLC*, No. 3:09-cv-03073, ECF #868 (C.D. Ill. Dec. 4, 2020).

Finally, Amici States litigate complementary actions with the FTC to the benefit of consumers. For example, in parallel to *FTC v. Kroger*, Colorado and Washington separately sued to block the merger, with Washington obtaining a permanent injunction, and each coordinated with the FTC throughout their

---

[4] Press Release, Connecticut Attorney General, *State Joins $125 Million Multistate Antitrust Settlement with Cephalon for Efforts to Delay Provigil Competition* (Aug. 4, 2016), https://portal.ct.gov/ag/press-releases-archived/2016-press-releases/state-joins-125-million-multistate-antitrust-settlement-with-cephalon-for-efforts-to-delay-provigil; Press release, FTC, *FTC Settlement of Cephalon Pay for Delay Case Ensures $1.2 Billion in Ill-Gotten Gains Relinquished; Refunds Will Go to Purchasers Affected By Anticompetitive Tactics* (May 28, 2015), https://www.ftc.gov/news-events/news/press-releases/2015/05/ftc-settlement-cephalon-pay-delay-case-ensures-12-billion-ill-gotten-gains-relinquished-refunds-will.

[5] Press Release, FTC, *Equifax to Pay $575 Million as Part of Settlement with FTC, CFPB, and States Related to 2017 Data Breach* (July 22, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/equifax-pay-575-million-part-settlement-ftc-cfpb-states-related-2017-data-breach.

respective investigations and much of the litigation. *See Washington v. Kroger Co.*, No. 24-2-00977-SEA (King Cnty. Super. Ct. 2024); *Colorado v. Kroger Co.*, No. 2024CV30459 (Denver Cnty. Dist. Ct. 2024). Similarly, California and the FTC are currently litigating overlapping claims against Amazon, and California is coordinating with the FTC in ongoing fact discovery. *See California v. Amazon.com, Inc.* (S.F. Super. Ct. Sept. 15, 2022); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC (W.D. Wa.).

This is exactly what Congress intended when it created the FTC following a period of unprecedented consolidation and trusts dominating business in the United States. *See* Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control, and Competition*, 71 Antitrust L.J. 1, at 6–7 (2003). The solution was to create an expert, bipartisan agency that "will have greater prestige and independence, and its decisions, coming from a board of several persons, will be more readily accepted as impartial and well considered." S. Rep. No. 63-597, at 11 (1914).

**B.    The FTC's Structure Fosters Expertise and Improves and Stabilizes Decision-Making.**

Against this backdrop, Congress carefully structured the FTC to promote institutional expertise and stability while avoiding undue partisan influence and agency capture. This careful construction has resulted in an agency with a 100-year record of expertise that brings substantial credibility to its actions through decisions based on sound professional judgment.

*First*, the commissioners' seven-year terms and removal protections give them "an opportunity to acquire the expertness in dealing with these special questions

concerning industry that comes from experience." *Hastings Mfg. Co. v. FTC*, 153 F.2d 253, 258 (6th Cir. 1946) (citing S. Rep. No. 63-597 at 11). And the staggering of their terms ensures that the Commission would not be "deprived" of experienced leadership due to turnover.  S. Rep. No. 63-597, at 11.

These protections provide the FTC a "continuity of policy and the tempering of swings in priorities across administrations" that create consistency and allow it to invest in research and analysis for specific issues and industries. *See* Edith Ramirez, *The FTC: A Framework for Promoting Competition and Protecting Consumers*, 83 Geo. Wash. L. Rev. 2049, 2053 (2015).[6] This continuity is one of the FTC's greatest strengths and comports with its founding goals—the Senate Committee sought to create an FTC with "a continuous policy" that "would be free from the effect of such changing incumbency." Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 24 (2010) (citing 51 Cong. Rec. 10,376 (1914)).

*Second*, the FTC's bipartisan membership—with no more than three members from one political party—creates compromise, enhances decision-making, and promotes cooperation with states. *See Humphrey's Ex'r*, 295 U.S. at 624 (FTC was intended to "act with entire impartiality"). The bipartisan composition promotes "a diversity of views and experiences" which ensures the FTC fully explores its matters and debates proposed solutions' weaknesses. *See* Ramirez, *supra*, at 2053. For example, in 2024, the FTC (with the DOJ) proposed substantial changes to an

---

[6] Then-Chairwoman Ramirez also noted that the benefits of the FTC's expertise are reflected in its near-perfect record on appeal.  *See* Ramirez, *supra*, at 2054.

important merger review form. Guided by public feedback and commissioners' debate, the FTC ultimately devised a final form that all five commissioners approved.[7] Bipartisan decision-making promotes regulatory certainty and stability—and avoids disruptive and confusing policy changes.[8]

An FTC that acts by consensus, rather than single-party dominance, better serves the public and avoids regulatory whipsawing. This characteristic follows the wisdom of a well-developed literature in organizational design that highlights how promoting transparency, encouraging challenging of views, and discouraging "group think" can lead to better results. *See, e.g.*, Irving L. Janis, *Groupthink: Psychological Studies of Policy Decision and Fiascoes* (2d ed. 1982).

Even without unanimity, the FTC's bipartisan membership promotes well-reasoned decisions. Commissioners in the minority can publish dissents which serve valuable purposes: they foster public debate, force the majority to defend its position,

---

[7] "My colleagues and I engaged in intense negotiations to separate the lawful wheat from the lawless chaff." Concurring Statement of Commissioner Andrew N. Ferguson, *In the Matter of Amendments to the Premerger Notification and Report Form and Instructions, and the Hart-Scott-Rodino Rule 16 C.F.R. Parts 801 and 803*, Matter Number P239300 (FTC Oct. 10, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-final-hsr-rule-statement.pdf.

[8] Other recent bipartisan accomplishments include the junk ticket and hotel fees rule, Press Release, FTC, *Federal Trade Commission Announces Bipartisan Rule Banning Junk Ticket and Hotel Fees* (Dec. 17, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/12/federal-trade-commission-announces-bipartisan-rule-banning-junk-ticket-hotel-fees; and increased focus on illegal right-to-repair restrictions, Press Release, FTC, *FTC to Ramp Up Law Enforcement Against Illegal Repair Restrictions* (July 21, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/07/ftc-ramp-law-enforcement-against-illegal-repair-restrictions.

and encourage transparency.[9] *See, e.g.*, *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 363 n.2 (1968) (Stewart, J., dissenting) ("One Commissioner attempted in vain to persuade the Commission to accept the theory which the Court today adopts."); *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 185 (D.C. Cir. 2018) (Kavanaugh, J. dissenting) (dissent can serve "as a 'fire alarm' that alerts Congress and the public at large that the agency's decision might merit closer scrutiny") (quoting Barkow, *supra*, at 41).

Further, bipartisan membership promotes the FTC's frequent work with bipartisan, multistate coalitions.[10] The FTC's bipartisanship ensures investigations and any decisions to seek relief are based on facts and public interest rather than partisan politics.[11] Even contested decisions do not always break along partisan lines. For instance, the decision to file suit against Facebook (now Meta) for monopolistic behavior was approved during the first Trump administration on a 3-2 vote, with the majority comprised of two Democrats and one Republican.[12]

---

[9] As the Plaintiffs' summary judgment motion points out, Chair Ferguson recently commented that he wrote over 400 pages of dissents during the last administration, which he believes "adds value." *See* ECF #20-2 at 8.

[10] Examples of recent FTC-state partnerships include actions targeting illegal telemarketing, financial independence scams, fraudulent charitable solicitations, unscrupulous financing and sales, deceptive radio ads, pyramid schemes, fraudulent grant funding, and fake reviews. Press Release, FTC, *Working Together to Protect Consumers*, at 6-9 (April 10, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/p238400_ftc_collaboration_act_report.pdf.

[11] *See, e.g.*, Leah Nylen, John Hendel & Betsy Woodruff Swan, *Trump Pressures Head of Consumer Agency to Bend on Social Media Crackdown*, Politico (Aug. 21, 2020), https://www.politico.com/news/2020/08/21/trump-ftc-chair-social-media-400104.

[12] *See* Press Release, FTC, *FTC Sues Facebook for Illegal Monopolization* (Dec. 9, 2020),https://www.ftc.gov/news-events/news/press-releases/2020/12/ftc-sues-facebook-illegal-monopolization.

States benefit from the FTC's expertise and resources, and the FTC benefits from states' local knowledge, as the states are well-positioned to gather evidence of harm from their own citizens. The FTC's removal protections and bipartisanship promote consistency in goals and strategy as large-scale matters often take years from an investigation's beginning to litigation's conclusion. The FTC's independence is critical to these administration-spanning matters' stability.

*Finally*, the FTC's structure and protections prevent agency capture. *See, e.g.*, James C. Cooper, Paul A. Pautler & Todd J. Zywicki, *Theory and Practice of Competition Advocacy at the FTC*, 72 Antitrust L.J. 1091, 1104 (2005) ("Because one industry would be unlikely to effectively capture all Commissioners, the views put forth in advocacy comments are highly unlikely to have resulted from interest-group pressure."). Congress charged the FTC with protecting consumers, and therefore it often acts against powerful businesses. The FTC's independence supports its consumer-protection mission without partisan pressure or the appearance of impropriety.

None of the above allows the FTC to escape political accountability or judicial review. Rather, the President chooses the FTC's chair, a position with significant influence on the FTC's agenda. *See PHH Corp.*, 881 F.3d at 190 (Kavanaugh, J. dissenting) ("By exercising their power to appoint chairs of the major multi-member independent agencies, Presidents may gain some control over the direction of those agencies within days of taking office at the start of their first terms."). And if the President disapproves of the chair's work, he is free to appoint a different chair at

10

any time. The commissioners' seven-year terms also ensure the President retains influence over the FTC by appointing two-to-three commissioners each term. *See* 15 U.S.C. § 41. Further, the FTC remains accountable to Congress through the appropriations process and rulemaking oversight. And the FTC ultimately acts through the courts, meaning that its decisions are subject to judicial review. 15 U.S.C. § 45(c). The FTC therefore is held accountable by all three branches of government while maintaining the ability to act on sound professional judgment based on its expertise.

### C. Eliminating the Removal Restrictions Would Destroy the FTC's Carefully Devised Structure and Harm its Mission.

Eliminating the removal restrictions would fundamentally destroy the FTC as we know it, removing the key structural features that have enabled the agency's success, including its expertise and deliberative, bipartisan structure. Unfettered removal would undermine the Commission's ability to carry out its mission. Empowered with at-will removal authority, the President would be able to fire all commissioners belonging to opposing political parties or even members of his own party deemed insufficiently obedient. Indeed, at-will removal authority would allow the President to transform the five-member Commission into a single-headed agency run by a commissioner subject to removal at the pleasure of the President.[13] Or, the

---

[13] The FTC Act contains no quorum requirement, stating instead that "a vacancy in the Commission shall not impair the right of the remaining Commissioners to exercise all the powers of the Commission." 15 U.S.C. § 41. Agency regulations provide that "a majority of the members of the Commission in office and not recused from participating in a matter (by virtue of 18 U.S.C. § 208 or otherwise) constitutes a quorum for the transaction of business in that matter." 16 C.F.R. § 4.14(b).

President could remove all commissioners, preventing the Commission from functioning entirely. Regardless, the removal restrictions are a key limitation ensuring the agency acts as a deliberative body based on sound expert judgment.

The public likewise stands to lose the benefits of the Commission's bipartisan structure and the stable, considered enforcement it affords. As discussed above, the Commission has historically worked to achieve consensus where possible, often altering proposals to do so. Even where consensus is not possible, the Commission's five-member, bipartisan structure allows differing views to be heard, leading to better decision-making and allowing dissenting opinions to become part of the record. The public benefits from this fact-based, bipartisan enforcement and public debate that drives policy forward. Without the removal restrictions, the FTC will likely be composed of only like-minded members of the President's party.

Eliminating the removal restrictions would effectively end the seven-year term and term rotation features, removing the benefits derived from the continuity in Commission membership and the expertise developed over a seven-year term. Commissioners are less likely to oversee the entirety of, or at least significant portions of, lengthy antitrust and consumer protection matters. Market participants will have reduced confidence that the Commission will not reverse course with each new presidency. And Amici States' coordination with the FTC on pending matters will be subject to greater disruption and increased uncertainty.

Finally, the greater disruption and oversight by the President will undermine the ability of the FTC to operate free of undue political interference, to the detriment

of the public, market participants, and co-enforcer States. Congress established the Tunney Act to ensure that the Department of Justice, which reports to the President, did not improperly settle or drop antitrust cases following a history of problematic political interference. *See* 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney); 15 U.S.C. § 16. Congress did not need to impose any similar restriction on the FTC because its independent structure provided an essential safeguard against that concern. This Court should not permit the undoing of that structure and raise the risk of the harms guarded against by the Tunney Act.

### III.    Federal Courts Can Award Relief Necessary to Remedy the Unlawful Conduct and Vindicate the Statutory Scheme.

In recent cases involving the President's attempts to remove members of other independent agencies, the Administration has argued that, even if the purported removals were unlawful, federal courts lack the authority to grant declaratory or injunctive relief remedying the injury. *See Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *16, n.22 (D. D.C. Mar. 6, 2025), *appeal docketed*, No. 25-5057 (D.C. Cir. Mar. 7, 2025); *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *7–14 (D.D.C. Mar. 4, 2024), *appeal docketed*, No. 25-5055 (D.C. Cir. Mar. 4, 2025). The Administration has characterized the plaintiff officers as seeking "reinstatement" and has contended that courts can, at most, award backpay. *See Wilcox*, 2025 WL 720914, at *16, n.22; *Harris*, 2025 WL 679303, at *9. This is an extreme position. The Administration essentially asserts that even if the President has no power to remove an officer, he can do it anyway, and there is nothing federal courts can do about it. That is not, and cannot be, the law. Courts have properly rejected this argument for

multiple reasons, including that it misapprehends the nature of the relief the plaintiffs seek and conflicts with binding precedent. *See Wilcox*, 2025 WL 720914, at *16, n.22; *Harris*, 2025 WL 679303, at *7–14.

Defendants' likely view—that plaintiffs are no longer commissioners and need a court order to "reinstate" them to their positions—is impossible to square with the Act. The Supreme Court has explained that, in specifying that a "Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office," 15 U.S.C. § 41, Congress "limit[ed] the executive power of removal to the causes enumerated," *Humphrey's Ex'r*, 295 U.S. at 626. Thus, the President has no power to remove a commissioner, as he has purported to here, for grounds not identified in the Act. Plaintiffs therefore do not need "reinstatement" to office—as a matter of law, they never left. They instead appropriately seek merely "*de facto*" relief that requires the relevant officers to "treat [them] as . . . member[s] of the [Commission] and allow[ ] [them] to exercise the privileges of that office." *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996).

A contrary conclusion would have untenable consequences. For instance, all parties presumably agree that the President does not have the power to remove an Article III judge. *See* U.S. Const. art. III, § 1 ("The Judges . . . shall hold their Offices during good Behaviour . . . ."). Thus, if the President purported to remove an Article III judge, that action would have no legal effect, and the judge would not need "reinstatement" to office. But, if the Marshals Service refused to allow the judge to enter the courthouse, she might, as a practical matter, need a declaration recognizing

that she remains in office and an injunction requiring the Service to stop interfering with the performance of her duties.

Federal courts can and should grant such injunctions. As a doctrinal matter, this "*de facto*" relief falls well within federal courts' remedial power. *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *accord Swan*, 100 F.3d at 979–81. And it is the only way to give meaningful effect to the Act's removal protection, since a President intent on dismissing a commissioner would likely consider the short-term provision of backpay from the public fisc—the only remedy that the Administration has endorsed—a small price to pay to enlarge his own authority.

At bottom, the Administration's position requires assuming that the President's action, even if unlawful, was nonetheless effective. That is not how our system of government works. The President cannot expand his powers through adverse possession. *See NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014); *id.* at 593 (Scalia, J., concurring in the judgment). In other words, while the President might assert that he has powers he does not, he cannot unilaterally force federal courts to comply with that assertion. The district court has the power to vindicate the statutory scheme and remedy the unlawful attempt to remove the Commissioners.

## CONCLUSION

The FTC plays a vital role in protecting consumers and competition in our nation. Its stability, bipartisanship, and expertise are key to the wellbeing of citizens in every state. Amici States urge this Court to uphold the rule of law and consider

these public interest factors as weighing heavily in favor of granting the Commissioners' motion for expedited summary judgment.

Dated: April 18, 2025                          Respectfully submitted,

**PHILIP J. WEISER**                           **KWAME RAOUL**
Attorney General                               Attorney General
State of Colorado                              State of Illinois

/s/ David Moskowitz                            /s/ Alex Hemmer
David Moskowitz (D.C. Bar No. 994469)          Alex Hemmer
Deputy Solicitor General                       Deputy Solicitor General
Arthur Biller                                  R. Sam Horan
Senior Assistant Attorney General             Assistant Attorney General
Zach W. Fitzgerald                             Office of the Illinois Attorney General
Ian Papendick                                  115 S. LaSalle St.
Assistant Attorneys General                    Chicago, IL 60603
Colorado Department of Law                     alex.hemmer@ilag.gov
Ralph L. Carr Judicial Center                  (312) 814-5526
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
David.Moskowitz@coag.gov


**KEITH ELLISON**                              **NICHOLAS W. BROWN**
Attorney General                               Attorney General
State of Minnesota                             State of Washington

/s/ Liz Kramer                                 /s/ Jonathan A. Mark
Liz Kramer                                     Jonathan A. Mark
Solicitor General                              Senior Assistant Attorney General
445 Minnesota Street, Suite 1400               Antitrust Division Chief
St. Paul, Minnesota, 55101                     Tyler W. Arnold
(651) 757-1010                                 Helen M. Lubetkin
                                               Miriam R. Stiefel
                                               Assistant Attorneys General
                                               800 Fifth Ave., Suite 2000
                                               Seattle, WA 98104-3188
                                               jonathan.mark@atg.wa.gov

16

**KRISTIN K. MAYES**
*Attorney General*
*State of Arizona*
165 Capitol Ave.
Hartford, CT 06106

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*
165 Capitol Ave.
Hartford, CT 06106

**BRIAN L. SCHWALB**
*Attorney General*
*District of Columbia*
400 6th St. NW
Washington, DC 20001

**AARON M. FREY**
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

**ANDREA JOY CAMPBELL**
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Pl.
Boston, MA 02108

**AARON D. FORD**
*Attorney General*
*State of Nevada*
100 N. Carson St.
Carson City, NV 89701

**LETITIA JAMES**
*Attorney General*
*State of New York*
28 Liberty St.
New York, NY 10005

**ROB BONTA**
*Attorney General*
*State of California*
1300 I St.
Sacramento, CA 95814

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*
820 N. French St.
Wilmington, DE 19801

**ANNE E. LOPEZ**
*Attorney General*
*State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

**ANTHONY G. BROWN**
*Attorney General*
*State of Maryland*
200 Saint Paul Pl.
Baltimore, MD 21202

**DANA NESSEL**
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*
25 Market St.
Trenton, NJ 08625

**DAN RAYFIELD**
*Attorney General*
*State of Oregon*
1162 Court St. NE
Salem, OR 97301

17

**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*
150 S Main St.
Providence, RI 02903

**JOSH KAUL**
*Attorney General*
*State of Wisconsin*
P.O. Box 7857
Madison, WI 53707

**CHARITY R. CLARK**
*Attorney General*
*State of Vermont*
109 State St.
Montpelier, VT 05609

**CERTIFICATE OF COMPLIANCE**

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the

requirements of LCvR 5.4, complies with the requirements set forth in Fed. R. App.

P. 29(a)(4), and does not exceed 25 pages in length.


Dated: April 18, 2025                    /s/ David Moskowitz

**CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2025, I electronically filed the original of this brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.


Dated: April 18, 2025                    /s/ David Moskowitz