**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REBECCA KELLY SLAUGHTER, in her
official and personal capacities,

and

ALVARO M. BEDOYA, in his official and
personal capacities,                          Case No. 1:25-cv-00909-LLA

                    Plaintiffs,

v.

DONALD J. TRUMP, et al.,

                    Defendants.

**BRIEF OF PROFESSOR JED HANDELSMAN SHUGERMAN**
**AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR EXPEDITED SUMMARY JUDGMENT**

Date: April 17, 2025              Richard F. Griffin (D.C. Bar ID: 358323)
                                 Faaris Akremi (D.C. Bar ID: 1672041)
                                 **BREDHOFF & KAISER, P.L.L.C.**
                                 805 15th St. N.W., Suite 1000
                                 Washington, D.C. 20005
                                 Tel: (202) 842-2600
                                 Fax: (202) 842-1888
                                 rgriffin@bredhoff.com
                                 fakremi@bredhoff.com

                                 *Counsel for Amicus Curiae*
                                 *Professor Jed H. Shugerman*

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................... i

**TABLE OF AUTHORITIES** ......................................................................................... iii

**INTEREST OF AMICUS CURIAE** ................................................................................ 1

**INTRODUCTION AND SUMMARY OF ARGUMENT** ................................................ 2

**I.** ***HUMPHREY'S EXECUTOR* IS GOOD LAW AND RECENT NON-CONTROLLING OPINIONS SUGGESTING OTHERWISE RELY ON DISPROVEN ASSUMPTIONS AND ERRONEOUS HISTORIES** .............................................................................. 3

**II.** **NEW EVIDENCE DEMONSTRATES THAT ARTICLE II DID NOT IMPLY UNCONDITIONAL PRESIDENTIAL REMOVAL** ......................................................... 5

   A. The Unitary Executive Theory's Three Pillars Are No Longer Standing. ........................ 5

      1. The Executive Vesting Clause Did Not Imply Presidential Removal. ........................ 5

      2. The "Take Care" Clause Did Not Imply Presidential Removal. ................................ 8

      3. New Research Shows that "the Decision of 1789" Is a Myth and that the First Congress Repeatedly Rejected Unconditional Presidential Removal Power. ................................. 9

   B. New Research Confirms that the Constitution's Text and Ratification Debates Undercut the Unitary Theory. ...................................................................................................... 11

      1. The Opinion Clause and the *Federalist Papers* Remain Stronger Counterevidence than Anything the Unitary Theorists Have Offered. ................................................................ 11

      2. The Anti-Federalists Were Remarkably Silent on Removal. ...................................... 11

**III.** **RECENT RESPONSES FROM UNITARY EXECUTIVE THEORISTS CONFIRM THE WEAKNESS OF THE ORIGINALIST CASE** .................................................... 12

   A. Professor McConnell's Prerogativist Interpretation of Article II Would Mean at Most a Defeasible Removal Power and His Anti-Royalist Republican Theory Would Reject the Approaches of Other Unitary Theorists. ............................................................................. 13

      1. McConnell's Method Would Hold that Article II Does Not Imply Removal Because Removal Was Not a Royal Prerogative. ........................................................................ 13

      2. Even if One Infers Removal from Article II, It Would Be an Implied (or "Residual") Power and Thus Defeasible by Congress. ................................................................... 14

   B. Bamzai and Prakash's *The Executive Power of Removal* Backfired, Exposing the Unitary Theory's Lack of Evidence and Repeated Misuse of Sources. ........................................ 15

      1. The Authors Misuse Anti-Federalist Arguments. ...................................................... 17

      2. The Authors Misuse the Federalist Papers. .............................................................. 18

      3. The Authors Retreat Later and Later Beyond the Ratification Era. ........................... 18

      4. The Authors Offer No Evidence the Framers Cited Royal Removal. ......................... 19

      5. Prakash Ignores Contradictions Regarding the "Strategic Ambiguity" of 1789. ......... 20

6.    The Authors Resort to Conflations and False Dichotomies............................................ 21

7.    The Authors' Have an Enduring *Marbury* Problem. .................................................... 22

C.   Historians Have Raised Serious Questions About Other Leading Unitary Theorists' Advocacy and Scholarship............................................................................................... 23

**CONCLUSION** ......................................................................................................................... **24**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Consumers' Rsch. v. Consumer Product Safety Comm'n*,
    91 F.4th 342 (5th Cir. 2024) ........................................................................9

*Free Enterprise Fund v. PCAOB*,
    561 U.S. 477 (2010) ..................................................................................2

*Harris v. Bessent*,
    No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) (en banc)....................3, 6

*Harris v. Bessent*,
    No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025) (motions panel)...............3, 4, 6, 7

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ..................................................................................2

*Leachco v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024) ....................................................................9

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803)......................................................................23

*Morrison v. Olson*,
    487 U.S. 654 (1988) ..................................................................................9

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ................................................................................8, 11, 19

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ..................................................................................2

**Constitutional Provisions**

U.S. Const. art. II, § 1 ..................................................................................5

U.S. Const. art. II, § 2 ................................................................................7, 18

U.S. Const. art. II, § 3 ..................................................................................8

**Scholarly Publications**

Aditya Bamzai & Saikrishna Prakash, *The Executive Power of Removal*, 136
    Harv. L. Rev. 1756 (2023) ................................................................. *passim*

Aditya Bamzai & Saikrishna Prakash, *How to Think About the Removal Power*,
    110 Va. L. Rev. Online 159 (2024) ..........................................................15, 18, 20

Andrea Scoseria Katz & Noah A. Rosenblum, *Removal Rehashed*, 136 Harv. L. Rev. Forum 404 (2023)...............................................................................16, 18, 19

Andrew Kent, Ethan J. Leib & Jed H. Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019) ......................................................................1, 8

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ......................................................................................................10

Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129 (2022)....................................................................................................10, 16

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1 (2020)..............7, 10

Christine Kexel Chabot, *Rejecting the Unitary Executive*, Utah L. Rev. (forthcoming 2025) .....................................................................................17

Christopher S. Havasy, Joshua C. Macey & Brian Richardson, *Against Political Theory in Constitutional Interpretation*, 76 Vand. L. Rev. 899 (2023)......................................6

Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175 (2021)..................................................................................5, 7, 11

Ilan Wurman, *The Original Presidency: A Conception of Administrative Control*, 16 J. L. Analysis 26 (2024)...............................................................................23

Ilan Wurman, *Some Thoughts on My Seila Law Brief*, Notice & Comment: Yale J. Reg. (Dec. 1, 2021)......................................................................................23

Jane Manners & Lev Menand, *Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021) ...................... *passim*

Jed H. Shugerman, *The Misuse of Ratification-Era Sources by Unitary Executive Theorists*, Mich. J. L. Reform (forthcoming 2025)................................................1, 16, 17, 18

Jed H. Shugerman, *Freehold Offices vs. 'Despotic Displacement': Why Article II 'Executive Power' Did Not Include Removal* (B.U. Sch. of L. Rsch. Paper No. 4521119, 2024) ......................................................................................1, 14, 19, 23

Jed H. Shugerman, *Venality: A Strangely Practical History of Unremovable Offices and Limited Executive Power*, 100 Notre Dame L. Rev. 213 (2024)................. *passim*

Jed H. Shugerman, *The Indecisions of 1789: Appendices on the Misuse of Historical Sources in Unitary Executive Theory* (Feb. 27, 2023) (unpublished manuscript) ......................................................................................16, 18, 21, 22

Jed H. Shugerman, *The Indecisions of 1789: Inconstant Originalism and Strategic Ambiguity*, 171 Univ. Penn. L. Rev. 753 (2023)............................................................ *passim*

Jed H. Shugerman, *Movement on Removal: An Emerging Consensus and the First Congress*, 63 Am. J. Legal Hist. 258 (2023) ...............................................................1, 12, 14

Jed H. Shugerman, *Removal of Context: Blackstone, Limited Monarchy, and the Limits of Unitary Originalism*, 33 Yale J. L. & Humanities 125 (2022)......................1, 14, 23

Jed H. Shugerman, *Vesting*, 74 Stan. L. Rev. 1479 (2022) ................................................ *passim*

Jed. H Shugerman, *Presidential Removal: The Marbury Problem and the Madison Solutions*, 89 Fordham L. Rev. 2085 (2021).....................................................1, 6, 24

Jodi Short & Jed Shugerman, *Major Questions About Presidentialism: Untangling the Chain of Dependence*, 65 B.C. L. Rev. 511 (2024)..........................................8

John F. Manning, *The Supreme Court, 2013 Term—Foreward: The Means of Constitutional Power*, 128 Harv. L. Rev. 1, 46 n.271 (2014)............................................10, 11

Jonathan Gienapp, *Removal and the Changing Debate over Executive Power at the Founding*, 63 Am. J. Legal Hist. 229 (2023) ......................................................................12

Jonathan Gienapp, *The Second Creation: Fixing the Constitution* (2018)....................................11

Joshua C. Macey & Brian M. Richardson, *Checks, Not Balances*, 101 Tex. L. Rev. 89 (2022) ...........................................................................................................................6

Michael McConnell, *The President Who Would Not Be King* (2020)................................8, 13, 14

Peter M. Shane, *The Originalist Myth of the Unitary Executive*, 19 J. Const. L. 323 (2016)...........................................................................................................................8

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021 (2006).........................................................................................................................20

William Crosskey, *The Reasons for the Enumeration of Congressional Powers: The Influence of the Royal Prerogative*, 1 Politics and the Const. in the Hist. of the U.S. 409 (1953)..........................................................................................13

**Other Authorities**

1 Annals of Cong. 463 (1789).................................................................................................7

Adam Liptak, *Lonely Scholar with Unusual Ideas Defends Trump, Igniting Legal Storm*, N.Y. Times (Sept. 25, 2017) ..................................................................................1

Brief of Amicus Curiae Professor Ilan Wurman, *SEC v. Jarkesy*, 603 U.S. 109 (2024) (No. 22-859)..........................................................................................13, 23

Brief of Amicus Curiae Professor Jed. H. Shugerman in Support of Petitioner,
*SEC v. Jarkesy*, 603 U.S. 109 (2024) (No. 22-859)............................................16, 24

The Daily Advertiser (June 20, 1789), *reprinted in* 11 *Documentary History* at
889..........................................................................................................................19

*Jed Shugerman Apologizes to Tillman and Blackman*, Originalism Blog (Sept. 25,
2017) .......................................................................................................................1

## INTEREST OF AMICUS CURIAE[1]

*Amicus Curiae* Jed Handelsman Shugerman is a Professor of Law at Boston University. He holds a JD and a PhD in History. Shugerman subscribes to the interpretation of the Constitution based on original public meaning (i.e., originalism) but has found many errors and misunderstandings in originalism-in-practice in the so-called unitary executive theory. This brief offers new evidence about the original public meaning of Article II and critiques new claims by unitary executive theorists. More comprehensive accounts of Shugerman's findings and analysis are contained in recent academic articles[2] and are part of a forthcoming book, *A Faithful President*. Shugerman has been fact-checking and raising questions about the use of historical sources in unitary executive scholarship for at least five years.[3] He acknowledges that every scholar has biases and makes mistakes. Indeed, this Amicus lives in a glass house.[4] In an Amicus role, serving

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than Amicus and his counsel made a monetary contribution intended to fund the preparation or submission of this brief.

[2] *See Venality: A Strangely Practical History of Unremovable Offices and Limited Executive Power*, 100 Notre Dame L. Rev. 213 (2024) [hereinafter *Venality*]; *Freehold Offices vs. 'Despotic Displacement': Why Article II 'Executive Power' Did Not Include Removal* (B.U. Sch. of L. Rsch. Paper No. 4521119, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521119 [hereinafter *Freehold Offices*]; *Movement on Removal: An Emerging Consensus and the First Congress*, 63 Am. J. Legal Hist. 258 (2023) [hereinafter *Movement on Removal*]; *The Indecisions of 1789: Inconstant Originalism and Strategic Ambiguity*, 171 Univ. Penn. L. Rev. 753 (2023) [hereinafter *Indecisions*]; *Vesting*, 74 Stan. L. Rev. 1479 (2022); *Removal of Context: Blackstone, Limited Monarchy, and the Limits of Unitary Originalism*, 33 Yale J. L. & Humanities 125 (2022) [hereinafter *Removal of Context*]; *Presidential Removal: The Marbury Problem and the Madison Solutions*, 89 Fordham L. Rev. 2085 (2021) [hereinafter *Marbury Problem*]; Andrew Kent, Ethan J. Leib & Jed H. Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019) [hereinafter *Faithful Execution*].

[3] *E.g.*, Jed H. Shugerman, *The Misuse of Ratification-Era Sources by Unitary Executive Theorists*, Mich. J. L. Reform (forthcoming 2025) (manuscript at Appendix 30-43) [hereinafter *Misuse*], https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5070241.

[4] Adam Liptak, *Lonely Scholar with Unusual Ideas Defends Trump, Igniting Legal Storm*, N.Y. Times (Sept. 25, 2017), https://www.nytimes.com/2017/09/25/us/politics/trump-emoluments-clause-alexander-hamilton.html; *Jed Shugerman Apologizes to Tillman and Blackman*,

as a friend to the Court, however, this brief is a defense of originalism against unitary theorists' ahistorical errors.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935), is good law and controlling precedent in this case. The government has recently embraced a maximalist reading of *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), and *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), in arguing to the contrary. Those cases' holdings were explicitly narrow, however, leaving the *Humphrey's Executor* rule for independent regulatory commissions—and, in particular, the Federal Trade Commission—in place.

As courts evaluate whether *Seila Law* and *Free Enterprise* call into question independent officers or agencies like the Commission, they must assess the historical claims underlying the government's effort to expand those decisions. Since the Supreme Court decided *Seila Law*, a wave of new historical research has shown that the Founding generation did not understand Article II to grant the President an indefeasible removal power over executive officials. *See infra* Part II. In response, scholars who advocate for the so-called unitary-executive theory have tried to offer new historical support. That evidence has not withstood scrutiny. For example, unitary theorists have been unable to address core critiques of their interpretations of sources from the First Congress, much less identify a single sentence from the voluminous Ratification Debates suggesting Article II's "executive power" implied removal. *See infra* Part III.

In short, the evidence of original public meaning is so unclear and mixed that the Supreme Court would not have a sufficient originalist basis to overturn *Humphrey's Executor* and

---

Originalism Blog (Sept. 25, 2017), https://originalismblog.typepad.com/the-originalism-blog/2017/09/jed-shugerman-apologizes-to-tillman-and-blackmanmichael-ramsey.html.

longstanding statutory removal protections like those for the Commission at issue in this case. That counsels caution from this Court in evaluating the government's invitation to treat as a foregone conclusion how the Supreme Court will resolve this case and others like it.

**I.     *HUMPHREY'S EXECUTOR* IS GOOD LAW AND RECENT NON-CONTROLLING OPINIONS SUGGESTING OTHERWISE RELY ON DISPROVEN ASSUMPTIONS AND ERRONEOUS HISTORIES.**

At the heart of the government's recently adopted position that statutory removal protections for members of bodies like the Commission are unconstitutional lies the so-called unitary executive theory. That theory has long rested on three key historical assertions about the original public meaning of the Constitution's text. As described more fully below, each of these assertions has been upended by recent scholarship.

Unfortunately, in reviewing the government's arguments, some members of the D.C. Circuit have recently relied on scholarly works championing those assertions. In her dissent from a recent *en banc* order in *Harris v. Bessent* that reaffirmed the continued vitality of *Humphrey's Executor*, for instance, Judge Rao adopted all three mistaken premises in a single paragraph:

> The Constitution vests all executive power in a single President. U.S. Const. art. II, § 1. The President has both the power and the responsibility to supervise and direct Executive Branch officers. *Id.* § 3 (requiring the President to "take Care that the Laws be faithfully executed"). To carry out this responsibility, the President must be able to remove officers at will. "Since 1789, the Constitution has been understood to empower the President to keep . . . officers accountable—by removing them from office, if necessary." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

*Harris v. Bessent* (*Harris II*), No. 25-5037, 2025 WL 1021435, at *3 (D.C. Cir. Apr. 7, 2025) (en banc) (Rao, J., dissenting).

But, as noted, recently excavated evidence rebuts each of the three historical assertions:

**1.** The first faulty assumption is that, at the Founding, the term "executive power" implied control and removal. *See Harris v. Bessent* (*Harris I*), No. 25-5037, 2025 WL 980278, at *1, 3-4

(D.C. Cir. Mar. 28, 2025) (motions panel) (Walker, J., concurring). That understanding has been widely refuted. *See infra* Part II.A.

**2.** The second is that the Take Care Clause is an unconditional, indefeasible grant of authority rather than an imposition of responsibilities and a limitation on discretion. *See Harris I*, No. 25-5037, 2025 WL 980278, at *1, 3-4 (motions panel) (Walker, J., concurring). But it would be incongruous for a "faithful execution" duty to create unconditional "at will" powers greater than the duty. *See infra* Part II.B.

**3.** The ostensible "Decision of 1789," *see Harris I*, No. 25-5037, 2025 WL 980278, at *5 (motions panel) (Walker, J., concurring), is the third fallen pillar, *see infra* Part II.C.

As such, each step of Judge Rao's analysis—and that of Judge Walker's concurring panel opinion before it—is based on recently disproven historical assumptions. This Court should not repeat those errors.

Judge Walker's opinion concurring in the original panel's decision in *Harris I* also relied on a largely debunked article, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756 (2023) [hereinafter *Executive Power of Removal*]. *See Harris I*, No. 25-5037, 2025 WL 980278, at *5-6, *12, nn.41, 46, 141. (motions panel) (Walker, J., concurring). Authored by Aditya Bamzai and Saikrishna Prakash, that article made so many serious errors that it should be regarded as counter-persuasive. In short, it suggests the authors could not find real originalist evidence for the claim that Article II implied a presidential removal power at pleasure. *See infra* Part III.B. Judge Walker further relied on erroneous dicta providing ahistorical explanations for the unremovability issue at the heart of *Marbury v. Madison*, *see Harris I*, No. 25-5037, 2025 WL 980278, at *5 & n.44, and erroneous interpretations of statements made by James Madison, *see, e.g.*, *id.* at *4-5.

4

Ultimately, originalism as a method tells us to update our understanding based on new research. There is no *stare decisis* for the dicta of past judges interpreting history where new research refutes the key assumptions underlying the scholarship on which courts have previously relied.

## II.   NEW EVIDENCE DEMONSTRATES THAT ARTICLE II DID NOT IMPLY UNCONDITIONAL PRESIDENTIAL REMOVAL.

### A.   The Unitary Executive Theory's Three Pillars Are No Longer Standing.

#### 1.   The Executive Vesting Clause Did Not Imply Presidential Removal.

Article II, Section 1 provides: "The executive Power shall be vested in a President of the United States of America." Unitary executive theorists suggest that "executive power" implied removal.[5] Historians and legal scholars, however, have dug into Anglo-American history to show that "executive power" did not imply removal.[6]

For example, Blackstone and many other sources described offices as "freehold" property interests, and Parliament's legislative power included the power to protect offices.[7] Many powerful executive officers in England, including cabinet members and even department heads and high treasury officials, were unremovable.[8] When an office was to be held for a term of years with no specification about the terms of its tenure, the default rule was that it was not held "at pleasure."[9] That default rule explains why Chief Justice Marshall in *Marbury v. Madison* observed three times

---

[5] *E.g.*, *Executive Power of Removal* at 1760, 1766-70.

[6] *See* Jane Manners & Lev Menand, *Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 20-21 (2021) [hereinafter *Three Permissions*]; *See also Venality*.

[7] Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175 (2021) [hereinafter *Interrogating the Historical Basis*].

[8] *Venality* at 258-65.

[9] *See generally Three Permissions*.

that Marbury was "not removable" from his office with a five-year term, even though his office was not an Article III judgeship.[10] Nor did "vesting" imply indefeasible powers in the eighteenth century, as recent historical scholarship shows the separation of powers was more a flexible structural concept than a formal doctrine.[11]

In her dissent from the D.C. Circuit's *en banc* order in *Harris II*, Judge Rao added the word "all" before the term "executive power." *Harris II*, No. 25-5037, 2025 WL 1021435, at *3 (en banc) (Rao, J., dissenting). That addition matters. Justices Thomas and Gorsuch have signaled that the "all" in the Legislative Vesting Clause is legally significant for non-delegation.[12] And if the presence of "all" is legally significant, so too must be its absence. As it happens, the Framers had good textual and contextual reasons to leave out the word "all": That omission reflects the reality of decentralized and non-exclusive execution in the Founding era.[13]

Judge Walker, too, in his panel concurrence in *Harris I* added a historical gloss to the Vesting Clause:

> The Framers envisioned a "chain of dependence" in the executive branch where "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President." The Vesting Clause empowers the President to direct and control those officials. As James Madison explained, "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws."

*Harris I*, No. 25-5037, 2025 WL 980278, at *4 & nn.34-35 (motions panel) (Walker, J., concurring) (citation omitted). In this passage, Judge Walker quoted Madison twice from the First

---

[10] *Id.* at 22-25; *accord Venality* at 248 n.177, 282; *Marbury Problem* at 2088-91.

[11] *Vesting* at 1486, 1503-04, 1519-21*; Venality* at 231, 234-35; Joshua C. Macey & Brian M. Richardson, *Checks, Not Balances*, 101 Tex. L. Rev. 89 (2022); Christopher S. Havasy, Joshua C. Macey & Brian Richardson, *Against Political Theory in Constitutional Interpretation*, 76 Vand. L. Rev. 899 (2023).

[12] *Vesting* at 1486-87, 1511-12.

[13] *Vesting* at 1499-1505, 1510-12.

Congress. But there is no evidence from the Convention or Ratification for this interpretation of the Executive Vesting Clause to include removal.[14] Significantly, "appointing" is, by Madison's description, "in its nature executive." 1 Annals of Cong. 463 (1789) (James Madison). But the Framers distributed that power between the President and the Senate. U.S. Const. Art. II, § 2, cl. 2. And any reference to "removal" is conspicuously missing from Madison's Ratification-era descriptions of executive authority. Nor does the position advocated by some scholars—that "controlling" must include removal—find support in the record of original public meaning. For example, the king could not control many powerful executive officials because they were unremovable, and even some members of the late-eighteenth century cabinet were unremovable.[15]

In his analysis, Judge Walker also accepted another of unitary theorists' interpretive missteps: the retreat to post-Ratification evidence related to Madison and Hamilton to try to overcome their anti-unitary *Federalist Papers* during Ratification. Even in the First Congress, they contradicted the unitary theory: Madison proposed an independent comptroller,[16] and Hamilton proposed an independent Sinking Fund, which Congress enacted.[17] Neither apparently believed independence to be contrary to Article II.

It is telling that removal theorists rely heavily on post-Ratification evidence while downplaying Madison and Hamilton's statements from the Convention and Ratification debates. *See, e.g.*, *Harris I*, No. 25-5037, 2025 WL 980278, at *5 n.44 (motions panel) (Walker, J., concurring). That failure inexplicably ignores the difference in the two men's incentives before

---

[14] *See Vesting* at 1493-1505, 1534-39; *Cf. Venality* at 215-18, 221, 261-64; *Interrogating the Historical Basis* at 182-83, 197-204.

[15] *See Venality* at 258-68.

[16] *See Indecisions* at 824-34;

[17] Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1 (2020).

and after they took roles in the constitutional structure they helped design. This Court should not be so hasty. As the Supreme Court has recently explained, "we must . . . guard against giving post-enactment history more weight than it can rightly bear." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 35 (2022).[18] So too here.

### 2. The "Take Care" Clause Did Not Imply Presidential Removal.

Article II, Section 3 provides: The President "shall take Care that the Laws be faithfully executed." Unitary executive theorists claim that the duty to "take care" implied a power to remove.[19]

New research has demonstrated that the Take Care clause, along with the Presidential Oath, imposes a duty of faithful execution similar to fiduciary obligations, drawing from centuries of English law. "Faithful execution" language in statutes and oaths limited the discretion of executive officials, not an expansion of their power.[20] It would be incongruous for a duty-imposing clause to imply a power beyond that duty. There is simply no historical evidence that the Take Care Clause or the structure of separation of powers implied "indefeasible" unconditional presidential power.[21]

---

[18] Notably, the Supreme Court's use of Madison's post-Ratification "chain of dependence" is tangled and contradictory between separation-of-powers doctrines like the Major Questions Doctrine, which should give this Court and additional reason for caution. *See* Jodi Short & Jed Shugerman, *Major Questions About Presidentialism: Untangling the Chain of Dependence*, 65 B.C. L. Rev. 511, 513-532 (2024).

[19] *E.g.*, Michael McConnell, *The President Who Would Not Be King*, 166, 258-62 (2020).

[20] *See Faithful Execution* at 2118-19, 2128, 2180-81.

[21] Unitary theorists have provided no originalist evidence that the Take Care Clause or the structure of separation of powers implied "indefeasible" unconditional presidential removal power. *Vesting* at 1517-21; Peter M. Shane, *The Originalist Myth of the Unitary Executive*, 19 J. Const. L. 323, 334-44 (2016).

This new research supports Chief Justice Rehnquist's interpretation and holding in his 7-1 majority in *Morrison v. Olson*, 487 U.S. 654 (1988). A "good cause" removal provision, the Chief Justice wrote, does not

> impermissibly burden[] the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act . . . because the independent counsel may be terminated for 'good cause,' the Executive, through the Attorney General, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities.

*Id.* at 692-93. And the same research also supports a reading of Article II that reflects the congruity and consistency between the Take Care Clause's duty of faithful execution and for-cause restrictions on removal.[22] Indeed, the history of such clauses indicates it had an original public meaning of deference to law, not that it granted indefeasible power to control.

### 3. New Research Shows that "the Decision of 1789" Is a Myth and that the First Congress Repeatedly Rejected Unconditional Presidential Removal Power.

Unitary executive theorists have also revived an older historical claim that the debates from the First Congress demonstrated that the Founding generation interpreted Article II to imply a presidential removal power. Not so. New research confirms that the First Congress actually rejected the interpretation that Article II implied presidential removal.[23]

---

[22] As noted by Judge Howell in her recent decision in *Wilcox v. Trump*, the ability of the president to remove a commissioner for neglect of duty or malfeasance in office is all that is required for the president to satisfy his obligation that the law be faithfully executed under Article II. *Wilcox*, — F. Supp. 3d —, 2025 WL 720914, at *3 (D.D.C. Mar. 6, 2025); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342 (5th Cir. 2024) (finding no issue with an agency with removal protections); *Leachco v. Consumer Prod. Safety Comm'n*, 103 F.4th 748 (10th Cir. 2024) (same). Jane Manners and Lev Menand note that a requirement to show neglect or malfeasance has a long history. As they explain, "it is no coincidence that in the case of the NLRB [and several other agencies], Congress limited the President's removal authority to those two causes alone. Article II . . . could be said to require this minimum delegation—but nothing more." *Three Permissions* at 69.

[23] *Indecisions* at 774-818, 834-45, 864-67.

It has always been problematic that a constitutional theory relied so heavily on messy legislative history.[24] That problem has only grown deeper. A vote-by-vote, speech-by-speech analysis has shown that only nine of 54 House members explicitly interpreted Article II as implying presidential removal (17%). An additional seven of 54 voted similarly but were silent or unclear about their reasons (13%), and few offered any hint about the issue in these cases: whether Congress could require the president to show cause for removal.[25] In other words, as John F. Manning observed, "the House was divided three ways—with roughly equal numbers."[26]

The best-case scenario for the unitary interpretation is thus that they had roughly thirty percent of the House. It is plausible that any portion of those 16 members may have supported good-cause conditions. And some may have been motivated not by their constitutional interpretation of Article III but rather by a *strategy of ambiguity* to navigate or evade House and Senate opposition.[27] Supporters and opponents had, after all, each identified such a strategy on the House floor.[28] Further resolving the ambiguity against a "Decision of 1789," the First Congress then proceeded to pass a series of statutes that contradicted the unitary executive theory of removal.[29] "Hence, even to the most informed of the founding generation, the removal question

---

[24] *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 377 (2012) (recounting a description of legislative history as like "entering a crowded cocktail party and looking over the heads of the guests for one's friends").

[25] *Indecisions* at 757-58, 764, 863-65.

[26] John F. Manning, *The Supreme Court, 2013 Term—Foreword: The Means of Constitutional Power*, 128 Harv. L. Rev. 1, 46 n.271 (2014) [hereinafter *Means of Constitutional Power*].

[27] *Id.* at 757, 761, 774-788.

[28] *Id.* at 786-87, 795.

[29] Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129 (2022); Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1 (2020); *Indecisions* at 844-46, 850; *Venality* at 282-85.

was unsettled."[30] Yet, Bamzai and Prakash, on whose scholarship Judge Walker relied in his *Harris I* concurrence, repeatedly misinterpret floor speeches and then deny the text's ambiguity to try to reconstruct a "decision." *See* Part III.B below.

A reading of the Ratification debates and the First Congress aided by the latest historical evidence simply cannot support the myth of a great "Decision of 1789."

**B. New Research Confirms that the Constitution's Text and Ratification Debates Undercut the Unitary Theory.**

**1. The Opinion Clause and the *Federalist Papers* Remain Stronger Counterevidence than Anything the Unitary Theorists Have Offered.**

Recent scholarship on historical understandings of the text and structure of the Constitution and the Ratification Debates have weakened the unitary executive theory. Key subjects of that recent scholarship include the Opinion Clause;[31] *Federalist* No. 39 (Madison);[32] and *Federalist* No. 77 (Hamilton).[33] Since *Seila Law*, moreover, the Supreme Court has emphasized that Ratification evidence is due more weight than post-Ratification evidence, *see Bruen*, 597 U.S. at 35, undermining certain of the unitary theorists' central interpretations.

**2. The Anti-Federalists Were Remarkably Silent on Removal.**

Recent research also explores the Anti-Federalists' accounts of the Ratification debates, which were silent about whether Article II "executive power" or the Take Care Clause implied a presidential removal power. That silence throughout six volumes of Herbert Storing's *The Complete Anti-Federalist* speaks loudly. The Anti-Federalists—especially the opponents of a

---

[30] *Means of Constitutional Power* at 46 n.271.

[31] *Venality* at 280-82.

[32] *Interrogating the Historical Basis* at 186-87, 229; *Three Permissions* at 20-21; *Indecisions* at 773, 776-79, 803 & n.264, 824-44; *Vesting* at 1501 n.113; *Venality* at 242-43.

[33] Jonathan Gienapp, *The Second Creation: Fixing the Constitution*, 154-55 (2018); *Indecisions* at 778.

strong presidency—had the strongest incentive to warn about implied presidential powers and even exaggerate them, yet they did not offer such an interpretation of removal.[34]

## III.  RECENT RESPONSES FROM UNITARY EXECUTIVE THEORISTS CONFIRM THE WEAKNESS OF THE ORIGINALIST CASE.

Efforts of leading unitary executive theorists to respond to recent evidence either deepen the problems with their interpretation or backfire when the claims do not hold up to scrutiny. Ironically, the unitary executive theorists have no unified theory of presidential removal. Instead, they split in contradictory and self-contradictory directions: an anti-royalist "prerogative" approach and a royalist approach, each lacking historical evidence to support its claim of a removal power.

One attempt to resolve the Opinion Clause puzzle concludes that specified powers are indefeasible, while implied powers are "defeasible"—meaning that Congress can set conditions. Under this approach, championed by scholars like Michael McConnell, even if one accepts that Article II implies removal, it still would be subject to regulations like the good-cause removal protections at issue here. Meanwhile, the royalist theories have contradictory explanations of the First Congress, the *Marbury* problem, and removal default rules. Their factual errors, misunderstandings, and sources taken out of context reveal how difficult it is to find originalist evidence that Article II included a removal power.

---

[34] *Venality* at 278-79; Jonathan Gienapp, *Removal and the Changing Debate over Executive Power at the Founding*, 63 Am. J. Legal Hist. 229, 248-50 (2023); *Movement on Removal* at 258-79.

A. **Professor McConnell's Prerogativist Interpretation of Article II Would Mean at Most a Defeasible Removal Power and His Anti-Royalist Republican Theory Would Reject the Approaches of Other Unitary Theorists.**

1. **Professor McConnell's Interpretation of Article II as a Matter of Text and Logic Would Support *Humphrey's Executor* and Congressional Limits on Removal Like the Federal Trade Commission's.**

McConnell's book *The President Who Would Not Be King* (2020) is a powerful critique of royalism. *See infra* Part III.B & C. McConnell offers a "prerogativist" thesis:[35] that the Framers drew upon a traditional list of the English Crown's prerogative powers, and this list is a more legitimate legalist and republican source than simply drawing from royal practices.[36] The Framers assigned some powers to Congress (like declaring war), shared some with the Senate (like appointment and treaty), and assigned some to the President (e.g., commander-in-chief, pardon, veto). Remaining prerogative powers were implied by Article II, such as removal.

As discussed in the following sections, other unitary executive theorists rely on British royal practice as a "backdrop" for understanding Article II.[37] McConnell rejects such reliance on royal practices as unreliable, vulnerable to selection bias, and inconsistent with republicanism and the rule of law. This is the point of his book title: *The President Who Would Not Be King*. Royal practices were "undefined by law," and royalism opened a dangerous door to an *ultra vires* "Schmittian conception of sweeping emergency powers and an unchecked executive."[38] By contrast, "legal prerogatives" were "defined and limited by law."[39] A fixed and established list of

---

[35] *See also* William Crosskey, *The Reasons for the Enumeration of Congressional Powers: The Influence of the Royal Prerogative*, 1 Politics and the Constitution in the History of the United States 409-67 (1953).

[36] *The President Who Would Not Be King* 11, 24-31.

[37] *See, e.g.*, *Executive Power of Removal* at 1790; Amicus Br. of Ilan Wurman at 13-17, *SEC v. Jarkesy*, 603 U.S. 109 (2024) (No. 22-859) (Aug. 22, 2023) [hereinafter Wurman *Jarkesy* Br.].

[38] *The President Who Would Not Be King* 28-29.

[39] *Id.*

prerogatives provided legality grounded in historical sources rather than unlimited assertions about necessity.[40]

McConnell originally claimed that English monarchs had a traditional prerogative power of removal. He relied on Blackstone and Joseph Chitty.[41] But neither included removal or anything like it on their lists of prerogative powers, and they did not even discuss removal as a general non-prerogative practice.[42] No other sources have listed removal as a royal prerogative.[43] And, to his credit, McConnell recently has conceded that he was wrong about removal as a listed prerogative power.[44]

**2. Even if One Infers Removal from Article II, It Would Be an Implied (or "Residual") Power and Thus Defeasible by Congress.**

The Opinions in Writing Clause has always been a problem for those who claim an indefeasible removal power. If Article II already gave the president an absolute removal power, why would it need to specify a lesser power merely to ask for opinions? Refusal to give an opinion surely would be sufficient cause for removal.

McConnell's thesis explains this puzzle. The Opinions Clause has a specific function: Without such an explicitly granted power, "nothing in the Constitution would have prevented Congress from using its Necessary and Proper authority to insulate officers from any such demands. . . . The Opinions in Writing Clause forecloses this kind of congressional

---

[40] *Id.* at 28.

[41] *See id.* at 30, 99, 161-62, 368 n.7.

[42] *Removal of Context* at 156-60.

[43] *Freehold Offices* at 42-46.

[44] *Movement on Removal* at 21-22.

interference."[45] McConnell posits that the specific "prerogative powers" that the Framers spelled out in Article II, Section 2 (e.g., commander in chief, opinions, and pardons) are "indefeasible" because they are explicit, whereas unenumerated "residual powers" (merely implied from the Executive Vesting Clause) are "defeasible" by Congress.[46] For example, if "executive power" implies foreign policy powers, the President can act unilaterally (e.g., the Neutrality Proclamation of 1793), but Congress retains a power to change the policy or set some conditions.

Even if one infers a removal power from Article II, it would be in the latter category: an implied and defeasible power. To argue that the Take Care Clause implies an indefeasible removal power is special pleading for removal, an exception for one implied power without historical support, inconsistent with the rest of McConnell's rule of law-based prerogative framework.

In sum, McConnell's republican approach and explicit/implied distinction should lead to the conclusion that "executive power" did not include removal at will, based on his recent acknowledgement that removal was never listed as a royal prerogative and on his approach to implied powers as defeasible.

**B. Bamzai and Prakash's *The Executive Power of Removal* Backfired, Exposing the Unitary Theory's Lack of Evidence and Repeated Misuse of Sources.**

In 2023 and 2024, Aditya Bamzai and Saikrishna Prakash attempted to rescue presidential removal in *Executive Power of Removal* and *How to Think About the Removal Power*, 110 Va. L. Rev. Online 159 (2024). If these two articles are the responses to the past five years of research

---

[45] *President Who Would Not Be King* at 244-45. McConnell's other explanation militates against a removal power. *See id.* If the Convention wanted to "negate" the council or "provide a textual anchor" for presidential power, it is notable that the delegates agreed only to add such a weak power (merely asking for opinions) and ignored removal. *Indecisions* at 772-73.

[46] *Id.* at 277-78.

disputing or disproving the unitary theory, they show that the theorists have little evidence to support their claims about Article II and presidential removal at pleasure.

The articles repeated many historical claims that had already been rebutted in other articles, and which have been rebutted again in several detailed papers. As Andrea Scoseria Katz and Noah Rosenblum explained: "*The Executive Power of Removal* fails to persuade on its own terms. It fails to seriously respond to critics of unitary theory. And it presents some of its sources in a way that could mislead less historically informed readers."[47] Indeed, "it largely rehashes old arguments with old sources."[48] Katz and Rosenblum conclude, in a section titled "Bamzai and Prakash's Handling of Sources Makes Us Worry That They Are Not Reliable Guides to Meaning in the Founding Era and Early Republic," that one document on which they rely, a Pennsylvania Censor's report, "probably means nearly the opposite of what Bamzai and Prakash claim."[49]

Other scholars have offered additional detailed critiques:

- Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129 (2022)

- Brief of Amicus Curiae Professor Jed. H. Shugerman in Support of Petitioner, *SEC v. Jarkesy*, 603 U.S. 109 (2024) (No. 22-859) [hereinafter Shugerman *Jarkesy* Br.], https://scholarship.law.bu.edu/cgi/viewcontent.cgi?article=4584&context=faculty_scholarship.

- *Venality* at 227-229, 248 n.177, 279 n.442.

Further critiques raising serious concerns about a new round of errors in the 2024 article are forthcoming:

---

[47] *Removal Rehashed*, 136 Harv. L. Rev. Forum 404, 406 (2023).

[48] *Id.* at 416.

[49] *Id.* at 417; *see also The Indecisions of 1789: Appendices on the Misuse of Historical Sources in Unitary Executive Theory* (Feb. 27, 2023) (unpublished manuscript) [hereinafter *Indecisions Appendix II*], https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4359596.

- *Misuse* (forthcoming 2025), Mich. J. L. Reform, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5070241.

- Christine Kexel Chabot, *Rejecting the Unitary Executive*, Utah L. Rev. (forthcoming 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4968775.

- Andrea Scoseria Katz, Noah Rosenblum & Jane Manners, *Disagreement and Historical Argument: Or How Not to Think About Removal*, Mich. J. L. Reform (forthcoming 2025).

- Shugerman, *Executive Power Without Removal at Pleasure* (forthcoming).

All told, Bamzai and Prakash have, since 2023, published almost 140 pages in response. But if their two recent articles are considered the most thorough and up-to-date argument for Article II presidential removal power, they are perhaps the clearest evidence against it. That is because they have failed to address serious questions about cherry-picking and misreading sources, provide new evidence that withstands basic scrutiny, or address critics' core arguments.

Although this brief can do no more than summarize these detailed critiques, we review here some main points.

### 1. The Authors Misuse Anti-Federalist Arguments.

Arguably Bamzai and Prakash's most serious error is a false claim about the Ratification debates. They pluck Luther Martin's limited reference to removal during the Ratification debates out of context.[50] But Martin mentioned only the removal of *military officers* under the Commander-in-Chief Clause, not *civil officers* subject to other parts of Article II. That lone speech suggests that neither the Constitution's proponents nor its opponents imagined that the Executive Vesting Clause or the Take Care Clause implied a removal power.[51] When Bamzai and Prakash defended their reliance on Martin, they repeated the same errors, even claiming "Martin did not

---

[50] *Executive Power of Removal* at 1772 & nn.10-11.

[51] *Venality* at 278-79.

tie his point about removal to any particular clause."[52] To the contrary, Martin referred to a removal power only in reference to military officers—"the army and navy" and "the militia"[53]—soon after citing the Commander-in-Chief Clause. *See* U.S. Const. art. II, § 2, cl. 1. None of their claimed sources from the Ratification debates withstands scrutiny.[54]

### 2. The Authors Misuse the Federalist Papers.

Bamzai and Prakash misinterpreted Hamilton's *Federalist* No. 66 in a failed attempt to parry his senatorial No. 77.[55] Hamilton simply referred to "*those who hold* offices during pleasure"; he was not asserting that *all* who hold offices hold them during pleasure.[56] They repeatedly point to simple references to tenure "during pleasure" and then make the illogical leap that the existence of *some executive offices at pleasure* meant a general rule for *all executive offices at pleasure*.[57] There is no reason, historical or logical, that the former entails the latter.

### 3. The Authors Retreat Later and Later Beyond the Ratification Era.

*The Executive Power of Removal* claims to subscribe to originalist methodology, but the vast majority of the article relies on post-Ratification evidence, including that from the mid- to late-nineteenth century.[58] The First Congress and other early post-Ratification evidence could be probative of original public meaning, but only with a large grain of salt about the evolving self-interest of political actors. As the Supreme Court recently explained, "we must . . . guard against

---

[52] *How to Think About the Removal Power* at 172 n.54.

[53] *Venality* at 279.

[54] *See generally Misuse*.

[55] Katz & Rosenblum, *supra* p.20, at 422; *Misuse* at 9-14; *Indecisions Appendix II* at 27-28. On the terms "presidentialists," "senatorialists," and "congressionalists," see *Indecisions* at 759, 863, 865.

[56] *Removal Rehashed* at 422.

[57] *Misuse* at 9-14.

[58] *Executive Power of Removal* at 1814-21.

giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. This is particularly true for mid- and late nineteenth-century evidence. The Court has repeatedly stated that post-Ratification events "do not provide as much insight into . . . original meaning as earlier sources." *Id.* at 36 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008)). Yet Bamzai and Prakash rely almost entirely on distant evidence, as none of their Ratification Debate evidence holds up to scrutiny.[59]

### 4. The Authors Offer No Evidence the Framers Cited Royal Removal.

Even Bamzai and Prakash's post-Ratification evidence is weak and self-contradictory.[60] Their only evidence of any American reference to a royal removal power, cited three separate times, is from *after* Ratification, a mere two sentences from a newspaper account of a speech by James Jackson, an obscure Georgia congressman, during the Foreign Affairs debates of 1789.[61] However, Jackson was an anti-presidentialist merely attributing this argument to the presidentialists to tar them as royalists. Jackson likely was exaggerating or inventing it, given that Bamzai and Prakash offer no evidence of presidentialists actually relying on royalist practice.

Moreover, Bamzai and Prakash pulled this fragment out of context: Jackson specifically said that an executive power to dismiss officers "might hold good in Europe, but it did not apply to our constitution, by which the President had not the executive powers exclusively."[62] Jackson then described a parade of monarchy's evils, including "the deadly influence of the crown in England, where offices were held during the pleasure of the king."[63] If this is their best evidence,

---

[59] *See Removal Rehashed* at 407-08 (on use of early state constitutions); *id.* at 422 (on use of *Federalist* No. 66).

[60] *Freehold Offices* at 10-16.

[61] *Executive Power of Removal* at 1769 n.76, 1791 nn.249 & 252.

[62] The Daily Advertiser (June 20, 1789), *reprinted in* 11 *Documentary History* at 889.

[63] *Id.* at 890 & nn.12-13.

it confirms that most eighteenth-century Americans on either side of the removal debate 1) understood that the Crown did *not* have a general removal power and 2) rejected appeals to royalism.

### 5. Prakash Ignores Contradictions Regarding the "Strategic Ambiguity" of 1789.

Prakash contradicts himself between 2006 and 2023. Back in 2006, Prakash conceded that the First Congress did not address the question of indefeasibility. In 2023, Bamzai and Prakash claim the First Congress resolved that question in favor of indefeasibility without showing where that debate or decision happened or even acknowledging this reversal. Likewise, Prakash in 2006 offered an "enigma" thesis that argued away the many "no" votes by saying the statutory text was so ambiguous, so some votes were only against too much ambiguity.[64] In 2023, he and Bamzai argued away the ambiguity by claiming the opposite: The text was so clear that the later votes on the same text were acquiescent to that meaning.[65]

The statutory text was, in fact, ambiguous. And Madison had good strategic reason to retreat to ambiguity: He had many reasons to think he did not have the votes for an explicit presidentialist clause. *See supra* Part II.C. Bamzai and Prakash have so far ignored the "strategic ambiguity" thesis of my response, *Indecisions of 1789: Inconstant Originalism and Strategic Ambiguity*.[66]

---

[64] Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1046-53 (2006).

[65] *Executive Power of Removal* at 1793-1802 (section entitled "The Supposed Ambiguity in the Decision of 1789").

[66] There is no reference to this counter-argument in the 140 combined pages in *Executive Power of Removal* or *How to Think About the Removal Power*.

6.   **The Authors Resort to Conflations and False Dichotomies.**

Bamzai and Prakash have repeatedly conflated presidentialists (whom they call "executive-power partisans") and congressionalists (whom they call "legislative-grant partisans").[67] For example, they claim Theodore Sedgwick was "[a] one-time proponent of the legislative-grant theory" but converted to presidentialism.[68] During the debates, Sedgwick gave speeches on three separate occasions that were clearly congressionalist.[69] Their only evidence of a conversion on the road to Damascus is Sedgwick's statement at the time of his final vote that the "majority of the house had decided, that all officers concerned in executive business, should depend upon the will of the president, for their continuance in office."[70] But Sedgwick did not explicitly specify a constitutional basis for this power, and his final statement is entirely compatible with his earlier statements: It may simply reflect his understanding that a majority, a combination of congressionalists and presidentialists, intended to apply the same textual compromise across the board to leading officers.

Bamzai and Prakash created two false dichotomies. First, on the scope of removal power, they assume presidentialists wanted a broad removal power, but congressionalists wanted a limited power. To the contrary, some presidentialists, including Madison, thought Article II implied a limited removal power, while some congressionalists supported granting a broader removal power.[71] The second is that if a member supported presidential removal but voted "no" on the new ambiguous clause (e.g., Sedgwick), *either* they were congressionalists *or* they found it too unclear

---

[67] *Executive Power of Removal* at 1793; *Indecisions* at 807-09; *Indecisions Appendix II*.

[68] *Executive Power or Removal* at 1795-96.

[69] *Indecisions* at 791, 847-48, 864.

[70] *Executive Power of Removal* at 1795-96.

[71] *Indecisions* at 834-41.

and confusing. This is illogical and ahistorical. It makes sense that a congressionalist like Sedgwick who thought Article II was silent would likely prefer a statute with a clear statement on a removal power. By conflating presidentialists and congressionalists, Bamzai and Prakash ignore the possibility that disparate supporters of the bill reached a loose compromise only about the *result*, rather than the constitutional basis for that result.

The mischaracterizations do not end there. Between Prakash's 2005 article and Bamzai and Prakash's 2023 and 2024 articles, they mischaracterized at least nine members of Congress (Sedgwick, Laurance, Richard Bland Lee, Richard Henry Lee, Fitzsimons, Hartley, William Smith of Maryland, Muhlenburg, and Cadwalader) and ignored the counterevidence from Senator Maclay.[72]

### 7.  The Authors' Have an Enduring *Marbury* Problem.

Finally, Bamzai and Prakash's discussion of *Marbury*'s statement that justice of the peace appointments were "not revocable"[73] is no more persuasive. They offer two alternative explanations for Marshall's conclusion that Marbury was unremovable. The first relies on a laconic fragmentary opinion by a fragmented court on a different question holding that justices of the peace were Article III judges.[74] This marginal position was ignored by Chief Justice Marshall. It would also make a mess of Article III life tenure, leading to bizarre results like Congress having the power to impose five-year term limits on Supreme Court Justices and federal judges.

---

[72] *Indecisions Appendix II* at 5-18, 29-37.

[73] *Executive Power of Removal* at 1802-14 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162 (1803)).

[74] *Id.* at 1810-14.

Their second alternative—that it was a territorial office[75]—concedes the argument. A territorial office is only a potential explanation for why Congress might have more latitude if it chose to protect that office. The statute gave the office a five-year term but was silent on removal. Why would Marshall infer unremovability? Bamzai and Prakash implicitly concede that when Congress granted an office with a term of years and silence on removal, Marshall applied the general default rule: It was *unremovable*.

Bamzai and Prakash thus wind up implicitly conceding the main point: Consistent with Founding-era evidence, Marshall understood that when an office was granted for a limited term of years, the default rule was that it was unremovable "property," following the long English tradition of offices-as-freehold property. *Marbury*, 5 U.S. (1 Cranch) at 155, 175.[76]

## C. Historians Have Raised Serious Questions About Other Leading Unitary Theorists' Advocacy and Scholarship.

In *Seila Law*, leading unitary theorists submitted an amicus brief riddled with misinterpretations and errors. To his credit, the lead author, Ilan Wurman, acknowledged one error. Unfortunately, the brief and companion articles made many more.[77] Especially troubling was Wurman's misquotation of Blackstone that fundamentally changed the meaning of a key sentence.[78] Wurman engaged in a new round of misinterpretations in his *Jarkesy* amicus brief and in a recent article,[79] without addressing several glaring questions raised in the meantime, including

---

[75] *Id.* at 1803, 1811.

[76] *See Three Permissions* at 5, 18-20; *Freehold Offices* at 46-50.

[77] *See Removal of Context* at 160-72.

[78] *See id.* at 162-64. For Wurman's incomplete reply, see Ilan Wurman, *Some Thoughts on My Seila Law Brief*, Notice & Comment: Yale J. Reg. (Dec. 1, 2021), https://www.yalejreg.com/nc/some-thoughts-on-my-seila-law-brief-by-ilan-wurman.

[79] Wurman *Jarkesy* Br. at 17-19 (citing *Indecisions* at 820); Ilan Wurman, *The Original Presidency: A Conception of Administrative Control*, 16 J. L. Analysis 26, 35-38 (2024) [hereinafter *Original Presidency*].

about his contradictory use of Latin maxims.[80] Among other issues, Wurman's Amicus Brief takes historical records out of context.[81]

*    *    *

A wave of new historical evidence since 2019—and the responses that abandoned originalist methods and historical accuracy—should caution against confidence about how the Supreme Court might assess executive removal authorities. The unitary theorists' errors are red flags on top of yellow flags—the signal in both car racing and in legal reasoning to slow down and proceed with caution. This is most of all true with respect to the Federal Trade Commission, the very entity at issue in *Humphrey's Executor*.

### CONCLUSION

There is no originalist basis to overturn longstanding unanimous Supreme Court precedents and expand presidential removal power. The Court should grant Plaintiffs' motion for summary judgment.

Dated: April 17, 2025

Respectfully submitted,

*/s/ Richard F. Griffin*
Richard F. Griffin (D.C. Bar ID: 358323)
Faaris Akremi (D.C. Bar ID: 1672041)
**BREDHOFF & KAISER P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888
rgriffin@bredhoff.com
fakremi@bredhoff.com

*Counsel for Amicus Curiae*
*Professor Jed H. Shugerman*

---

[80] Shugerman *Jarkesy* Br. 27-29; *see also Three Permissions* at 5, 18-27; *Venality* at 247-48, 255, 282; *Marbury Problem* at 2085-90, 2103-13.

[81] Shugerman *Jarkesy* Br. 27-29.

24