UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA KELLY SLAUGHTER, in her official and personal capacities, and ALVARO M. BEDOYA, in his official and personal capacities,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, ANDREW N. FERGUSON, in his official capacity as Chair of the Federal Trade Commission, MELISSA HOLYOAK, in her official capacity as Commissioner of the Federal Trade Commission, and DAVID B. ROBBINS, in his official capacity as the Executive Director of the Federal Trade Commission,<br><br>*Defendants*. | Case No. 25 Civ. 909<br><br>Judge Loren L. AliKhan |

**BRIEF OF *AMICI CURIAE* LAW PROFESSORS JOHN C. COATES, JEFFREY N. GORDON, KATHRYN JUDGE, AND LEV MENAND IN SUPPORT OF PLAINTIFFS' MOTION FOR EXPEDITED SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     INTERESTS OF AMICI ....................................................................................1

II.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................2

III.   ARGUMENT ..................................................................................................5

       A.    Central-bank independence is an essential component of monetary policy
             and long-term economic growth. ........................................................5

             1.    Central-bank independence is the solution to what economists call
                   "the time-inconsistency problem." ............................................7

             2.    Maintaining the credibility of Fed independence is crucial to
                   containing systemic banking risks. ..........................................10

       B.    The President's proposal to limit Fed independence to the Fed's monetary
             functions is unworkable. ..................................................................12

       C.    Overturning or more narrowly construing *Humphrey's Executor* would
             threaten Fed independence. ..............................................................15

IV.    CONCLUSION ...............................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Consumer Fin. Prot. Bureau* v. *Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) (Alito, J., dissenting) ............................................................ 16

*Dellinger v. Bessent*,
   No. 24A790 (U.S. 2025) ............................................................................................ 15

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935) ...................................................................... 3, 4, 7, 15, 16, 18

*Marbury v. Madison*,
   5 U.S. 127 (1803) ........................................................................................................ 5

*PHH Corp. v. Consumer Fin. Protection. Bureau*,
   881 F.3d 75 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) ................... 16

*Seila Law LLC* v. *Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ............................................................................................. 3, 16

**Federal Statutes**

12 U.S.C. § 242 ............................................................................................................... 7

12 U.S.C. § 301 ............................................................................................................... 7

12 U.S.C. § 1823 ........................................................................................................... 11

Dodd-Frank Act § 203(a) ............................................................................................. 12

Dodd-Frank Act § 5383(a) ........................................................................................... 12

Federal Reserve Act of 1913 ....................................................................................... 16

**Rules**

Fed. R. App. P. 29(a)(4) ................................................................................................. 1

**Regulations**

12 C.F.R. §§ 200–299 ................................................................................................... 16

90 Fed. Reg. 3615 ......................................................................................................... 14

Exec. Order No. 14,215, 90 Fed. Reg. 10,447 (Feb. 24, 2025),
https://www.govinfo.gov/content/pkg/FR-2025-02-24/pdf/2025-03063.pdf .........................12

**Other Authorities**

Alberto Alesina & Lawrence H. Summers, *Central Bank Independence and Macroeconomic Performance: Some Comparative Evidence*, 25 J. MONEY, CREDIT & BANKING 151 (1993) ..............................................................................9

Alex Cukierman, Steven B. Webb & Bilin Neyapti, *Measuring the Independence of Central Banks and Its Effect on Policy Outcomes*, 6 WORLD BANK ECON. REV. 353 (1992) ....................................................................................................8

Alexander Hamilton, *Final Version of the Second Report on the Further Provision Necessary for Establishing Public Credit (Report on a National Bank)*, Nat'l Archives Founders Online, https://founders.archives.gov/documents/Hamilton/01-07-02-0229-0003#ARHN-01-07-02-0229-0003-fn-0152-ptr. ..................................................17

Ana Carolina Garriga & Cesar M. Rodriguez, *Central Bank Independence and Inflation Volatility in Developing Countries*, 78 ECON. ANALYSIS 1320 (2023) .....................8

Ben S. Bernanke, Fed Emergency Lending, Brookings (Dec. 3, 2015), https://www.brookings.edu/articles/fed-emergency-lending/ .................................................15

Burton A. Abrams, *How Richard Nixon Pressured Arthur Burns: Evidence from the Nixon Tapes*, 20 J. ECON. PERSPECTIVES 177 (2006) ........................................9

Catherine L. Mann, The Great Moderation 20 Years On—and Beyond, Address to the Annual Conference of the Society of Professional Economists (Nov. 14, 2024), https://www.bankofengland.co.uk/speech/2024/november/catherine-l-mann-society-of-professional-economists-annual-conference .................................................9

*Central Bank Independence*, IMF WORKING PAPER WP/24/35 (Feb. 2024), https://www.imf.org/en/Publications/WP/Issues/2024/02/23/A-New-Measure-of-Central-Bank-Independence-545270 .......................................................................13

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 NOTRE DAME L. REV. 1 (2020) ....................... 10, 17

Christopher Crowe & Ellen E. Meade, *The Evolution of Central Bank Governance around the World*, 21 J. ECON. PERSPECTIVES 69 (2007) ....................................7

Colby Smith & Tony Romm, *Trump Lashes Out at Fed Chair for Not Cutting Rates*, N.Y. TIMES (Apr. 17, 2025), https://www.nytimes.com/2025/04/17/business/economy/trump-jerome-powell-fed.html?smid=nytcore-ios-share&referringSource=articleShare&sgrp=g&pvid=5DFA0DCD-50DD-400A-832C-C68BFA10A6D0 ............................................................................... 3

Cristina Bodea & Raymond Hicks, *Price Stability and Central Bank Independence: Discipline, Credibility, and Democratic Institutions*, 69 INT'L ORGS. 35 (2015) .............................................................................................. 9, 10

European Central Bank, *Benefits of Price Stability*, https://www.ecb.europa.eu/mopo/intro/benefits/html/index.en.html#:~:text=When%20inflation%20is%20low%2C%20stable,turn%20creating%20jobs%20and%20prosperity ................................................................................................ 6

*Federalist* No. 77 ....................................................................................................... 17

THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES (2020), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf ............................... 7

GEOFFREY M. HODGSON, THE WEALTH OF A NATION: INSTITUTIONAL FOUNDATIONS OF ENGLISH CAPITALISM (2023) ....................................................... 6

*Great Depression, 1929–41*, FEDERAL RESERVE HISTORY, https://www.federalreservehistory.org/essays/great-depression ............................... 7

Hearing on H.R. 7001 Before the Subcomm. on Domestic Monetary Pol'y of the H. Comm. on Banking, Fin. & Urb. Affs., 96th Cong. 60 (1980) ......................................... 14

Ines Ferré, *Trump Again Calls on 'Slow Moving' Fed to Cut Rates as Markets Continue Tumble*, yahoo!finance (Apr. 7, 2025), https://finance.yahoo.com/news/trump-again-calls-on-slow-moving-fed-to-cut-rates-as-markets-continue-tumble-122755240.html ......................................... 3

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1 (2021) ...................... 16

Lev Menand & Joshua Younger, *One System, Two Mandates: The Federal Reserve and the Public Debt*, Columbia Law School Working Paper, Feb. 2, 2025 ....................................................................................................... 3

Lev Menand, *The Logic and Limits of the Federal Reserve Act*, 40 YALE J. ON REG. 197 (2023) ...................................................................................... 14

MORGAN RICKS, GANESH SITARAMAN, SHELLEY WELTON & LEV MENAND, NETWORKS, PLATFORMS, AND UTILITIES: LAW AND POLICY (2022) ......................... 6

Nat'l Archives Founders Online,
    https://founders.archives.gov/documents/Hamilton/01-07-02-0229-
    0003#ARHN-01-07-02-0229-0003-fn-0152-ptr ................................................................. 17

Nicolò Fraccaroli, Rhiannon Sowerbutts & Andrew Whitworth, *Does Regulatory
    and Supervisory Independence Affect Financial Stability?* J. BANKING & FIN.
    107318 (2025) ..................................................................................................................... 8

Thomas W. Merrill, *The Essential Meaning of the Rule of Law*, 17 J. OF LAW,
    ECON. & POL. 673 (2022) .................................................................................................... 18

## I.    INTERESTS OF AMICI[1]

Amici are law professors with financial-regulation expertise who have published extensive research on that subject. Here they urge that the Court grant the plaintiffs' motion for expedited summary judgment. Denying the motion could seriously harm monetary and financial stability by signaling to markets that the independence of the Federal Reserve System is jeopardized. This, in turn, could prompt significant market turmoil and undermine the credibility of Federal Reserve officials in ways that might not be easily reversed.

**John C. Coates** is the John F. Cogan Professor of Law and Economics at Harvard Law School. His research focuses on financial regulation and institutional design, including administrative and constitutional law relevant to those topics. He has served as General Counsel of the Securities and Exchange Commission, has served as a monitor for the Department of Justice of a large systemically important financial institution, has advised the Department of Treasury and the Federal Reserve Board, and was a partner focused on financial institutions at Wachtell Lipton Rosen & Katz before coming to Harvard.

**Jeffrey N. Gordon** is the Richard Paul Richman Professor of Law at Columbia Law School. Professor Gordon teaches and writes extensively on a variety of business-law subjects, including the regulation of financial institutions. He is the co-author of *Principles of Financial Regulation* (2016), which addresses the challenges facing regulators of financial institutions and markets in an interconnected and evolving global financial system, particularly the challenges in maintaining financial stability. Before becoming an academic, Professor Gordon served as an

---

[1] Pursuant to LCvR 7(o) (referencing Fed. R. App. P. 29(a)(4)), counsel for amici represent that no party's counsel authored this brief, in whole or in part, or contributed money that was intended to fund preparing or submitting this brief, and that no person contributed money that was intended to fund preparing or submitting this brief, which was prepared on a pro bono basis.

attorney for the U.S. Department of the Treasury in Washington, D.C.

**Kathryn Judge** is the Harvey J. Goldschmid Professor of Law at Columbia Law School. Her research focuses on banking, financial crises, regulatory architecture, and intermediation design. She has served as a member of the Financial Stability Task Force co-sponsored by the Brookings Institution and the Chicago Booth School of Business, and as a member of the Financial Research Advisory Committee (FRAC) to the Office of Financial Regulation. While serving on FRAC, she co-chaired the working groups on financial innovation and the London Interbank Offered Rate (LIBOR) transition.

**Lev Menand** is an associate professor of law at Columbia Law School, where he teaches financial institutions and administrative law. He has written extensively on money and banking, including a book, *The Fed Unbound: Central Banking in a Time of Crisis* (2022). Professor Menand served as senior adviser to the deputy secretary of the Treasury from 2015 to 2016 and as senior adviser to the assistant secretary for Financial Institutions from 2014 to 2015. He was previously an economist at the Federal Reserve Bank of New York, where he helped to develop econometric models for the Federal Reserve System's first Comprehensive Capital Assessment and Review. While at the New York Fed, Menand was seconded to the Financial Stability Oversight Council, where he helped to prepare the Council's first financial-stability report.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT[2]

Amici curiae write to urge the Court to grant the plaintiffs' expedited motion for summary judgment. Markets could construe denial as undermining the carefully calibrated institutional design of the Federal Reserve System, which prevents the President from removing

---

[2] Throughout this brief, unless otherwise indicated, emphases were added to quotations, while internal citations, footnotes, brackets, ellipses, and the like were omitted from them.

members of the Federal Reserve's Board of Governors (or from demoting the Board's Chair) before they have completed their statutory terms, except for cause.

The Fed's independence rests on the same legal foundations as the independence of the Federal Trade Commission. Both agencies are multimember expert boards.[3] Both enjoy a degree of separation from the White House. Both are covered by *Humphrey's Executor v. United States*,[4] the Supreme Court's seminal decision concluding that Congress may protect certain officials from at-will removal by the President. Denying the plaintiffs' motion would immediately call into question the Fed's independence from the White House, with potentially adverse consequences for economic and financial stability.

Recent events raise the stakes. The President's recent threat to terminate Fed Chair Jerome Powell and his unprecedented assertion of sole authority over critical features of economic policy have generated enormous instability.[5] Stock markets are currently experiencing significant volatility, and bond markets are facing technical breakdowns. The Treasury market in particular has teetered in recent days. The Fed plays an essential role in stabilizing this market.[6]

---

[3] *See Seila Law LLC* v. *Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) (affirming President's power to remove individual agency heads at will, but distinguishing agencies led by multimember boards like the FTC in *Humphrey's Executor*).

[4] 295 U.S. 602 (1935).

[5] *See* Colby Smith & Tony Romm, *Trump Lashes Out at Fed Chair for Not Cutting Rates*, N.Y. TIMES (Apr. 17, 2025) (quoting President Trump as stating that "Powell's termination cannot come quick enough!"), https://www.nytimes.com/2025/04/17/business/economy/trump-jerome-powell-fed.html?smid=nytcore-ios-share&referringSource=articleShare&sgrp=g&pvid=5DFA0DCD-50DD-400A-832C-C68BFA10A6D0; Ines Ferré, *Trump Again Calls on 'Slow Moving' Fed to Cut Rates as Markets Continue Tumble*, yahoo!finance (Apr. 7, 2025), https://finance.yahoo.com/news/trump-again-calls-on-slow-moving-fed-to-cut-rates-as-markets-continue-tumble-122755240.html (reporting that President Trump called for the Fed to cut interest rates after markets declined in response to his tariff announcement: "'This would be a PERFECT time for Fed Chairman Jerome Powell to cut Interest Rates,' Trump said in a post on his social media app Truth Social on Friday. 'He is always "late," but he could now change his image, and quickly.'").

[6] Lev Menand & Joshua Younger, *One System, Two Mandates: The Federal Reserve and the Public Debt*, Columbia Law School Working Paper, Feb. 2, 2025.

And those recent gyrations could prove to be mild relative to the dysfunction that might ensue if investors fear that the President could exercise control over how the Fed navigates future instability. Denying plaintiffs' motion could shake belief in the Fed's capacity to act independently in formulating monetary policy and addressing financial instability.

Amici law professors also write to explain the critical importance of Federal Reserve independence to the government's capacity to maintain price stability, fight inflation, and promote economic growth. Research on central-bank independence demonstrates that the government's capacity to achieve broadly agreed-upon aims—such as monetary expansion consistent with the economy's long-run potential to increase production—depends on governance structures that impose modest but meaningful limits on the capacity of outside actors such as the President to direct policy. These structures include provisions that tenure members of multi-member boards like the Federal Reserve Board and authorize the President to remove them only for cause.

As we further explain, courts cannot easily avoid these consequences by simply announcing a "Fed exception." Distinguishing the Fed's Board from the boards of other agencies would require full consideration of the enabling acts of numerous financial authorities and the importance of the Fed's pre-1935 structure (before *Humphrey's Executor*). Moreover, there is no way to bifurcate the Fed's independence (by, for example, distinguishing between the Fed's "monetary policy" and its "regulation of financial institutions") without irreparably harming the legislative scheme and undermining the Fed's ability to credibly commit to long-term price stability.

For all these reasons, as set forth more fully below, amici urge the Court to grant plaintiffs' motion for expedited summary judgment.

### III.    ARGUMENT

Congress created the Federal Reserve System to maintain price stability and promote economic growth. Research demonstrates that its capacity to achieve monetary expansion that is consistent with the economy's long-run potential to increase production depends on governance structures that impose modest but meaningful limits on the President's power to direct policy. These structures include provisions that tenure members of multi-member boards like the Federal Reserve Board—that is, grant them a fixed term of office[7]—and authorize the President to remove them only for cause.

The U.S. has enshrined central-bank independence into law since the Federal Reserve's inception. Any judicial intervention to redress supposed constitutional deficiencies in this design would upend longstanding historical practice and settled constitutional understandings. It also would put the judiciary in the position of usurping legislative prerogatives. Legislators delegated extraordinary power to the Fed to control the money supply on the express understanding that these powers would *not* be subject to presidential direction. To convert the Fed's Chair to an at-pleasure appointment would be to write a statute that the enacting Congress almost certainly would not have passed.

### A.    Central-bank independence is an essential component of monetary policy and long-term economic growth.

The economy's long-term health requires a central bank with a measure of independence from executive direction. Modern economies depend on long-term investments, and the level of

---

[7] *See Marbury v. Madison*, 5 U.S. 127, 172–73 (1803) ("[T]he applicant has, to that commission, a vested legal right, of which the executive cannot deprive him. He has been appointed to an office, from which he is not removable at the will of the executive; and being so appointed, he has a right to the commission.").

long-term investment is tied to expectations that prices will remain stable.[8] When price stability is lost, long-term investment becomes more expensive, growth slows—and those adverse effects are hard to reverse. Deflationary spirals can be similarly destructive. Monetary instability has famously contributed to democratic erosion and collapse around the world.[9]

The central goal of monetary policy is to expand the money supply at a rate that lowers the cost of investment and maximizes long-term economic growth. It has long been recognized that achieving this goal requires careful institutional design, with officials insulated from short-term pressures that could undermine confidence that the central bank will adopt the appropriate stance. Indeed, to generate expectations that monetary policy will not be excessively expansionary over the long term, nations have relied on institutions that are independent of close executive control. This innovation dates to the Bank of England Act in 1694, which created an independent corporation, the Bank of England, to expand the money supply, arguably launching modern financial capitalism and the industrial revolution.[10]

Congress created the Federal Reserve System in 1913. The initial governance structure dispersed authority over monetary policy among twelve Federal Reserve Banks (FRBs), federally chartered banking corporations partly owned and controlled by a subset of the country's investor-owned banks. This structure, designed to insulate monetary policy from partisan political control, contributed to policy failures in the early 1930s, triggering an

---

[8] European Central Bank, *Benefits of Price Stability*, https://www.ecb.europa.eu/mopo/intro/benefits/html/index.en.html#:~:text=When%20inflation%20is%20low%2C%20stable,turn%20creating%20jobs%20and%20prosperity.

[9] *See generally* J. BRADFORD DELONG, SLOUCHING TOWARDS UTOPIA: AN ECONOMIC HISTORY OF THE TWENTIETH CENTURY (2022).

[10] *See* MORGAN RICKS, GANESH SITARAMAN, SHELLEY WELTON & LEV MENAND, NETWORKS, PLATFORMS, AND UTILITIES: LAW AND POLICY 819–20 (2022); GEOFFREY M. HODGSON, THE WEALTH OF A NATION: INSTITUTIONAL FOUNDATIONS OF ENGLISH CAPITALISM (2023).

unprecedented banking collapse and the Great Depression.[11] In August 1935—relying on the Court's *Humphrey's Executor* decision, which had been decided just a few months earlier—Congress shifted control over monetary policy from the FRBs to a new organization, the Federal Open Market Committee (FOMC), dominated by the Fed's public Board of Governors. To promote long-term decision-making, Congress also converted the Board members' terms to fourteen years (the President appoints these officials, but can remove them only "for cause") and removed the Secretary of the Treasury and Comptroller of Currency from the body.[12] Five FOMC members are FRB presidents appointed to their positions by the FRB boards of directors, subject to Board of Governors approval.[13]

1.    **Central-bank independence is the solution to what economists call "the time-inconsistency problem."**

Recent decades have seen the rise of an entire economic literature on "central-bank independence," or CBI, demonstrating the relationship between independence and a healthy economy. In this literature, CBI is widely understood to be the antidote to a dilemma that economists have dubbed the "time-inconsistency problem." That problem arises from the fact that central-bank policies operate over an extended time frame, but a non-independent central bank can face pressures to quickly stimulate the economy for partisan political reasons.[14]

---

[11] *See* MILTON FRIEDMAN & ANNA SCHWARTZ, A MONETARY HISTORY OF THE UNITED STATES 1867–1960 (1963); Gary Richardson, *The Great Depression, 1929–41*, FEDERAL RESERVE HISTORY, https://www.federalreservehistory.org/essays/great-depression.

[12] 12 U.S.C. § 242.

[13] The Board may "suspend or remove any officer or director of any Federal Reserve bank, the cause of such removal to be forthwith communicated in writing." 12 U.S.C. § 301; *see also id.*, § 248(f). For a more detailed description of the Fed's structure, *see* THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES 6–13 (2020), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf [hereinafter *Fed Explained*].

[14] *See* Christopher Crowe & Ellen E. Meade, *The Evolution of Central Bank Governance around the World*, 21 J. ECON. PERSPECTIVES 69 (2007).

To put it in more straightforward terms: There are times when a political leader seeking re-election will prioritize short-term economic activity over long-term price stability. A president may, for example, want unemployment to go down and economic activity to increase in the run-up to an election. More accommodative monetary policy can achieve such effects but also will increase the risk of higher levels of future inflation.

The cure for the time-inconsistency problem is to lengthen the decision-making horizon of central bankers by shielding them from certain forms of partisan political pressure. Research, theory, and evidence all demonstrate that a central bank's ability to control inflation hinges on its ability to formulate and implement monetary policy over reasonable time frames without undue outside interference. Consequently, nearly all advanced economies and many developing countries now have independent central banks that set monetary policy without being subject to direction by outside officials.[15] Empirically, greater regulatory and supervisory independence is associated with improved financial stability.[16]

This is not just an abstract theory. Economists have developed a robust literature showing that lower levels of central-bank independence are correlated with higher levels of inflation.[17]

---

[15] *See generally* Alex Cukierman, Steven B. Webb & Bilin Neyapti, *Measuring the Independence of Central Banks and Its Effect on Policy Outcomes*, 6 WORLD BANK ECON. REV. 353, 375–76 (1992) (concluding that a central bank's "legal independence is systematically and inversely related to inflation in industrial . . . countries"); Ana Carolina Garriga & Cesar M. Rodriguez, *Central Bank Independence and Inflation Volatility in Developing Countries*, 78 ECON. ANALYSIS 1320, 1320 (2023) (finding that CBI not only "has been linked with lower levels of inflation in developed and developing countries" but also is "directly and unconditionally associated with . . . reduction of [inflation] volatility," defined as "the prospect that the market's psychology switches abruptly from fears of inflation to concerns about deflation, and back again").

[16] *See* Nicolò Fraccaroli, Rhiannon Sowerbutts & Andrew Whitworth, *Does Regulatory and Supervisory Independence Affect Financial Stability?*, 170 J. BANKING & FIN. 107318, at 2 (2025).

[17] *See* nn.15–16, *supra*.

Experience in the United States has borne out these concerns.[18]

The correlation between CBI and low inflation exists "only in the presence of multiple constitutional checks and balances."[19] CBI does not imply lack of accountability but does require some degree of insulation from day-to-day direct control by officials in other parts of the government. Indeed, as economists have shown in formal models and empirical studies, public belief in the Fed's independence from political forces is crucial to the Fed's effectiveness in preventing high levels of inflation. "[I]f the public *believes* that the central bank is free from interference and that the law [governing the bank] is unlikely to change swiftly and without debate, it will also lower inflationary expectations, leading to price stability above and beyond the control of the money supply."[20] By the same token, doubts about the constitutional viability of the Fed's design and independence may not only roil markets but also trigger knock-on effects that are hard to predict and may prove hard to contain. Concerns (warranted or unwarranted) that the Fed's operations could be subject to interference by other executive-branch officials could undermine the Fed's credibility, creating a heightened risk of financial instability and persistently higher levels of inflation.[21]

Far from jeopardizing democratic accountability, this limited form of insulation enables

---

[18] Burton A. Abrams, *How Richard Nixon Pressured Arthur Burns: Evidence from the Nixon Tapes*, 20 J. ECON. PERSPECTIVES 177, 178 (2006) [hereinafter *Nixon Pressure*]; *see also* Catherine L. Mann, The Great Moderation 20 Years On—and Beyond, Address to the Annual Conference of the Society of Professional Economists (Nov. 14, 2024), https://www.bankofengland.co.uk/speech/2024/november/catherine-l-mann-society-of-professional-economists-annual-conference.

[19] Cristina Bodea & Raymond Hicks, *Price Stability and Central Bank Independence: Discipline, Credibility, and Democratic Institutions*, 69 INT'L ORGS. 35, 37 (2015) [hereinafter *Stability and Independence*].

[20] *Id*.

[21] *See generally* Alberto Alesina & Lawrence H. Summers, *Central Bank Independence and Macroeconomic Performance: Some Comparative Evidence*, 25 J. MONEY, CREDIT & BANKING 151 (1993).

democracies to adopt widely agreed-upon policies, like price stability. "Delegation of monetary policy to an independent central bank in democracies allows the bank to actually behave in a conservative fashion that is reflected directly in lower rates of money supply growth [or other restrictive policies]. That is, the central bank can increase interest rates or target the exchange rate or money supply to ensure, most prominently, price stability, regardless of short-term government pressure."[22] CBI therefore promotes democratic values by allowing the government to create the conditions that allow economies to thrive and individuals living in those economies to exercise meaningful choice in their lives.

CBI is at least as important here, in the world's largest economy, as it is in any other nation. An infamous case of CBI breakdown in this country involved President Nixon's pressuring of Fed Chairman Arthur Burns to pursue an expansionary monetary policy in the run-up to the 1972 presidential election. That policy helped Nixon get reelected, but it also "helped to trigger an extremely costly inflationary boom-bust cycle" that took a decade to resolve.[23]

### 2. Maintaining the credibility of Fed independence is crucial to containing systemic banking risks.

Protecting central-bank officials from the threat of immediate removal because of policy differences also is critical to combatting moral hazard[24] and helping to contain systemic banking risks. Congress has sought to control those risks by enacting a system of checks and balances designed to control the immediate impulse to "bail out" a failing financial institution in response to political pressure to avoid the pain of an institution's default and curb losses to uninsured

---

[22] *Stability and Independence* at 37.

[23] *Nixon Pressure* at 187.

[24] "Moral hazard" refers to the extra risk that people and entities take on because they believe that they are insured against resulting losses.

depositors.

Fed independence plays an integral role in this system of checks and balances. In the "resolution" of a failing bank, the Federal Deposit Insurance Corporation (FDIC) protects insured depositors but is otherwise mandated to resolve the bank with the "least possible cost to the deposit insurance fund." 12 U.S.C. § 1823(c)(4). This may mean imposing losses on sophisticated creditors who receive higher yields for bearing greater risk and who are presumed to have the capacity to monitor the bank's risk-taking.

There will always be intense pressure to protect those sophisticated creditors in order to avoid local economic fallout or political pushback. Yet to make such bailouts commonplace would erode the discipline on which banking-system stability depends. In that event, we would see more risk-taking and more bailouts.

To avoid this, Congress devised a scheme that critically relies on the independence of multiple regulators—including the Fed. Under that scheme—known as "the systemic-risk exception"—the FDIC *can* depart from the "least possible cost" framework, but only after the relevant agencies make an "emergency determination" that such help is necessary in order to avoid "serious adverse effects on economic conditions or financial stability." 12 U.S.C. § 1823(c)(4). Invoking the systemic-risk exception requires not only a determination by the Secretary of the Treasury but also a supermajority vote of the Board of the FDIC *and* of the Governors of the Federal Reserve. 12 U.S.C. § 1823(c)(4)(G).

The point is this: Protecting against excessive bailouts, shielding the "least possible cost" scheme from erosion, and resisting political pressure all depend on one thing: the credible independence of the regulatory agencies that have to sign off on any invocation of the systemic-risk exception—namely, the FDIC and the Fed. But that independence would be shattered, and

Congress's careful cabining of the systemic-risk exception would collapse into short-term considerations, if the President could remove the board members of those agencies at will. The consequence would be more risk-taking and more ongoing threats to financial stability.[25]

### B. The President's proposal to limit Fed independence to the Fed's monetary functions is unworkable.

The President recently issued an Executive Order ("EO")[26] rejecting the concept of independent agencies while carving out a narrow exception for the Fed's independence "in its conduct of monetary policy."[27] The EO purports to eliminate Fed independence only as to "its supervision and regulation of financial institutions."[28] But the proposed dichotomy is unworkable.

CBI is a system of interdependent protections. Withdrawing even one critical element can bring that system crashing down. Two elements are especially important: the term tenure of the

---

[25] Congress created a similar "triple key" approach for invoking the "Orderly Liquidation Authority" in the Dodd Frank Act of 2010. *See* Dodd-Frank Act § 203(a), 12 U.S.C. § 5383(a). Triggering "Orderly Liquidation Authority" ("OLA") moves a failing financial firm into a special proceeding that is likely to reduce creditor losses through use of Treasury resources. The alternative would be a bankruptcy proceeding. Before triggering the special proceeding, the Secretary of the Treasury needs to obtain the agreement of a supermajority of the Board of Governors of the Federal Reserve and of either the FDIC Board (in most cases) or the Securities Exchange Commission (in the case of a securities firm). In short, to minimize politicization of the OLA decision, Congress required concurrence by two independent financial regulatory agencies. But if board members could be removed without cause, the agencies' independence would collapse, and market participants could foresee that political pressure will substitute for sound financial management. This, too, would produce more risk-taking and thus an on-going threat to financial stability.

[26] "Ensuring Accountability for All Agencies," Exec. Order No. 14,215, 90 Fed. Reg. 10,447 (Feb. 24, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-24/pdf/2025-03063.pdf [hereinafter "EO"]. Among other things, the EO (1) suggests that independent agencies violate the constitutional separation of powers, (2) announces that the Administration's policy is to "ensure Presidential supervision and control of the *entire* executive branch," and (3) requires "all executive departments and agencies, including so-called independent agencies," to submit all proposed and final "significant regulatory actions" to the White House Office of Information and Regulatory Affairs before publication in the *Federal Register*. EO § 1 at 10,447.

[27] *Id*., § 2(b) at 10,477; *see also id*., § 3(a) at 10,478.

[28] *Id*., § 2(b) at 10,447.

Governors, which can be abrogated only for cause; and the term tenure of the Chair, which cannot be abrogated—that is, the Chair cannot be demoted, only removed entirely from the Board for cause. If either of these critical foundations is weakened, Fed independence collapses.[29] For example: The Fed Chair enjoys extensive power over policy. If the Chair can be demoted, the President will have gained a tool that functionally ends Fed independence; markets are likely to react; and any other CBI protections may be rendered illusory.[30]

It would shatter the credibility that the Fed needs to conduct effective monetary policy to adopt the Government's split-the-baby approach, under which Board members and the Chair serve at the President's pleasure and under the President's direction when it comes to the "regulation of financial institutions" but not as to "monetary policy." Two specific problems would arise.

First, markets would swiftly realize that the President can circumvent the Fed's remaining zone of purported independence. If the President could remove Fed officials (or demote the Fed Chair) without cause except "in [the Fed's] conduct of monetary policy," the President would have an enormous incentive to identify a non-monetary *pretext* for removal or demotion—i.e., a claim that, *outside* the realm of monetary policy, the Fed isn't obeying his directives.

For example, a President displeased by the Fed's refusal to loosen *monetary policy* in the

---

[29] *See* Tobias Adrian, Ashraf Khan & Lev Menand, *A New Measure of Central Bank Independence*, IMF WORKING PAPER WP/24/35 at p. 13 (Feb. 2024), https://www.imf.org/en/Publications/WP/Issues/2024/02/23/A-New-Measure-of-Central-Bank-Independence-545270 (discussing interdependence of CBI protections—e.g., if a central bank's chief can be removed at will by the executive, the chief's term of office "does not matter much at all," and if the chief's term of office is one year, strong removal protections are "not particularly valuable").

[30] *Id*. (proposing a new measure of CBI that "do[es] not credit central bank laws that appear to offer central bank officials decisional independence in some ways but contain loopholes that render the independence generated by those features illusory.").

run-up to an election might exert control by demoting the Fed Chair on the pretextual ground that the Fed just isn't *regulating banks appropriately*. And once that happens, the Fed's credibility as an inflation-fighter is shot. Indeed, the President need not actually terminate or demote anyone for the Fed's inflation-fighting credibility to take a serious hit—it is enough that market participants believe that the President now *could* do so.

The second problem with the EO's split-the-baby approach is that the Fed's various functions don't fit neatly into the EO's two buckets. As former Fed Chair Paul Volcker once put it, "[t]he borderline between monetary, regulatory, and supervisory powers is sometimes indistinguishable."[31]

When conducting monetary policy, the Fed also regulates financial institutions. For example, under its current implementation framework, when the Fed changes its target for the federal funds rate—the rate at which depository institutions lend to each other[32]—it implements that adjustment through rulemaking. Specifically, it amends Regulation D, the rule that sets reserve requirements for depository institutions and the rate of interest paid on balances maintained at the Federal Reserve banks.[33]

The Fed also plays a critical role as a "lender of last resort" to banks and nonbanks during

---

[31] To Modernize the Federal Reserve System: Hearing on H.R. 7001 Before the Subcomm. on Domestic Monetary Pol'y of the H. Comm. on Banking, Fin. & Urb. Affs., 96th Cong. 60 (1980) (statement of Hon. Paul A. Volcker, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.). Chairman Volcker pointed out that "information which the [Federal Reserve] System obtains in the course of exercising its supervisory functions provides key insights into such matters as the state of liquidity and viability of the Nation's banking institutions, indispensable elements in the formulation and implementation of monetary policy." *Id.*

[32] *Fed Explained* at 12.

[33] The Fed set the latter rate at 4.4% through an interim final rule on December 19, 2024. 90 Fed. Reg. 3615. More generally, bank balance-sheet regulation and supervision significantly implicate monetary policy. A restrictive regulatory and supervisory framework fosters monetary contraction while a permissive regime drives credit expansion and inflation. *See* Lev Menand, *The Logic and Limits of the Federal Reserve Act*, 40 YALE J. ON REG. 197, 240–50 (2023).

periods of financial distress—and that role overlaps with its role in preserving price stability. Former Federal Reserve Chair and Great Depression expert Ben Bernanke has described collateralized lending as "[t]he most important tool that central banks (like the Fed) have for fighting financial panics."[34] Such lending enables the Federal Reserve to deter bank runs, quell the need for fire sales, smooth market functioning, and otherwise promote credit creation.

The primary reason why central banks around the world are (and have long been) tasked with serving as lenders of last resort is that central banks alone have the capacity to create unlimited money instruments. The magnitude of the Great Financial Crisis of 2008 and the financial ramifications of the COVID-19 pandemic would have been far greater had the Fed not been willing and able to use that tool as needed to help contain the impact of the economic shocks. These containment efforts did not wholly prevent, but helped significantly to mitigate, the impact on the real economy—including its capacity to grow and to provide employment opportunities.

### C.    Overturning or more narrowly construing *Humphrey's Executor* would threaten Fed independence.

The Government repeatedly has asserted that, even if *Humphrey's Executor* is not overruled, the "exception" that *Humphrey's Executor* created to the rule of unrestricted presidential removal power "does not apply to multimember agencies that exercise substantial executive power, for instance by promulgating binding rules or issuing final decisions in administrative adjudications."[35]

---

[34] Ben S. Bernanke, Fed Emergency Lending, Brookings (Dec. 3, 2015), https://www.brookings.edu/articles/fed-emergency-lending/.

[35] Application to Vacate the Order Issued by the United States District Court for the District of Columbia and Request for an Administrative Stay at p. 17 n.5, *Dellinger v. Bessent*, No. 24A790 (U.S. 2025).

That reading of *Humphrey's Executor* would eliminate Fed independence. The Fed is a "multimember agenc[y]" that promulgates "binding rules." *See* 12 C.F.R. §§ 200–299. And the same officials oversee both short-term interest-rate policy and banking and financial-stability policy. If the latter are subject to executive control, then as a practical matter the former will be as well.

Overruling *Humphrey's Executor* would even more clearly undermine the Fed's independence. There are foundational structural similarities between the Fed—a multimember commission designed by Congress on the model of the Interstate Commerce Commission—and the Federal Trade Commission, the multimember commission that was created the following year (on the same model) and that was the subject of *Humphrey's Executor*.

Courts likewise jeopardize the Fed's policy credibility by characterizing it as "a special arrangement sanctioned by history," as Justice Alito proposed in a dissent last term.[36] For three reasons, market participants may not believe that a historically based "Fed exception" will hold.

First, a carve-out based on the Fed's supposedly distinctive history would rest on dubious historiography.[37] Recent scholarship has shown that the first Congress, many of whose members helped draft the Constitution, saw no constitutional impediment to empowering commissions, at

---

[36] *Consumer Fin. Prot. Bureau* v. *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 467 n.16 (2024) (Alito, J., dissenting). Justice Alito argued that the Fed "should not be seen as a model for other Government bodies" because it "is a unique institution with a unique historical background" and a structure "adopted in the Federal Reserve Act of 1913 [that] represented an intensely-bargained compromise between two insistent and influential camps: those who wanted a largely private system, and those who favored a Government-controlled national bank." *Id*., *see also Seila Law*, 591 U.S. at 222 n.8 (noting, without endorsing, the argument that the Fed may "claim a special historical status."); *PHH Corp. v. Consumer Fin. Protection. Bureau*, 881 F.3d 75, 192 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (referring to the Fed Chair as "an historical anomaly . . . due to the Federal Reserve's special functions in setting monetary policy and stabilizing the financial markets").

[37] Contemporary arguments about the President's inherent power over government officials have become unusually unmoored from original understandings of Constitutional text and structure. *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1 (2021).

least some of whose members could **not** be terminated at will by the President.[38] For example, the first Congress created a Sinking Fund Commission to repay the national debt through open-market purchases of U.S. securities.[39] Its members included Alexander Hamilton, Thomas Jefferson, John Jay, and Edmund Randolph; and the President had no power to replace or remove several of them.[40] Likewise, Hamilton's plan for the first National Bank provided for "removal of a Director by the Stockholders"—but not by the President.[41] There is no evidence that these arrangements were treated at the time as special cases, as opposed to ordinary exercises of legislative power.

Second, market participants would have reason to doubt the longevity of a Fed carveout if the judiciary continues along its path of continually scaling back agency independence. Absent a logical basis in doctrine, observers may wonder how long the "Fed exception" will last (after

---

[38] Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 NOTRE DAME L. REV. 1, 27–28 (2020) [hereinafter *Originalist Argument*]. Moreover, the Federalist Papers treated the Appointments Clause—which vests authority to appoint principal officers jointly in the President and Senate—as requiring *both* the President and Senate to agree to removals unless otherwise specified by Congress. *The Federalist* No. 77 ("The Appointing Power Continued and Other Powers of the Executive Considered") explained:

> It has been mentioned as one of the advantages to be expected from the co-operation of the Senate, in the business of appointments, that it would contribute to the stability of the administration. ***The consent of that body would be necessary to displace as well as to appoint.*** A change of the Chief Magistrate, therefore, would not occasion so violent or so general a revolution in the officers of the government as might be expected, if he were the sole disposer of offices. . . . Those who can best estimate the value of a steady administration, will be most disposed to prize a provision which connects the official existence of public men with the approbation ***or disapprobation*** of that body [i.e., the Senate] which, from the greater permanency of its own composition, will in all probability be less subject to inconstancy.

[39] *Originalist Argument* at 34.

[40] *Id*. at 3–4.

[41] Alexander Hamilton, *Final Version of the Second Report on the Further Provision Necessary for Establishing Public Credit (Report on a National Bank)*, Nat'l Archives Founders Online, https://founders.archives.gov/documents/Hamilton/01-07-02-0229-0003#ARHN-01-07-02-0229-0003-fn-0152-ptr.

all, in this hypothetical world, the "*Humphrey's Executor* exception" has not survived).

Third, as the only remaining independent agency, the Fed will be far more vulnerable to presidential interference. For example, the President might challenge the Fed carveout (a course of action consistent with what the President is now doing for the NLRB and MSPB); and observers could conclude that such a challenge may succeed on grounds that future courts will articulate.[42]

Even if observers expect such a challenge to fail, significant damage may be inflicted by the very process of litigating over the authority of Fed officials whom the President has attempted to remove or demote. The mere possibility of policy uncertainty while such litigation remains pending may be enough to immediately damage the ability of the United States to sustain price stability over time, resulting in near-term and potentially irreversible harm to economic growth and vitality.

## IV.    CONCLUSION

Stability and predictability are core aspects of the rule of law.[43] The Framers were particularly concerned with stable administration and understood the Constitution to empower Congress to design government bodies in ways that facilitate policy continuity. Accordingly, the U.S. has long relied on tenured officers, including independent judges and administrators, to formulate law that may be relied upon to persist over time. Drawing on this tradition, Congress created the Federal Reserve and insulated it from day-to-day presidential direction, thus enabling

---

[42] For example, if the Supreme Court overturns *Humphrey's Executor* while establishing a putative Fed carveout, the market nonetheless may anticipate that courts in the future will weaken the "cause" requirement to the point where it presents no obstacle to presidential direction, thus effectively acquiescing in the President's assertion of control over the Fed.

[43] *See generally* Thomas W. Merrill, *The Essential Meaning of the Rule of Law*, 17 J. OF LAW, ECON. & POL. 673 (2022).

it to exercise its vast powers in ways conducive to long-term economic flourishing.

Modern economic research has borne out the wisdom of that design. For all the reasons stated above, the Court should not undermine the carefully calibrated institutional design of the Federal Reserve, which tenures members of the Federal Reserve Board and prevents the President from removing them (or demoting the Board Chair), except for cause.

Dated:  April 18, 2025

Respectfully submitted,

By:    */s/ Steven A. Hirsch*
STEVEN A. HIRSCH
(D.C. Bar No. 418647)
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111
Telephone:  415-391-5400
shirsch@keker.com

Counsel of Record for Amici Curiae
John C. Coates, Jeffrey N. Gordon, Kathryn
Judge, and Lev Menand

**CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2025, the foregoing document and all attachments were filed with the Clerk of the Court, using the CM/ECF system, causing them to be served on all parties.

Dated:  April 18, 2025                                        /s/ Steven A. Hirsch
                                                                      STEVEN A. HIRSCH

20