# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REBECCA KELLY SLAUGHTER, in her official and personal capacities, and ALVARO M. BEDOYA, in his official and personal capacities,

       *Plaintiffs,*

    v.

DONALD J. TRUMP, in his official capacity as President of the United States, ANDREW N. FERGUSON, in his official capacity as Chair of the Federal Trade Commission, MELISSA HOLYOAK, in her official capacity as Commissioner of the Federal Trade Commission, and DAVID B. ROBBINS, in his official capacity as the Executive Director of the Federal Trade Commission,

       *Defendants.*

Case No. 1:25-cv-00909-LLA

---

## BRIEF OF FLORIDA, 20 OTHER STATES, AND THE ARIZONA LEGISLATURE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JAMES UTHMEIER
  *Attorney General of Florida*
JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
NATHAN A. FORRESTER
DAVID M. COSTELLO
  *Chief Deputy Solicitors General*
DARRICK W. MONSON
ROBERT S. SCHENCK
  *Assistant Solicitors General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*

*Counsel for* Amicus *State of Florida*

April 28, 2025

[Additional signatories listed inside cover page]

# ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

STEVE MONTENEGRO
Speaker of the Arizona
    House of Representatives

WARREN PETERSON
President of the Arizona Senate

TIM GRIFFIN
Attorney General
State of Arkansas

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JASON MIYARES
Attorney General
Commonwealth of Virginia

JOHN MCCUSKEY
Attorney General
State of West Virginia

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae*, the State of Florida, 20 other States, and the Arizona Legislature, verify that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................ ii

TABLE OF AUTHORITIES ...................................................................................... iv

INTEREST OF *AMICI CURIAE* ................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

ARGUMENT ........................................................................................................... 3

I.    The President has absolute authority to remove Commissioners of the Federal Trade Commission. ................................................. 4

II.   By threatening the separation of powers, "independent" executive officers and agencies in turn threaten state sovereignty. ............................... 10

III.  Slaughter and Bedoya are not entitled to reinstatement in any event. ....................................................................................... 13

      A.   Slaughter and Bedoya did not invoke the exclusive avenue for challenging a federal officer's removal: the statutory quo-warranto process. ............................................................. 13

      B.   Even if Slaughter and Bedoya could seek relief outside of the quo-warranto process, the federal courts cannot grant their requested relief. ................................................................ 17

            1.   Historically, equity courts would not remedy allegedly unlawful removals. ...................................................... 17

            2.   Declaratory relief is unavailable because it too is a form of equitable relief. .............................................................. 21

            3.   Slaughter and Bedoya have not shown a clear legal right to obtain mandamus. ......................................................... 22

CONCLUSION ....................................................................................................... 25

CERTIFICATE OF COMPLIANCE ......................................................................... 26

CERTIFICATE OF SERVICE .................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967)............................................................21

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984)..............................................15, 21

*Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320 (2015) ......................................13

*Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979) ...........................................12

*Baker v. Carr*, 369 U.S. 186 (1962) ..............................................................................20

*Beebe v. Robinson*, 52 Ala. 66 (1875)............................................................................19

*Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) .......................20

*Bessent v. Dellinger*, 145 S. Ct. 515 (2025) ....................................................17, 20, 21

*Bittner v. United States*, 143 S. Ct. 713 (2023)............................................................16

*Bond v. United States*, 564 U.S. 211 (2011)............................................................1, 11

*Bonner v. State*, 7 Ga. 473 (1849).............................................................................23, 24

*Case v. Beauregard*, 101 U.S. 688 (1880).....................................................................21

*Chi. Sch. Finance Auth. v. City Council of City of Chi.*, 472 N.E.2d 805 (Ill. 1984) . 24

*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793).......................................................10

*Cochran v. McCleary*, 22 Iowa 75 (1867) ...................................................................19

*Collins v. Yellen*, 594 U.S. 220 (2021) ........................................................................10

*Delahanty v. Warner*, 75 Ill. 185 (1874)......................................................................19

*Delgado v. Chavez*, 140 U.S. 586 (1891)................................................................14, 23

*Eccles v. Peoples Bank*, 333 U.S. 426 (1948)...............................................................21

*Edmond v. United States,* 520 U.S. 651 (1997) ............................................................5

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012)..............................................................16

*Free Ent. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) .............. 9

*French v. Cowan*, 10 A. 335 (Me. 1887) ...................................................................... 23

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) .................................. 11

*Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867) ........................................................ 18

*Green v. Mansour*, 474 U.S. 64 (1985) ...................................................................... 22

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .................................................................. 17

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,

    527 U.S. 308 (1999) ........................................................................................... 17, 20

*Heckler v. Ringer*, 466 U.S. 602 (1984) .......................................................... 22, 23, 24

*Humphrey's Executor v. United States*,

    295 U.S. 602 (1935) ............................................ 2, 4, 5, 6, 7, 8, 9, 10, 11, 24

*Ill. Cent. R.R. Co. v. ICC*, 206 U.S. 441 (1907) ........................................................... 7

*In re Sawyer*, 124 U.S. 200 (1888) ................................................................... 18, 19, 20

*Johnson v. Horton*, 63 F.2d 950 (9th Cir. 1933) ........................................................ 21

*Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013) ....................................... 24

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,

    453 U.S. 1 (1981) ............................................................................................... 13, 14

*Morrison v. Olson*, 487 U.S. 654 (1988) .............................................................. 5, 8, 9

*Murray v. Lewis*, 576 So. 2d 264 (Fla. 1990) ............................................................. 24

*Myers v. United States*, 272 U.S. 52 (1926) .................................................................. 6

*Newman v. United States ex rel. Frizzell*, 238 U.S. 537 (1915) .................................. 15

*Nw. Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO,*

    451 U.S. 77 (1981) ........................................................................................... 13

*People ex rel. Arcularius v. City of New York,*

    3 Johns. Cas. 79 (N.Y. Sup. Ct. 1802) ........................................................ 22, 23

*People ex rel. Dolan v. Lane*, 55 N.Y. 217 (Ct. App. 1873) ........................................ 23

*Props. of the Vills., Inc. v. FTC,*

    No. 5:24-cv-316, 2024 WL 3870380 (M.D. Fla. Aug. 15, 2024) .............................. 12

*Republica v. Cobbett*, 3 U.S. 467 (Pa. 1798) ............................................................ 10

*Ryan, LLC v. FTC*, No. 3:24-cv-986, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024) .. 12

*Samuels v. Mackel*, 401 U.S. 66 (1971) ................................................................ 21, 22

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) 4, 5, 8, 10, 11, 24

*Sheridan v. Colvin*, 78 Ill. 237 (1875) ...................................................................... 19

*State ex rel. McCaffery v. Aloe*, 54 S.W. 494 (Mo. 1899) ........................................... 19

*State v. Otis*, 230 P. 414 (Wash. 1924) .................................................................... 23

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ...................................... 20

*Stern v. Marshall*, 564 U.S. 462 (2011) ..................................................................... 8

*Tappan v. Gray*, 9 Paige Ch. 506 (Ch. Ct. N.Y. 1842) ............................................... 19

*Taylor v. Kercheval*, 82 F. 497 (C.C.D. Ind. 1897) ................................................... 19

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) .............................. 16

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ................................................... 5, 12

*United States v. Perkins*, 116 U.S. 483 (1886) ........................................................... 5

*Vitarelli v. Seaton*, 359 U.S. 535 (1959) .................................................................. 20

*Walton v. House of Representatives of Okla.*, 265 U.S. 487 (1924)...................... 17, 20

*Whitcomb v. Chavis*, 403 U.S. 124 (1971) ................................................................. 17, 18

*White v. Berry*, 171 U.S. 366 (1898) ........................................................................... 20

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ...................................... 8

*Wiener v. United States*, 357 U.S. 349 (1958) ............................................................. 5

**Statutes**

8 U.S.C. § 1252.............................................................................................................. 21

15 U.S.C. § 41............................................................................................................ 2, 10

15 U.S.C. § 45................................................................................................................ 7

15 U.S.C. § 46................................................................................................................ 7

15 U.S.C. § 56................................................................................................................ 8

15 U.S.C. § 2805........................................................................................................... 21

28 U.S.C. § 1361........................................................................................................... 24

42 U.S.C. § 1983........................................................................................................... 14

42 U.S.C. § 2000e-5........................................................................................................ 3

D.C. Code § 16-3501............................................................................................... 14, 15

D.C. Code §§ 16-3547................................................................................................... 16

D.C. Code §§ 16-3545, 3548......................................................................................... 16

Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973) ................................................ 6

Pub. L. No. 93-637, §§ 205–206, 88 Stat. 2183, 2200–02 (1975)................................. 6

**Constitutional Provisions**

U.S. Const. art. I, § 7, cl. 2 ........................................................................ 9

U.S. Const. art. II, § 1, cl. 1 ...................................................................... 4

U.S. Const. art. II, § 3 ........................................................................... 4, 9

**Regulations**

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024)................................. 12

**Other Authorities**

1 Annals of Cong. 463 (1789) (J. Madison) ................................................. 4

*Empire in Equity*, 97 Notre Dame L. Rev. 1985 (2022)........................................... 18

*English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382 (1922) . 18

*Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397 (2018) ................... 18

## INTEREST OF *AMICI CURIAE*

The Attorney General of Florida, on behalf of the State of Florida, 20 other States, and the Arizona Legislature, respectfully submits this amicus brief pursuant to Local Civil Rule 7(o)(1) in opposition to plaintiffs' motion for summary judgment. President Trump lawfully removed plaintiffs from their posts.

The States ceded sovereign authority to the federal government when they joined the union on the understanding that the power of the federal government was limited, that this power would be divided among multiple branches of government, and that the States and their citizens would be able to hold federal officials democratically accountable for their exercise of that power. Yet when it comes to independent agencies, none of that is true. Federal power is instead consolidated in a select few accountable to no one. And that naturally leads to the expansion of that power.

*Amici* have an interest in ensuring that federal officials exercise their power— power that flows from the States themselves—within constitutional limits. After all, "[s]eparation-of-powers principles" do not just "protect each branch of government from incursion by the others"; they "protect the individual" and state sovereignty, as well. *Bond v. United States*, 564 U.S. 211, 222 (2011). The issue here—and the separation-of-powers principles involved in resolving it—go to the heart of the federalist bargain struck by the Framers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Rebecca Kelly Slaughter and Alvaro M. Bedoya challenge President Trump's authority to remove them from their presidentially appointed positions as

1

Commissioners of the Federal Trade Commission ("FTC"). But as FTC Commissioners, plaintiffs exercise significant policymaking discretion within the executive branch and are answerable to no one except the President. Because they are principal officers exercising substantial executive power on behalf of the President, the Constitution requires that they be removable at the President's will. This Court should not be deterred by the Supreme Court's ruling in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). The evaluation of the Commissioners' duties in that case—on which the Court relied to justify statutory restrictions on their removal—no longer holds. If ever it was true, it is no longer the case that the FTC "occupies no place in the executive department" and "exercises no part of the executive power vested by the Constitution in the President." *Id.* at 628. *Humphrey's Executor* thus does not dictate the outcome of this case, and the provision of 15 U.S.C. § 41 purporting to allow removal of Commissioners only "for inefficiency, neglect of duty, or malfeasance in office" should be deemed unconstitutional.

The at-will tenure of executive officers under the U.S. Constitution is important for many reasons, including that it safeguards state sovereignty. When the States surrendered some of their sovereign power to the federal government upon joining the union, they never would have imagined unaccountable officials wielding that power independent of anyone who must answer to the people or the States for its exercise. That was not what the Constitution promised them. Yet when it comes to independent agencies and tenure-protected executive officers, that is precisely what the States get. When independent agencies and tenure-protected officers wield

2

executive power outside the purview of a democratically elected President, it not only usurps the President's authority, but it also strikes at the core of the compact the States agreed to at the Founding. And state sovereignty and individual liberty suffer.

Finally, even if this Court disagrees with all the foregoing, it still cannot grant plaintiffs the relief they seek: (1) an injunction ordering their reinstatement, DE1 ¶ 56, at 19; (2) a declaration that they are entitled to hold their offices, DE1 ¶ 49, at 17; and (3) a writ of mandamus "prohibiting their removal from office," DE1 ¶ 54, at 18. Such relief would flout Congress's decision to channel removal challenges through quo-warranto proceedings. Injunctive relief would violate the longstanding rule that courts may not use their equitable powers to remedy unlawful removals absent an act of Congress. *See, e.g.*, 42 U.S.C. § 2000e-5(g) (authorizing courts to "reinstate[]" employees who suffer discrimination). Reinstatement through a declaration or a writ of mandamus would be no less offensive to the separation of powers. This Court should deny plaintiffs' motion for summary judgment.

## ARGUMENT

Core separation-of-powers principles, bolstered by long historical understanding, require that the President have the authority to remove executive branch officials. That limitation on Congress's power indirectly preserves state sovereignty by ensuring that "independent agencies" are politically accountable should they attempt to intrude in state affairs. And a federal court would in any event lack the authority to reinstate plaintiff to her post.

I.    **The President has absolute authority to remove Commissioners of the Federal Trade Commission.**

"'[T]he 'executive Power'—all of it—is 'vested in a President, who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). And "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789) (J. Madison). That necessarily includes the authority to remove executive officers. Indeed, "lesser officers must remain accountable to the President," for it is his "authority they wield." *Seila Law*, 591 U.S. at 213. Without the power to remove, the President lacks the ability to compel compliance with his directives, *id.* at 213–14, and thus to fulfill his oath to execute the law, U.S. Const. art. II, § 3.

Given the "necessity of an energetic executive," *The Federalist* No. 70, at 472 (Hamilton) (Jacob E. Cooke, ed., 1961), and the legislative branch's historic tendency to "draw[] all power into its impetuous vortex," *The Federalist* No. 48, at 333 (Madison) (Jacob E. Cooke, ed., 1961), it is critical that the President's authority to direct and supervise the executive branch in the performance of its functions be protected from legislative encroachment. As a result, the Supreme Court has recognized only two exceptions to the President's otherwise "exclusive and illimitable power of removal." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935); *see also Seila Law*, 591 U.S. at 215 (referring to the President's "unrestricted removal power"). Neither exception covers a member of the modern-day FTC.

The first exception is for certain inferior officers, and it has been applied to only two: a naval cadet-engineer, *United States v. Perkins*, 116 U.S. 483 (1886), and the so-called independent counsel, *Morrison v. Olson*, 487 U.S. 654 (1988). Whatever its continuing vitality, that inferior-officer exception is inapplicable to members of the FTC. Members of the FTC do not have a superior other than the President. They thus qualify as principal officers under the chief criterion the Supreme Court has recognized for determining whether an Officer of the United States is principal or inferior. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021); *Edmond v. United States*, 520 U.S. 651, 662–63 (1997).

The second exception, recognized in *Humphrey's Executor* and later in *Wiener v. United States*, 357 U.S. 349 (1958), is for "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [i]s said *not to exercise any executive power*." *Seila Law*, 591 U.S. at 216 (emphasis added). *Humphrey's Executor* employed that exception to uphold statutory restrictions on the President's authority to remove FTC Commissioners. To fit the FTC within that narrow exception, *Humphrey's Executor* characterized the FTC as "charged with the enforcement of no policy except the policy of the law." 295 U.S. at 624. "Its duties," the Supreme Court said, "are neither political nor executive, but predominantly quasi-judicial and quasi-legislative." *Id*. The Court thus concluded that the FTC "occupie[d] no place in the executive department" and "exercise[d] no part of the executive power vested by the Constitution in the President," *id*. at 628, taking the FTC

Commissioners outside the category of executive officers who are subject to "the unrestricted power of the President to remove," *Myers v. United States*, 272 U.S. 52, 172 (1926).

That assessment of the authority of FTC Commissioners is no longer accurate. The FTC exercises considerable policymaking discretion in its authority to interpret such open-ended provisions as the prohibition on price discrimination in the Robinson-Patman Act, Pub. L. No. 74-692, 19 Stat. 1526 (1936), and the prohibition on "unfair or deceptive acts or practices in or affecting commerce" in the Wheeler-Lea Act, Pub. L. No. 447, 52 Stat. 111 (1938), designed to expand the authority of the FTC to protect consumers directly, instead of just through antitrust regulation under the Sherman and Clayton Acts. These statutes postdate the decision in *Humphrey's Executor*, and the expansion of FTC authority has only continued apace. *See, e.g.*, Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973); Pub. L. No. 93-637, §§ 205–206, 88 Stat. 2183, 2200–02 (1975). These statutes have also proven a staging ground for considerable political controversy within the Commission,[1] hardly the mark of an agency "charged with the enforcement of no policy except the policy of the law." 295 U.S. at 624.

---

[1] *See, e.g.*, Dissenting Statement of Commissioner Andrew N. Ferguson in the Matter of Non-Alcoholic Beverages Price Discrimination Investigation, Matter No. 2210158 (Jan. 17, 2025), https://tinyurl.com/36fsk8px ("The Democrats intend to 'revive' the Robinson-Patman Act as a political matter. . . . This case is . . . about partisan politics, pure and simple. It is the single most brazen assertion of raw political power I have witnessed during my time as a Commissioner."); J. Howard Beales, *The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection* (May 30, 2003), https://tinyurl.com/4azfn6zr.

The FTC has also recently interpreted its rulemaking authority in 15 U.S.C. § 46(g) in concert with the original prohibition on "unfair methods of competition" in section 5 of the Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 719 (1914) (codified as amended at 15 U.S.C. § 45), to give the FTC authority to promulgate "substantive legal rules" of competition, not just procedural rules or internal operating procedures.[2] One dissenting Commissioner characterized this rulemaking as "by far the most extraordinary assertion of authority in the Commission's history."[3] The FTC, in short, is not the neutral, dispassionate "body of experts 'appointed by law and informed by experience'" that the Supreme Court considered it to be in 1935. *Humphrey's Ex'r*, 295 U.S. at 624 (quoting *Ill. Cent. R.R. Co. v. ICC*, 206 U.S. 441, 454 (1907). It is a policymaking arm of the executive branch, prototypically the type of executive agency whose heads must be freely removable by the President.

Finally, the enforcement authority of the FTC—a quintessentially executive power—has expanded significantly since *Humphrey's Executor* in 1935. Even as of 1938, the FTC enforced the penalties for violation of its cease-and-desist orders by "certify[ing] the facts" supporting an individual or business entity's liability "to the Attorney General," whose duty in turn was "to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection." Pub. L.

---

[2] Dissenting Statement of Commissioner Melissa Holyoak Joined by Commissioner Andrew N. Ferguson in the Matter of the Non-Compete Clause Rule, Matter No. P201200, at 3 (June 28, 2024), https://tinyurl.com/55m6pchn.

[3] Dissenting Statement of Commissioner Andrew N. Ferguson Joined by Commissioner Melissa Holyoak in the Matter of the Non-Compete Clause Rule, Matter No. P201200, at 1 (June 28, 2024), https://tinyurl.com/9hxv84da.

No. 447-49, sec. 3, § 5(*l*), 52 Stat. 111, 114; *id.* sec. 4, § 16, 52 Stat. 116 (1938). Today, by contrast, if the Attorney General "fails within 45 days" to commence, defend, or intervene in such an action, "the Commission may commence, defend, or intervene in, and supervise the litigation of, such action and any appeal of such action in its own name by any of its attorneys designated by it for such purpose." 15 U.S.C. § 56(a)(1).

If there remains any doubt about whether the FTC Commissioners fall within the mine run of presidential appointees who are freely removable by the President, that doubt should be resolved in favor of removability. *Humphrey's Executor* was already straining reality when it proposed the existence of a new class of officers—"a *de facto* fourth branch of Government," *Seila Law*, 591 U.S. at 240 (Thomas, J., concurring)—that acted "in part quasi legislatively and in part quasi judicially." *Humphrey's Ex'r*, 295 U.S. at 628. *Humphrey's Executor* did so based on reasoning "devoid of textual or historical precedent for the novel principle it set forth." *Morrison*, 487 U.S. at 726 (Scalia, J., dissenting). If an officer exercises "quasi-legislative" power, that officer belongs in the legislative branch. If, on the other hand, an officer exercises "quasi-adjudicative" power, that officer belongs in the judicial branch. It could hardly be otherwise, since Congress "lacks the authority to delegate its legislative power." *Seila Law*, 591 U.S. at 247 (Thomas, J., concurring) (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001)). Congress also "cannot authorize the use of judicial power by officers acting outside of the bounds of Article III." *Id.* (citing *Stern*

*v. Marshall*, 564 U.S. 462, 484 (2011)).[4] In suggesting the contrary, *Humphrey's Executor* defied one of the most basic principles of the separation of powers embodied in the American experiment.

Not surprisingly, *Humphrey's Executor* has seen its already shaky foundations eroded over the years. In *Morrison*, the Supreme Court sidestepped *Humphrey's Executor*'s troublesome reliance "on the terms 'quasi-legislative' and 'quasi-judicial,'" instead grounding its endorsement of tenure protection for the independent counsel on the conclusion that tenure protection did not "unduly trammel[] on executive authority." 487 U.S. at 689, 691. *Humphrey's Executor* similarly avoided scrutiny in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, in part because the parties there "agree[d] that the Commissioners [of the Securities and Exchange Commission] cannot themselves be removed by the President except under the FTC Act's standard of 'inefficiency, neglect of duty, or malfeasance in office.'" 561 U.S. 477, 487 (2010) (quoting *Humphrey's Ex'r*, 295 U.S. at 620). But the majority opinion in *Free Enterprise Fund* is replete with reminders that allowing officers to "execute the laws" without plenary presidential supervision "is contrary to Article II's vesting of the executive power in the President," 561 U.S. at 496—a principle squarely at odds with

_____

[4] There are exceptions, of course, as part of the checks and balances of government. For example, the Constitution gives the President a limited role in the legislative process (e.g., to "recommend to [Congress] such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3; and to decide whether to "approve" an act of Congress upon presentment, U.S. Const. art. I, § 7, cl. 2). An executive officer might assist the President in performing these duties. But these explicit textual exceptions merely prove the rule that no implicit exceptions for "quasi-legislative" or "quasi-adjudicative" functions exist.

*Humphrey's Executor*. And most recently, in *Seila Law* and again in *Collins v. Yellen*, 594 U.S. 220 (2021), the Supreme Court took particular care not to widen the application of *Humphrey's Executor* beyond its essential facts. This history counsels in favor of treating the *Humphrey's Executor* exception for politically balanced, multi-member commissions as narrowly as possible.

In short, because of the substantial change in the nature of the duties and authorities of the FTC since the *Humphrey's Executor* decision in 1935, the FTC Commissioners are not entitled to the tenure protections set forth in 15 U.S.C. § 41.

## II. By threatening the separation of powers, "independent" executive officers and agencies in turn threaten state sovereignty.

Whether Congress may shield executive officials from presidential oversight has grave ramifications for *amici* States. Before joining the union, "the several States had absolute and unlimited sovereignty within their respective boundaries." *Republica v. Cobbett*, 3 U.S. 467, 473 (Pa. 1798). By entering a compact under the Constitution, the States "surrendered" some of that sovereignty to the United States. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 435 (1793) (Iredell, J., dissenting). But "in every instance where [their] sovereignty ha[d] not been delegated to the United States, [the States remained] completely sovereign." *Id.* The result was a "system of government" that "differ[ed], in form and spirit, from all other governments, that ha[d] [t]heretofore existed in the world"—a carefully calibrated balance of power between States and the federal government. *Republica*, 3 U.S. at 473. "[T]he United States ha[s] no claim to any authority but such as the States have surrendered to [it]." *Chisholm*, 2 U.S. at 435 (Iredell, J., dissenting).

When ceding that sovereign power, the States ensured that it would be divided among distinct branches of the federal government. They "viewed the principle of the separation of powers as the central guarantee of a just government." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 870 (1991). To protect their sovereignty and preserve individual liberty, the founding States "scrupulously avoid[ed] concentrating power in the hands of any single individual." *Seila Law*, 591 U.S. at 223. The one exception was the executive branch. Because an "energetic executive" is "essential" to perform that branch's "unique responsibilities," the Framers decided to "fortif[y]" that power in "one man." *Id.* at 223–24. To mitigate their concerns over power consolidation, they made the executive branch "the most democratic and politically accountable" in the federal government. *Id.* at 224. Only the President and Vice President are "elected by the entire Nation." *Id.* And because of the nature of the electoral college, they are elected not just by the People, but also by the States. This carefully calibrated "allocation of powers"—essential to the compact the States agreed to upon joining the union—protects "libert[y]" and state "sovereignty." *Bond*, 564 U.S. at 221.

Independent agencies threaten that compact. *See, e.g.*, *Seila Law*, 591 U.S. at 246 (Thomas, J., concurring) (observing that cases like *Humphrey's Executor* "laid the foundation for a fundamental departure from our constitutional structure"). They represent one of the founding States' worst fears: the consolidation of power in one or a few democratically unaccountable officials. *See Seila Law*, 591 U.S. at 222–24. Without "a politically accountable officer [to] take responsibility" for the exercise of executive power, "the public [and the States] can only wonder 'on whom the blame or

11

the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Arthrex*, 594 U.S. at 16 (quoting *The Federalist* No. 70, at 476 (A. Hamilton) (Jacob E. Cooke, ed., 1961)). By eviscerating the "clear and effective chain of command down from the President, on whom all people vote," the actions of independent agencies are deprived of "legitimacy and accountability to the public" and the States. *Id.* at 11 (internal quotation marks omitted).

One need not search long for an egregious example. Just last year, in the afore-cited ruling on non-compete agreements, *see supra* notes 2–3, the FTC banned non-compete clauses in employment contracts nationwide. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024). In "the most extraordinary assertion of authority in the Commission's history," a few unaccountable commissioners "prohibit[ed] a business practice that has been lawful for centuries" and "invalidate[d] thirty million existing contracts." Dissenting Statement of Commissioner Andrew N. Ferguson, *supra* note 3, at 1. And they did so even though "[c]ommercial agreements traditionally are the domain of state law." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979). Nor did the FTC care that 46 states had exercised their sovereign authority to permit noncompete agreements in some form. *See* Ferguson Dissent at 14. But because of the FTC's independence, the States have no one to hold to account for that dramatic intrusion on their sovereignty.[5]

---

[5] The FTC's authority to promulgate the non-compete rule is being tested in several pending cases. *See Ryan, LLC v. FTC*, No. 3:24-cv-986, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024), *appeal docketed*, No. 24-10951 (5th Cir. Oct. 18, 2024); *Props. of the Vills., Inc. v. FTC*, No. 5:24-cv-316, 2024 WL 3870380 (M.D. Fla. Aug. 15, 2024), *appeal docketed*, No. 24-13102 (11th Cir. Sept. 24, 2024).

In sum, the FTC wields extraordinary authority to usurp state sovereignty. To exercise such authority, they must account in the chain of command to the States and their citizens. Anything else is not the sovereign authority the States ceded the federal government when they joined the union.

### III.    Slaughter and Bedoya are not entitled to reinstatement in any event.

The lawfulness of their removals aside, Slaughter and Bedoya still are not entitled to reinstatement. First, they did not seek writs of quo warranto under the D.C. Code, the exclusive remedial process for removed officials. Second, courts sitting in equity have historically lacked the power to reinstate a public official.

### A.    Slaughter and Bedoya did not invoke the exclusive avenue for challenging a federal officer's removal: the statutory quo-warranto process.

Congress may "foreclose" freestanding legal avenues for relief and instead channel legal challenges through a statutory enforcement scheme. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 328–29 (2015); *see Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–20 (1981). To express such an "intent" for a given remedial context, *Armstrong*, 575 U.S. at 328, Congress typically codifies a "comprehensive" enforcement and "remedial scheme." *Nw. Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO*, 451 U.S. 77, 93-94 (1981). In *Sea Clammers*, for instance, this Court determined that two federal environmental laws were "elaborate enforcement provisions" sufficient to prevent alternative enforcement through other causes of action. 453 U.S. at 13–15. Those federal laws "conferr[ed] authority to sue . . . both on government officials and private citizens" for violations

of those laws, and "specified procedures" and available remedies. *Id.* at 13–14. Given that "comprehensive enforcement scheme," the Court concluded that it "must be chary" in allowing other means of enforcement—even other express causes of action like 42 U.S.C. § 1983. *Id.* at 14–15, 20.

Congress has similarly erected a broad remedial scheme for federal officers challenging their removals: the D.C. Code's quo-warranto process. *See* D.C. Code § 16-3501 *et seq.* That scheme is exclusive.

Historically, the writ of quo warranto was the exclusive process for clearing one's title to office. *Delgado v. Chavez*, 140 U.S. 586, 590 (1891) ("[Q]uo warranto is a plain, speedy, and adequate, as well as the recognized, remedy for trying the title to office[.]"). The writ of quo warranto derived from ancient England and was used by "the king, against one who usurped or claimed any office, franchise or liberty of the crown, to inquire" into whether that individual had the right to exercise that office, franchise, or liberty. James L. High, *Extraordinary Legal Remedies* §§ 591–92 (1896) (quo warranto literally means "by what right"). The king's attorney general "prosecuted" the suit, *id.* § 603, though eventually private individuals were able to use the writ to litigate their own disputes over title to office and "quiet the possession" of that office, *id.* § 602.

Congress built upon that common law in enacting the modern quo-warranto framework.[6] The result is a reticulated process for a removed federal officer to

---

[6] *See* An Act to enact Part II of the District of Columbia Code, entitled "Judiciary and Judicial Procedure" codifying the general and permanent laws relating to the

challenge her removal. *See Andrade v. Lauer*, 729 F.2d 1475, 1497–98 (D.C. Cir. 1984). It dictates what situations are covered: where a person "usurps, intrudes into, or unlawfully holds or exercises" a federal office. D.C. Code § 16-3501. It provides how the law is enforced: a "civil action" against the intruder, *id.*, with rules for pleading, *id.* §§ 16-3541, 3544; and "notice" to the alleged intruder, *id.* § 16-3542. And the Code tells litigants where to sue: in "the United States District Court for the District of Columbia." *Id.* § 16-3501.

What is more, the statute details who may enforce the provisions: usually, the Attorney General or a United States attorney. *Id.* §§ 16-3502, 3503. But "[i]f the Attorney General or United States attorney refuses" to sue, an "interested person may apply to the court" to proceed anyway. *Id.* §§ 16-3503; *see also Newman v. United States ex rel. Frizzell*, 238 U.S. 537, 544, 550–51 (1915) (explaining that the Code "gives a person who has been unlawfully ousted before his term expired, a right, on proof of interest, to the issuance of the writ").

Last, as critical here, the Code outlines the available remedies. If quo warranto is issued, the district court must "oust[] and exclude[]" the intruder from office and allow "the relator [to] recover his costs" from the litigation. *Id.* §§ 16-3545. And the Code authorizes compensatory damages, permitting the "relator" to sue "the party ousted and recover the damages sustained by the relator" after obtaining judgment in the initial quo-warranto case. *Id.* §§ 16-3548.

---

judiciary and judicial procedure of the District of Columbia, Pub. L. No. 88-241, § 1, 77 Stat. 602 (1963).

"Given the painstaking detail with which the [D.C. Code] sets out the method" for challenging a removal, it should be clear that "Congress intended" the Code to be the "exclusive" process for testing one's title to office. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11–13 (2012). Yet Slaughter and Bedoya did not so much as mention "quo warranto" in their complaints, let alone invoke the D.C. Code's quo-warranto process or allege facts showing that they have complied with its procedural requirements.

One way or another, the Code does not permit the reinstatement Slaughter and Bedoya seek. It authorizes just three remedies for federal officers challenging their removals: (1) legal "oust[er]" of the "intrude[r]," (2) physical "exclu[sion]" of the intruder from the office, and (3) "damages" for the removed official. D.C. Code §§ 16-3545, 3548. Nowhere does the code authorize reinstatement, either through an injunction or a writ of mandamus. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) (explaining that a statute that "expressly provides a particular remedy or remedies" typically excludes other remedies). That silence is deafening, given that Congress did authorize reinstatement in the Code for quo-warranto proceedings involving D.C.-based corporations. *See* D.C. Code §§ 16-3547 ("[T]he court may render judgment . . . that the relator, if entitled to be declared elected, be admitted to the office."), 3546 (authorizing the court to "perpetually restrain[] and enjoin[] [defendants] from the commission or continuance of the acts complained of"). "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 143 S. Ct. 713, 720 (2023). Here, the difference

is that Congress permitted reinstatement for *corporate* officers but left to the President the power to reinstate *federal* officers. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[T]he character of those who [may] exercise government authority" "is a decision of the most fundamental sort for a sovereign entity[.]").

In sum, Slaughter and Bedoya failed to travel under the D.C. Code—Congress's chosen mechanism for adjudicating federal-officer removals. The Code would not authorize the relief they seek in any event. For either reason, the Court should deny the plaintiffs' summary judgment motion.

## B. Even if Slaughter and Bedoya could seek relief outside of the quo-warranto process, the federal courts cannot grant their requested relief.

Independent of that, Slaughter's and Bedoya's claims fail because courts sitting in equity have never been empowered to reinstate public officials. They cannot dodge that limitation by requesting a declaration or a writ of mandamus.

### 1. Historically, equity courts would not remedy allegedly unlawful removals.

"The remedial powers of an equity court . . . are not unlimited." *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971). Federal courts may issue only equitable remedies "traditionally accorded by courts of equity." *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., joined by Alito, J., dissenting) (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). And history teaches that "[a] court of equity has no jurisdiction over the appointment and removal of public officers." *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924); *Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) (finding it "well settled that a

court of equity has no jurisdiction over the appointment and removal of public officers" (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).

That rule flows from English common law. Recognizing the critical "distinction between judicial and political power," English courts would not wield equity to vindicate a litigant's "political right[]" to office. *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 71, 76 & n.20 (1867) (collecting cases); *see Sawyer*, 124 U.S. at 212 (collecting cases, including *Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 491, 498, 34 Eng. Rep. 190, 193 (Ch. 1810)). In *Earl of Clarendon*, for instance, the English Court of Chancery declined to remove public-school officers for lack of necessary legal qualifications. 34 Eng. Rep. at 191. According to that court, a court of equity "has no jurisdiction with regard either to the election or the [removal] of" officers. *Id.* at 193. Contemporary English cases agreed. *See* Joseph Story, *Commentaries on Equity Pleadings and the Incidents Thereof* §§ 467–70 (2d ed. 1840) (explaining that equity courts would not adjudicate rights of a "political nature"); Seth Davis, *Empire in Equity*, 97 Notre Dame L. Rev. 1985, 2011–12 (2022).[7]

---

[7] Although *Earl of Clarendon* and some cases cited in *Sawyer* involved corporate officers, those legal entities were treated more like governments and public entities. Colonial governments, for example, were created through corporate charters, with "shareholders" acting like modern-day voters and voting for corporate boards that looked like modern-day state and local governments. Nikolas Bowie, *Why the Constitution Was Written Down*, 71 Stan. L. Rev. 1397, 1416-21 (2018); *see also* Letter from John Adams to the Inhabitants of the Colony of Massachusetts-Bay, April 1775, https://founders.archives.gov/documents/Adams/06-02-02-0072-0015. And as noted in *Hagner v. Heyberger*, limits on equitable jurisdiction that applied to "private corporations" apply "*à fortiori*" to "public officer[s] of a municipal character." 7 Watts & Serg. 104, 105 (Penn. 1844); *see also* W.S. Holdsworth, *English Corporation Law in the 16th and 17th Centuries*, 31 Yale L.J. 382, 383-84 (1922) (For both public and private

American courts imported that principle after the Framing. In the early 19th century, courts nationwide denied equitable relief to removed officials, even when the official's ouster was illegal and unauthorized. *Tappan v. Gray*, 9 Paige Ch. 506, 508–09 (Ch. Ct. N.Y. 1842); *see also Hagner*, 7 Watts & Serg. at 105; *Sawyer*, 124 U.S. at 212 (collecting cases). *Hagner* is emblematic. There, the Supreme Court of Pennsylvania declined to enjoin a defendant from unlawfully acting as a school director because it possessed no more power than "an English court of chancery." *Hagner*, 7 Watts & Serg. at 106–07. Because chancery courts traditionally "would not sustain the injunction proceeding to try the election or [removal] of corporators of any description," Pennsylvania's high court held that it could not either. *Id.* Other courts took a similar tack throughout Reconstruction.[8]

This Court confirmed that equitable constraint in *Sawyer*. A locally elected officer there obtained a federal injunction barring local officials from removing him. 124 U.S. at 204–06. After the local officials were held in contempt of that injunction, the Court issued a writ of habeas corpus to vacate their convictions because the injunction was issued without jurisdiction. This Court explained that a federal equity court "has no jurisdiction . . . over the appointment and removal of public officials."

---

corporations, "creation by and subordination to the state are the only terms upon which the existence of large associations of men can be safely allowed to lead an active life.").

[8] *See, e.g.*, *Cochran v. McCleary*, 22 Iowa 75, 91 (1867) ("The right to a public office or franchise cannot, as the authorities above cited show, be determined in equity."); *Delahanty v. Warner*, 75 Ill. 185, 186 (1874) (similar); *Sheridan v. Colvin*, 78 Ill. 237, 247 (1875) (similar); *Beebe v. Robinson*, 52 Ala. 66, 73 (1875) (similar); *Taylor v. Kercheval*, 82 F. 497, 499 (C.C.D. Ind. 1897) (similar); *State ex rel. McCaffery v. Aloe*, 54 S.W. 494, 496 (Mo. 1899) (similar).

*Id.* at 210.[9] A wall of contemporary treatises echoed that understanding.[10] As one 19th-century commentator put it, "[n]o principle of the law of injunctions" "is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." 2 High, *Law of Injunctions* § 1312.

By contrast, there is no established tradition of equity courts' remedying unlawful removals, at least not without express statutory authorization. *See Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) ("'No English case' involved 'a bill for an injunction to restrain the appointment or removal of a municipal officer.'" (quoting *Sawyer*, 124 U.S. at 212)). We know of only two cases[11] in which a federal court sitting in equity reinstated a removed officer, both of which were decided in the later 20th century, and neither of which grappled with limits on federal remedial power. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by" rulings have "no precedential effect."). The lack of historical pedigree for removal-related remedies proves that they were "unknown to traditional equity practice." *Grupo Mexicano*, 527 U.S. at 327.

---

[9] *See also White v. Berry*, 171 U.S. 366, 377 (1898); *Walton*, 265 U.S. at 490; *Baker v. Carr*, 369 U.S. 186, 231 (1962).

[10] *See* 2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909); 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1760 (4th ed. 1918); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 n.98 (1911).

[11] *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983); *Vitarelli v. Seaton*, 359 U.S. 535 (1959).

The absence of a historical equitable remedy is confirmed by the presence of a historical *legal* remedy: the writ of quo warranto. "[T]he exclusive remedy" for "direct[ly] attack[ing]" one's removal has traditionally been "a *quo warranto* action." *Andrade*, 729 F.2d at 1497; *see also Johnson v. Horton*, 63 F.2d 950, 953 (9th Cir. 1933) (agreeing with appellees that "the question of the title to the office cannot be tried by a proceeding in equity, but that the exclusive remedy is by a writ of quo warranto" (quotation omitted)). And because a "court of equity will not entertain a case for relief where the complainant has an adequate legal remedy," quo warranto undercuts any "novel equitable power to return an agency head to his office." *Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting) (quoting *Case v. Beauregard*, 101 U.S. 688, 690 (1880)).

## 2. Declaratory relief is unavailable because it too is a form of equitable relief.

Those same considerations foreclose declaratory relief. A "declaratory judgment," after all, is a "form[] of equitable relief." *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948); *accord Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967) ("[t]he declaratory judgment and injunctive remedies are equitable in nature"). Congress, as well as this Court, has adopted that view. *See* 15 U.S.C. § 2805(b)(1) (stating that "the court shall grant such equitable relief as the court determines is necessary . . . including declaratory judgment"); 8 U.S.C. § 1252(e)(1) (prohibiting "declaratory, injunctive, or other equitable relief" in certain circumstances).

This rule makes sense. A declaration "has virtually the same practical impact as a formal injunction would." *Samuels v. Mackel*, 401 U.S. 66, 72 (1971). As a result, "equitable principles relevant to the propriety of an injunction must be taken into

21

consideration by federal district courts in determining whether to issue a declaratory judgment." *Id.* at 73. In enacting the Declaratory Judgment Act, "Congress . . . explicitly contemplated that the courts would decide to grant or withhold declaratory relief on the basis of traditional equitable principles." *Id.* at 70. A declaratory judgment is therefore "not available when," as here, "the result would be a partial end run around" other equitable precedents. *Green v. Mansour*, 474 U.S. 64, 73 (1985).

Declaratory relief—like its injunctive sibling—provides no quarter for Slaughter and Bedoya.

### 3. Slaughter and Bedoya have not shown a clear legal right to obtain mandamus.

As already noted, *see supra* Part III.A, by channeling claims regarding title to office through the D.C. Code's quo-warranto statute, Congress has foreclosed any use of mandamus to reinstate federal officers. But even if federal courts could use mandamus to reinstate officers, mandamus could issue only if the defendant had shirked a "clear" legal duty. *Heckler v. Ringer*, 466 U.S. 602, 615–16 (1984). Here the alleged duties of the defendants are far from clear.

a. For starters, it is still uncertain whether Slaughter and Bedoya hold legitimate title to office, and they may not establish that title for the first time in a mandamus proceeding. They must first settle the cloud over their title through the statutory quo-warranto process. *See, e.g.*, *People ex rel. Arcularius v. City of New York*, 3 Johns. Cas. 79, 79-80 (N.Y. Sup. Ct. 1802) ("The proper remedy, in the first instance, is by an information in the nature of a quo warranto, by which the rights of the parties may be tried."); High, *Extraordinary Legal Remedies* § 49. Only then is their title

sufficiently "clear" to justify reinstatement through mandamus. *Heckler*, 466 U.S. at 615–16.

That two-step process has stood for centuries. Courts used mandamus to "compel" only "clear and specific dut[ies]" that were "positively required by law." High, *Extraordinary Legal Remedies* § 24. Yet at common law, "the only efficacious and specific" way to clear up one's "title to an office" was through the writ of quo warranto. *Id.* § 49; *see also Delgado v. Chavez*, 140 U.S. 586, 590 (1891); *State v. Otis*, 230 P. 414, 458 (Wash. 1924) ("The petition here shows that the title to an office is involved, and that is a question which may arise just as well where there is only one person asserting title as where there are two."); *People ex rel. Dolan v. Lane*, 55 N.Y. 217, 219 (Ct. App. 1873) ("Indeed, it is doubtful whether the title to an office ought ever to be tried collaterally on proceedings by mandamus instituted in behalf of a party out of possession."). Until quo warranto issued to clarify one's title to office, disputes over title precluded the clarity necessary for reinstatement through mandamus. *See French v. Cowan*, 10 A. 335, 339–40 (Me. 1887).

For that reason, the common law developed a two-step process for a removed officer seeking to oust an intruder and obtain reinstatement. First, officers would resolve clouds on their title through quo warranto: By "*quo warranto*," the courts would "test the title to the office." *Id.* at 340.[12] Then, the aggrieved official would seek

---

[12] *See also The King v. Mayor of Colchester*, 100 Eng. Rep. 141, 141–42 (K.B. 1788); *City of New York*, 3 Johns. Cas. at 79; *The Queen v. Councillors of Derby*, 112 Eng. Rep. 528, 528-29 (Q.B. 1837); *The Queen v. Phippen*, 112 Eng. Rep. 734, 735 (Q.B. 1838); *Bonner v. State*, 7 Ga. 473, 479–80 (1849).

mandamus if the executive refused to restore them to their office: "[B]y *mandamus* the legal officer is put in his place." *Id.*; *see also Chi. Sch. Finance Auth. v. City Council of City of Chi.*, 472 N.E.2d 805, 808 (Ill. 1984) (refusing to issue writ of mandamus because the court had "confidence that the city council will perform its [legal] duty"); *Murray v. Lewis*, 576 So. 2d 264, 267 (Fla. 1990) (similar). Congress presumptively incorporated the same limitations into the modern mandamus framework. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (Congress legislates against the backdrop of common law); *see also Heckler*, 466 U.S. at 616 (noting that "[t]he common-law writ of mandamus" is "codified in 28 U.S.C. § 1361"). Because they have not first tested their right to office through quo warranto, mandamus is not available to Slaughter and Bedoya.

b. Finally, even if the Court could use mandamus to determine title to office *and* restore officers to their positions, Slaughter and Bedoya are not "clear[ly]" right on the merits. *Heckler*, 466 U.S. at 616–17. Given the President's nearly "unrestricted removal power" over officers "who wield executive power," he and his subordinates have no duty to reinstate either of them. *Seila Law*, 591 U.S. at 204. As explained, whatever the nature of the FTC in 1935, when *Humphrey's Executor* was decided, it can no longer be said that the FTC "exercises no part of the executive power vested by the Constitution in the President," 295 U.S. at 628, certainly not clearly so. Slaughter and Bedoya thus have not shown a clear legal right to dislodge the President's decision to remove them through the extraordinary remedy of judicial reinstatement.

24

## CONCLUSION

The Court should deny plaintiffs' motion for summary judgment.

April 28, 2025                              Respectfully submitted,

                                           JAMES UTHMEIER
                                             *Attorney General of Florida*

                                           JEFFREY PAUL DESOUSA
                                             *Acting Solicitor General*
                                           NATHAN A. FORRESTER
                                           DAVID M. COSTELLO
                                             *Chief Deputy Solicitors General*
                                           DARRICK W. MONSON
                                           ROBERT S. SCHENCK
                                             *Assistant Solicitors General*
                                           Office of the Attorney General
                                           PL-01, The Capitol
                                           Tallahassee, FL 32399-1050
                                           (850) 414-3300
                                           jeffrey.desousa@myfloridalegal.com

                                           *Counsel for* Amicus *State of Florida*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and page-length require-ments of Local Civil Rules 5.1(d) and 7(o)(4).

*/s/ Jeffrey Paul DeSousa*
Acting Solicitor General

## CERTIFICATE OF SERVICE

I certify that on April 28, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Jeffrey Paul DeSousa*
Acting Solicitor General
