IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Rebecca Kelly Slaughter**, et al.,

*Plaintiffs*,

v.

**Donald J. Trump**, et al.,

*Defendants.*

**Civil Action No.** 1:25-cv-00909-LLA

---

**Brief of Amicus Curiae Christian Employers Alliance
in Support of Defendants' Cross-Motion for Summary Judgment**

---

**Julie Marie Blake**
D.C. Bar No. 998723
VA Bar No. 97891
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655

**Matthew S. Bowman**
D.C. Bar No. 993261
**Erin M. Hawley***
D.C. Bar No. 500782
**Natalie D. Thompson****
D.C. Bar No. 90026665
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*Attorneys for Amicus Curiae Christian Employers Alliance*

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................iii

Statement of Interest of Amicus Curiae ...................................................... 1

Introduction .................................................................................................. 3

Statement of Facts ....................................................................................... 4

I.    The FTC exercises substantial executive power. .............................. 4

II.   The President removed Slaughter and Bedoya from office. ............. 9

Argument ...................................................................................................... 12

I.    Officers of the United States serve at the pleasure of the President. ........... 12

II.   *Humphrey's Executor* does not control an agency that exercises
      substantial executive power. ........................................................... 17

Conclusion ................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ........................................................................... 5

*Christian Employers Alliance v. Equal Employment Opportunity Commission*,
  719 F. Supp. 3d 912 (D.N.D. 2024) .................................................... 1

*City of Arlington v. Federal Communications Commission*,
  569 U.S. 290 (2013) .......................................................................... 18

*Collins v. Yellen*,
  594 U.S. 220 (2021) ...................................................... 13, 14, 16, 17

*Consumers' Research v. Consumer Product Safety Commission*,
  98 F.4th 646 (5th Cir. 2024) ............................................................. 19

*Dobbs v. Jackson Women's Health Organization*,
  597 U.S. 215 (2022) ............................................................... 6, 18, 19

*Federal Trade Commission v. Kochava Inc.*,
  671 F. Supp. 3d 1161 (D. Idaho 2023) ............................................ 7, 8

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
  561 U.S. 477 (2010) ...................................................... 13, 14, 15, 16

*FTC v. Kochava, Inc.*,
  2025 WL 371082 (D. Idaho Feb. 3, 2025) .......................................... 8

*Humphrey's Executor*,
  295 U.S. 602 (1935) ........................................................... 3, 5, 17, 19

*Morrison v. Olson*,
  487 U.S. 654 (1988) ..................................................................... 4, 13

*Myers v. United States*,
  272 U.S. 52 (1926) ............................................................................ 12

*PHH Corporation v. Consumer Financial Protection Bureau*,
  881 F.3d 75 (D.C. Cir. 2018) ...................................................... 13, 16

*Roe v. Wade*,
  410 U.S. 113 (1973) ........................................................................ 8–9

*Ryan, LLC v. Federal Trade Commission*,
  764 F. Supp. 3d 369 (N.D. Tex. 2024) ............................................... 6

*Seila Law LLC v. Consumer Financial Protection Bureau,*
   591 U.S. 197 (2020) ................................................................. passim

*Trump v. United States,*
   603 U.S. 593 (2024) ................................................................. 4

*VHS Acquisition Subsidiary No. 7 v. National Labor Relations Board,*
   2024 WL 5056358 (D.D.C. Dec. 10, 2024) ........................................... 14, 16–17

**Constitutional Provisions**

U.S. Const. art. II, § 1 ................................................................. 12, 13

U.S. Const. art. II, § 3 ................................................................. 13

**Statutes**

15 U.S.C. § 13 ................................................................. 5

15 U.S.C. § 21 ................................................................. 4

15 U.S.C. § 45 ................................................................. 4, 6, 8

15 U.S.C. § 46 ................................................................. 5

15 U.S.C. § 47 ................................................................. 5

15 U.S.C. § 53 ................................................................. 5

15 U.S.C. § 57 ................................................................. 4

**Regulations**

Children's Online Privacy Protection Rule,
   16 C.F.R. §§ 312.1–.13 (2013) ................................................................. 5

FTC Non-Compete Clause Rule,
   89 Fed. Reg. 38,342 (May 7, 2024) ................................................................. 6

Health Breach Notification Rule,
   16 C.F.R. §§ 318.1–.9 (2024) ................................................................. 5–6

Telemarketing Sales Rule,
   16 C.F.R. §§ 310.1–.9 (2010) ................................................................. 5

## Other Authorities

@RKSlaughterFTC, X (Sep. 9, 2020, 1:28 PM),
    https://x.com/RKSlaughterFTC/status/1303762111433265153 ....................... 9

1 Annals of Cong. (1789) ............................................................................ 15

2 Cong. Rec. (1789) .................................................................................. 16

30 Writings of George Washington (J. Fitzpatrick ed., 1939) .................................. 14

Aditya Bamzai & Saikrishna Bangalore Prakash, *The Executive Power of
    Removal*, 136 Harv. L. Rev. 1756 (2023) .................................................. 15, 16

Complaint for Injunctive & Declaratory Relief, *Christian Employers Alliance
    v. United States Equal Employment Opportunity Commission*,
    No. 1:25-cv-00007 (D.N.D. Jan. 15, 2025) ...................................................... 1, 2

Complaint for Permanent Injunction and Other Relief, *FTC v. Kochava, Inc.*,
    No. 2:22-cv-00377-DCN, 2022 WL 4080538 (D. Idaho Aug. 29, 2022) .............. 8

*Dissenting Statement of Commissioner Alvaro M. Bedoya On the "Emergency"
    Motion to Delegate Authority to the Chairman to Comply with the
    Executive Orders on DEI Programs and Associated Guidance*, FTC File
    No. P859900 (Jan. 23, 2025), https://www.ftc.gov/system/files/ftc_gov/
    pdf/bedoya-statement-emergency-motion.pdf .................................................. 10

Exec. Order No. 14,076, Protecting Access to Reproductive Healthcare
    Services, 87 Fed. Reg. 42,053 (July 8, 2022) .................................................. 6, 7

Exec. Order No. 14,168, Defending Women from Gender Ideology Extremism,
    90 Fed. Reg. 8615 (Jan. 20, 2025) ................................................................ 11

Exec. Order No. 14,173, Ending Illegal Discrimination and Restoring Merit-
    Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025) .................................... 11

Kristin Cohen, *Location, Health, and Other Sensitive Information: FTC
    Committed to Fully Enforcing the Law Against Illegal Use and Sharing
    of Highly Sensitive Data* (July 11, 2022), https://perma.cc/2P6N-QFUV ......... 7

Lauren Feiner, *How FTC Commissioner Slaughter Wants to Make Antitrust
    Enforcement Antiracist*, CNBC (Sept. 20, 2020, 10:45 AM EDT),
    https://www.cnbc.com/2020/09/26/ftc-commissioner-slaughter-on-
    making-antitrust-enforcement-antiracist.html. ................................................ 9

*Legal Library: Cases and Proceedings*, FTC, https://www.ftc.gov/legal-
    library/browse/cases-proceedings ................................................................ 5

Press Release, FTC, FTC Chairman Ferguson Announces that DEI is Over at
the FTC (Jan. 22, 2025), https://www.ftc.gov/news-events/news/press-
releases/2025/01/ftc-chairman-ferguson-announces-dei-over-ftc. ................... 10

Press Release, FTC, FTC Sues Kochava for Selling Data that Tracks People
at Reproductive Health Clinics, Places of Worship, and Other Sensitive
Locations (Aug. 29, 2022), https://www.ftc.gov/news-events/news/press-
releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-
reproductive-health-clinics-places-worship-other ............................................ 8

Proposed Intervenor-Defendants Choices Pregnancy Centers of Greater
Phoenix, Inc. and Christian Employers Alliance's Motion to Intervene,
*Samuels v. Trump*, No. 1:25-cv-01069-TSC (D.D.C. April 24, 2025) ............... 2

Rebecca Kelly Slaughter, Comm'r, FTC, *Antitrust at a Precipice: Remarks as
Prepared for Delivery at the GCR Interactive: Women in Antitrust* (Nov.
17, 2020), https://perma.cc/88FR-9MV5 ............................................................ 9

*Statement of Chairman Andrew N. Ferguson Joined by Commissioner Melissa
Holyoak Motion to Delegate Authority to Chairman to Comply with
January 2025 Executive Orders on DEI Programs and Associated
Guidance*, FTC File No. P859900 (Jan. 23, 2025), https://www.ftc.gov/
system/files/ftc_gov/pdf/ferguson-dei-delegation-statement.pdf ..................... 11

*Statement of Commissioner Rebecca Kelly Slaughter Regarding the Motion to
Delegate Authority to Chairman to Comply with January 2025
Executive Orders on DEI Programs and Associated Guidance*,
FTC File No. P859900 (Jan. 23, 2025), https://www.ftc.gov/pdf/system/
files/ftc_gov/pdf/2025-1-23_rks_statement_motion_delegation.pdf ............... 11

The Federalist No. 51 (James Madison) .............................................................. 14, 16

The Federalist No. 70 (Alexander Hamilton) ...................................................... 14, 17

The Federalist No. 72 (Alexander Hamilton) ............................................................ 15

*What the FTC Does*, FTC, https://www.ftc.gov/news-events/media-
resources/what-ftc-does ...................................................................................... 5

White House, FACT SHEET: President Biden to Sign Executive Order
Protecting Access to Reproductive Health Care Services (July 8, 2022),
https://perma.cc/NHE6-D5J9 .............................................................................. 6

White House, FACT SHEET: White House Task Force on Reproductive
Healthcare Access Announces New Actions and Marks the 51st
Anniversary of *Roe v. Wade* (Jan. 22, 2024), https://perma.cc/3KC7-
D4PD ............................................................................................................ 9

**STATEMENT OF INTEREST OF AMICUS CURIAE†**

This case is about whether officers of the United States can wield executive power independent of the President, and so from the people.

Amicus Christian Employers Alliance and its members have felt firsthand agencies wielding executive power without political accountability. CEA is a nonprofit membership organization that advances the freedom of Christian employers to conduct their businesses consistent with their religious beliefs. Twice in two years, it has sued the Equal Employment Opportunity Commission for unilaterally trying to broaden federal statutes. In one case, CEA successfully challenged EEOC's expansion of Title VII to require employers to provide insurance coverage for gender transitions. *Christian Emps. All. v. EEOC*, 719 F. Supp. 3d 912, 928 (D.N.D. 2024) (*CEA v. EEOC I*). In the other—a case pending today—CEA is challenging EEOC's application of Title VII and the Pregnant Workers Fairness Act. This time, EEOC has forced employers to use employees' self-selected pronouns and to allow males in female-only private spaces. *See* Complaint for Injunctive & Declaratory Relief ¶¶ 37–75, *Christian Emps. All. v. EEOC*, No. 1:25-cv-00007 (D.N.D. Jan. 15, 2025), ECF No. 1 (*CEA v. EEOC II* Compl.). Plus, EEOC required employers to facilitate employees getting abortions, which includes even stopping employers from speaking their pro-life beliefs. *Id.* ¶¶ 105–30.

In other words, EEOC has wielded executive power to make monumental policy decisions on hotly contested issues. Gender transitions, pronoun use, female-only bathrooms, abortion—the list goes on. And as a so-called independent agency, EEOC has done so without political accountability to the President or the people.

---

† Christian Employers Alliance is a North Dakota nonprofit corporation, it has no parent corporation, nor does any publicly held company own 10% or more of its stock. No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

That's a problem. It violates the separation of powers and Article II's vesting of the executive power in the President. Indeed, that is one of CEA's claims in its ongoing case against EEOC. *CEA v. EEOC II* Compl. ¶¶ 291–301. And that is why CEA has moved to intervene in *Samuels v. Trump*, No. 1:25-cv-01069-TSC, where a former EEOC Commissioner also claims the President unlawfully removed her. *See* Proposed Intervenor-Defendants Choices Pregnancy Centers of Greater Phoenix, Inc. and Christian Employers Alliance's Motion to Intervene, *Samuels v. Trump*, No. 1:25-cv-01069-TSC (D.D.C. April 24, 2025), ECF No. 6.

So CEA has an interest in the courts clarifying that independent agencies wielding executive power are unconstitutional. Officers of the United States cannot exercise executive power without direct or indirect supervision from the President. If an official oversteps, he must answer to the President, up to the point of losing his job. The President's dependence on the people provides agency accountability when the agencies are dependent on him. And agencies need that accountability.

Moreover, CEA is interested here because CEA's members are regulated by the Federal Trade Commission. The FTC's powers touch most of the American economy, and so does CEA's membership. For example, the FTC enforces the Magnuson-Moss Warranty Act, which governs warranties on consumer goods, *see* Compl. ¶ 31(a), ECF No. 1, and CEA has members that manufacture and sell consumer goods. The FTC enforces privacy laws, *see id.* ¶ 31(b), (e), and CEA has members that operate online platforms, apps, and services, including some covered by the FTC's Children's Online Privacy Protection Rule. The FTC enforces the Clayton Act and other antitrust laws, *see id.* ¶ 31(c)–(d), (h), which affect many CEA members' businesses. Finally, the FTC has broad enforcement authority when it comes to consumer protection laws, truth-in-advertising regulations, and other statutes prohibiting misleading or deceptive trade practices, *see id.* ¶ 31(f)–(g)— these broad regulatory functions could impact nearly every CEA member.

## INTRODUCTION

The Constitution requires that the President be able to fire executive-branch officials who have substantial policymaking authority. Today's FTC wields substantial executive power. Whatever the FTC's role in 1935, it now investigates alleged violations of many consumer protection and antitrust statutes, brings enforcement actions against private persons, and issues regulations with the force of law. These are core executive functions that put the FTC outside the limited exception to the President's removal power recognized in *Humphrey's Executor*, 295 U.S. 602 (1935). This means FTC Commissioners must be accountable to the President and thus to the people.

Former FTC Commissioners Slaughter and Bedoya pursued aggressive and harmful policies as FTC Commissioners—going so far as to promote "diversity, equity, and inclusion" (DEI) as an enforcement priority for the FTC. When the President removed Slaughter and Bedoya from office, he explained that their continuance in office was inconsistent with his administration's policies and priorities. The Constitution demands no more.

Yet Slaughter and Bedoya have sued the President, demanding a declaration stating they are still in office as FTC Commissioners, and injunctive or mandamus relief. They aim to stop the President from appointing new commissioners who align with his policy positions. If the President cannot exercise his constitutional duty to supervise and remove officers in "independent" agencies like the FTC, there is no democratic accountability when these officials stray from the will of the people. Officers wielding executive power are accountable to the President, and he is accountable to us. The buck stops with him—not with unelected bureaucrats. The Court should deny Slaughter and Bedoya's request for relief.

## STATEMENT OF FACTS

### I.    The FTC exercises substantial executive power.

The FTC wields "vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U. S. economy." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020). It is empowered to prevent nearly any American business "from using unfair methods of competition … and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2). The FTC has other statutory enforcement authority, too—like its power to block mergers and acquisitions under the antitrust laws. The FTC has issued numerous rules and regulations, and it regularly investigates violations and brings enforcement actions. These are core executive functions.

*First*, the FTC possesses broad enforcement and investigative powers over scores of consumer protection and antitrust laws. Investigating violations of the law and bringing enforcement actions are "quintessentially executive function[s]." *Trump v. United States,* 603 U.S. 593, 620–21 (2024) (discussing "investigation and prosecution of crimes" (cleaned up)); *accord Morrison v. Olson*, 487 U.S. 654, 691 (1988) ("law enforcement functions" traditionally are executive); *id.* at 706 (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function.").

As Defendants explain, the FTC has investigative powers and, if it finds a violation, it can adjudicate enforcement action within the agency. *See* Memo. Supp. Defs.' Cross-Mot. for Summ. J.& Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Memo.") at 4–6, ECF No. 33. During the FTC's administrative enforcement proceedings, the FTC may issue cease-and-desist orders and seek monetary penalties and damages for violations. 15 U.S.C. §§ 21, 45, 57; *cf. Seila Law*, 591 U.S. at 219 (agency head "may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications"). The FTC can also initiate civil enforcement actions

4

in federal court. 15 U.S.C. §§ 13(b), 53(b); *see* Defs.' Memo. at 5, 7. "Every year the FTC brings hundreds of cases against individuals and companies for violating consumer protection and competition laws that the agency enforces," and it does so on behalf of the United States.[1] The FTC is thus empowered "to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power." *Seila Law*, 591 U.S. at 219. This is far beyond "submitting recommended dispositions to an Article III court," *id.* at 218–19—the function described as "quasi-judicial" in *Humphrey's Executor*, 295 U.S. at 628 (discussing FTC Act § 7 (codified at 15 U.S.C. § 47 (1914))).

*Second*, the FTC can issue regulations with the force of law. Today's FTC is not limited to "making investigations and reports thereon for the information of Congress." *Humphrey's Executor*, 295 U.S. at 628 (discussing FTC Act § 6 (codified at 15 U.S.C. § 46 (1914)). To the contrary, the FTC "possesses the authority to promulgate binding rules" implementing a jaw-dropping number of federal statutes. *Seila Law*, 591 U.S. at 218. The FTC has jurisdiction over more than 70 laws, including the Federal Trade Commission Act, Telemarketing Sales Rule, Identity Theft Act, Fair Credit Reporting Act, and Clayton Act.[2] "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher v. Synar*, 478 U.S. 714, 733 (1986).

The FTC issues regulations that interpret and apply statutory requirements and govern market participants throughout the economy. For example, the FTC issued and enforces the Telemarketing Sales Rule, 16 C.F.R. §§ 310.1–.9 (2010), the Children's Online Privacy Protection Rule, *id.* §§ 312.1–.13 (2013), and the Health

---

[1]    *See Legal Library: Cases and Proceedings*, FTC, https://www.ftc.gov/legal-library/browse/cases-proceedings (last visited Apr. 28, 2025).

[2]    *See What the FTC Does*, FTC, https://www.ftc.gov/news-events/media-resources/what-ftc-does (last visited Apr. 28, 2025).

Breach Notification Rule, *id.* §§ 318.1–.9 (2024). The FTC's regulations can have a massive economic impact. Near the end of the Biden administration, for example, the FTC issued a regulation prohibiting nearly all noncompete clauses in employment contracts. *See* FTC Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024). As statutory authority for the Non-Compete Rule, the agency pointed to the FTC Act's prohibition on "unfair methods of competition … and unfair or deceptive acts or practices." 15 U.S.C. § 45(a). This rule was vacated before its effective date, with the court explaining that the rule exceeds the FTC's statutory authority. *See Ryan, LLC v. FTC*, 764 F. Supp. 3d 369 (N.D. Tex. 2024), *appeal docketed*, No. 24-10951 (5th Cir. Oct. 24, 2024).

In sum, without any Executive Branch oversight, the FTC "may … issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Seila Law*, 591 U.S. at 225. That's called taking care that the laws be faithfully executed.

The FTC's executive functions are not merely ministerial duties. For instance, after *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), President Biden held a press conference declaring his opposition to Dobbs and "commit[ing] to doing everything in his power to defend reproductive rights and protect access to … abortion." [3] He issued an executive order instructing federal agencies to take action to "protect and expand access to abortion." Exec. Order No. 14,076 § 3, Protecting Access to Reproductive Healthcare Services, 87 Fed. Reg. 42,053, 42,053 (July 8, 2022). One of those agencies was the FTC. President Biden "encouraged" the FTC Chair "to protect consumers' privacy when seeking information and provision of reproductive healthcare services," including through

---

[3]     White House, FACT SHEET: President Biden to Sign Executive Order Protecting Access to Reproductive Health Care Services (July 8, 2022), https://perma.cc/NHE6-D5J9.

enforcement of the FTC Act. *Id.* § 4(b)(1), 87 Fed. Reg. at 42,054 (citing 15 U.S.C. § 41 et seq.). (Given President Biden's many statements promoting abortion, there's no doubt what that meant—privacy laws should be enforced to the benefit of the abortion industry.)

A few days later, the FTC declared its "commit[ment] to fully enforcing the law against illegal use and sharing of … information related to personal reproductive matters."[4] As an example, the FTC identified "products that track women's periods, monitor their fertility, oversee their contraceptive use, or even target women considering abortion."[5] It went on to laud the Massachusetts Attorney General for pursuing consumer protection charges against a pro-life organization that directed advertisements about alternatives to abortion to mobile devices located near abortion facilities.[6] The FTC declared this a "misuse of mobile location and health information."[7] There can be no doubt about the aim of the Biden FTC's enforcement goal—helping the abortion industry, while interfering with pro-life speech intended to advocate for unborn children and give pregnant women information about alternatives.

Just a month later, the FTC implemented this priority by targeting a company that markets geolocation data on the theory that such data could theoretically be used to show that a consumer had been to an abortion clinic. It sued Kochava, Inc., a data analytics company that packages geolocation data sets gathered from consumers who consent to location tracking on mobile devices. *See FTC v. Kochava Inc.*, 671 F. Supp. 3d 1161, 1167 (D. Idaho 2023). The FTC called

---

[4]    Kristin Cohen, *Location, Health, and Other Sensitive Information: FTC Committed to Fully Enforcing the Law Against Illegal Use and Sharing of Highly Sensitive Data* (July 11, 2022), https://perma.cc/2P6N-QFUV.

[5]    *Id.*

[6]    *Id.*

[7]    *Id.*

this an unfair trade practice. Complaint for Permanent Injunction and Other Relief ¶ 34, *FTC v. Kochava, Inc.*, No. 2:22-cv-00377-DCN, 2022 WL 4080538 (D. Idaho Aug. 29, 2022) (citing 15 U.S.C. § 45(a)). The agency claimed that the "geolocation data sales could enable third parties to track consumers' past movements to and from sensitive locations and, based on inferences arising from that information, inflict secondary harms including stigma, discrimination, physical violence, and emotional distress." *Kochava Inc.*, 671 F. Supp. 3d at 1171 (cleaned up). "Reproductive health clinics," unsurprisingly, were first on the Biden FTC's list of "sensitive locations."[8] Geolocation data, the FTC theorized, "could be used to identify people who have visited a reproductive health clinic and therefore expose their private medical decisions," or "used to identify medical professionals who perform … reproductive health services."[9]

The district court dismissed the FTC's original complaint because it failed to "allege[ ] that consumers are suffering or are likely to suffer" harm. *Kochava Inc.*, 671 F. Supp. 3d at 1171. To the contrary, the FTC "only alleges that secondary harms are theoretically possible." *Id.* But the FTC has twice amended its complaint, and for three years the company has been embroiled in litigation. *See FTC v. Kochava, Inc.*, No. 2:22-CV-00377-BLW, 2025 WL 371082 (D. Idaho Feb. 3, 2025).

President Biden touted the FTC's enforcement actions in his "Reproductive Rights Task Force" statement marking what would have been the 51st anniversary

---

[8]    Press Release, FTC, FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations (Aug. 29, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other.

[9]    *Id.*

of *Roe v. Wade*, 410 U.S. 113 (1973).[10] The FTC "has committed to enforcing the law against illegal use and sharing of highly sensitive data, including information related to reproductive health care," the White House explained.[11] "Consistent with this commitment," the White House went on, "the FTC has taken several enforcement actions against companies for disclosing consumers' personal health information, including highly sensitive reproductive health data."[12]

## II. The President removed Slaughter and Bedoya from office.

Slaughter and Bedoya were first appointed to the FTC in 2018 and 2021, respectively. *See* Compl. ¶¶ 25–26. They do not share the President's policy goals. Most prominently, they favor using the FTC to push DEI initiatives and policies.

Slaughter has long been on record in favor of DEI, even going so far as to proclaim that the FTC's antitrust enforcement "can and should be []anti-racist."[13] She thinks antitrust law shouldn't "be neutral in the face of systemic racism and structural racism," and insists that promoting anti-racism "is consistent with the FTC's mission and mandate."[14] So she advocated for using antitrust enforcement "as a tool for combatting structural racism."[15]

---

[10] White House, FACT SHEET: White House Task Force on Reproductive Healthcare Access Announces New Actions and Marks the 51st Anniversary of *Roe v. Wade* (Jan. 22, 2024), https://perma.cc/3KC7-D4PD.

[11] *Id.*

[12] *Id.*

[13] @RKSlaughterFTC, X (Sep. 9, 2020, 1:28 PM), https://x.com/RKSlaughterFTC /status/1303762111433265153.

[14] Lauren Feiner, *How FTC Commissioner Slaughter Wants to Make Antitrust Enforcement Antiracist*, CNBC (Sept. 20, 2020, 10:45 AM EDT), https://www.cnbc.com/2020/09/26/ftc-commissioner-slaughter-on-making-antitrust-enforcement-antiracist.html.

[15] Rebecca Kelly Slaughter, Comm'r, FTC, *Antitrust at a Precipice: Remarks as Prepared for Delivery at the GCR Interactive: Women in Antitrust* 4 (Nov. 17, 2020), https://perma.cc/88FR-9MV5.

On inauguration day, President Trump issued an executive order directing all federal agencies to cease "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)." Exec. Order No. 14,151, Executive Order on Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025).

On his first day as Chair of the FTC, Chairman Ferguson began to implement the President's executive order. "DEI is Over at the FTC," Ferguson announced.[16] He immediately closed the agency's DEI office and terminated its Diversity Counsel, removed DEI materials from FTC websites, and "[o]rdered an immediate review of all Commission orders to ensure that the Biden Administration's DEI dictates did not make their way into formal Commission decisions," among other things.[17] As to actions requiring a vote of the full FTC, the Chair asked "that the Commission delegate to him the authority [needed] to be able to comply fully with President Trump's orders."[18]

Bedoya took umbrage. "Andrew Ferguson could have made his first public act as Chairman a motion to study the rising cost of groceries" or pursue other enforcement priorities, Bedoya complained.[19] "Instead, he cancelled 'DEI.'"[20] As to Slaughter, she declined to vote on the Chairman's motion because she believed she

---

[16]     Press Release, FTC, FTC Chairman Ferguson Announces that DEI is Over at the FTC (Jan. 22, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-chairman-ferguson-announces-dei-over-ftc.

[17]     *Id.*

[18]     *Id.*

[19]     *Dissenting Statement of Commissioner Alvaro M. Bedoya On the "Emergency Motion to Delegate Authority to the Chairman to Comply with the Executive Orders on DEI Programs and Associated Guidance* 1, FTC File No. P859900 (Jan. 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/bedoya-statement-emergency-motion.pdf.

[20]     *Id.* at 2.

"lacked sufficient time to consider the matter."[21] At the same time, she criticized the motion as an "[un]precedent[ed]" and "radical departure from agency practice," that "invites" "lawlessness" by the Chair.[22] And she suggested the motion was a prelude to "chicanery" meant to "unilaterally alter the terms of existing Commission orders."[23]

As Chairman Ferguson observed, "[Bedoya's] are not process objections. Commissioner Bedoya is objecting to the outcome of the election. President Trump campaigned openly on ending DEI in the federal government. … Within hours of his inauguration, he delivered on his promise to the American people and ordered DEI out of the federal government."[24] Bedoya may "wish[ ] that the federal government … continue to advance DEI ideology," but his "objections have nothing to do with" the process for implementing the President's executive order.[25]

On March 18, the President removed both Slaughter and Bedoya from office. *See* Compl. ¶ 33 & Ex. A, ECF No. 1-2. "As presently constituted, the FTC exercises substantial executive power," the President explained. Compl. Ex. A. "The FTC issues subpoenas, 15 U.S.C. § 49, promulgate[s] binding rules, *id.* §§ 46, 57a,

---

[21]    *Statement of Commissioner Rebecca Kelly Slaughter Regarding the Motion to Delegate Authority to Chairman to Comply with January 2025 Executive Orders on DEI Programs and Associated Guidance* 2, FTC File No. P859900 (Jan. 23, 2025), https://www.ftc.gov/pdf/system/files/ftc_gov/pdf/2025-1-23_rks_statement_motion_delegation.pdf.

[22]    *Id.* at 3.

[23]    *Id.* n.8.

[24]    *Statement of Chairman Andrew N. Ferguson Joined by Commissioner Melissa Holyoak Motion to Delegate Authority to Chairman to Comply with January 2025 Executive Orders on DEI Programs and Associated Guidance* 2, FTC File No. P859900 (Jan. 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-dei-delegation-statement.pdf. *See also* Exec. Order No. 14,168, Defending Women from Gender Ideology Extremism, 90 Fed. Reg. 8615 (Jan. 20, 2025); Exec. Order No. 14,173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[25] *Id.*

11

imposes injunctions on private parties, *id.* § 53, and issues final decisions in administrative adjudications, *id.* § 45(g)." Compl. Ex. A. "An independent agency of this kind has 'no basis in history and no place in our constitutional structure,'" the President said. *Id.* (quoting *Seila Law*, 591 U.S. at 220). "Your continued service on the FTC is inconsistent with my Administration's priorities," the President concluded. *Id.* "Accordingly, I am removing you from office pursuant to my authority under Article II of the Constitution." *Id.*

Slaughter and Bedoya have now sued the President, Chairman Ferguson, Commissioner Holyoak, and the FTC's Executive Director, Robbins, arguing that they remain FTC Commissioners. *E.g.* Compl. ¶¶ 3–8. They demand injunctive and declaratory relief that would allow them to once again exercise executive power from within an "independent" agency. *See* Compl. at 19–20.

The Court should deny Slaughter and Bedoya's motion for summary judgment and enter judgment for Defendants. The FTC does not fit within the narrow confines of *Humphrey's Executor*. And even if it did, *Humphrey's Executor* is not good law.

## ARGUMENT

## I.    Officers of the United States serve at the pleasure of the President.

The Constitution requires presidential control over all executive branch officials. So the President may remove an officer for any reason or no reason at all— that is "the rule, not the exception." *Seila Law*, 591 U.S. at 228; *see Myers v. United States*, 272 U.S. 52 (1926) (holding Congress could not require the President to seek advice and consent from the Senate before removing a postmaster). This flows from the very structure of the Constitution and is reflected in the historical record.

Article II places executive power in the President: "The executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1.

And it allows for no exceptions. The "'executive Power'—all of it—is 'vested in a President.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1). And he alone is instructed by the Constitution to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Of course, that job is too big for one person. So the President relies on "subordinate officers" for help. *Seila Law*, 591 U.S. at 204; *accord Collins v. Yellen*, 594 U.S. 220, 252 (2021). But those officers are just that: subordinate. They cannot wield executive power apart from the President. He must be able to "supervise" those "who wield executive power on his behalf." *Selia Law*, 591 U.S. at 204; *see also PHH Corp. v. Cons. Fin. Prot. Bureau*, 881 F.3d 75, 164 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) ("To carry out the executive power and be accountable for the exercise of that power, the President must be able to supervise and direct those subordinate officers.").

To be sure, the text of Article II does not necessarily require direct control over all officers wielding executive power. For example, the President could directly supervise a principal officer who in turn supervises an inferior officer. But the key is that the exercise of executive power is traceable to the President, who has final say. Lesser "officers must remain accountable to the President." *Seila Law*, 591 U.S. at 213. The President must directly or indirectly "by chain of command" control all officers wielding his executive power. *Morrison*, 487 U.S. at 721 (Scalia, J., dissenting). Under Article II's plain language, the "buck stops with the President." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010).

Otherwise, the "entire 'executive Power' [would not] belong[ ] to the President alone." *Seila Law*, 591 U.S. at 213. And he would be unable to ensure the laws are faithfully executed. "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." *Free Enter. Fund*, 561 U.S. at 484. To do that, the President must be able to "hold[ ]

13

[his] subordinates accountable for their conduct." *Id.* at 496; *accord VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 1:24-cv-02577, 2024 WL 5056358, at *3 (D.D.C. Dec. 10, 2024) ("The authority of the President to remove subordinates at pleasure is derivative of the executive power."), *appeal docketed*, No. 25-5021 (D.C. Cir. Feb. 5, 2025). Officers logically "must fear and, in the performance of [their] functions, obey," only "the authority that can remove" them from office. *Seila Law*, 591 U.S. at 213–14 (alteration in original) (cleaned up). That's why the "removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch." *Collins*, 594 U.S. at 252.

This understanding is reflected in the historical record. "[T]he Framers thought it necessary to secure the authority of the Executive so that he could carry out his unique responsibilities." *Seila Law*, 591 U.S. at 223. The "weakness of the executive" needed to "be fortified." *Id.* (quoting The Federalist No. 51, at 350 (James Madison) (J. Cooke ed., 1961)). So the Framers thought it "essential" to create "an energetic executive"—one not bogged "down with the 'habitual feebleness and dilatoriness' that comes with a 'diversity of views and opinions.'" *Id.* at 223–24 (quoting The Federalist No. 70, *supra*, at 471 (Alexander Hamilton)). Instead, the executive would have "the '[d]ecision, activity, secrecy, and dispatch' that 'characterise the proceedings of one man.'" *Id.* at 224 (alteration in original) (quoting The Federalist No. 70, *supra*, at 472).

For that system to work, lesser officers wielding executive authority had to remain "subject to the ongoing supervision and control of the elected President." *Seila Law*, 591 U.S. at 224. The executive officials were to "assist the supreme Magistrate in discharging the duties of his trust." *Id.* at 213 (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed., 1939)). They could not wield executive power apart from the President: "'the lowest officers, the middle grade, and the

14

highest' all 'depend, as they ought, on the President, and the President on the community.'" *Id.* at 224 (quoting 1 Annals of Cong. 499 (1789) (James Madison)).

Indeed, the Framers expressly recognized that the President's executive power included supervising his subordinates. Madison was clear on that: if "any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Seila Law*, 591 U.S. at 213 (quoting 1 Annals of Cong. 463 (1789)). And he was not alone. As Publius, Hamilton wrote that executive officers "ought to be considered as the assistants or deputies of the Chief Magistrate" who are "subject to his superintendence." Aditya Bamzai & Saikrishna Bangalore Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1773 (2023) (quoting The Federalist No. 72, *supra*, at 434 (Alexander Hamilton)). Likewise, William Maclaine "spoke of the Chief Executive being responsible for the orders he gave to revenue 'deputies.'" *Id.* (cleaned up). And antifederalists agreed that one man could better "superintend the execution of laws with discernment and decision, with promptitude and uniformity"—implying the man would direct others under him. *Id.* (cleaned up). In short, the Framers widely believed that the President would oversee those exercising executive power.

Congress debated the removal of executive officers "extensively" in the summer of 1789. *Free Enter. Fund*, 561 U.S. at 492. The House at first settled on including language in a bill saying that the President could remove the Secretary of Foreign Affairs. Bamzai & Prakash, *supra*, at 1774. But representatives worried that the "language might be misread as a legislative grant of removal authority when, in fact, a House majority believed that the President had a constitutional power to remove." *Id.* So the House changed the language to note that the President could remove without implying a Congressional grant of authority: "'Whenever the [officer] shall be removed by the President,' … the chief clerk shall have custody of

15

papers." *Id.* (quoting 2 Cong. Rec. 3 (1789)). And the Senate approved the bill after rejecting amendments to the removal language. *Id.*

As Madison later explained, the prevailing view tracked the Constitution's text and provided "the requisite responsibility and harmony in the Executive Department." *Free Enter. Fund*, 561 U.S. at 492 (cleaned up). That view was that the "executive power included a power to oversee executive officers through removal; because that traditional executive power was not expressly taken away, it remained with the President." *Id.* (cleaned up). Again, the President could oversee through removal. Removal is a method—indeed, "the most direct method"—of control. *Seila Law*, 591 U.S. at 225.

Presidential removal authority is also a democratic safeguard. Unlike agency officials, the President is elected. That's why his control of executive officers "is essential to subject Executive Branch actions to a degree of electoral accountability." *Collins*, 594 U.S. at 252. Indeed, the President is "the most democratic and politically accountable official in Government," being elected by the entire Nation. *Seila Law*, 591 U.S. at 224. And the "solitary nature of the Executive Branch" offers "a single object for the jealousy and watchfulness of the people." *Id.* (quoting The Federalist No. 51, *supra*, at 479). In other words, our system depends on the people holding the President accountable for executive action. But they cannot do so for independent agencies. And that's a problem.

Such agencies "wield considerable executive power without Presidential oversight." *Seila Law*, 591 U.S. at 240 (Thomas, J., concurring in part). They "possess extraordinary authority over vast swaths of American economic and social life." *PHH Corp.*, 881 F.3d at 170 (Kavanaugh, J., dissenting). And that authority can—and often does—include making huge policy decisions that infringe on individual liberty. Limitations on removal can "offer[ ] wayward technocrats the ability to 'clothe the circumstances with so much ambiguity' that no citizen could

16

ever find the right party to hold responsible." *VHS Acquisition Subsidiary*, 2024 WL 5056358, at *6 (quoting The Federalist No. 70, *supra*, at 428). The President's authority to remove subordinates from office therefore "ensure[s]" that they "serve the people effectively and in accordance with the policies that the people presumably elected the President to promote." *Collins*, 594 U.S. at 252.

## II.    *Humphrey's Executor* does not control an agency that exercises substantial executive power.

As the Supreme Court recognized in *Seila Law*, *Humphrey's Executor* has been overtaken by events. Because the *Humphrey's Executor* Court limited its holding "to officers of the kind here under consideration," 591 U.S. at 215 (quoting *Humphrey's Executor*, 295 U.S. at 632), "the contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court," *id.* "Rightly or wrongly, the [*Humphrey's Executor*] Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Id.* (quoting 295 U.S. at 628). Instead, the agency merely performed "specified duties as a legislative or as a judicial aid." *Id.* (quoting 295 U.S. at 628). *Seila Law* read *Humphrey's Executor* to narrowly permit "Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216. And even if the FTC in 1935 "possessed broader rulemaking, enforcement, and adjudicatory powers than the *Humphrey's* Court appreciated," the Court reasoned, "what matters is the set of powers the Court considered as the basis for its decision." *Id.* at 219 n.4. So the narrow *Humphrey's Executor* exception is limited to "multimember expert agencies that do *not* wield substantial executive power." *Id.* at 218 (emphasis added).

That does not describe "the characteristics of the [FTC] before [this] Court" today. *Id.* at 215. As the Supreme Court explained, "[t]he Court's conclusion that

the FTC did not exercise executive power has not withstood the test of time." *Id.* at 216 n.2. Whatever the FTC's functions in 1935, the agency exercises substantial executive power today. It has significant investigative and law enforcement authority, including the power to bring enforcement actions seeking ruinous damages against private persons in federal court. And it possesses significant rulemaking authority, allowing it to promulgate regulations interpreting broad federal statutes like the Sherman Act and the FTC Act with the force of law. By any reckoning, Slaughter and Bedoya exercised substantial executive power as Commissioners of the FTC.

If a government agency adjudicates violations of the law and brings enforcement lawsuits, it is exercising *some* executive power. *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). There is no historical or structural support for executive officials operating outside the chief executive's control. While agency actions may "'take "legislative" and "judicial" forms, … they are exercises of— indeed, under our constitutional structure they *must be* exercises of—the "executive Power.'" *Seila Law*, 591 U.S. at 216 n.2 (quoting *City of Arlington*, 569 U.S. at 304 n.4). And even if some of the FTC's functions today could be described as "quasi-legislative" or "quasi-judicial," in the words of *Humphrey's Executor*, the agency also has "substantial executive power," *Seila Law*, 591 U.S. at 217–18. That means the *Humphrey's Executor* exception cannot allow statutory removal restrictions on FTC Commissioners.

Slaughter and Bedoya's core contention is that Congress could prohibit the President from removing FTC Commissioners from office under *Humphrey's Executor*. *See* Pls.' Memo. Supp. Mot. Summ. J. at 10–14, ECF No. 20-2. If that is right, *Humphrey's Executor* should be overruled. That decision was wrongly decided, and stare decisis principles do not "counsel[ its] continued acceptance." *Dobbs*, 597 U.S. at 263. We recognize that doing so is not open to this Court, but preserve the

18

issue for further review. In brief, the concept of an executive-branch agency that cannot "be characterized as an arm or an eye of the executive," *Humphrey's Executor*, 295 U.S. at 628, is untenable, and the decision failed to address constitutional structure, like Article II's vesting clause. The exception has also proved unworkable, as lower courts have for nearly a century struggled to apply it while respecting other separation of powers doctrines. *Compare, e.g.*, *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 98 F.4th 646, 647–50 (5th Cir. 2024) (Willett, J., concurring in the denial of rehearing en banc), *with id.* at 651–57 (Oldham, J., dissenting from same). And recognizing the President's removal power going forward does not infringe on reliance interests in retaining the *Humphrey's Executor* exception. "*[S]tare decisis* is … at its weakest when the Court interprets the Constitution." *Dobbs*, 597 U.S. at 263 (cleaned up). It does not require retaining *Humphrey's Executor* any longer.

## CONCLUSION

The President lawfully removed Slaughter and Bedoya from their offices in the executive branch. The President must have the power to control any exercise of the Article II executive power. Amicus CEA urges the Court to deny Plaintiffs' motion for summary judgment, grant Defendants' cross-motion for summary judgment, and enter judgment dismissing Plaintiffs' claims.

Respectfully submitted this 30th day of April, 2025.

/s/ Matthew S. Bowman

**Matthew S. Bowman**
D.C. Bar No. 993261
**Erin M. Hawley\***
D.C. Bar No. 500782
**Natalie D. Thompson\*\***
D.C. Bar No. 90026665
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
mbowman@ADFlegal.org
ehawley@ADFlegal.org
nthompson@ADFlegal.org

**Julie Marie Blake**
D.C. Bar No. 998723
VA Bar No. 97891
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

*Counsel for Amicus Curiae*
*Christian Employers Alliance*

*\*Motion for pro hac vice admission filed*
*concurrently*
*\*\*Admission to the Bar of this Court pending oath*
*of office*