**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REBECCA KELLY SLAUGHTER, in her official and personal capacities, and ALVARO M. BEDOYA, in his official and personal capacities, | Case No. 25 Civ. 909-LLA |
| *Plaintiffs*, | Judge Loren L. AliKhan |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, ANDREW N. FERGUSON, in his official capacity as Chair of the Federal Trade Commission, MELISSA HOLYOAK, in her official capacity as Commissioner of the Federal Trade Commission, and DAVID B. ROBBINS, in his official capacity as the Executive Director of the Federal Trade Commission, | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'**
**MOTION FOR EXPEDITED SUMMARY JUDGMENT AND IN OPPOSITION TO**
**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT .............................................................................................1

ARGUMENT ..........................................................................................................................3

I.    Defendants' Attempt to Evade *Humphrey's Executor* Fails .............................................3

    A. Defendants' Argument that *Humphrey's Executor* No Longer Protects FTC Commissioners Must Fail ......................................................................................3

    B. Defendants' Argument Is Based on a Misguided Interpretation of *Seila Law* that Would Overturn *Humphrey's Executor* and Invalidate the 1935 FTC .....................6

        i.    Defendants Overread Seila Law to Reach a Result It Disclaimed .................6

        ii.   Taken "On Its Own Terms," The FTC Remains Comfortably Within the Bounds of Humphrey's Executor ...................................................................12

II.   Defendants Disregard Longstanding Historical Practice in Direct Contravention of Supreme Court Guidance ............................................................................................16

III.  Defendants Do Not Attempt to Show that the FTC Act Prevents the President from Taking Care that the Laws Be Faithfully Executed ..........................................................20

    A. The FTC Has Every Feature Courts Favor When Upholding Removal Protections....21

    B. The FTC Act's Removal Protections Also Allow the President to Exercise the Power Necessary to "Take Care that the Laws Be Faithfully Executed" ................23

IV.  If the FTC Act Gained a Constitutional Defect After 1935, the Offending Amendment Would Be Severed, Not the Removal Restriction ..........................................................27

    A. Traditional Severability Principles Require Severance of Any New Offending Amendment ..............................................................................................................27

    B. This Court Should Not Create a New FTC with At-Will Removal ..........................29

V.   This Court Has the Power to Provide Plaintiffs a Meaningful Remedy ............................30

    A. Defendants Ignore Recent, Persuasive Authority Awarding Declaratory and Injunctive Relief ......................................................................................................31

    B. Defendants Offer No Basis to Deny Declaratory Relief ..........................................32

    C. Defendants Offer No Basis to Deny Injunctive Relief ............................................33

        i.    Governing Law Does Not Limit Plaintiffs to Backpay ...............................34

        ii.   Tradition and History Do Not Limit Plaintiffs' Remedy to Backpay ...........36

    D. The Court Should Enjoin the Non-Presidential Defendants from Interfering With Plaintiffs' Continued Service as FTC Commissioners .............................................38

        i.    Plaintiffs Have Suffered Irreparable Harm .................................................38

        ii.   The Balance of Equities and Public Interest Favor Injunctive Relief ...........41

    E. This Court Can Grant Mandamus Relief ................................................................42

CONCLUSION ......................................................................................................................44

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. First L. Foundation v. Roberts*,
　25 Civ. 1232 (D.D.C. Apr. 22, 2025) ........................................................ *passim*

*AMG Cap. Mgmt., LLC v. FTC*,
　593 U.S. 67 (2021) ...................................................................................... 14

*Armstrong v. Exceptional Child Ctr., Inc.*,
　575 U.S. 320 (2015) .................................................................................... 38

*Baker v. Carr*,
　369 U.S. 186 (1962) .................................................................................... 38

*Barr v. AAPC*,
　591 U.S. 610 (2020) ............................................................................27, 28, 29

*Berry v. Reagan*,
　No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) .............................36, 39, 40

*Bowsher v. Synar*,
　478 U.S. 714 (1986) .................................................................................... 24

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
　601 U.S. 416 (2024) .................................................................................... 19

*In re Cheney*,
　406 F.3d 723 (D.C. Cir. 2005) .................................................................... 42

*Chiafalo v. Washington*,
　591 U.S. 578 (2020) .................................................................................... 19

*Clinton v. Jones*,
　520 U.S. 681 (1997) .................................................................................... 32

*Clinton v. New York*,
　524 U.S. 417 (1998) ................................................................................ 7, 32

*Collins v. Yellen*,
　594 U.S. 220 (2021) ............................................................................. *passim*

*Consumers' Rsch. v. CPSC*,
　91 F.4th 342 (5th Cir. 2024) ................................................................. *passim*

*Dellinger v. Bessent*,
　No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ............................ 36

*E. Griffiths Hughes, Inc. v. FTC,*
    63 F.2d 362 (D.C. Cir. 1933) ........................................................................ 13

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................................... 35

*Free Enterprise Fund v. PCAOB,*
    561 U.S. 477 (2010) .............................................................................. *passim*

*FTC v. Am. Nat'l Cellular, Inc.,*
    810 F.2d 1511 (9th Cir. 1987) ...................................................................... 14

*FTC v. Precision Patient Outcomes, Inc.,*
    No. 22-CV-07307-VC, 2023 WL 3242835 (N.D. Cal. May 3, 2023) .................... 5

*FTC v. Roomster Corp.,*
    654 F. Supp. 3d 244 (S.D.N.Y. 2023) .............................................................. 5

*FTC v. U.S. Anesthesia Partners, Inc.,*
    No. 4:23-CV-03560, 2024 WL 2137649 (S.D. Tex. May 13, 2024) ...................... 5

*g., Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006) ...................................................................................... 35

*Great Lakes Dredge & Dock Co. v Huffman,*
    319 U.S. 293 (1943) ...................................................................................... 32

*Grundmann v. Trump,*
    No. CV 25-425 (SLS), 2025 WL 782665 (D.D.C. Mar. 12, 2025) ............. *passim*

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) .............................................................................. *passim*

*Harkrader v. Wadley,*
    172 U.S. 148 (1898) ...................................................................................... 38

*Harris v. Bessent,*
    2025 WL 980278 (D.C. Cir. Mar. 28, 2025) ............................................ *passim*

*Harris v. Bessent,*
    No. CV 25-412 (RC), 2025 WL 679303 (D.D.C. Mar. 4, 2025) ............ 31, 34, 39

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) .............................................................................. *passim*

*Illumina, Inc. v. FTC,*
    88 F.4th 1036 (5th Cir. 2023) ................................................................. 4, 12

*INS v. Chadha,*
    462 U.S. 919 (1983) ...................................................................................... 14

*Kalbfus v. Siddons*,
    42 App. D.C. 310 (D.C. Cir. 1914) ............................................................................ 34, 42

*Leachco, Inc. v. CPSC*,
    103 F.4th 748 (10th Cir. 2024) .............................................................................. 5, 11, 19

*Leachco, Inc. v. CPSC*,
    No. 24-156, 2024 WL 4817360 (U.S. Nov. 14, 2024) ...................................................... 10

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................................ 41

*Macauley v Waterman S.S. Corp.*,
    327 U.S. 540 (1946) ............................................................................................................ 32

*Mackie v. Bush*,
    809 F. Supp. 144 (D.D.C. 1993) ......................................................................................... 36

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) ......................................................................................................... 5, 6

*Marbury v. Madison*,
    5 U.S. 137 (1803) ......................................................................................................... 32, 44

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) .............................................................................................................. 18

*McPherson v. Blacker*,
    146 U.S. 1 (1892) ............................................................................................................... 18

*Meta Platforms, Inc. v. FTC*,
    723 F. Supp. 3d 64 (D.D.C. 2024) ................................................................................. 4, 14

*Meta Platforms, Inc. v. FTC*,
    No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) ................................................ 4

*Miller v. Clinton*,
    687 F.3d 1332 (D.C. Cir. 2012) .......................................................................................... 35

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................................................................ 18

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) ............................................................................................................ 41

*Moore v. Harper*,
    600 U.S. 1 (2023) ............................................................................................................... 19

*Moore v. United States*,
    602 U.S. 572 (2024) ............................................................................................................ 19

*Morrison v. Olson*,
    487 U.S. 654 (1988)......................................................................................9, 20, 24

*Myers v. United States*,
    295 U.S. (1926)................................................................................................... *passim*

*Nat'l Petroleum Refiners Ass'n v. F.T.C.*,
    482 F.2d 672 (D.C. Cir. 1973).......................................................................... 13

*Nat'l Sec. Archive v. CIA*,
    104 F.4th 267 (D.C. Cir. 2024)........................................................................ 6

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)............................................................................................ 17, 18

*Paroczay v. Hodges*,
    219 F. Supp. 89 (D.D.C. 1963).......................................................................... 36

*Parsons v. United States*,
    167 U.S. 324 (1987)............................................................................................ 37

*PHH Corp. v. CFPB*,
    881 F.3d 75 (D.C. Cir. 2018)............................................................................ *passim*

*President v. Vance*,
    627 F.2d 353 (D.C. Cir. 1980).......................................................................... 33

*Printing Packaging & Prod. Workers Union of N. Am. v. Int'l Bhd. of Teamsters*,
    No. CV 23-1872, 2024 WL 3835353 (D.D.C. Aug. 15, 2024)............................ 33

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015)..................................................................... 41

*Sampson v. Murray*,
    415 U.S. 61 (1974)............................................................................................35, 37, 39

*Samuels v. Mackell*,
    401 U.S. 66 (1971)............................................................................................ 32

*In re Sawyer*,
    124 U.S. 200 (1888)............................................................................................ 38

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)........................................................................................... *passim*

*Service v. Dulles*,
    354 U.S. 363 (1957)........................................................................................... 35, 37

*Severino v. Biden*,
    71 F.4th 1038 (D.C. Cir. 2023)........................................................................ *passim*

*Shurtleff v. United States,*
    189 U.S. 311 (1903)...................................................................................................37

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996)................................................................................ *passim*

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021)...................................................................................................34

*United States v. Curtiss-Wright Exp. Corp.,*
    299 U.S. 304 (1936)...................................................................................................20

*United States v. Midwest Oil Co.,*
    236 U.S. 459 (1915)...................................................................................................18

*United States v. SunSetter Prods. LP,*
    No. 23-CV-10744 2024 WL 1116062 (D. Mass. Mar. 14, 2024) ...........................5

*United States v. Texas,*
    599 U.S. 670 (2023) .................................................................................................13

*Vitarelli v. Seaton,*
    359 U.S. 535 (1959)...................................................................................................35

*White v. Berry,*
    171 U.S. 366 (1898)...................................................................................................38

*Wiener v. United States,*
    357 U.S. 349 (1958)................................................................................................ *passim*

*Wilcox v. Trump,*
    No. CV 25-334 (BAH), 2025 WL 720914 (D.D.C. Mar. 6, 2025) ...........................31, 34, 39

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)...................................................................................18, 35

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015).......................................................................................................18

**Statutes**

15 U.S.C. § 41 ........................................................................................................ *passim*

15 U.S.C. § 45(m)(a) ......................................................................................................14

15 U.S.C. § 57b ..............................................................................................................14

28 U.S.C. § 1361 ............................................................................................................42

31 U.S.C. § 1105(a)(21)(B)............................................................................................23

31 U.S.C. § 1108 ................................................................................................ 23

44 U.S.C. § 3501. .............................................................................................. 16

**Legislative Materials**

Dodd-Frank Act, Pub. L. No. 111-203, §124 Stat. 1376 (2010)................................. 16

Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 719 (1914) .......................... 5, 13

Federal Trade Commission Improvement Act, Pub. L. No. 96-252, §§ 5, 11, 19, 94
    Stat. 374 (1980) ........................................................................................... 16

Federal Trade Commission Act Amendments, Pub. L. No. 103-312, §§ 2, 9, 108
    Stat. 1691 (1994) ......................................................................................... 16

**Executive Materials**

Executive Order No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993).............................. 23

**Administrative Materials**

5 C.F.R. § 1320.3(c) ......................................................................................... 16

16 C.F.R. § 0.8 ................................................................................................ 22

Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43569 (2011)............................ 16

**Other Authorities**

Aditya Bamzai, *Taft, Frankfurter, and the First Presidential for-Cause Removal*,
    52 U. Rich. L. Rev. 691 (2018) ........................................................................ 24

Andrew Kent et. al., *Faithful Execution and Article II*,
    132 Harv. L. Rev. 2111 (2019)......................................................................... 26

Audrey Davis, *A Return to the Traditional Use of the Writ of Mandamus*,
    24 Lewis & Clark L. Rev. 1527 (2020) ............................................................... 43

FTC Press Releases (Jan. 22, Feb. 10, & Feb. 26, 2025), *available at*
    *https://www.ftc.gov/news-events/news/press-releases* ............................................. 22

Jane Manners, Lev Menand, *The Three Permissions: Presidential Removal and the
    Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021) ...................... 24–26

**Constitutional Provisions**

U.S. Const., Art. II, Sec. 3 ................................................................................ 2, 24

## PRELIMINARY STATEMENT

Defendants do not deny that the FTC Act provides that Commissioners can be removed by the President only "for inefficiency, neglect of duty, or malfeasance in office," nor do they offer any alternative interpretation of that statute. 15 U.S.C. § 41. Defendants also admit that Plaintiffs have not, in fact, engaged in any "inefficiency, neglect of duty, or malfeasance in office" and that the President has not accused them of doing so. Thus, there is no dispute: Defendants' attempt to remove Plaintiffs from office violates 15 U.S.C. § 41.

Defendants nevertheless ask this Court to deny Plaintiffs summary judgment—and, indeed, to grant summary judgment in their favor—on two grounds. Neither has merit.

*First*, Defendants assert that the President has inherent authority under Article II to remove FTC Commissioners and thus the removal protections in the FTC Act are unconstitutional. (Def. Mem. Part I.) However, this is precisely the argument a unanimous Supreme Court rejected nine decades ago in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and Defendants' attempts to evade this decision fail, *see infra* Part I.

*Humphrey's Executor* held that the President does not have Article II authority to remove FTC Commissioners at will and that he could not terminate a Commissioner "except for one or more of the causes named in the applicable statute." *Id.* at 632. Defendants concede, as they must, that this decision has not been overruled and that this Court "of course . . . cannot" overrule it either. (Def. Mem. at 2.) But Defendants nevertheless insist that if this Court applies *Humphrey's Executor* "as elaborated on" by *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020) and *Collins v. Yellen*, 594 U.S. 220 (2021), "to the Commission as it exists today," this Court would be compelled to reach the exact opposite conclusion as *Humphrey's Executor* did and invalidate the very same removal protections that decision upheld. (Def. Mem. at 2.)

Defendants' argument has been rejected by every court that has considered it, including

1

this Court and the D.C. Circuit, each of which has held that *Humphrey's Executor* forecloses this contention. *See infra* Section I.A. Defendants' arguments are also unconvincing: they ask this Court to brush aside a century of precedent in favor of an untenable reading of *Seila Law* that ignores broad swaths of that opinion, misconstrues the FTC's authority, side-steps much of U.S. history, and would overturn several Supreme Court decisions and invalidate two-dozen statutes adopted and adhered to by nearly every President and Congress over the last 150 years. *See infra* Section I.B & Part II. And Defendants ask this Court to wreak havoc on the U.S. Code without attempting to explain how the FTC Act's removal protections—which have been in place for 111 years, through the service of 20 Presidents—impede a President's ability to "take Care that the Laws be faithfully executed," U.S. Const., Art. II, Sec. 3. *See infra* Part III.

Finally, even if Defendants could show that one or more post-1935 amendments to the FTC Act violated Article II by giving the FTC too much executive power, only the newly offending amendment(s) should be severed, not the preexisting removal protection at the core of the original law already upheld by the Supreme Court. That is what traditional severability principles dictate, while Defendants' proposed remedy would disfigure the FTC Act by removing a provision Congress placed at the heart of the statutory scheme. *See infra* Part IV.

<u>*Second*</u>, Defendants maintain that even if the President's assertion of Article II power is baseless and his attempt to remove Plaintiffs is patently unlawful, this Court remains powerless to provide a meaningful remedy. (Def. Mem. Part II.) That is false. Plaintiffs' opening submission demonstrated that they are entitled to declaratory and injunctive relief to ensure their ability to continue as FTC Commissioners, and Defendants' effort to rebut this showing by rehashing long-rejected and unsupported arguments falls flat. *See infra* Part V.

Accordingly, Plaintiffs respectfully request that this Court grant summary judgment to

Plaintiffs and issue declaratory and injunctive relief to remedy their illegal purported removals.

## ARGUMENT

### I.    Defendants' Attempt to Evade *Humphrey's Executor* Fails

According to Defendants, "the question" in this case "is not whether *Humphrey's Executor* remains good law"; they concede that it does.  (*See* Def. Mem. at 2, 14.)  Rather, Defendants assert that, after *Seila Law*, the question is "whether the Supreme Court's characterization of a 1935 FTC Commissioner . . . remains true of today's FTC Commissioners." (*Id*. at 14.)  Defendants' contention is simple: they claim that the 1935 FTC "bears no resemblance to the FTC today" (*id.* at 2; *see also id.* at 3–7), and therefore ask this Court to hold that *Humphrey's Executor* should no longer protect FTC Commissioners.

This Court is obliged to reject this argument.  As numerous courts have held, binding Supreme Court precedent forecloses Defendants' reasoning—not only *Humphrey's Executor*, but also the many Supreme Court cases reaffirming it.  *See infra* Section I.A.  Moreover, Defendants' interpretation of *Seila Law* would wipe out 90 years of precedent and threaten every "traditional independent agency headed by a multimember board or commission," 591 U.S. at 207.  That interpretation is profoundly incorrect, cannot be squared with the holding or reasoning of *Seila Law*, and has likewise been repeatedly rejected.  *See infra* Section I.B.  Defendants are effectively asking this Court to do what they concede "of course it cannot do," namely, "overrule *Humphrey's Executor*."  (Def. Mem. at 2.)  This Court must decline that invitation.

### A.    Defendants' Argument that *Humphrey's Executor* No Longer Protects FTC Commissioners Must Fail

Defendants are far from the first litigants to attempt the maneuver they deploy here.  Just last year, in connection with the FTC's long-running litigation concerning Meta Platforms, Inc., Meta raised precisely the argument Defendants now offer, *i.e.*, that the FTC Act's "for-cause

removal protection constitutes an unconstitutional restriction on the president's removal

powers," and that "*Humphrey's Executor* does not dictate the outcome of this case because the

Commission that exists today is a fundamentally different body from the one that existed in

1935." *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 86 (D.D.C. 2024). In other words,

Meta took the position—as Defendants do here—that "*Humphrey's Executor* is effectively a

historical decision that is inapplicable to the current FTC." *Id.*

   This Court (Moss, J.) held that this argument gave the court no "authority (or reason) to

disregard the Supreme Court's holding in *Humphrey's Executor* that the for-cause removal

restriction contained in the FTC Act passes constitutional muster." *Id.* at 87. When Meta

appealed—seeking, in the first instance, an injunction pending appeal—the D.C. Circuit found

this argument no more compelling than Judge Moss had. Meta again "claim[ed] that the Federal

Trade Commission Act likely violates Article II by limiting the President's power to remove the

Commissioners," but the Circuit curtly rejected this contention: "The Supreme Court already

answered this question adversely to Meta. *See Humphrey's Executor v. United States*, 295 U.S.

602, 629–32 (1935). The Supreme Court has not disturbed that precedent." *Meta Platforms, Inc.*

*v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (*per curiam*) (Millett,

Pillard, and Wilkins, JJ.).

   The result has been the same when litigants presented this argument in other Circuits.

Faced with the identical contention—*i.e.*, that the "FTC's authority has changed so

fundamentally as to render *Humphrey's Executor* no longer binding"—the Fifth Circuit

dismissed the issue as one "for the Supreme Court, not us, to answer." *Illumina, Inc. v. FTC*, 88

F.4th 1036, 1047 (5th Cir. 2023) (Clement, J.). The Northern District of California likewise held

that any challenge to the FTC Act's removal protections remained "clearly foreclosed by

Supreme Court precedent." *FTC v. Precision Patient Outcomes, Inc.*, No. 22-CV-07307-VC, 2023 WL 3242835, at *1 (N.D. Cal. May 3, 2023).  And the Southern District of New York dismissed the contention "that *Humphrey's Executor* stands only for the . . . narrow[] proposition that the FTC's structure and powers were constitutional at the time of the decision, *i.e.*, in 1935," as "patently wrong" and accused the defendant of "grossly misinterpret[ing] binding Supreme Court precedent." *FTC v. Roomster Corp.*, 654 F. Supp. 3d 244, 259–60 (S.D.N.Y. 2023); *see also FTC v. U.S. Anesthesia Partners, Inc.*, No. 4:23-CV-03560, 2024 WL 2137649, at *8 (S.D. Tex. May 13, 2024) ("Precedent forecloses this argument.").

Likewise, last year, the Fifth Circuit confronted a parallel set of arguments in a challenge to the Consumer Products Safety Commission (CPSC), which it found to be "[s]tructurally . . . a mirror image of the Federal Trade Commission," and concluded that "*Humphrey's* does settle the question," the CSPC's removal protections are constitutional, and "[o]nly the Supreme Court has [the] power to" reach a different result. *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 346, 356 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024); *see also Leachco, Inc. v. CPSC*, 103 F.4th 748, 761, 763 (10th Cir. 2024) (same), *cert. denied*, 145 S. Ct. 1047 (2025); *United States v. SunSetter Prods. LP*, No. 23-CV-10744 2024 WL 1116062, at *3–4 (D. Mass. Mar. 14, 2024).

In short, as Plaintiffs' opening submission demonstrated (Pl. Mem. at 10–14) and common sense confirms, no "precedent" has more "direct application in a case" than *Humphrey's Executor* does to this one.  *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (internal quotation marks and citations omitted).  Here, again, a President claims Article II authority to disregard the FTC Act's removal protections, the contours of which have not changed by one letter in the intervening 111 years, *compare* FTC Act, Pub. L. No. 63-203, § 1, 38 Stat. 717, 717 (1914) ("Any commissioner may be removed by the President for inefficiency,

neglect of duty, or malfeasance in office."), *with* 15 U.S.C. § 41 (same). This Court is obliged to "follow the case which directly controls," *Mallory*, 600 U.S. at 136, the Supreme Court has repeatedly reaffirmed *Humphrey's Executor* (*see* Pl. Mem. at 12–14), and thus that case still "directly controls [the] particular issue" presented here, *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024).

If Defendants believe that amendments to other provisions of the FTC Act or subsequent Supreme Court decisions have created "tension" with *Humphrey's Executor*, they are free to make that argument in the Supreme Court, *Mallory*, 600 U.S. at 136, as they clearly plan to do (*see* Def. Mem. at 13 n.1). But those contentions cannot carry the day here.

**B. Defendants' Argument Is Based on a Misguided Interpretation of *Seila Law* that Would Overturn *Humphrey's Executor* and Invalidate the 1935 FTC**

Even if this Court could entertain Defendants' attempt to evade *Humphrey's Executor*, their arguments are based on (i) a misreading of both *Seila Law* and *Humphrey's Executor* that would strike down removal protections for *all* agencies—even the 1935 FTC—and (ii) an account of the FTC's powers that fails to do as the Supreme Court has directed and take *Humphrey's Executor* "on its own terms," rather than "through gloss added by a later Court in dicta," *Seila Law*, 591 U.S. at 219 n.4.

*i. Defendants Overread* Seila Law *to Reach a Result It Disclaimed*

Defendants contend that, under *Seila Law*, because "[t]he FTC wields [executive] power . . . FTC Commissioners must therefore be removable at will." (Def. Mem. at 1-2; *see also id.* at 10, 13, 17-18.) Elsewhere, Defendants assert that, "at most," an agency's leaders may have removal protections only if they "'do not wield substantial executive power.'" (Def. Mem. at 16 (quoting *Seila Law*, 591 U.S. at 218); *see also id.* at 2 ("[B]ecause FTC Commissioners exercise substantial executive power, they must be directly accountable to and removable by the

President.").)  The precise measure of "executive power"—"any" or "substantial"—is seemingly of little significance, however, as Defendants further assert that *everything* the FTC does—and, in truth, *anything any* agency does—"must be" an exercise of "executive Power."  (*Id.* at 12.) The conclusion is unavoidable: agencies cannot have removal protections if they "wield executive power" or "substantial executive power," but all agency power is executive power, therefore removal protections are unconstitutional for any agency with any meaningful authority. (*See* Def. Mem. at 1–2.)[1]

This interpretation of *Seila Law* cannot be squared with either its holding or its reasoning:

<u>*First*</u>, Defendants' broad reading disregards the Court's own account of its holding.  The Court repeatedly stated that it was being asked to address a "*new* configuration," *i.e.*, the "*novel* context of an independent agency *led by a single Director*," who "cannot be removed by the President unless certain statutory criteria are met."  591 U.S. at 204 (emphasis added).  The Court found this "configuration" unconstitutional because "[s]uch an agency lacks a foundation in historical practice and clashes with constitutional structure by concentrating power in a *unilateral actor* insulated from Presidential control."  *Id.* (emphasis added).  The fact that the CFPB Director "*acting alone*, wield[ed] significant executive power," *id.* at 238 (emphasis

---

[1] One need not speculate regarding the breadth of Defendants' theory, as the President is simultaneously seeking to invalidate the removal protections for the leaders of the FTC, NLRB, MSPB, and FLRA, using these same arguments. *See Harris v. Bessent*, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025); *Grundmann v. Trump*, No. CV 25-425 (SLS), 2025 WL 782665 (D.D.C. Mar. 12, 2025).  Indeed, this theory seems to know no bounds: an organization with close ties to the President—the America First Legal Foundation—recently filed an action in this Court against Chief Justice Roberts himself, asserting that the Judicial Conference of the United States and the Administrative Office of the U.S. Courts are executive agencies that "must be supervised" not by Chief Justice Roberts but "by executive officers who are appointed and accountable to other executive officers."  *Am. First L. Foundation v. Roberts*, 25 Civ. 1232 (D.D.C. Apr. 22, 2025); *see also* Compl. ¶¶ 10, 44-45.  The action ostensibly concerns FOIA requests, *see generally id.*, but its implications are obviously farther reaching.

added), was the "critical respect" in which that agency differed from others the Court had upheld, *id.* at 207. *Collins v. Yellen* confirmed this view: while not mentioning any of the "executive power" test(s) that Defendants purport to have distilled from *Seila Law*, the *Collins* Court held that "[a] straightforward application of our reasoning in *Seila Law* dictate[d] the result" because "[t]he FHFA (like the CFPB) is an agency *led by a single Director*, and the Recovery Act (like the Dodd Frank Act) restricts the President's removal power." 594 U.S. 220, 251 (2021) (emphasis added). To state the obvious, the 111-year-old, bi-partisan, multimember FTC is not a "novel" entity. *See also Consumers' Rsch.*, 91 F.4th at 355 ("Because the Commission's structure is not novel, *Seila Law* does not apply."); *infra* Part II.

<u>*Second*</u>, *Seila Law* also reaffirmed that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power," *id.* at 204, and, even more specifically, "we do not revisit *Humphrey's Executor* or any other precedent," *id.* at 228; *see Collins*, 594 U.S. at 250–51 (confirming that *Seila Law* "did not revisit our prior decisions allowing certain limitations on the President's removal power"). These statements are flatly inconsistent with the notion that *Seila Law* compels this Court to strike removal protections for the same "traditional independent agenc[ies] headed by a multimember board or commission," *Seila Law*, 591 U.S. at 207, the Supreme Court's undisturbed "prior decisions" upheld; *see also id.* at 204 ("In *Humphrey's Executor* . . . we held that Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause.").

<u>*Third*</u>, despite the Court's declarations, Defendants insist on a reading of *Seila Law* that would not just "revisit" but eliminate all limitations on the President's removal power. Defendants' logic does not withstand scrutiny. True, *Humphrey's Executor* used the nomenclature "quasi-judicial" and "quasi-legislative" to characterize the FTC's functions and

thus concluded, in upholding the FTC Act's removal protections, that an FTC Commissioner "exercises no part of the executive power," *Humphrey's Executor*, 295 U.S. at 628. And the Court did observe in *Morrison v. Olson* that the nomenclature had since evolved and that the FTC's powers in 1935 "would at the present time be considered 'executive,' at least to some degree," 487 U.S. 654, 689 n.28. *Selia Law*'s majority confirmed that point, 591 U.S. at 216 n.2, 219 n.4, and the dissent also agreed that "today we view *all* the activities of administrative agencies as exercises of the 'executive Power,'" *id.* at 278 n.7 (Kagan, J., dissenting). But Defendants make a further leap: if all agency action is now considered "executive power," then "*Humphrey's Executor's* conclusion that the FTC did not wield executive authority was simply incorrect" (Def. Mem. at 14), and that decision no longer protects the FTC because the FTC can no longer be "said not to exercise any executive power," *Seila Law*, 591 U.S. at 216.

There is a glaring flaw in this logic: it would not only invalidate removal protections for "today's FTC Commissioners" (Def. Mem. at 14), it would invalidate *all* removal protections for *all* agency leaders, including those for a "1935 FTC Commissioner" (*id.*), *see Humphrey's Executor*; SEC Commissioners who supervise the PCAOB, *see Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 509 (2010); members of a Commission that adjudicates administrative claims and orders disbursements from the Treasury, *see Wiener v. United States*, 357 U.S. 349 (1958); and an independent counsel performing limited "law enforcement functions," *see Morrison*, 487 U.S. at 691. In other words, Defendants' reading of *Seila Law*—which expressly states that it "[did] not revisit" *Humphrey's Executor* or *any* of these "prior decisions," 591 U.S. at 204—must nevertheless be read to overrule *all of them*. The Court should reject a result so at odds with the Supreme Court's express directives.[2]

---

[2] Defendants' analysis would also collapse the distinction that *Seila Law* and its predecessors

*Fourth*, and finally, Defendants admit that, under their theory, an agency's structure is irrelevant: removal protections are impermissible whether the agency's leadership "acts alone or in a multimember body" (Def. Mem. at 16) and regardless of the "form of the agency" (*id.*). This concession underscores that Defendants' reading of *Seila Law* simply cannot be correct.

Far from disregarding the "form of the agency" (Def. Mem. at 16), *Seila Law* "h[e]ld that the *structure* of the CFPB violates the separation of powers," 591 U.S. at 205 (emphasis added), because it lacked the hallmarks of a "traditional independent agency headed by a multimember board or commission," 591 U.S. at 207, including (a) multimember leadership, (b) partisan balance; (c) staggered terms to ensure regular Presidential appointments and preservation of expertise, (d) participation in the standard appropriations process, and (e) "foundation in historical practice," *id.* at 204.  In addition, underlining the importance of these considerations, seven Justices agreed that Congress could rectify any constitutional infirmity by "converting" the CFPB "into a multimember agency." *Id.* at 237.  Defendants dismiss this "single sentence from the remedies analysis" (Def. Mem. at 16), but as the government observed not long ago, litigants "cannot plausibly maintain that" the Supreme Court "invited Congress to adopt a structure that the preceding pages of the same opinion had just declared unconstitutional." U.S. Brief in Opp., *Leachco, Inc. v. CPSC*, at 15, No. 24-156, 2024 WL 4817360 (U.S. Nov. 14, 2024).

---

have maintained between (1) "'purely executive officers" who under *Myers v. United States*, 295 U.S. 52 (1926), the President has "unrestrictable power . . . to remove"; (2) "officers that closely resembled the FTC Commissioners," who can have removal protection; and (3) those that reside in the "field of doubt" in-between. *See Seila Law*, 591 U.S. at 217 (discussing *Humphrey's Executor*, 295 U.S. at 632).  Defendants' approach effectively treats all agency officials as "purely executive," but the Court unanimously rejected the notion that *Myers* applied "no matter what the relation of the executive to the discharge of their duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure," *Wiener*, 357 U.S. at 352. Indeed, even *Myers* recognized that "[t]he degree of guidance in the discharge of their duties that the President may exercise over executive officers varies with the character of their service as prescribed in the law under which they act." 272 U.S. at 132.

Agency structure has always been critical to the constitutional analysis of removal protections. *Seila Law* reaffirmed that "the characteristics of the agency before the Court" is critical under *Humphrey's Executor*, *see* 591 U.S. at 215. Likewise in *Free Enterprise Fund*, the Court considered structural issues and their impact on the "[t]he President's" ability to "hold the Commission to account," concluding that one level of protection would allow the President to hold the SEC "fully accountable," whereas two levels would "change[] the nature of the President's review," 561 U.S. at 495–96. In addition, structural analysis was at the heart of the dissents in *PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018), from then-Judge Kavanaugh and Judge Henderson, both of which *Seila Law* cites with approval, *see* 591 U.S. at 218, 226. Judge Kavanaugh's dissent, for example (which Defendants also cite, *see* Def. Mem. at 17) contrasted the CFPB with a sample list of 25 other multimember-led independent agencies, *PHH Corp.*, 881 F.3d at 173; traced the "deeply rooted tradition" of independent agencies, *id.* at 177–78; devoted ten pages to describing how multimember bodies preserve both liberty and presidential authority, *id.* at 183–193, and concluded that "the original design, common understanding, and consistent historical practice of independent agencies as multi-member bodies reflect the larger values of the Constitution," *id.* at 187; *see also id.* at 137–164 (Henderson, J., dissenting).

In sum, Defendants ask this Court to ignore all of the above in favor of a tautological analysis focused solely on executive power that flies in the face of *Seila Law*'s holding and reasoning. Courts presented with this argument have either (a) held that *Seila Law* confirms the continued validity of removal protections for traditional multimember agencies, as the Fifth and Tenths Circuits have, *see Consumers' Rsch.*, 91 F.4th at 354–56; *Leachco*, 103 F.4th at 761–62; or (b) held that, at minimum, any "tension" purportedly introduced by *Seila Law* can be resolved only by the Supreme Court, particularly with respect to the FTC, *see supra* Part I.A.

11

The Fifth Circuit's analysis in *Consumers' Research* is particularly instructive. "Having concluded that the [CPSC] exercises substantial executive power (in the modern sense)," the court held that *Seila Law*'s reaffirmance of *Humphrey's Executor* and its extensive focus on the issues described above—"novelty" vs. historical tradition, the CFPB's single director, and agency structure—compelled the conclusion that "*Seila Law*'s holding . . . reach[es] only 'single-Director' agencies," and that it reaffirmed the "simple rule [that] [P]rincipal officers may retain for-cause protection when they act as part of an expert board." 91 F.4th at 353-56. In doing so, the Fifth Circuit expressly rejected the argument that *Seila Law* "held that for-cause removal *always* creates a separation-of-powers violation . . . if the agency at issue exercises substantial executive power (which nearly all agencies do)," concluding that *Seila Law* cannot be "read . . . so broadly," particularly as "dozens of other agencies would all be unconstitutionally structured" under such a theory, *id.* at 345, 352.

Whether this Court concludes that Defendants' reading of *Seila Law* is incorrect, that their argument is properly directed to the Supreme Court, or both, Plaintiffs prevail here.

   ii.   <u>Taken "On Its Own Terms," The FTC Remains Comfortably Within the Bounds of</u> Humphrey's Executor

Any argument that "the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is" either inconsistent with *Seila Law* or, at a minimum, "for the Supreme Court, not [this Court], to answer," *Illumina* 88 F.4th at 1046–47, *see supra* Section I.B.i. To the extent it is relevant however, Defendants fail to show that the FTC is no longer "an agency with the characteristics assessed in" *Humphrey's Executor* (Def. Mem. at 13). *Seila Law* instructs that, while we no longer use the terms "quasi-judicial" and "quasi-legislative" to describe agency functions, 591 U.S. at 219 n.4, 287 n.7, *Humphrey's Executor* should be taken "on its own terms, not through gloss added by a later Court in dicta," and "what

matters is the set of powers the Court considered as the basis for its decision," *id.* at 219 n.4. Defendants' analysis of FTC powers (Defs. Mem. at 10–13) fails this test in multiple respects.

*First*, Defendants repeatedly highlight powers that the FTC had at its inception, notwithstanding *Humphrey's Executor*. Defendants point to the FTC's investigatory powers, its administrative complaints, and its adjudication and rulemaking powers (Def. Mem. at 11–12). But the FTC was always able to perform investigations, FTC Act § 6(a), 38 Stat. at 721; including with subpoena power, *id.* § 9, 38 Stat. at 722; always had the power to serve administrative complaints and perform adjudications, *id.* § 5(b), 38 Stat. at 720; and likewise had rulemaking authority since its inception, *id.* § 6(g), 38 Stat. at 722; *Nat'l Petroleum Refiners Ass'n v. F.T.C.*, 482 F.2d 672, 698 (D.C. Cir. 1973); *see also E. Griffiths Hughes, Inc. v. FTC*, 63 F.2d 362, 363 (D.C. Cir. 1933) ("we have uniformly held that a regulation adopted under [the FTC Act] has the force of law").[3] And, indeed, *Humphrey's Executor* "considered" nearly all of these powers, including, *inter alia*, the powers to issue complaints, 295 U.S. at 620, perform adjudications, *id.*, undertake investigations, *id.* at 621, issue cease and desist orders, *id.* at 620–21, and seek enforcement of those orders in the Courts of Appeals, *id.* With respect to rulemaking, in particular, the *Humphrey's Executor* court discussed Section 6, *id.* at 621, and characterized the FTC as "quasi-legislative," *id.* at 624, 628, and 629, which was understood then as now as referring to legislative-style activity like rulemaking.[4]

---

[3] To the extent Seila Law opined that "what matters is the set of powers the Court considered as the basis for its decision, *not any latent powers that the agency may have had not alluded to by the Court*," 591 U.S. 197, 219 n.4 (emphasis added) (quoted in Def. Mem. at 14), this statement responded to Justice Kagan's assertion that, under this Circuit's precedent, the FTC has had rulemaking authority since its inception under § 6(g) of the FTC Act. *Id.* at 287 n.10 (citing *Nat'l Petroleum Refiners Assn.*, 482 F.2d at 686.) The Supreme Court has not opined on that holding, and Chief Justice Roberts declined the invitation to do so.

[4] *See e.g.*, *United States v. Texas*, 599 U.S. 670, 696 (2023) (Gorsuch, J., concurring) ("At the time of the APA's adoption, conventional wisdom regarded agency rules as 'quasi-legislative' in

*Second*, Defendants point to certain authority the FTC gained after 1935 but ignore the fact that these powers are either (a) functionally related to the powers *Humphrey's Executor* considered, or (b) are controlled by the Executive.  Specifically, Defendants point to the FTC's powers to seek equitable relief in the form of injunctions or disgorgement (Def. Mem. at 15), but again, the FTC's applications for equitable relief cannot be meaningfully distinguished from the original FTC's power to issue cease and desist orders, which *Humphrey's Executor* discussed at length.  295 U.S. 602, 620–21; *see FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987) ("In *Humphrey's Executor,* the Court discussed the FTC's power to issue cease and desist orders, and to obtain enforcement of those orders from the courts of appeals. . . . [T]he FTC's current power to seek injunctive relief pursuant to section 13(b) does not so materially differ from the power to seek cease and desist orders as to render *Humphrey's Executor* inapposite.").  The FTC's power to apply for equitable monetary relief, such as disgorgement, is also closely related to its powers to issue cease and desist orders and seek their enforcement in court, which, again, *Humphrey's Executor* specifically considered.  295 U.S. at 620-21; *see also AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77 (2021) (describing FTC's power under, *inter alia*, 15 U.S.C. § 57b, which allows for monetary relief solely "where the Commission has issued cease and desist orders, *i.e.*, where the Commission has engaged in administrative proceedings").

The FTC's power to seek monetary penalties (as opposed to rescission or disgorgement) is highly constrained.  The ability to seek penalties under § 45(*l*) is hardly "independent," as such penalties may only be "'recovered in a civil action brought by the Attorney General of the United States' in a U.S. District Court."  *Meta*, 723 F. Supp. at 64.  The FTC can seek penalties under 15

---

nature."); *INS v. Chadha*, 462 U.S. 919, 954 n.16 (1983) ("some administrative agency action—rulemaking, for example—may resemble 'lawmaking'" and the Court "has referred to agency activity as being 'quasi-legislative' in character").

U.S.C. § 45(m)(a), but only for conduct "previously identified as prohibited in a final cease and desist order" or a rule passed to prohibit deceptive conduct—*i.e.*, in defense of the proceedings *Humphrey's Executor* upheld, including with respect to enforcing them in court. *See* 295 U.S. at 620-21. Moreover, any targeted conduct must have been (a) previously "defined with specificity"; and (b) undertaken with "actual knowledge that such act or practice is unfair or deceptive," and any penalty remains (c) subject to a court's assessment of "degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require," *id.* §§ 45(m), 57a(a)(1)(B)–(2).

Defendants also reference the 1938 expansion of the FTC's mandate to include consumer protection (*see* Def. Mem. at 6), but that change altered the subject-matter of the FTC's work, not the structure or "character of the agency" on which a removal protection's constitutionality "depend[s]." 295 U.S. at 631. Indeed, *Collins* held that, in this context, "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." 594 U.S. at 224

*Third*, Defendants tell a one-sided story: since 1935, the President's control of the Commission has increased, and the FTC's authority has been reduced in some respects.

Fifteen years after *Humphrey's Executor*, Congress and the President amended the FTC Act to grant the President the authority to designate the FTC Chair, who was given significant administrative and agenda-setting control over the Commission. (*See* Pl. Mem. at 4; *infra* Section III.A.) This new authority "serve[s] as a check on the [agency's] authority and help[s] bring the agency in line with the President's preferred policies." *Seila Law*, 581 U.S. at 225; *see also PHH Corp.*, 881 F.3d at 189–90 (Kavanaugh, J., dissenting) (detailing Presidential "control" and

"influence" over agenda-setting, budgetary, and personnel matters through multimember agency

chairs).  Defendants ignore this critical post-1935 change to the FTC Act.

In addition, in the 1980 Federal Trade Commission Improvement Act, Congress

restricted the FTC's activities in a variety of areas, including children's advertising, the funeral

industry, and investigations of the insurance industry.  *See* Pub. L. No. 96-252, §§ 5, 11, 19, 94

Stat. 374.  In the Federal Trade Commission Act Amendments of 1994, Congress restricted the

FTC's authority over agriculture cooperatives and required the Commission to consider any

countervailing benefits to consumers before declaring a practice unfair under section 5.  Pub. L.

No. 103-312, §§ 2, 9, 108 Stat. 1691.  In the Paperwork Reduction Act, Congress required the

FTC to submit any attempts to collect information from ten or more persons to review by the

Office of Management and Budget.  *See* 44 U.S.C. § 3501 *et seq.*; 5 C.F.R. § 1320.3(c).  And in

2010, as part of the Dodd-Frank Act, Congress transferred enforcement of fourteen FTC rules to

the CFPB.  *See* Pub. L. No. 111-203, §124 Stat. 1376 (2010); Identification of Enforceable Rules

and Orders, 76 Fed. Reg. 43569 (2011).  Defendants likewise mention none of these changes.

In sum, even if it were necessary for this Court to analyze this issue—which it is not, *see*

*supra* Section I.A—today's FTC fits within *Humphrey's Executor*, "taken . . . on its own terms,"

*Seila Law*, 591 U.S. at 219 n.4.

## II.    Defendants Disregard Longstanding Historical Practice in Direct Contravention of Supreme Court Guidance

The flaws in Defendants' position outlined above are sufficient to compel this Court to

enter judgment for Plaintiffs.  However, several other deficiencies further confirm that this Court

should reject Defendants' effort to invalidate the FTC Act's removal provisions.

The question before the Court is no different than it was 90 years ago: "Whether the

power of the President to remove an officer shall prevail over the authority of Congress to

condition the power by fixing a definite term and precluding a removal except for cause."
*Humphrey's Executor*, 295 U.S. at 631.  When "the interpretive questions . . . concern the
allocation of power between two elected branches of Government," a court should "put
significant weight upon historical practice," including "practice [that] began after the founding
era," and should "hesitate to upset the compromises and working arrangements that the elected
branches of Government themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 524–
26 (2014) (emphasis omitted) (collecting cases).  (*See also* Pl. Mem. at 21.)  Plaintiffs' opening
submission situated the 111-year-old FTC within a long tradition of boards, commissions, and
agencies whose leaders are provided by law some form of for-cause removal protection to ensure
the integrity of their decision-making.  (*See* Pls. Mem. Part III.C; *see also* Brief of Professor Jed
Handelsman Shugerman as *Amicus Curiae* in Support of Plaintiffs' Motion for Expedited
Summary Judgement, ECF 29, at Parts II-III; Brief of Members of Congress as *Amici Curiae* in
Support of Plaintiffs' Motion for Expedited Summary Judgment, ECF 23-1 (Congressional
Amicus) at Parts II–III.)  The FTC is the quintessential "traditional independent agency headed
by a multimember board or commission," *Seila Law*, 591 U.S. at 207, whose structure is
mirrored in numerous statutes adopted and adhered to by every Congress and President over the
last 150 years, has been repeatedly reaffirmed by the Supreme Court, and which has roots
running back far to the Founding and, indeed, long before.  (*See* Pl. Mem. Part III.C.)

    Defendants dispute none of this history.  Indeed, they barely acknowledge it. After
pausing to gesture again toward the notion that the FTC's authority has changed over time,
Defendants simply state that the existence of numerous "other agencies with removal protections
. . . is immaterial to this court's analysis." (Defs. Mem. at 17.)  This is profoundly mistaken.

    Defendants' narrow, ahistorical approach defies direct instructions from the Supreme

Court about how a court should analyze separation-of-powers issues. *See Noel Canning*, 573 U.S. at 524–26. For example, while Defendants passingly cite then-Judge Kavanaugh's dissent in *PHH Corp.* in this context,[5] that opinion is a monument to the fact that "historical practice matters to separation of powers analysis." 881 F.3d at 179–81. Here is merely a sample of the "long line of Supreme Court precedent" Judge Kavanaugh compiled to illustrate the point, *id.*:

- "In separation-of-powers cases this Court has often put significant weight upon historical practice." *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015). . . .

- "[T]raditional ways of conducting government . . . give meaning to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989).

- "Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring). . . .

- "Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character." *The Pocket Veto Case*, 279 U.S. 655, 689 (1929).

- In "determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation." *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915).

- "[W]here there is ambiguity or doubt [in the words of the Constitution], or where two views may well be entertained, contemporaneous and subsequent practical construction are entitled to the greatest weight." *McPherson v. Blacker*, 146 U.S. 1, 27 (1892).

- A "doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.)

---

[5] Defendants cite this opinion for the proposition that Presidents have not "consistently acquiesced to Congress's attempts to impose restraints on Article II removal authority" (Def. Mem. at 17). But the page cited (881 F.3d at 169), and Defendants' accompanying citation to *Humphrey's Executor* itself (Def. Mem. at 17), indicate that Defendants are merely noting that, 90 years ago, President Roosevelt challenged the FTC's removal protections. Given that this challenge was then forcefully rejected by a unanimous Supreme Court and has not been repeated since, this is hardly a helpful historical anecdote for Defendants.

316, 401 (1819).[6]

Thus, the long history of consistent practice among all three branches, which has led to the creation of numerous "other agencies with removal protections" is not "immaterial" (Def. Mem. at 17). Rather, it is central to the analysis. And it is a long history indeed: over the last 150 years, Congress has passed and Presidents have signed dozens of laws establishing multimember commissions, tasked them with a variety of responsibilities, and granted their leaders some form of removal protection, the prototype of which is the FTC standard at issue here—"inefficiency, neglect of duty, or malfeasance in office"—which is used in the statutes governing "two-dozen multimember independent agencies," *Seila Law*, 591 U.S. at 230. (Pl. Mem. at at Part III.C; Congressional Amicus at Part II.) The Supreme Court has repeatedly endorsed this structure over the last century: first, directly and unanimously in *Humphrey's Executor*, then, again unanimously, in *Wiener*, 357 U.S. 349, and more recently in opinions in which the *failure* to adhere to this well-established "tradition[]" was decisive, *see Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 251; *Free Enter. Fund*, 561 U.S. at 501; *PHH Corp.*, 881 F.3d at 174 (Kavanaugh, J., dissenting) (contrasting CFPB with "the deeply rooted historical practice of independent agencies as multi-member agencies").[7]

---

[6] The Supreme Court has continued to reiterate this principle. *See Moore v. United States*, 602 U.S. 572, 592 (2024) ("Such a '[l]ong settled and established practice' can carry 'great weight in' resolving constitutional questions—and here it reflects and reinforces this Court's precedents." (citation omitted)); *Moore v. Harper*, 600 U.S. 1, 32 (2023) ("We have long looked to settled and established practice to interpret the Constitution." (internal quotation marks and citations omitted)); *Chiafalo v. Washington*, 591 U.S. 578, 592–93 (2020) (same); *see also CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442, 445 (2024) (Kagan, J., joined by Sotomayor, Kavanaugh, and Barrett, JJ., concurring) (citing "[t]he way our Government has actually worked, over our entire experience" as "reason to uphold Congress's decision about how to fund the CFPB")

[7] *See also Leachco*, 103 F.4th at 760 ("This nation's history indicates that Congress and the President have both long valued a relatively independent agency as a means of addressing specialized disputes with specialized expertise and providing at least a temporal degree of some

Thus, while Defendants urge this Court to disregard the fact that their reading of *Seila Law* would "stamp [a] multitude of comparable acts . . . as likewise invalid," the Supreme Court has long instructed that such an "impressive array of legislation" should be given "unusual weight": "A legislative practice such as we have here, evidenced not by only occasional instances, but marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice . . . ." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327–28 (1936). That Defendants do not even try to reconcile their position with the contrary and "[l]ong settled and established practice" of all three branches, *The Pocket Veto Case*, 279 U.S. at 689, further undermines their already untenable argument.[8]

## III.    Defendants Do Not Attempt to Show that the FTC Act Prevents the President from Taking Care that the Laws Be Faithfully Executed

Defendants' submission suffers from yet another telling omission: they invoke the President's "responsibility to 'take Care that the Laws be faithfully executed" (Def. Mem. at 1) but make no effort to explain (a) what level of control and influence the President actually has over the FTC and its Commissioners; or (b) why that arrangement supposedly falls short of the Take Care Clause's requirements. Indeed, Defendants ask this Court to declare that 15 U.S.C.

---

independence for the agency from short-term political pressures that may not always have been welcome, even by the President."); *see also Morrison v. Olson*, 487 U.S. 654, 724-25 (1988) (Scalia, J., dissenting) (stating that since *Humphrey's Executor*, "removal restrictions have been generally regarded as lawful for so-called 'independent regulatory agencies'").

[8] The fact that "the constitutionality of" the "removal protections" that apply to the NLRB and MSPB are also "the subject of pending litigation" (Def. Mem. at 17) only underscores this point. Defendants are in no position to deny that the arguments they make in this case would, if adopted, also invalidate the removal protections of every other similar "agenc[y] with removal protections," as that is the precise purpose of the other "pending litigation[s]" they have brought on by terminating other agency leaders in violation of their statutory rights (*id.*).

§ 41 is an unconstitutional intrusion on the President's Article II authority (*id.*), but do not provide any account of what it does, and does not, allow the President to do.

This omission is presumably driven, again, by Defendants' belief that, under *Seila Law*, whether their leaders "act alone or in a multimember body," agencies that exercise executive power (or, "at most," "substantial executive power") cannot have removal protections, and thus no further discussion is required. *See supra* Section I.B.i. This simplistic overreading of *Seila Law* is wrong: *Seila Law* and its predecessors demonstrate that any Article II analysis of an agency's removal protections requires a practical consideration of the "direct" and "indirect methods of Presidential control" the relevant statutory structure provides. *Seila Law*, 591 U.S. at 204, 225–226; *see also supra* Section I.B.i. Defendants "emphasize[] that this case is only about the Commission. But the Supreme Court has told us to decide the case by comparing *this* Commission to others," *Consumers' Rsch.*, 91 F.4th at 354, and that analysis entirely favors upholding the FTC Act's removal protections.

### A. The FTC Has Every Feature Courts Favor When Upholding Removal Protections

The structural analysis undertaken by *Seila Law* and related cases demonstrates that the FTC boasts every one of the features of Presidential control that courts have relied on to find removal protections permissible under Article II. Specifically:

- FTC Commissioners are nominated by the President. *See* 15 U.S.C. § 41.

- The FTC has five Commissioners, *see id.*, and thus respects the "constitutional structure," which, with "the sole exception of the Presidency . . . scrupulously avoids concentrating power in the hands of any single individual." *Seila Law*, 591 U.S. at 224–25; *see Consumers' Rsch.*, 91 F.4th at 354 (identifying single-Director leadership as "the defining feature that the Supreme Court in *Seila Law* relied on to hold the CFPB unconstitutional").[9]

---

[9] Of course, courts have also emphasized that the FTC's multimember structure has benefits beyond the influence it gives the Executive Branch. For example, a multi-member structure "helps to prevent arbitrary decision-making and abuse of power, and to protect individual

- The FTC requires partisan balance among Commissioners, *see* 15 U.S.C. § 41; *see Seila Law*, 591 U.S. at 218.

- FTC Commissioners serve staggered terms to ensure that Presidents can regularly appoint Commissioners. *See id.* Here, President Trump nominated all five Commissioners during his first term, and has already nominated and confirmed another in the first months of his second term. (Plaintiffs' Statement of Material Facts Not in Dispute, ECF No. 20-1 (Pl. SMF) ¶¶ 1, 2, 24.) The FTC's "staggered terms" also "guarantee[] that there [will] always be some Commissioners who ha[ve] accrued significant expertise." *Seila Law*, 591 U.S. at 218.

- Since 1950, the President has had the power to select the Chair of the FTC, *see* 15 U.S.C. § 41, which "serve[s] as a check on the" Commission's "authority and help[s] bring the agency in line with the President's preferred policies." *Seila Law*, 591 at 225; *PHH Corp.*, 881 F.3d at 189–90 (Kavanaugh, J., dissenting) (detailing critical agenda-setting, budgetary, and personnel powers granted to multimember agency chairs).

- The President's chosen Chair is the "executive and administrative head of the agency," and controls the agency's expenditures and personnel decisions, *see* 16 C.F.R. § 0.8.[10]

- The power to appoint the Chair also grants the President "some control over the direction of . . . agencies within days of taking office at the start of their first terms," even if a Commission seat is not immediately open. *Id.* Here, President Trump made Defendant Ferguson Chair effective the first day of the President's second Term. (Pl. SMF ¶ 14.)

- The FTC Chair is removable at will and thus subject to direct Presidential control as leader of the Commission. *See PHH Corp.*, 881 F.3d at 188 (Kavanaugh, J., dissenting) ("In traditional multi-member agencies, the President may designate the chair of the agency, and the President may remove a chair at will from the chair position.").

- "The FTC is and always has been subject to the appropriations process" and "must go to the Congress every year with a detailed budget request explaining its expenditure of public money," and "the Presentment Clause gives the President the power to veto

---

liberty." *PHH Corp.*, 881 F.3d at 183–84 (Kavanaugh, J., dissenting) ("As a former Chair of the Federal Trade Commission has explained, it takes 'a consensus decision of at least a majority of commissioners to authorize, or forbear from, action.' That in turn makes it harder for the agency to infringe your liberty." (quoting Edith Ramirez, *The FTC: A Framework for Promoting Competition and Protecting Consumers*, 83 Geo. Wash. L. Rev. 2049, 2053 (2015)).)

[10] For example, in the first month after President Trump named him Chair, Defendant Ferguson appointed new Director and Deputy Directors of the FTC's Bureau of Competition and Bureau of Consumer Protection, as well as a new General Counsel; launched a new Joint Task Force on Unfair Labor Practices; and "deliver[ed] on the promise that President Trump made to the American people" regarding "DEI." *See* FTC Press Releases (Jan. 22, Feb. 10, & Feb. 26, 2025), *available at https://www.ftc.gov/news-events/news/press-releases*).

legislation, including spending bills." *PHH Corp.*, 881 F.3d at 146-47 (Henderson, J., dissenting); *see also Seila Law*, 591 U.S. at 226 (discussing "appropriations process," including potential for Presidential veto).

- The President controls the FTC's budget requests via the Office of Management and Budget, *see* 31 U.S.C. §§ 1105(a)(21)(B), 1108, and he can thus use "budgetary tools to influence the policies of independent agencies." *Seila Law*, 591 U.S. at 226; *PHH Corp.*, 881 F.3d at 147 (Henderson, J., dissenting) ("Acting through OMB, the President uses his annual budget to influence the policies of independent agencies, including the FTC.")

- The President has long required the FTC, as well as other independent agencies, to "prepare an agenda of all regulations under development or review" and submit them to the Office of Information and Regulatory Affairs to ensure "coordination of regulations" that "promote the President's priorities." Exec. Order No. 12866, § 4, 58 Fed. Reg. 51735 (Sept. 30, 1993); *see PHH Corp.*, 881 F.3d at 147 (Henderson, J., dissenting).  President Trump continued this practice.  *See* Exec. Order No. 14219, § 4, 90 Fed. Reg. 10583 ("Agencies shall continue to follow the processes set out in Executive Order 12866 for submitting regulations for review by OIRA.").

In sum, the FTC is the quintessential "traditional independent agency headed by a multimember board or commission," *Seila Law*, 591 U.S. at 207, that the Supreme Court and Courts of Appeals have repeatedly held can enjoy removal protections.  Defendants defy these precedents by refusing to acknowledge or discuss *any* of these structural features.

**B.  The FTC Act's Removal Protections Also Allow the President to Exercise the Power Necessary to "Take Care that the Laws Be Faithfully Executed"**

In addition to numerous tools of Presidential influence and control outlined above, there is the one hiding at the heart of this case: *"Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."*  15 U.S.C. § 41 (emphasis added). Because Presidents have almost never attempted to remove an agency leader with statutory removal protections, "the meaning of th[is] standard's three grounds for removal," sometimes referred to collectively as "INM," "remains largely unexamined."  *PHH Corp.*, 881 F.3d at 127 (Griffiths, J., concurring).[11]  However, the INM standard does have a meaning, and, in fact, it

---

[11] Justice Breyer suggested in 2010 that "no President has ever actually sought to exercise [the removal] power by testing the scope of a 'for cause' provision," *see Free Enter. Fund*, 561 U.S.

allows the President to exercise the executive power necessary to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3. Defendants state that FTC Commissioners "must be accountable to the President through the removal power" (Def. Mem. at 13) *and they are*.

While the Supreme Court has never been required to definitively interpret the INM standard, it has confirmed that it grants the President constitutionally significant authority. The Court has: (1) observed that "these terms" are "very broad," *Bowsher v. Synar*, 478 U.S. 714, 729–30 (1986) (rejecting statute permitting Congressional removal on these grounds); (2) held that "a single-level of good cause tenure" protection for the SEC, under the INM standard, would make the Commission appropriately "subject . . . to Presidential oversight," *Free Enter. Fund*, 561 U.S. at 509; and (3) held that "good cause" removal provisions gave "the Executive, through the Attorney General . . . ample authority to assure that the [independent] counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act," *Morrison*, 487 U.S. at 692.

Moreover, research published since *Seila Law* has confirmed that "the President's power to remove agency officials for neglect of duty or malfeasance is the constitutional equivalent of the authority to remove officials who fail to faithfully fulfill their duties." Jane Manners, Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 67 (2021) (hereinafter "*Three Permissions*"). In other words, the INM standard specifically targets "the official misbehavior that the Take Care Clause purportedly obliges the President to prevent." *Id.* at 8.

---

at 524 (Breyer, J., dissenting), but that was mistaken. President Taft, later the author of *Myers*, dismissed two members of the Board of General Appraisers by making findings of "inefficiency, neglect of duty, or malfeasance in office," as required by the Customs Administrative Act of 1890. *See* Aditya Bamzai, *Taft, Frankfurter, and the First Presidential for-Cause Removal*, 52 U. Rich. L. Rev. 691 (2018) (describing this process).

In *Seila Law*, some parties urged the Court to "avoid" the "constitutional problem" by "broadly construing the statutory grounds for removing the CFPB Director from office," but the Court rejected that invitation because those parties failed to "advance[] any workable standard derived from the statutory language," 591 U.S. at 229.  However, tracing these terms back to English common law, through early American usage, and into the 19th Century, Professors Manners and Menand have since persuasively shown that (1) "'Neglect of duty' meant failing to perform one's duties in a way that caused specific harm to the entity . . . to which the duties were owed," *Three Permissions* at 29; and (2) "malfeasance" connoted the commission of an unlawful act in the performance of one's official duties," *id.*; and (3) the "inefficiency" standard targets concerns about "waste, especially . . . result[ing] from self-interested dealing," and was designed to "ensur[e] that . . . officers did their jobs competently and honestly," *id.* at 48–49.[12]

There is nothing "uncertain and elastic" about this understanding, and it is firmly anchored in the "statutory language."  *Seila Law*, 591 U.S. at 230.  It remains "broad," yet it does not "leave the President free to remove an officer based on disagreements about agency policy," *id.* at 229, or "priorities," *Free Enter. Fund*, 561 U.S. at 502; or permit him to "influence[ ] the Commission in passing on a particular claim," *Wiener*, 357 U.S. at 355–56, or to fire a

---

[12] Judge Griffiths' concurrence in *PHH Corp.* is one of the few examples of sustained judicial attention to the INM standard.  That opinion's interpretation of "neglect of duty" and "malfeasance" is generally in harmony with the above, *see* 881 F.3d at 131, but it adopts a far broader reading of "inefficiency": "an officer is inefficient when he fails to produce or accomplish the agency's ends, as understood or dictated by the President . . . ." *Id.* at 134. That conclusion is contrary to the original intent of the term: "['Inefficiency'] was not intended to give the President authority over an official's exercise of their lawful discretion," but "was meant to allow Presidents to remove officials who are incapable: the attribute, associated with the spoils system, that the incorporation of the term 'efficiency' into the civil service lexicon was trying to eradicate." *Three Permissions* at 67–68; *see PHH Corp.*, 881 F.3d at 122 (Wilkins, J., concurring) (interpreting "inefficiency" to mean "incompetence or deficient performance" amounting to "fail[ure] to comply with the various statutory mandates").

Commissioner simply because "he wanted his own appointees," *id.*  While the Court has

disapproved of even such "'modest restrictions' on the President's power to remove the head of

an agency *with a single top officer*," *Collins*, 594 U.S. at 256 (quoting *Seila Law*, 591 U.S. at

228) (emphasis added), the Court has consistently permitted such protections for traditional

multimember agencies, *see supra* Section III.A.[13]

Finally, this understanding of the INM standard also confirms that "Congress has not

been on an unconstitutional legislating spree for the past 150 years." *Three Permissions* at 68.  If

"the Take Care Clause gives the President the authority to supervise term-tenured officers when

those officers exercise some part of the executive power, this reading can be squared with

independent agencies by recognizing that Congress designed these agencies consistent with the

President's duty to supervise." *Id.*[14]  The Supreme Court has directed courts to harmonize

constitutional and statutory interpretation with longstanding governmental practice, *see supra*

Part II, and such a result is available here.  By contrast, Defendants offer no interpretation of 15

U.S.C. § 41, much less one that that justifies the chaos of the contrary result.

---

[13] The portions of *Myers* not disclaimed by later Courts also support the notion that the INM standard allows the President to discharge his constitutional responsibilities.  Speaking specifically of heads of "department[s] or bureau[s]" empowered by Congress to "adopt[] . . . regulations . . . to make the law workable and effective," or who have "duties of a quasi judicial character . . . whose decisions after hearing affect interests of individuals," Chief Justice Taft—who was quite familiar with the INM standard, *see supra* n.11—stated: "Finding such officers to be negligent or inefficient, the President should have the power to remove them," although "the President cannot in a particular case properly influence or control" the outcome.  272 U.S. at 135.  He then opined that the President could "consider the decision after . . . as reason for removing the officer," *id.*, but *Humphrey's Executor* and *Wiener* unanimously "'disapproved'" of this further extension.  *Wiener*, 357 U.S. at 352 (quoting *Humphrey's Executor*, 295 U.S. at 626–27).

[14] The alignment between the INM standard and the Take Care Clause, is no accident, as they both have their origins in Founding-era concepts of fiduciary duties, including "true, honest, diligent, due, skillful, careful, good faith, and impartial execution of law or office," avoiding "misappropriating profits," and the duty to "obey the law . . . that created the officer's power." Andrew Kent et. al., *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111, 2118 (2019).

IV.    **If the FTC Act Gained a Constitutional Defect After 1935, the Offending Amendment Would Be Severed, Not the Removal Restriction**

Defendants concede that this Court is bound by *Humphrey's Executor* and that it "found no constitutional problem with restricting the removal of FTC Commissioners in 1935." (Def. Mem. at 11.) It follows that there can be no constitutional problem today with upholding the removal protections in the FTC Act with respect to the agency powers and structure the Court permitted in *Humphrey's Executor*. Defendants' proposed remedy ignores this logic.

In Defendants' view, if the "present-day FTC" has been granted new powers such that *Humphrey's Executor* no longer applies, this Court should not sever those new powers from the statute, but rather eliminate the previously constitutional removal protections and have the FTC exercise *all* of its current authority under the threat of the President's new at-will removal power. (Def. Mem. at 14, 17.) Precedent forecloses that approach and this Court should reject it.

A.    **Traditional Severability Principles Require Severance of Any New Offending Amendment**

The Supreme Court "has long applied severability principles in cases . . . where Congress added an unconstitutional amendment to a prior law" that could and did stand on its own. *Barr v. AAPC*, 591 U.S. 610, 630 (2020) (plurality opinion of Kavanaugh, J.) (citing *United States v. Jackson*, 390 U.S. 570, 586 (1968); *Frost v. Corporation Comm'n of Okla.*, 278 U.S. 515, 526–527; (1929); *Truax v. Corrigan*, 257 U.S. 312, 342 (1921); *Eberle v. Michigan*, 232 U.S. 700, 704–705 (1914)). "In those cases, the Court has treated the original, pre-amendment statute as the 'valid expression of the legislative intent.'" 591 U.S. at 630.

*AAPC* is instructive. "In 1991, Congress enacted a general restriction on robocalls to cell phones," which did not violate the First Amendment. *Id.* at 622–23, 636. "In 2015," Congress then added a new provision to the statute "allow[ing] robocalls made to collect government debt," and the Court held that the addition of the new provision rendered the previously valid

27

restriction in the 1991 act "unconstitutional" in violation of the First Amendment. *Id.* at 636. "Applying traditional severability principles, seven Members of the Court conclude[d] that the entire 1991 robocall restriction should not be invalidated, but rather that the 2015" amendment "*must* be invalidated and severed from the remainder of the statute." *Id.* at 614 (emphasis added); *see id.* at 631 (concluding that, even absent a severability clause, established severability principles would "require" severing the later-enacted amendment from a previously valid law).

The same approach would be required here. Defendants do not specify which precise post-1935 addition to the FTC Act purportedly rendered its removal restrictions unconstitutional, *see supra* Section I.B.ii, but assuming they could do so, it would be that ostensibly "offending" amendment that purportedly rendered an indisputably valid preexisting act—the 1935 FTC considered in *Humphrey's Executor*—unconstitutional. *See AAPC*, 591 U.S. at 627 n.7, 628–29. In that circumstance, the "unconstitutional statutory amendment 'is a nullity' and 'void' *when enacted*, and for that reason *has no effect on the original statute*." *Id.* at 631 (emphases added; quoting *Frost*, 278 U.S. at 526–27). Moreover, if these purportedly "problematic" statutory amendments were severed from the original valid law, there could be no question that "the remainder of the statute is capable of functioning independently and thus would be fully operative as a law." *AAPC*, 591 U.S. at 628 (quotation marks omitted). "Indeed, the remainder of the" FTC Act "did function independently and fully operate as law . . . before" any purportedly problematic provision "was added." *See Id.* at 630.

In short, "the correct result" here is to sever any constitutionally offending amendments "and leave in place" the otherwise valid provisions of the statute. *Id.* at 633–34. That approach "reflects the confined role of the Judiciary in our system of separated powers," yields results that are "stable, predictable, and commonsensical," *id.* at 626–27, 636, and avoids enmeshing the

courts in "free-wheeling" policymaking determinations that could not be made "in a principled way," *id.* at 626–27 n.7.

### B. This Court Should Not Create a New FTC with At-Will Removal

Even if traditional severability principles did not "require" the Court to leave in place the "law as originally enacted," *AAPC*, 590 U.S. at 631, the Court should still reject Defendant's invitation to rewrite the FTC Act to operate without the for-cause removal restriction.

*First*, courts have "the negative power to disregard an unconstitutional enactment," not the positive power to "rewrite Congress' work." *Seila Law*, 591 U.S. at 237–38. Severing an allegedly unconstitutional amendment to the originally valid FTC Act would "disregard an unconstitutional enactment," but invalidating a concededly valid provision of the original FTC Act would "rewrite Congress' work" by undoing valid applications of the for-cause removal provision, including the precise applications upheld in *Humphrey's Executor* in 1935 (and any permissible post-1935 amendments).

*Second*, invalidating the FTC Act's removal protections in all of its applications would do "appreciable damage to Congress's work." *See Seila Law*, 591 U.S. at 237. As the Supreme Court has explained, that provision effectuates policy goals that are "vital" to the FTC:

> [T]he language of the act, the legislative reports, and the general purposes of the legislation as reflected by the debates, all combine to demonstrate the congressional intent to create a body of experts who shall gain experience by length of service; a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government. To the accomplishment of these purposes, it is clear that Congress was of opinion that length and certainty of tenure would vitally contribute.

*Humphrey's Executor*, 295 U.S. at 625–26.

By contrast, excising any additions to the FTC Act that purportedly created a constitutional issue would *not* fundamentally change the nature of the Commission. Put bluntly, an FTC that could not, for example, seek certain penalties or issue certain rules (*see* Def. Mem.

at 6–7), would still be recognizable as the FTC Congress created; by contrast, an FTC where Commissioners are removable at the President's whim would not be. *Humphrey's Executor* leaves no doubt: "[T]o hold that . . . the members of the commission continue in office at the mere will of the President, might . . . thwart, in large measure, the very ends which Congress sought to realize by definitely fixing the term of office." 295 U.S. at 626. If a court assumes "that Congress would prefer that we use a scalpel rather than a bulldozer in curing" any "constitutional defect [it] identif[ies]," the right approach is clear. *Seila Law*, 591 U.S. at 237.[15]

In sum, Defendants' constitutional defense to violating 15 U.S.C. § 41 would fail even if they could establish that one or more post-1935 amendments somehow tipped the scales under Article II by vesting too much executive power in an agency with removal protections. Traditional severability principles would require the Court to remedy the alleged constitutional infirmity—assuming there is any—by severing any offending post-1935 amendments, not disfiguring the FTC Act through a judicial rewrite of the statutory scheme.

## V.    **This Court Has the Power to Provide Plaintiffs a Meaningful Remedy**

Defendants contend that, even if Plaintiffs have been illegally removed from the FTC with no constitutional excuse, Commissioners Slaughter and Bedoya can receive no recompense other than backpay. (Def. Mem. Part II.) Yet this result would render moot the removal protections afforded to leaders of every agency, from the Federal Reserve to the National Transportation Safety Board. This Court should grant Plaintiffs declaratory relief and a

---

[15] The contrast with *Seila Law* is critical. There, the Court had not previously passed on the validity of the statute, and the "only constitutional defect" was "the Director's insulation from removal." 591 U.S. at 234. Here, under *Humphrey's Executor*, the removal provision did not itself create any "constitutional defect," and it would only be (if Defendants are correct) subsequent changes to *other* parts of the act that created a problem. Under traditional severability principles, those changes that must be excised, not the removal protections.

permanent injunction to remedy their purported terminations.

**A.** **Defendants Ignore Recent, Persuasive Authority Awarding Declaratory and Injunctive Relief**

Just weeks ago, the D.C. Circuit ruled *en banc* that the exact relief Plaintiffs seek is available. In *Harris v. Bessent* (consolidated with *Wilcox v. Trump*), the D.C. Circuit declined to stay, pending appeal, this Court's judgments (a) declaring that the President had unlawfully removed Cathy Harris as Member of the Merit Systems Protection Board and Gwynne Wilcox as an NLRB Commissioner and that these plaintiffs remain in their positions, and (b) enjoining inferior officers from interfering with plaintiffs' execution of their jobs. *See* 2025 WL 1021435, at *1–2 (D.C. Circ. Apr. 7, 2025) (*en banc*). In doing so, the Circuit recognized the likely availability of the relief this Court had ordered. *Id.* at *2.

The Court cited as support the Panel Order dissent, *id.*, in which Judge Millett soundly rejected the arguments against issuance of a declaratory and injunctive relief in favor of Harris and Wilcox, *see Harris v. Bessent*, 2025 WL 980278, at *43–45 (D.C. Circ. Mar. 28, 2025) (Millet, J. dissenting). This Court's underlying decisions in those cases were in accord as well. *See Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at *16–17 (D.D.C. Mar. 6, 2025); *Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025); *see also Grundmann v. Trump*, No. CV 25-425 (SLS), 2025 WL 782665, at *14–16 (D.D.C. Mar. 12, 2025) (awarding injunctive relief against subordinate officials to remedy President's unlawful dismissal of member of Federal Labor Relations Authority).

Defendants' silence about the *Harris* and *Wilcox* (and *Grundmann*) rulings is not an effective means of avoiding them. They are persuasive, if not controlling, authority here, and this Court has every reason to follow them and order Plaintiffs declaratory and injunctive relief.

31

**B. <u>Defendants Offer No Basis to Deny Declaratory Relief</u>**

Defendants tacitly concede that the Court may issue a declaration that the President's removal of Plaintiffs as FTC Commissioners was unlawful. (Def. Mem. at 25–26.) Indeed, the Court's "duty . . . to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), applies even when the person violating the law is the President. *See, e.g.*, *Clinton v. New York*, 524 U.S. 417, 421 (1998); *Clinton v. Jones*, 520 U.S. 681, 703 (1997).

Instead, Defendants submit only that declaratory relief cannot "effectively reinstate Plaintiffs as Commissioners," by way of "a declaration that Plaintiffs are and shall continue to be Commissioners." (Def. Mem. at 25.) Selectively quoting *Samuels v. Mackell,* 401 U.S. 66, 73 (1971), Defendants seek to apply the standard for an injunction as a barrier to declaratory relief. (Def. Mem. at 25.) But, as the full holding makes clear, *Samuels* merely extended *Younger* abstention to declaratory judgments with respect to ongoing state criminal prosecutions, to avoid a *res judicata* effect on state court proceedings akin to an injunction. *See Samuels*, 401 U.S. at 73 ("*In cases where the state criminal prosecution was begun prior to the federal suit*, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and that where an injunction would be impermissible . . ., declaratory relief should ordinarily be denied as well.") (emphasis added). Indeed, the Court explicitly stated it was "express[ing] no views on the propriety of declaratory relief when no state proceedings is pending at the time the federal suit is begun." *Id.* at 73. *Samuels* does not limit the availability of declaratory relief here.[16]

---

[16] Defendants' other authority (Def. Mem. at 25–26) is farther afield. *See Macauley v Waterman S.S. Corp.*, 327 U.S. 540, 545 & n.4 (1946) (denying declaration where court lacked jurisdiction because applicable "administrative process, far from being exhausted, had hardly begun"); *Great Lakes Dredge & Dock Co. v Huffman*, 319 U.S. 293, 300 (1943) (noting "Declaratory Judgments Act was not devised to deprive courts of their equity powers or of their freedom to withhold

"[I]t is well settled that a declaratory judgment always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980).  Plaintiffs have demonstrated (Pl. Mem., Part IV.A) that a declaration that their purported terminations were unlawful and that Plaintiffs are FTC Commissioners would "clarify[] the legal relations at issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Printing Packaging & Prod. Workers Union of N. Am. v. Int'l Bhd. of Teamsters*, No. CV 23-1872, 2024 WL 3835353, at *9 (D.D.C. Aug. 15, 2024).)

## C. Defendants Offer No Basis to Deny Injunctive Relief

Defendants also fail to address persuasively Plaintiffs' showing that they are entitled to injunctive relief against the Non-Presidential Defendants under controlling D.C. Circuit precedent, namely, *Swan v. Clinton,* 100 F.3d 973, 976–81 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023).  (*See* Pl. Mem. at 31–32.)

In *Swan*, the Circuit held that courts have authority to issue injunctions against subordinate federal officials to "redress" an official's "injury" caused by a President's unlawful removal (in fact from a multi-member commission).  100 F.3d 973, 976–81 (D.C. Cir. 1996) (addressing President Clinton's removal of plaintiff from board of National Credit Union Administration).  Then, two years ago, the Circuit reaffirmed the principle in *Severino*, reiterating that courts "can enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment."  71 F.4th at 1042–43 (quoting *Swan*, 100 F.3d at 980) (addressing President Biden's removal of plaintiff as council member of Administrative Conference of the United States).  In recently finding

---

relief upon established equitable principles" and observing that Act "only provided a new form of procedure for the adjudication of rights in conformity to those principles").

injunctive relief available for unlawfully removed officers, this Court followed *Swan* and *Severino* repeatedly. *See Grundmann*, 2025 WL 782665, at *13–16; *Wilcox*, 2025 WL 720914, at *16; *Harris*, 2025 WL 679303, at *12; *see also Harris*, 2025 WL 1021435, at *1-2.

While making no effort to distinguish *Severino* (as with *Grundmann*, *Wilcox*, and *Harris*), Defendants read *Swan* as limited to disputes about "standing." (Def. Mem. at 21 n.3.) This is not correct. To establish standing, plaintiffs must show, *inter alia*, that their "injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Accordingly, standing (and jurisdiction) in *Swan* depended on whether an injunction was available to redress Swan's alleged unlawful removal from office. By finding standing, the Court necessarily found that such relief was available to restore an illegally terminated federal officer to office. *Swan*, 100 F.3d 973, 976–81.

*Severino*, *Swan,* and *Harris* (*en banc*) show Plaintiffs are entitled to the relief they seek.

### i. *Governing Law Does Not Limit Plaintiffs to Backpay*

Despite the governing law above, Defendants contend Plaintiffs can seek only backpay because the "court lacks the power to issue any order reinstating principal executive officers." (Def. Mem. at 18 & n.2.) This is doubly wrong: Defendants need no "reinstatement" and Defendants cannot overcome the wealth of support permitting the relief Plaintiffs do seek.

Defendants argue that *reinstatement* is at issue because "an allegedly unlawful removal is still a removal." (Def. Mem. at 18 n.2.) This is sophistry. Plaintiffs do not seek reinstatement, the law of this Circuit holds that they need not do so. Because the President's putative removal of Plaintiffs as FTC Commissioners was "illegal and void"—the President lacked authority to remove Plaintiffs—"the office never became vacant," *Kalbfus v. Siddons*, 42 App. D.C. 310, 321 (D.C. Cir. 1914), and Plaintiffs were not in fact removed. Plaintiffs' Complaint is clear on this point. (*See* Compl. ¶¶ 37, 38, 42, 45, 51, and Prayer For Relief.) Accordingly, an injunction

34

need not "reinstate" Plaintiffs nor require the President to exercise his appointments power, but would simply recognize that Plaintiffs remain entitled "'to exercise the privileges'" of their office and to serve their statutory terms.  *Severino*, 71 F.4th at 1043 (quoting *Swan*, 100 F.3d at 980).  The requested relief does no more than require subordinate officials to honor the fact that Plaintiffs *are* Commissioners.  *See Swan*, 100 F.3d at 989 (Silberman, J., concurring) (observing this kind of injunction provides plaintiff "all the relief" plaintiff will "ever need" "without ever attempting to impose judicial power directly on the President of the United States").

Moreover, whatever term is used, injunctive relief—not just backpay—is the appropriate remedy when an individual has been wrongly deprived of a federal position.  Defendants assert Plaintiffs' authorities do not apply because they "did not address principal or inferior executive officers and are therefore inapposite."  (Def. Mem. at 21 n.3.)  Plaintiffs' cases (Pl. Mem. at 31–32) unequivocally show federal court jurisdiction to "review the claim of a discharged governmental employee" and use "injunctive power" to remedy the injury.  *Sampson v. Murray*, 415 U.S. 61, 71–72, 92 n.68 (1974); *see Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959) (federal employee challenging "illegal and ineffective" dismissal was "entitled to the reinstatement which he seeks"); *Service v. Dulles*, 354 U.S. 363, 370, 389 (1957) (based on unlawful termination, federal employee obtained injunctive and declaratory relief on remand); *Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) ("Courts have long held that citizens facing unconstitutional conduct can seek equitable relief—for an employee facing unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination.").[17]

---

[17] Injunctions against subordinate executive officials to prevent illegal action by the Executive Branch are commonplace.  *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 567 (2006); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583 (1952); *see also Franklin v.*

Nothing in these decisions suggests they do not apply where a President unlawfully dismisses a commissioner of an independent commission and, in fact, *Severino*, *Swan,* and *Harris* (*en banc*) put that question to rest.  *See also Mackie v. Bush*, 809 F. Supp. 144, 148 (D.D.C. 1993) (enjoining termination of Postal Service Board of Governors members), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993); *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *6 (D.D.C. Nov. 14, 1983) (enjoining "prevent[ion] or interfer[ence] with plaintiffs['] service as members of the U.S. Commission on Civil Rights"), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983);[18] *Paroczay v. Hodges*, 219 F. Supp. 89, 95 (D.D.C. 1963) (ordering Department of Commerce official was "entitled to be reinstated to his position" and retaining jurisdiction to issue "a mandatory injunction" to enforce that judgment).

### ii.    *Tradition and History Do Not Limit Plaintiffs' Remedy to Backpay*

Defendants further claim that "[t]raditionally, executive officers challenging their removal by the President have sought back pay, not reinstatement," but they provide no basis to transform their precedents into a "rule" reflecting "separation of powers problems that arise if a court attempts to reinstate—that is, reappoint—a principal executive removed by the President." (Def. Mem. at 18.)  There is no such rule or tradition.

*First*, Defendants' authority (Def. Mem. at 18) does not show a rule, or even tradition. Reinstatement was not an issue in *Humphrey's Executor* or *Myers* because Humphrey was dead

---

*Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and in judgment) ("Review of . . . Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.").  Such injunctions do not "necessarily target[] the President," *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 n.2 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting), as they put the President under no legal obligation.

[18] Defendants' effort to distinguish *Berry*, 1983 WL 538, at *2 (Def. Mem. at 20), conflates the merits with entitlement to a remedy for an unlawful purported dismissal.  Defendants do not discuss *Mackie* or *Paroczay*.

and Myers's term had ended when he filed suit. *See Humphrey's Executor*, 295 U.S. at 618–19;

*Myers*, 272 U.S. at 106. Plaintiff in *Wiener* initially did seek reinstatement, but abandoned that

effort after the War Claims Commission was abolished, mooting his effort. *See* 357 U.S. at 350–

51 & n.*. Further, any argument from two older cases—*Shurtleff v. United States*, 189 U.S. 311

(1903); *Parsons v. United States*, 167 U.S. 324 (1987), in which the courts made no mention of

reinstatement as a remedy—fails to account for other cases where plaintiffs *did* seek

reinstatement. *E.g. Swan*, 100 F.3d at 980; *Severino*, 71 F.4th at 1042–43.

  *Second*, quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S.

308, 319 (1999), Defendants argue an injunction would exceed the Court's equitable powers

because a "federal court may grant only those equitable remedies that were 'traditionally

accorded by courts of equity.'" (Def. Mem. at 19.) This is wrong. *Grupo*—which recognized

"that equity is flexible"—did not freeze equity in the 18th Century. 527 U.S. at 322. Rather,

*Grupo* held only that specific relief ordered by the district court—an injunction prohibiting

"defendant[s] from transferring assets in which no lien or equitable interest is claimed"—had

"never been available before" and was "specifically disclaimed by longstanding judicial

precedent." *Id.* at 310, 322. That holding has no bearing on whether injunctive relief against

inferior officers is an available remedy for a wrongful discharge, no less after the D.C. Circuit's

reaffirmation of the remedy after *Grupo*. *See Severino*, 71 F.4th at 1042–43.

  Moreover, in *Sampson*, the Supreme Court recognized *but then disclaimed* the historical

limitation on courts of equity, as then-Justice Rehnquist explained: "Much water has flowed over

the dam," and modern "federal courts do have authority to review the claim of a discharged

governmental employee." 415 U.S. at 71; *see id.* at 71–72 (noting, since merger of law and

equity, "cases such as *Service v. Dulles*," 354 U.S. 363, 370, 389 (1957), "establish that federal

courts do have authority" to grant injunctive relief to a wrongfully terminated federal employees).  *Grupo* has no bearing on an injunction here.  *See also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (recognizing Supreme Court has "long held" plaintiffs may seek injunctive relief "with respect to violations of federal law by federal officials").[19]

*Third*, Defendants point to three "members of the First Congress [who] argued against requiring the Senate's advice and consent for removals precisely because . . . such a procedure would require the President to retain someone he had sought to remove."  (Def. Mem. at 18–19.) This is unconvincing.  As *Grundmann* explained, the argument "paints with too broad a brush . . . . [T]hree individuals cannot speak for the entire First Congress, especially considering the wide spectrum of opinion it expressed on removal protections.  The implications of the debate, properly understood, were highly ambiguous and prone to overreading."  2025 WL 782665, at *15 (quotation marks and citations omitted).  This Court, too, should "decline[]to enter this historical fray," *Grundmann*, 782665, at *15—which provides no bar against the requested relief.

## D.  The Court Should Enjoin the Non-Presidential Defendants from Interfering With Plaintiffs' Continued Service as FTC Commissioners

### i.  *Plaintiffs Have Suffered Irreparable Harm*

As Plaintiffs demonstrated (Pl. Mem. at 28–29), this Court has recognized that the deprivation of a "statutory right" to serve as officers on a multi-member commission created by

---

[19] Defendants' citation to older pre-*Sampson* caselaw holding an injunction cannot restore someone to an Executive Branch position cannot revive their argument.  (Def. Mem. at 19–20 (citing *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898); *White v. Berry*, 171 U.S. 366, 377 (1898); *In re Sawyer*, 124 U.S. 200, 212 (1888).)  In fact, at least two of these cases, *White*, 171 U.S. at 377 and *In re Sawyer*, 124 U.S. at 212, expressly acknowledged the availability of mandamus as a remedy.  *See also infra* Section V.E (discussing availability of mandamus).  Finally, reliance on *Baker v. Carr*, 369 U.S. 186, 231 (1962), also is misplaced as *Baker* did not involve removal of a federal official.

Congress—the harm Plaintiffs are suffering—is "irreparable" injury. *See, e.g., Grundmann*, 2025 WL 782665, at *17; *Wilcox*, 2025 WL 720914, at *15; *Harris*, 2025 WL 679303, at *13; *Berry*, 1983 WL 538, at *5. Defendants nevertheless argue that this loss of employment does not amount to an irreparable harm because backpay is available. (Def. Mem. at 22–23 (citing *Sampson*, 415 U.S. at 92 n.68).) But *Sampson* expressly contemplates "that cases may arise in which the circumstances surrounding an employee's discharge . . . may so far depart from the normal situation that irreparable injury might be found" and that injunctive relief is not "foreclose[e]d" in a "genuinely extraordinary situation." 415 U.S. at 92 n.68. This is just such a "genuinely extraordinary situation."

"A check in the mail does not address the gravamen of this lawsuit." *Grundman*, 2025 WL 782665, at *17. Backpay would not get Plaintiffs back their roles as Commissioners of the FTC—roles that the President appointed them to, that the Senate confirmed them for, in an agency that both Congress and the President in their considered judgment created with statutory removal protections. If they are barred from their offices, no amount of money will repair that injury. *See Wilcox*, 2025 WL 720914, at *15 (depriving plaintiffs improperly of "ability to carry out . . . congressional mandate" "cannot be repaired in the absence of an injunction," nor "retroactively cured by monetary damages"); *Harris*, 2025 WL 679303, at *13 (violation of statutory removal limits is "genuinely extraordinary situation" that "merit[s] injunctive relief" under *Sampson*); *Berry*, 1983 WL 538, at *5 (*Sampson* exception met where "Commission's ability to fulfill its mandate is disrupted by plaintiffs removal").

While Defendants do not address *Harris* or *Wilcox*, they do endeavor to distinguish *Berry* on the ground that the FTC "continues to operate" even after Plaintiffs' unlawful firing. (Def. Mem. at 23.) But the *Berry* ruling was not so cramped; it looked to "the obviously disruptive

39

effect the denial of . . . relief will likely have on the Commission[]." 1983 WL 538 at *5 (emphasis omitted). Here, too, Plaintiffs' loss of their "statutory right to function" would undermine the FTC's "ability to fulfill its mandate," *id.*—that is, to operate as a bi-partisan Commission, with five Commissioners, each appointed for seven-year terms to maximize expertise, consisting of no more than three from one party. *See* 15 U.S.C. § 41. *Humphrey's Executor* held that these provisions are essential to the "very ends which Congress sought to realize." 295 U.S. at 626

Indeed, Defendants' observation that the confirmation of Mark R. Meador as a third Commissioner provides the FTC a quorum (Def. Mem. at 23) backfires, as Defendants underscore that the unlawful termination Plaintiffs leaves the Commission, today, with three Republican and zero Democratic Commissioners, undermining the FTC's operation as the bi-partisan commission Congress created. Defendant Ferguson has spoken eloquently about the "value" of "minority commissioner[s]" who can issue "dissents" to ensure that the FTC is not "exceeding the law" or "abusing the companies that it purports to regulate." (SMF ¶ 15.) The FTC is currently operating with no such check, contrary to Congress's intent.

Defendants further point out that, usually, "loss of employment does not constitute irreparable harm" and highlight cases that "reject[] the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury." (Def. Mem. at 22.) But Defendants' cases, none of which involved a federal officer of Plaintiffs' stature, do not support the broad rule they propose. (*See id.* (citing cases involving corporate managers, subordinate local and state officials, lower-level federal employees, and credit union board member).)

Finally, Defendants belittle concern that a backpay-only remedy would undermine the FTC Act and dozens of other statutes with similar dismissal protections—calling this harm

"speculative" and challenging Plaintiffs' standing to even make the argument. (Def. Mem. at 23–24.) This is deeply cynical, given that Defendants are currently seeking to invalidate removal protections for a wide range of agencies under the same theory presented here. *See supra* n.1. Again, if this Court concludes that there is no statutory or constitutional justification for Plaintiff's termination, to hold that such wrongfully terminated agency leaders can recover backpay only would give this President (and all future Presidents) *carte blanche* to fire principal officers of all agencies with impunity, knowing the taxpayers will cover the bill, hollowing out the same removal protections the Court just affirmed. Denying injunctive relief would undermine the protection Congresses and Presidents have long deemed necessary for FTC Commissioners and other agency leaders to perform their functions without fear or favor. These values would be "effectively lost," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), as every commissioner would live beneath the "Damocles' sword of removal," *Wiener*, 357 U.S. at 356.

ii.    *The Balance of Equities and Public Interest Favor Injunctive Relief*

Defendants' contention that "the equities and public interest weigh strongly against reinstating Plaintiffs" has it backwards. (Def. Mem. at 24.) Defendants submit no authority to counter the D.C. Circuit's considered view that "substantial public interest" favors "'having governmental agencies abide by the federal laws that govern their existence and operations,'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))—including when it comes to laws providing for-cause removal protections (Pl. Mem. 29–30 (citing cases)); *cf. R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required").

Rather than address applicable law, Defendants rehash merits arguments to assert that "an injunction functionally reinstating" two FTC officers "would raise grave separation-of-powers

concerns and work a great and irreparable harm to the Executive." (Def. Mem. at 24.) They submit that "the public interest is better served by FTC Commissioners who hold the President's confidence and, accordingly, will more effectively serve him in executing his duties as Chief Executive." (*Id.* at 25.) This further assault on the FTC has no legitimacy under current law, and neither carries the day on the merits, *see supra* Parts I–III, nor should it prevail to bar relief.

In truth, it is Defendants who ignore the separation-of-powers risks at issue in this case, including Plaintiffs' right to injunctive relief. More than 100 years ago, Congress and the President together created the FTC and provided its Commissioners removal protections that struck a balance between ensuring that they could act independently while allowing the President to "take Care that the Laws are faithfully executed." *See supra* Section III.B. The Supreme Court unanimously upheld that statute, and Congresses and Presidents have continued to rely on and adhere to the FTC Act's requirements. Presidents appointed Plaintiffs to their positions and the Senate confirmed them. (SMF ¶¶ 5–6, 8–9.) If this Court finds that the FTC Act's removal protections are constitutional—as Plaintiffs respectfully submit it is obliged to do, *see supra* Part I—it would not serve the equities or the public interest to then deny the injunctive relief necessary to ensure that this statute has practical effect. *See Swan*, 100 F.3d at 978.

E. **This Court Can Grant Mandamus Relief**

Even if no other remedy were available, Plaintiffs are entitled to relief "in the nature of mandamus." *See* 28 U.S.C. § 1361; *In re Cheney*, 406 F.3d 723, 728–29 (D.C. Cir. 2005). (Pl. Mem. Section IV.C.) "[O]verwhelming" authority establishes that "mandamus" is an "appropriate remedy" for an illegal removal from office–including when the power of removal may not be exercised "except for the causes specified" by law. *Kalbfus v. Siddons*, 42 App. D.C. 310, 319–21 (D.C. Cir. 1914) (discussing authorities and treating attempted illegal removal as "void"). That has long been the law. *See, e.g.*, William Blackstone, 3 Commentaries, at 264–65

42

(explaining that "mandamus" provides a "full and effectual remedy" "for refusal or admission where a person is intitled to an office" and "for wrongful removal, when a person is legally possessed" and "the franchise[] concern[s] the public").

The use of mandamus to request "restoration to public office" was not only "frequently" employed and "welcomed by courts"; it was "listed in treatises as the primary type of case in which a court would grant mandamus." *See* Audrey Davis, *A Return to the Traditional Use of the Writ of Mandamus*, 24 Lewis & Clark L. Rev. 1527, 1540–41 (2020) (explaining that such requests "brought into play"—and were understood to satisfy—"many of the fundamental characteristics of mandamus," such as the existence of "a clear, legal right," the "lack of an adequate remedy," and a legal duty involving "little to no discretion").

In opposition, Defendants err in asserting that Plaintiffs have not established "a clear right to . . . relief" or a "ministerial duty" owed to them (Def. Mem. at 26). Defendants have a "clear" and statutorily required "ministerial duty" to treat Plaintiffs as what they are—properly appointed federal officers who have not been removed pursuant to the terms of the FTC Act. *See Humphrey's Executor*, 295 U.S. at 632; *see also Swan*, 100 F.3d at 976 n.1, 979–80 (finding, in context of case challenging plaintiff's removal by the President from federal office, that the "prerequisites for stating a cause of action under the mandamus statute are met," including that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff," and explaining that certain non-presidential defendants could substantially redress plaintiff's injury by "direct[ing] the staff to treat Swan as a Board member").

Defendants do not help their cause by asserting that "[t]he President's selection of who should lead an Executive Branch agency is certainly not a mere ministerial task." (Def. Mem. at

43

26.)  Plaintiffs do not seek relief directing the President to *select* them as FTC commissioners; they just want to ensure Defendants cannot illegally *block* them from occupying offices to which they have already been lawfully nominated and confirmed by the Senate.  *See Marbury*, 5 U.S. at 173 (concluding that a Senate-confirmed official whose commission was wrongfully withheld . . . presented "a plain case for a mandamus").

It is no answer to say "[t]he potential availability of backpay . . . provides an adequate alternative remedy."  (Def. Mem. at 27.)  Plaintiffs seek to remedy the unlawful deprivation of their right—and improper interference with their duty—to serve the public in offices to which they have been properly appointed.  Even the *actual* "availability of backpay" cannot adequately remedy those injuries.  *See supra* Section V.C.  *A fortiori*, neither does Defendants' grudging and noncommittal reference to the "*potential* availability" of backpay.

Finally, that mandamus is "governed by equitable considerations" (Def. Mem. at 27) supports rather than undermines the propriety of the relief sought.  Every President since FDR, including President Trump during his first term, has abided by the modest removal restrictions Defendants now seek to cast aside.  Defendants have not even tried to assert that Plaintiffs' continued service on the FTC would impair the President's ability to effectuate any legitimate governmental interest, and longstanding equitable principles weigh against Defendants' extreme view that that there should be no effectual remedy for their violation of law.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment, deny Defendants' motion for summary judgment, enter declaratory relief for Plaintiffs, and enter an order permanently enjoining the Non-Presidential Defendants from interfering with Plaintiffs' continued service as FTC Commissioners (or, in the alternative, grant relief in the nature of mandamus).

Dated: May 5, 2025                    Respectfully submitted,

                                      CLARICK GUERON REISBAUM LLP

                                      By: /s/ Aaron Crowell_____
                                      Aaron Crowell (*admitted pro hac vice*)
                                      Gregory A. Clarick (*admitted pro hac vice*)
                                      David Kimball-Stanley (*admitted pro hac vice*)
                                      41 Madison Avenue, 23rd Floor
                                      New York, NY 10010
                                      Tel.: (212) 633-4310
                                      acrowell@cgr-law.com
                                      gclarick@cgr-law.com
                                      dkimballstanley@cgr-law.com

                                      PROTECT DEMOCRACY PROJECT, INC.

                                      Benjamin L. Berwick (D.D.C. Bar No.
                                      MA0004) 15 Main Street, Suite 312
                                      Watertown, MA 02472
                                      Tel.: (202) 579-4582
                                      ben.berwick@protectdemocracy.org

                                      Amit Agarwal (D.C. Bar No. 90002013)
                                      Beau Tremitiere (*admitted pro hac vice*)
                                      2020 Pennsylvania Ave. NW, Suite # 163
                                      Washington, DC 20006
                                      Tel.: (202) 579-4582
                                      amit.agarwal@protectdemocracy.org
                                      beau.tremitiere@protectdemocracy.org

                                      Jared F. Davidson (*admitted pro hac vice*)
                                      3014 Dauphine Street, Suite J
                                      New Orleans, LA 70117
                                      Tel.: (202) 579-4582
                                      jared.davidson@protectdemocracy.org

                                      *Attorneys for Plaintiffs Rebecca Kelly Slaughter*
                                      *and Alvaro M. Bedoya*

45