## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA KELLY SLAUGHTER, in her official and personal capacities, *et al.*, | |
| *Plaintiffs,* | Case No. 1:25-cv-00909-LLA |
| *v.* | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*., | |
| *Defendants.* | |

## REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................2

I.    Restrictions on the Removal of FTC Commissioners Are Unconstitutional...........................2

      A.    *Humphrey's Executor* Did Not Hold that the FTC's Removal Protections Remain Constitutional in Perpetuity No Matter What Power the Agency Wields. ..................................................................................................................3

      B.    Historical Practice Does Not Support the FTC's Removal Protections.....................11

      C.    Removal Is Critical to the President's Responsibility to Take Care that the Laws Be Faithfully Executed. .............................................................................12

      D.    This Court Should Hold Unconstitutional the FTC's Removal Protections, Not Grants of Executive Authority to the Commission. ...............................................15

II.   Plaintiffs Are Not Entitled to the Relief Sought. .........................................................19

      A.    This Court May Not Reinstate Plaintiffs to their Former Offices. ...........................19

      B.    Plaintiffs Are Not Entitled to a Permanent Injunction. ..................................22

      C.    Plaintiffs Are Not Entitled to a Declaratory Judgment that Would Amount to Reinstatement. ..................................................................................................24

      D.    Plaintiffs Are Not Entitled to a Writ of Mandamus.........................................24

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*13th Reg'l Corp. v. U.S. Dep't of Interior,*
    654 F.2d 758 (D.C. Cir. 1980) ................................................................................................25

*Alcresta Therapeutics, Inc. v. Azar,*
    318 F. Supp. 3d 321 (D.D.C. 2018) .........................................................................................22

*Allegheny Gen. Hosp. v. NLRB,*
    608 F.2d 965 (3d Cir. 1979) .....................................................................................................8

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ................................................................................................................20

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) ................................................................................................................18

*Barnes v. Kline,*
    759 F.2d 21 (D.C. Cir. 1984) ..................................................................................................22

*Barr v. Am. Ass'n of Pol. Consultants, Inc. (AAPC),*
    591 U.S. 610 (2020) ...........................................................................................................16, 17

*Bessent v. Dellinger,*
    145 S. Ct. 515 (2025) ..............................................................................................................21

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ...........................................................................................................13, 14

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .....................................................................................................................6

*Cactus Canyon Quarries, Inc. v. Fed. Mine Safety and Health Review Comm.,*
    820 F.3d 12 (D.C. Cir. 2016) ...................................................................................................8

*Church v. Biden,*
    573 F. Supp. 3d 118 (D.D.C. 2021) .......................................................................................22

*Collins v. Yellen,*
    594 U.S. 220 (2021) .....................................................................................................5, 9, 10, 17

*Dellinger v. Bessent,*
    No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025) ...................................................23

*Ex parte Hennen,*
    38 U.S. (13 Pet.) 230 (1839) ...................................................................................................25

*Express Scripts, Inc. v. FTC,*
    No. 4:24-cv-01549 (E.D. Mo. Feb. 18, 2025), 2025 WL 521812 ................................................. 16, 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ..............................................................................................................*passim*

*FTC v. Kochava Inc.,*
    No. 2:22-cv-00377-BLW, 2023 WL 3249809 (D. Idaho May 4, 2023) .............................................16

*FTC v. Walmart Inc.,*
    664 F. Supp. 3d 808 (N.D. Ill. 2023) .............................................................................................16

*Goodluck v. Biden,*
    104 F.4th 920 (D.C. Cir. 2024) .....................................................................................................21

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) ......................................................................................................................21

*Harris v. Bessent,*
    No. 25-5057, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025) ........................................................ 23, 24

*Harris v. Bessent,*
    No. 25-5037, 2025 WL 1021435 (D.C. Circ. Apr. 7, 2025) ...................................................19, 23, 24

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ...............................................................................................................*passim*

*In the Matter of H&R Block Inc.,*
    No. 9427, 2024 WL 4544201 (FTC Oct. 18, 2024)............................................................................16

*Kalbfus v. Siddons,*
    42 App. D.C. 310 (D.C. Cir. 1914) ................................................................................................25

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023) ........................................................................................................................8

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) .........................................................................................................25

*Marsh v. Chambers,*
    463 U.S. 783 (1983) ......................................................................................................................21

*Meta Platforms, Inc. v. FTC,*
    723 F. Supp. 3d 64 (D.D.C. 2024) .................................................................................................16

*Meta Platforms, Inc. v. FTC,*
    No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024) ......................................................... 7, 8

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau,*
    785 F.3d 684 (D.C. Cir. 2015) ....................................................................................24

*Morrison v. Olson,*
    487 U.S. 654 (1988) ......................................................................................................1

*Myers v. United States,*
    272 U.S. 52 (1926) ......................................................................................................21

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ....................................................................................................13

*PHH Corp. v. Consumer Fin. Prot. Bureau,*
    881 F.3d 75 (D.C. Cir. 2018) ................................................................................ 11, 12

*Raines v. Byrd,*
    521 U.S. 811 (1997) ....................................................................................................22

*Regan v. Time, Inc.,*
    468 U.S. 641 (1984) ....................................................................................................16

*Sampson v. Murray,*
    415 U.S. 61 (1974) ................................................................................................ 20, 22

*Samuels v. Mackell,*
    401 U.S. 66 (1971) ......................................................................................................24

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ..............................................................................................*passim*

*Severino v. Biden,*
    71 F.4th 1038 (D.C. Cir. 2023) ............................................................................. 19, 20

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .........................................................................19, 20, 25

*Trump v. United States,*
    603 U.S. 593 (2024) ...........................................................................................6, 9, 13, 23

*Trump v. Wilcox,*
    No. 24A966, 2025 WL 1063917 (U.S. Apr. 9, 2025) ................................................19

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) .................................................................................................. 1, 15

*Vitarelli v. Seaton,*
    359 U.S. 535 (1959) ....................................................................................................20

*White v. Berry*,
  171 U.S. 366 (1898) ........................................................................................................ 20, 23

## Constitutional Provisions

U.S. Const. art. II, § 1, cl. 1 ....................................................................................................1

U.S. Const. art. II, § 3.................................................................................................................1

## Statutes

12 U.S.C. § 5491 ......................................................................................................................14

12 U.S.C. § 5565 ........................................................................................................................7

15 U.S.C. § 18a ........................................................................................................................18

15 U.S.C. § 41 ....................................................................................................................14, 17

15 U.S.C. § 45 (1938) ..............................................................................................................18

15 U.S.C. § 45 (1975) ..............................................................................................................18

15 U.S.C. § 45 ..............................................................................................................4, 6, 7, 17

15 U.S.C. § 49 ..........................................................................................................................14

15 U.S.C. § 53 ....................................................................................................................4, 17

15 U.S.C. § 57a ..................................................................................................................15, 17

15 U.S.C. § 1691 (1974) ..........................................................................................................18

15 U.S.C. § 6502 (1998) ..........................................................................................................18

15 U.S.C. § 6502 ......................................................................................................................15

15 U.S.C. § 8404 ......................................................................................................................15

Antitrust Procedural Improvements Act of 1980,
  Pub. L. No. 96-349, 94 Stat. 1154 (1980).............................................................................18

Children's Online Privacy Protection Act,
  Pub. L. No. 105-277, 112 Stat. 2681 (1998) ..........................................................................6

Gramm-Leach-Bliley Act,
  Pub. L. No. 106-102, 113 Stat. 1338 (1999) ..........................................................................6

Hart-Scott-Rodino Antitrust Improvements Act,
    Pub. L. No. 94-435, 90 Stat. 1390 (1976) ................................................................ 6, 18

International Antitrust Enforcement Assistance Act of 1994,
    Pub. L. No. 103-438, 108 Stat. 4597 (1994) ............................................................. 18

Magnuson-Moss Warranty—Federal Trade Commission Improvements Act in 1975,
    Pub. L. No. 93-637, 88 Stat. 2183 (1975) ................................................................ 5, 18

Restore Online Shoppers' Confidence Act,
    Pub. L. No. 111-345, 124 Stat. 3618 (2010) ............................................................ 6

Wheeler-Lea Act of 1938,
    Pub. L. No. 75-447, 52 Stat. 111 ............................................................................... 18

**Regulations**

16 C.F.R. Ch. 1, Subch. C ............................................................................................ 6

**Other Authorities**

Federal Trade Commission, Legal Library: Rules,
    https://www.ftc.gov/legal-library/browse/rules ..................................................... 4

Letter from James Madison to Thomas Jefferson (June 30, 1789),
    16 Documentary History of the First Federal Congress (2004) ............................. 12

The Federalist No. 70 (Alexander Hamilton) ............................................................... 13

## INTRODUCTION

Plaintiffs argue that so long as the Federal Trade Commission (FTC) bears the same name it bore when the Supreme Court decided *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), then the FTC's removal protections are constitutional no matter how much Congress has changed the agency's authority since 1935. This Court should reject Plaintiffs' argument. They fail to grapple meaningfully with the Supreme Court's authoritative and recent pronouncements that there are only two exceptions to the general rule of unrestricted removal: for inferior officers with limited authority, as set forth in *Morrison v. Olson*, 487 U.S. 654 (1988); and for bipartisan, multimember bodies that do not exercise substantial executive power, as set forth in *Humphrey's Executor*. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020). Plaintiffs do not (and cannot) dispute that FTC Commissioners are principal executive officers who prosecute, regulate, and investigate nearly every sector of the American economy pursuant to the federal antitrust and consumer-protection laws. Whatever may have been true of the FTC in 1935, it exercises substantial executive power today. The exception announced in *Humphrey's Executor* therefore does not apply to the current FTC, and its removal protections are unconstitutional.

Unable to dispute that the FTC exercises substantial executive power, Plaintiffs argue that the nature of an official's duties and authority is irrelevant to whether the *Humphrey's Executor* exception applies so long as that official is part of a balanced, multi-member body. This rule contravenes constitutional text and principles requiring that all officials exercising executive power be accountable to the President because the Constitution vests the "'executive Power'—all of it"—in him alone. *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). This ensures that executive authority retains "its legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021). Because the FTC's removal protections break that chain, they are unconstitutional.

Plaintiffs' argument also misreads the governing precedents. *Humphrey's Executor* held that the President's removal power "depend[s] upon the character of the office." 295 U.S. at 628. And in *Seila Law*, the Supreme Court held that the removal exception announced in *Humphrey's Executor* applies only to agencies that (1) are multi-member boards *and* (2) do not wield substantial executive power. 591 U.S. at 218. The nature of an agency's power is thus the critical question for the application of the *Humphrey's Executor* exception. Whatever may have been true about the "quasi-legislative, quasi-judicial" FTC of 1935, *id.* at 216 (quoting *Humphrey's Executor*, 295 U.S. at 628), the FTC of 2025 indisputably wields substantial executive power. Plaintiffs cannot contend otherwise with a straight face. *Humphrey's Executor* therefore does not apply to the 2025 FTC.

In all events, this Court should not take the unprecedented step of effectively ordering Plaintiffs reinstated. Plaintiffs identify no binding authority from before this year in which a federal court used its equitable power to compel the reinstatement of principal officers. And the extraordinary remedy proposed by Plaintiffs would not only exceed this Court's Article III power, but would also severely intrude upon the President's Article II prerogatives. The proper remedy for an (allegedly) unlawful termination of a federal officer is backpay, not forcing the President to work alongside subordinates in whom he lacks trust. Likewise, neither a declaratory judgment that effectively reinstates Plaintiffs in their former offices nor a writ of mandamus to that effect is available.

## ARGUMENT

## I.    Restrictions on the Removal of FTC Commissioners Are Unconstitutional.

As the Supreme Court's recent decisions make clear, any analysis of a restriction on the President's removal authority must proceed from the "general rule" that the President possesses "unrestricted" "'authority to remove those who assist him in carrying out his duties.'" *Seila Law*, 591 U.S. at 215 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513-14 (2010)); *see also id.* at 228 ("[T]ext, first principles, the First Congress's decision in 1789, *Myers*[ *v. United States*, 272 U.S.

52 (1926)], and *Free Enterprise Fund* all establish that the President's removal power is the rule, not the exception."). There are "only two exceptions to the President's unrestricted removal power": for inferior officers with limited authority (the *Morrison* exception) and for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power" (the *Humphrey's Executor* exception). *Id.* at 204, 216. Plaintiffs do not (and cannot) dispute that FTC Commissioners are principal officers, so the *Morrison* exception does not apply. Plaintiffs similarly do not (and cannot) dispute that FTC Commissioners exercise substantial executive power. *See* Defs.' Mem. in Supp. of Cross-Mot. for Summ. J. ("Defs.' Mem.") at 10-13, ECF No. 32-1. That should end the matter. Plaintiffs nonetheless ask this Court to sanction their exercise of substantial executive power insulated from removal by the President—and thus from accountability to the American people. As explained further below, Plaintiffs' arguments fail.

   **A. *Humphrey's Executor* Did Not Hold that the FTC's Removal Protections Remain Constitutional in Perpetuity No Matter What Power the Agency Wields.**

   1. Plaintiffs first argue (Pls.' Mem. of Law in Supp. of Expedited Summ. J & in Opp'n to Defs.' Cross-Mot. for Summ. J., at 3-6 ("Opp."), ECF No. 38) that Defendants "effectively ask[] this Court to . . . overrule *Humphrey's Executor*." Not by a long shot. Defendants explained (Defs.' Mem. at 13-14) that *Humphrey's Executor* recognized a limited "exception" to the rule of at-will removal of principal officers for a Commissioner of the 1935 FTC as "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216-17. Critically, each of these elements must be present for the exception to be applicable: the Supreme Court did not hold that *every* multimember body of experts or bipartisan agency could be insulated from presidential control irrespective of the agency's functions and authority. Thus, *Humphrey's Executor* means exactly what it said—removal protections are constitutionally tolerable only for a multimember board that "exercises no part of the executive power vested by the Constitution in the President." 295 U.S. at 628.

That does not describe today's FTC, which exercises quintessentially executive authority. *See* Defs.' Mem. at 10-13. It investigates and prosecutes violations of federal antitrust and consumer protection statutes in federal court. *See* 15 U.S.C. § 45(b) (authorizing Commission to bring administrative complaint for violations of Section 5 of the FTC Act); 15 U.S.C. § 53(b) (authorizing the Commission to seek preliminary and permanent injunctions in federal court). And it can seek daunting monetary penalties against private parties, a "quintessentially executive power not considered in *Humphrey's Executor*." *Seila Law*, 591 U.S. at 219. It also promulgates binding rules and regulations that flesh out federal statutes, "including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy," *id.* at 218. That too was a core executive power that went unmentioned in *Humphrey's Executor*, but which the Commission has exercised dozens of times since 1935. *See* Federal Trade Commission, Legal Library: Rules, https://www.ftc.gov/legal-library/browse/rules (listing 73 Commission rules, all postdating *Humphrey's Executor*).

Plaintiffs nonetheless maintain (Opp. 12-16) that the FTC possessed these powers "at its inception." That is simply untrue. The Commission did not obtain investigative and enforcement authority over consumer-protection matters *at all* until 1938; authority to seek monetary relief in federal court until 1975; authority to obtain preliminary and permanent injunctions in the first instance until 1973; and authority to promulgate rules prohibiting deceptive acts and practices until 1975. Defs.' Mem. at 15.

Plaintiffs' response is also beside the point. "[W]hat matters is the set of powers the [*Humphrey's Executor*] Court considered as the basis for its decision, not any latent powers the agency may have had not alluded to by the Court." *Seila Law*, 591 U.S. at 219 n.4. The power to issue subpoenas, to conduct law-enforcement investigations (not investigations for legislative reports), and to issue binding rules went unmentioned in *Humphrey's Executor*. Even assuming the FTC possessed these powers in 1935, they played no role in the Court's decision. Rather, the Court understood the

agency "as a legislative or as a judicial aid" that "exercises no part of the executive power vested by the Constitution in the President." 295 U.S. at 628. And the Court's understanding that the 1935 FTC did not exercise *any* executive power was the basis for its decision. *Id.*

The powers Congress has conferred on the Commission since 1935, however, leave no room for dispute that the 2025 FTC wields substantial executive power and is therefore outside the *Humphrey's Executor* exception. Consider first the authority to issue regulations prohibiting unfair or deceptive acts and practices, which the Supreme Court in *Collins v. Yellen* emphasized amounts to a "clear[]" exercise of executive power, 594 U.S. 220, 254 (2021). Plaintiffs insist (Opp. at 13) that *Humphrey's Executor* considered analogous regulatory authority because the Court "characterized the FTC as 'quasi-legislative.'" But when describing the FTC "as a legislative agency," *Humphrey's Executor* was referring to the Commission's authority "[i]n making investigations and reports thereon for the information of Congress under section 6, in aid of the legislative power." 295 U.S. at 628. Indeed, *Seila Law* confirmed the Supreme Court was not considering the power to promulgate regulations. *See* 591 U.S. at 218 ("Instead of making reports and recommendations to Congress, as the 1935 FTC did, . . . ."). Issuing reports is a far cry from proscribing conduct through binding regulations with significant economic implications.

Nor is the significant expansion of the FTC's regulatory and enforcement authority to encompass consumer-protection aims irrelevant. In *Seila Law*, the Supreme Court made clear that the power to "promulgate binding rules fleshing out . . . a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy" compelled the conclusion that the CFPB exercised substantial executive power. 591 U.S. at 218. That authority mirrors the authority the FTC gained in 1975 to promulgate rules defining unfair or deceptive acts or practices in the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act of 1975 ("Magnuson-Moss"), Pub. L. No. 93-637, 88 Stat. 2183, 2193-98, and therefore compels the same conclusion.

5

Moreover, given that *Seila Law* suggested that the application of *Humphrey's Executor* may turn at least in part on the substantiality of the power an agency exercises, 591 U.S. at 218, Congress's massive expansion of the scope of the FTC's enforcement authority to include consumer-protection-law violations in 1938 is relevant to whether *Humphrey's Executor* continues to apply to the FTC. Indeed, Congress has continued expanding the Commission's consumer-protection and antitrust authority since 1938, granting new rulemaking, enforcement, or civil-penalty authorities in various statutes over many decades. *See, e.g.*, Hart-Scott-Rodino Antitrust Improvements Act, Pub. L. 94-435, 90 Stat. 1390 (1976); Children's Online Privacy Protection Act, Pub. L. 105-277, 112 Stat. 2681 (1998); Gramm-Leach-Bliley Act, Pub. L. 106-102, 113 Stat. 1338 (1999); Restore Online Shoppers' Confidence Act, Pub. L. 111-345, 124 Stat. 3618 (2010). In the years since *Humphrey's Executor*, Congress has instructed the Commission to make rules governing everything from wool product labels to telemarketing to energy market manipulation. *See, e.g.*, 16 C.F.R. Ch. 1, Subch. C (listing myriad rules the Commission has promulgated under specific acts of Congress enacted since 1939).

Turning to the power to seek injunctive relief in federal court, Plaintiffs assert (Opp. at 14) that this "cannot be meaningfully distinguished" from the power to issue cease-and-desist orders because the latter must be enforced in court. Not so. The former is "prosecutorial decisionmaking," which "is 'the special province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President." *Trump v. United States*, 603 U.S. 593, 620 (2024). The Supreme Court has long recognized that "conducting civil litigation in the courts of the United States for vindicating public rights" must be discharged "only by" executive branch officers under Article II, Section 2. *Buckley v. Valeo*, 424 U.S. 1, 140 (1976). Cease-and-desist orders, which the Commission issues following administrative adjudications, *see* 15 U.S.C. § 45(b), do not implicate the same authority.

Additionally, in an attempt to minimize the import of the FTC's power under Section 45(m)(1)(A) to "seek daunting monetary penalties against private parties on behalf of the United States

in federal court," *Seila Law*, 591 U.S. at 219—which Plaintiffs acknowledge the FTC acquired after *Humphrey's Executor*—Plaintiffs note (Opp. 14-15) that the FTC must prove additional elements before a court can impose monetary relief. This distinction is meaningless. The same is true of every claim for a monetary penalty, including those that the CFPB could seek through "a quintessentially executive power" in *Seila Law*, 591 U.S. at 219. *Compare* 12 U.S.C. § 5565(b) & (c) (considerations for civil monetary penalties in court and administrative actions brought by the CFPB include whether defendant "knowingly violates a Federal consumer financial law," "the gravity of the violation," "history of previous violations," and "size of financial resources") *with* 15 U.S.C. § 45(m)(1)(A) (considerations for civil monetary penalties in action brought by the FTC include "actual knowledge," "degree of culpability," "history of prior such conduct," and "ability to pay").[1]

Accordingly, the FTC today exercises substantial executive power that the Supreme Court did not—indeed, could not—consider in *Humphrey's Executor*. To ensure the officials exercising that power remain accountable to the President and the American people, FTC Commissioners must be removable by the President at will under *Humphrey's Executor* as applied in *Seila Law* and *Collins*.

2. Plaintiffs nevertheless insist (Opp. 4-5) that even if the FTC today exercises authority that *Humphrey's Executor* did not consider, the question whether the FTC's authority has changed from the powers considered in *Humphrey's Executor* such that the removal protections are no longer valid is a question that only the Supreme Court can answer. In support, Plaintiffs marshal nonbinding cases that arrived at that conclusion.[2] To be sure, this Court may not disregard Supreme Court precedent

---

[1] Plaintiffs also contend (Opp. 15-16) that the President's control of the FTC has increased since 1935 "in some respects." But as explained *infra* pp. 12-15, the removal power is unique in ensuring that the exercise of executive power remains accountable to the President and, thus, the American people. *See Free Enterprise Fund*, 561 U.S. at 514.

[2] The D.C. Circuit's order denying an injunction pending appeal in *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024), is not controlling on the merits and, in any event, is distinguishable because the constitutional challenge in that case was "surrendered in the two prior consent orders," *id.* at *3.

"which directly controls," even if that precedent "is in tension with 'some other line of decisions.'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023). But Plaintiffs read *Humphrey's Executor* to require lower courts to sustain the FTC's removal protections *forever*, no matter how Congress alters the nature and function of the agency, so long as it bears the same name the agency bore in 1935. That cannot be the law. Indeed, on Plaintiffs' reading, Congress could grant the FTC the executive authority wielded by the Department of Justice—including the power to seek warrants, make criminal arrests, obtain indictments, and prosecute crimes—and Commissioners would remain insulated from presidential control. Congress could even give the FTC the power to conduct military operations, but the President could not remove Commissioners at will.

That is not the way precedent operates. Rather, "the precedential value of a decision is defined by the context of the case from which it arose. If, in light of that context, the decided case is materially or meaningfully different from a superficially similar later case, the holding of the earlier case cannot control the latter." *Cactus Canyon Quarries, Inc. v. Fed. Mine Safety and Health Review Comm.*, 820 F.3d 12, 18 (D.C. Cir. 2016) (cleaned up); *see also Allegheny Gen. Hosp. v. NLRB*, 608 F.2d 965, 969 (3d Cir. 1979) ("A judicial precedent attaches a specific legal consequence to a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts."). Here, the 1935 FTC is materially different from today's FTC, which no longer fits within *Humphrey's Executor's* rationale—that Congress may limit the President's removal power over officers "who exercise[] no part of the executive power vested by the Constitution in the President." 295 U.S. at 628. *Humphrey's Executor* therefore does not control this case.

Plaintiffs respond (Opp. at 8) that *Seila Law* declined to "revisit *Humphrey's Executor* or any other precedent." True, but irrelevant. The FTC was not at issue in *Seila Law*; the CFPB was. The Court therefore had no reason to consider whether *Humphrey's Executor* applies to today's FTC. In

any event, Plaintiffs offer no explanation for why the Supreme Court in *Seila Law* carefully cabined its summary of *Humphrey's Executor*'s holding to the "1935 FTC" and the "New Deal-era FTC," 591 U.S. at 218, or why it noted that the 1935 FTC was "*said* not to exercise any executive power" in *Humphrey's Executor, id.* at 216, or that, "rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power,'" *id.* at 215. The Court went out of its way to avoid confirming whether the Supreme Court even correctly understood the FTC in 1935, much less that the exception continues to apply to the FTC as it exists today. The only plausible explanation for these qualifications is that the Supreme Court intended to underscore that *Humphrey's Executor* does not sanction the removal protections of today's FTC. *See also Collins*, 594 U.S. at 287-88 (Sotomayor, J., concurring) (contrasting FHFA with the "1935 FTC").

3. To sustain their overbroad reading of *Humphrey's Executor*, Plaintiffs misread *Seila Law* and *Collins* (Opp. at 7-8) as standing only for the limited proposition that agencies cannot be led by a single director insulated from presidential control. To do so, Plaintiffs disclaim the relevance of the executive power exercised by the insulated official. This argument flouts the very constitutional principles from which the President's "conclusive and preclusive" removal authority is derived, *Trump*, 603 U.S. at 608-09. The President possesses that removal authority precisely because he must remain accountable to the American people for the exercise of *executive* power, *Free Enterprise Fund*, 561 U.S. at 514. The starting point in every assessment of the constitutionality of an executive official's removal protections is therefore whether that official exercises executive power.

Plaintiffs' position also defies unambiguous Supreme Court precedent. Take *Humphrey's Executor* itself. The Supreme Court there made clear that the availability of that exception "will depend upon the character of the office" because the President's Article II removal authority does not extend to an officer "who exercises no part of the executive power vested by the Constitution in the President." 295 U.S. at 628, 631. And it expressly "limited its holding to 'officers of the kind here

under consideration.'" *Seila Law*, 591 U.S. at 215 (quoting *Humphrey's Executor*, 295 U.S. at 632). The nature of the FTC's power was therefore the ground on which the *Humphrey's Executor* exception rested. *Seila Law*, 591 U.S. at 215 ("In reaching that conclusion, the [*Humphrey's Executor*] Court stressed that Congress's ability to impose such removal restrictions 'will depend upon the character of the office.'" (quoting *Humphrey's Executor*, 295 U.S. at 631)).

*Seila Law* brought this point into even sharper relief. There, the Court held that the *Humphrey's Executor* exception applies *only* to "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." 591 U.S. at 216. To be eligible for the *Humphrey's Executor* exception, then, an agency must satisfy three independent requirements: (1) it must be a multimember body of experts; (2) it must be balanced along partisan lines; and (3) it must perform legislative and judicial functions and not exercise executive power. *Id.*; *see also id.* at 218 (describing the *Humphrey's Executor* exception as limited to "multimember expert agencies that do not wield substantial executive power"). If an agency is a multimember body of experts balanced along partisan lines, but it wields executive authority, then Congress may not constitutionally insulate it from the President's plenary removal authority. *Id.* at 216–18.

*Collins* reiterated this point. It held that the FHFA "clearly exercises executive power" in response to the argument "that Congress may restrict the removal of the FHFA Director because . . . the Agency . . . does not wield executive power." *Collins*, 594 U.S. at 254; *see also id.* at 273 (Kagan, J., concurring) ("If an agency did not exercise 'significant executive power,' the constitutionality of the removal restriction would remain an open question."). Accordingly, Plaintiffs are flat wrong (Opp. at 8) that there exists no "'executive power' test" for assessing a removal protection's constitutionality.

Plaintiffs are similarly wrong that assessing the nature of the power that an insulated official exercises requires overruling *Humphrey's Executor*. Assessing the nature of the power exercised is

precisely what the Supreme Court did in that case, *supra* p. 9, and a faithful application of that case to today's FTC therefore requires applying the same analysis to new facts.[3]

### B. Historical Practice Does Not Support the FTC's Removal Protections.

Plaintiffs also argue (Opp. at 16-20) that historical practice supports the constitutionality of the FTC's removal protections, aggregating support for that proposition from then-Judge Kavanaugh's dissent in *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 189-91 (D.C. Cir. 2018) (Kavanaugh, J., dissenting). But historical practice cannot undermine the Supreme Court's unambiguous holding that only two exceptions to the President's Article II removal authority exist— one for certain inferior officers, and another for multimember, partisan-balanced bodies of experts that do not wield any executive power. *Seila Law*, 591 U.S. at 216. And in any event, Plaintiffs' appeal to the historical record cannot salvage the FTC's removal protections for two independent reasons.

*First*, as explained previously (Defs.' Mem. at 6-7) and *supra* pp. 4-7, historical practice as to the FTC is of limited relevance to the constitutionality of the present-day FTC's removal protections because the FTC's powers have expanded significantly over time. Thus, that many previous Presidents declined to challenge Congress's removal restrictions for prior iterations of the FTC, *but see Humphrey's Executor*, 295 U.S. 602, does not support the constitutionality of today's removal restrictions.

*Second*, as demonstrated by both *Humphrey's Executor* itself and then-Judge Kavanaugh's dissent in *PHH Corporation*, the historical record regarding restrictions on the President's removal power does not uniformly favor Congress's ability to impose such restrictions. Rather, at the time of the First

---

[3] Plaintiffs suggest (Opp. at 9-10 n.2) that Defendants' reading of *Seila Law* requires that "all agency officials" be removable at will. Of course not. Under *Seila Law*, Congress may impose removal protections in two situations: under *Morrison* for inferior officers without substantial policymaking or administrative authority, and under *Humphrey's Executor* for principal officers who are members of multimember boards that do not wield substantial executive authority. 591 U.S. at 204, 215. Defendants' position here is simply that the *Humphrey's Executor* and *Morrison* exceptions must be narrowly limited to their facts, as *Seila Law* itself makes clear. And in no circumstance can be they be construed as broadly as Plaintiffs suggest, which would eviscerate the general rule of unrestricted presidential removal.

Congress, "[t]he view that 'prevailed, as most consonant to the text of the Constitution' and 'to the requisite responsibility and harmony in the Executive Department,' was that the executive power included a power to oversee executive officers through removal." *Free Enterprise Fund*, 561 U.S. at 492 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 Documentary History of the First Federal Congress 893 (2004)). The understanding "soon became the settled and well understood construction of the Constitution." *Id.*

"[T]hat bedrock constitutional principle was challenged" only "in the late 1800s and the early 1900s" when Congress purported to create "new agencies that were independent of the President" and exercised combined powers. *PHH Corp.*, 881 F.3d at 169 (Kavanaugh, J., dissenting). And the constitutionality of insulating those agencies from the President's removal power was quickly "called into doubt by the Supreme Court in the 1926 *Myers* decision." *Id.* "The *Myers* Court's articulation of the President's broad removal power appeared to mean that Congress could no longer create independent agencies," and "Congress itself read *Myers* that way." *Id.* While *Humphrey's Executor* resolved that dispute as to the 1935 FTC, then-Judge Kavanaugh's dissent demonstrates that it was not due to Executive Branch acquiescence to congressionally imposed removal, but rather a protracted give-and-take between the political branches that continues to the present. The dispute here is of a piece with that historical give-and-take, not a departure from it.

### C. Removal Is Critical to the President's Responsibility to Take Care that the Laws Be Faithfully Executed.

Plaintiffs also argue (Opp. at 20-26) that mechanisms other than removal ensure the President exercises sufficient control over the FTC to take care that the laws be faithfully executed. To start, Plaintiffs are wrong on the law. The Constitution—and the promise of democratic accountability that it embodies—requires that the President have authority to direct and supervise the Executive Branch. The removal power is *the* key mechanism for that direction and supervision "for it is 'only the authority that can remove' such officials that they must 'fear and, in the performance of their functions, obey.'"

12

*Seila Law*, 591 U.S. at 213–14 (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)). "Congress cannot reduce the Chief Magistrate to a cajoler-in-chief" by denying him the power to remove government officials who wield substantial executive authority. *Free Enter. Fund*, 561 U.S. at 502. Indeed, the Supreme Court addressed many of the same indirect mechanisms of control in *Free Enterprise Fund*, holding that "power over Board functions is not equivalent to the power to remove Board members" because supervising officials "cannot wield a free hand to supervise individual members if [they] must destroy the Board in order to fix it." *Id.* at 504. Thus, any mechanism of control that falls short of removal is insufficient to ensure that the Executive Branch remains "accountable to the people" because "[w]ithout such power . . . the buck would stop somewhere else" in a "diffusion of authority" that "would greatly diminish the intended and necessary responsibility of the chief magistrate himself." *Id.* at 513-14 (quoting The Federalist No. 70, at 478 (Alexander Hamilton)). Accordingly, "[t]he President's 'management of the Executive Branch' requires him to have 'unrestricted power to remove the most important of his subordinates . . . in their most important duties.'" *Trump*, 603 U.S. at 621 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982)).

For this reason, *Seila Law* emphasized that "[t]he CFPB Director's insulation from removal by an accountable President *is enough* to render the agency's structure unconstitutional." 591 U.S. at 225 (emphasis added). The additional "indirect methods of Presidential control," *id.*, were mere icing on the cake—"features" that "combine to make the Director's removal protection *even more* problematic," *Seila Law*, 591 U.S. at 225 (emphasis added). The Court did not suggest that providing the President "indirect methods" to control an agency could save otherwise unconstitutional removal protections.

Plaintiffs are similarly wrong on the facts, identifying characteristics of the FTC that do not provide the same assurance of accountability that the removal power protects. For example, while it is true that FTC Commissioners "are nominated by the President," Opp. at 21, Commissioners serve staggered terms of seven years, 15 U.S.C. § 41, such that a President may be unable to place a majority

of his appointees on the Commission during a single presidential term. Only removal power can ensure that outcome. Similarly, the President's ability to select and remove a Chairman of the FTC does not provide control over individual Commissioners exercising executive authority by, for example, issuing a subpoena pursuant to a Commission-issued resolution for compulsory process, 15 U.S.C. § 49. Nor is the President's ability to submit the FTC's budget requests through the Office of Management and Budget or veto spending legislation an adequate substitute for the control afforded by removal; the Commission could still use those budgeted funds to pursue policy aims contrary to those of the President. Likewise, the mere fact that the FTC must "prepare an agenda of all regulations" (Opp. at 23) for the Office of Information and Regulatory Affairs is a far cry from giving the President control over the FTC's regulatory power. While these indirect methods may provide the President with means to influence the FTC, they fall short of establishing the presidential control required by Article II. *See Bowsher*, 478 U.S. at 726 ("[I]t is only the authority that can remove him . . . that [an officer] must fear and, in the performance of his functions, obey.").

Finally, Plaintiffs argue (Opp. 23-26) that the FTC Act's removal protections—which allow the President to remove a Commissioner for "inefficiency, neglect of duty, or malfeasance in office," 15 U.S.C. § 41—provide the President with sufficient control over a principal officer exercising substantial executive power. But it is telling that Plaintiffs' principal authority is a law review article, as no Supreme Court decision supports this proposition. Indeed, Plaintiffs acknowledge (Opp. at 25) that a similar argument was made in *Seila Law*, where the Director could only be removed on the same grounds and where *amicus* asked the Court to construe broadly that standard to allow policy-based removal. *Compare* 15 U.S.C. § 41 *with* 12 U.S.C. § 5491(c)(3). The Court declined to do so, explaining that *"Humphrey's Executor* implicitly rejected an interpretation that would leave the President free to remove an officer based on disagreements about agency policy." 591 U.S. at 229. The inefficiency, neglect of duty, or malfeasance standard therefore does not provide for plenary presidential control

14

over executive officers, but does the opposite—it insulates those officials from his authority. If the President cannot remove a Commissioner over a policy disagreement regarding that Commissioner's exercise of executive power, "all of" "the 'executive Power'" is no longer vested in the President. *Id.* at 203. The executive power would be divided between the democratically elected President and a handful of unelected and unaccountable bureaucrats who may not be willing to implement the President's agenda for the Executive Branch. Such division would untether the exercise of executive power from the will of American people, depriving that power of "its legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President, on whom all the people vote," and depriving the people of their right to self-governance. *Arthrex*, 594 U.S. at 11.

### D. This Court Should Hold Unconstitutional the FTC's Removal Protections, Not Grants of Executive Authority to the Commission.

Plaintiffs finally argue (Opp. at 27-29) that, if this Court holds unconstitutional the combination of the FTC's executive power and restrictions on the President's removal authority, it should invalidate the statutes conferring executive power on the FTC and leave in place its removal protections. Plaintiffs' extraordinary position demands American consumers and workers pay the price for Plaintiffs to recover their offices, asking this Court to strike down broad swaths of the FTC's authority to protect consumers and workers—including, potentially, enforcing the consumer-protection laws, 15 U.S.C. § 57a, protecting children's privacy online, 15 U.S.C. § 6502, and protecting consumers from unfair online subscription schemes, 15 U.S.C. § 8404—rather than striking down their removal protections. Precedent, traditional severability principles, and Congress's intent as embodied in the FTC Act and its subsequent amendments foreclose their arguments.

*First*, the most analogous severability cases are *Free Enterprise Fund* and *Seila Law*. In both, the Court severed the officers' removal protections but left intact the officers' authority to act. *Free Enter. Fund*, 561 U.S. at 508-10, 513; *Seila Law*, 591 U.S. at 233-38. Indeed, the Supreme Court directly rejected Plaintiffs' position in *Free Enterprise Fund*, noting that it could "blue-pencil a sufficient number

of the Board's responsibilities so that its members would no longer be 'Officers of the United States.'"

561 U.S. at 511. It declined, noting that "such editorial freedom—far more extensive than" merely

striking down the removal protections—"belongs to the Legislature, not the Judiciary." *Id.* And the

Court has never taken a different approach in a removal case. Lower courts have likewise concluded

that, should there be a problem with the Commissioners' removal protections, severing that provision

would be the appropriate remedy rather than stripping the FTC of the power to bring enforcement

actions and adopt regulations to protect American consumers and workers. *See FTC v. Kochava Inc.*,

No. 2:22-cv-00377-BLW, 2023 WL 3249809, at *12 (D. Idaho May 4, 2023); *FTC v. Walmart Inc.*, 664

F. Supp. 3d 808, 845 (N.D. Ill. 2023).[4] Those authorities compel the same outcome here.

      *Second*, traditional severability principles require that courts "limit the solution to the problem,"

and "refrain from invalidating more of the statute than is necessary." *Barr v. Am. Ass'n of Pol.*

*Consultants, Inc.*, 591 U.S. 610, 626 (2020) (*AAPC*) (quoting *Free Enter. Fund*, 561 U.S. at 508, and *Regan*

*v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality)); *Walmart*, 664 F. Supp. 3d at 845. Here, the agency's

enforcement power is not the problem; "[t]he real problem" would be "a potentially unconstitutional

limit on the President's removal power." *Walmart*, 664 F. Supp. 3d at 845; *see also Free Enter. Fund*, 561

U.S. at 508-09; *Collins*, 594 U.S. at 258 n.23 ("[T]he unlawfulness of the removal provision does not

strip the Director of the power to undertake the other responsibilities of his office."). Indeed,

---

[4] Indeed, Plaintiffs themselves voted against that remedy for administrative law judges' removal
protections when they were Commissioners. *See In the Matter of H&R Block Inc.*, No. 9427, 2024 WL
4544201, at *8 (FTC Oct. 18, 2024) ("[T]he 'good cause' requirement of [the ALJ removal provision]
could be severed as it applies to Commission ALJs, leaving the Commission's ALJs terminable at will
by the Commission or the President."); *id.* ("More likely, Congress would accept an imperfect but still
functional system under which executive officers with less protection than they currently possess
could carry on the Government's work. Severability would allow this outcome."). The Commission
has also taken similar positions in several briefs filed while Plaintiffs were Commissioners. *See, e.g.*,
Def.'s Reply in Supp. of Mot. to Dismiss (ECF No. 22) at 3-4, Def.'s Resp. to Pl.'s Sur-Reply (ECF
No. 25) at 2-5, *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64 (D.D.C. 2024) (No. 1:23-cv-03563);
Mem. of Law in Opp. To Pls.' Mot. for Prelim. Inj. (ECF No. 44) at 18-19, *Express Scripts, Inc. v. FTC*,
No. 4:24-cv-01549 (E.D. Mo. Feb. 18, 2025), 2025 WL 521812; Defs'. Opp. to Pls' Mot. for Prelim.
Inj. (ECF No. 23) at 21, *Asbury Auto. Group v. FTC*, No. 4:24-cv-00950 (N.D. Tex. Nov. 12, 2024).

Plaintiffs' severance proposal is both under- and over-inclusive—"striking the FTC's ability to sue for injunctive and monetary relief might not be enough" because "the *Humphrey's Executor* Court may not have accurately assessed the FTC's executive powers." *Walmart*, 664 F. Supp. 3d at 845.[5]

Further, severing the removal provision—nine words in 15 U.S.C. § 41—would be the more precise, surgical solution to any separation-of-powers violation. Plaintiffs' preference for severing the FTC's post-1935 powers, scattered in various provisions of the FTC Act, 15 U.S.C. §§ 45(m), 53(b), 57a(a), is infeasible because it is unclear which of them should be cut.

*Third*, Plaintiffs are incorrect (Opp. at 29-30) that Congress's intention for the FTC to be independent trumps Congress's intention to grant the FTC substantial executive authority. To start, the Supreme Court rejected a similar argument in *Seila Law* when severing the CFPB Director's removal protections. The Court recognized that "Congress preferred an independent CFPB to a dependent one," but "the critical question [was] whether Congress would have preferred a dependent CFPB to *no agency at all*." 591 U.S. at 236. And it "seem[ed] clear" to the Court that the Congress would prefer a dependent CFPB, as the elimination of the CFPB would cause "major regulatory disruption" and "leave appreciable damage to Congress's work in the consumer-finance arena." *Id.* Here, similarly, eliminating the FTC's enforcement authorities would cause major regulatory disruption and undermine the work that Congress has done over decades to ensure that consumers and competition are protected. The Commission's authority to protect consumers from fraud and unfairness, to obtain monetary redress for consumers, to conduct premerger review, to protect

---

[5] Plaintiffs cite (Opp. at 27-28) *AAPC* for a different proposition, claiming it supports a time-of-enactment rule under which a court must sever the later-filed amendment. That case adopted no such test as it did not address *which part* of a statute to sever—to the contrary, it reiterated that the "normal rule" is to "limit the solution to the problem" so as to leave as much of the act as possible intact. 591 U.S. at 625. Indeed, *AAPC* relied primarily on the traditional principle of severability, which emphasizes the judiciary's "confined role" and "respect for Congress's legislative role by keeping courts from unnecessarily disturbing a law apart from invalidating the provision that is unconstitutional." *Id.* at 626-27. It only cited other cases severing amendments as further support for its conclusion under that principle.

children's online privacy, to protect borrowers from racially discriminatory lending tactics, and to adopt rules prohibiting unfairness and deception all postdate *Humphrey's Executor. See* 15 U.S.C. § 45(a) (1938) (directing the FTC to prevent unfair or deceptive acts or practices); 15 U.S.C. § 45(m)(1)(A) (1975) (authorizing the FTC to seek civil penalties); *id.* § 57b (1975) (authorizing the FTC to seek consumer redress); *id.* § 18a (authorizing the FTC to conduct premerger notification and review, including with rulemaking); *id.* § 1691c (1974) (authorizing the FTC to enforce parts of the Equal Credit Opportunities Act) *id.* § 6502 (1998) (directing the FTC to protect children's online privacy, including via rulemaking); *id.* § 57a (1975) (authorizing the FTC to promulgate rules defining unfair or deceptive acts or practices.)  The suggestion that Congress would rather leave American consumers and workers exposed to wanton misconduct than see Plaintiffs removed by the President is absurd.

Plaintiffs also urge (Opp. at 29-30) this Court not to "rewrite" or "damage" Congress's work. But severing any unconstitutional provision requires some damage to the underlying statute.  The severability doctrine requires courts to limit the damage to the narrowest possible excision necessary to remedy the constitutional violation while preserving Congress's intent. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329–30 (2006).  The relevant inquiry is thus whether severing the Commissioners' removal protections does less damage to Congress's work than severing the statutory provisions passed after 1935 that conferred executive authority on the Commission.  The latter would require parsing every statute passed after 1935 that conferred executive authority on the FTC.  *See, e.g.,* Wheeler-Lea Act of 1938, Pub. L. No. 75-447, 52 Stat. 111, 111-112; Magnuson-Moss, Pub. L. No. 93-637, 88 Stat. 2183 (1975); Hart-Scott-Rodino Antitrust Improvements Act of 1976, Public Law 94-435, 90 Stat. 1390 (1976); Antitrust Procedural Improvements Act of 1980, Pub. L. No. 96-349, 94 Stat. 1154 (1980); International Antitrust Enforcement Assistance Act of 1994, Pub. L. 103-438, 108 Stat. 4597 (1994); *see also supra* p. 7 (listing specific acts of Congress and regulations pursuant to specific acts of Congress, granting rulemaking and enforcement authority to the Commission). Plaintiffs

cannot seriously contend that judicial revisions of each of these statutes would do less damage to Congress's work across decades than severance of a single removal provision.

## II.    Plaintiffs Are Not Entitled to the Relief Sought.

### A.  This Court May Not Reinstate Plaintiffs to their Former Offices.

As Defendants explained, Article III courts may not order the reinstatement of a principal executive officer because such relief contravenes our constitutional structure and exceeds the scope of this Court's equitable powers.  Defs.' Mem. at 18-21.

1.  Plaintiffs first respond (Opp. at 31-32) that the *en banc* D.C. Circuit declined to stay reinstatement orders in *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *1–2 (D.C. Cir. Apr. 7, 2025) (*en banc*).  But the D.C. Circuit declined to engage meaningfully with the "district court's remedial overreach" in that order.  *Id.* at *2 (Rao, J., dissenting); *see also id.* ("[T]he majority . . . should have explained why the government is not likely to prevail on its argument that the injunctions exceed the court's equitable authority. Instead, the order devotes a single sentence to this question, likely because these remedies have no historical basis.").  And the Supreme Court granted an administrative stay of those orders while it considers the government's application, which remains pending.  *Trump v. Wilcox*, No. 24A966, 2025 WL 1063917, at *1 (U.S. Apr. 9, 2025) (mem.).  Until the Supreme Court acts on that application, the lawfulness of those reinstatement orders remains an open question.

2.  Plaintiffs next rehash (Opp. 33-34) their account of *Swan v. Clinton*, 100 F.3d 973, 976–81 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023), as authorizing reinstatement.  Neither case supports that proposition.  To start, both decisions were issued at the motion-to-dismiss stage regarding Article III standing and did not grant any relief, much less reinstatement.  *See* Defs.' Mem. at 21 n.3.  And both cases acknowledged significant questions about what relief was available, including whether such relief would meaningfully redress the injury.  *See Swan*, 100 F.3d at 980–81 ("recognizing that the President has the power, if he so chose, to undercut

this relief."); *Severino*, 71 F.4th at 1042 (explaining the court "need not confront that difficult question" of "whether an injunction ordering a presidential appointment would be available or appropriate"). Accordingly, neither decision supports *ordering* the relief sought here.

3. Plaintiffs maintain (Opp. at 34-35) that injunctive relief amounting to reinstatement "is the appropriate remedy when an individual has been wrongly deprived of a federal position." But "a court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." *White v. Berry*, 171 U.S. 366, 377 (1898); *see* Defs.' Mem. at 19-20 (collecting authorities). Plaintiffs cite no contrary authority from before this year in which the D.C. Circuit or Supreme Court reinstated a principal executive officer.[6]

Plaintiffs invoke (Opp. at 38) *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015), for the proposition that injunctive relief is available "with respect to violations of federal law by federal officials." True enough, but that general proposition has no bearing on the availability of the specific type of injunctive relief—reinstatement—sought here. The Supreme Court's longstanding precedent on that precise question controls. *See White*, 171 U.S. at 377.

4. Plaintiffs also fail to establish that history and tradition authorize reinstatement. To start, Plaintiffs are simply wrong (Opp. at 36-37) that there exists no such rule establishing the boundaries discussed above. To the contrary, "by the 1880s," the Supreme Court "considered it 'well settled that

---

[6] Plaintiffs note (Opp. at 37-38) that *Sampson v. Murray*, 415 U.S. 61, 71 (1974), acknowledged "federal courts do have authority to review the claim of a discharged governmental employee." But there is a critical difference between reviewing the claim of a discharged employee—in that case, a probationary employee in the Public Buildings Service of the General Services Administration—and issuing an injunction that reinstates a principal officer who controls an Executive Branch department's exercise of executive power. Only the latter places the judiciary on a collision course with the President's Article II appointment power. In any event, *Sampson* does not support the relief sought here as the Court reversed the grant of a preliminary injunction even in that disparate factual context. *Id.* at 92. *Vitarelli v. Seaton*, 359 U.S. 535 (1959), similarly addressed an Education and Training Specialist in the Department of the Interior, not a principal officer exercising executive power.

a court of equity has no jurisdiction over the appointment and removal of public officers.'" *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (mem.) (Gorsuch, J., dissenting); *see also supra* p. 21.

Plaintiffs then argue (Opp. at 37) that *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), was limited to an injunction prohibiting the transfer of assets. But if the Court in that case concluded it was a "wrenching departure" from equitable practice merely to extend remedies of post-judgment creditors to pre-judgment creditors, *id.* at 322, then it necessarily follows that Plaintiffs here cannot transform a history of injunctions intended to prevent future legal violations to injunctions reinstating principal executive officials. *See also Whole Woman's Health v. Jackson*, 595 U.S. 30, 43-45 (2021) (explaining "[t]he equitable powers of federal courts are limited by historical practice" in declining to adopt a "novel plan . . . to expand the equitable powers of federal courts"). Plaintiffs cite nothing to support their claim that *Grupo Mexicano* should be limited to its facts, and D.C. Circuit precedent is to the contrary. *See Goodluck v. Biden*, 104 F.4th 920, 925 (D.C. Cir. 2024) ("courts considering an equitable remedy 'must ask' whether it 'was traditionally accorded by courts of equity'"). Accordingly, because courts of equity have not historically granted reinstatement of principal officers, that remedy is unavailable.

Finally, Plaintiffs (Opp. at 38) attempt to minimize the import of the historical record from the First Congress, claiming that "three individuals cannot speak for the entire First Congress." But Plaintiffs identify no contrary views from that Congress, and the Supreme Court has instructed that those views are "entitled to great weight" in the removal context, *see Myers*, 272 U.S. at 122, and for constitutional interpretation generally, *see Marsh v. Chambers*, 463 U.S. 783, 790 (1983). Plaintiffs are therefore not entitled to reinstatement by injunction.

21

## B.  Plaintiffs Are Not Entitled to a Permanent Injunction.

Independently, Plaintiffs are not entitled to a permanent injunction because they have failed to establish that they face irreparable injury and that the balance of the equities weighs in their favor. Defs.' Mem. at 21-25.  As detailed below, their arguments to the contrary are unavailing.

1.  Plaintiffs insist (Opp. 38-41) that they have suffered irreparable harm through "the deprivation of a 'statutory right' to serve as officers."  That reasoning is unsound.  Although a public official's "loss of salary" amounts to a judicially cognizable harm, his "loss of political power" does not.  *Raines v. Byrd*, 521 U.S. 811, 820-21 (1997).  The notion that public officials "have a separate private right, akin to a property interest, in the powers of their offices" is "alien to the concept of a republican form of government."  *Barnes v. Kline*, 759 F.2d 21, 50 (D.C. Cir. 1984) (Bork, J., dissenting). Executive power belongs to the President, not to Plaintiffs.

*Sampson* is not to the contrary.  Although *Sampson* contemplated "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found," the Court made clear that "external factors common to most discharged employees" "will not support a finding of irreparable injury."  415 U.S. at 92 n.68.  And as almost every executive branch official removed by the President could claim a right to serve in their prior position, injury to that asserted right does not amount to irreparable harm under the test put forth in *Sampson.*  Indeed, for that reason, principal officers have historically sought to remedy their removal through suits for backpay, not for injunctions that would effectively reinstate them to their prior positions.  *See* Defs.' Mem. at 18.

Plaintiffs also claim harm to the FTC's ability to fulfill its mandate.  But Plaintiffs cannot dispute that the FTC continues to function with three Commissioners, as it has at various points throughout its history with fewer than five Commissioners.  In any event, harm to the FTC's ability to function would not irreparably harm *Plaintiffs,* and therefore cannot satisfy the irreparable harm requirement.

"Abstract harm" to third parties "does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021); *see also Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018). That same principle forecloses Plaintiffs' attempt (Opp. at 41) to assert an injury to "the protection Congresses and Presidents have long deemed necessary for FTC Commissioners." The only harm *to Plaintiffs* is a reparable loss of employment.

2. Regardless, the balance of equities and public interest significantly outweigh any minimal harm that Plaintiffs may suffer because an injunction would irreparably harm the Executive—and, indeed, the American people—by severing the link between the Executive Branch and the American people. Defs.' Mem. at 24-25. An injunction would force the President to continue allowing Plaintiffs to exercise executive power as principal officers, even though the President has removed them. That unprecedented interference "impinges on the conclusive and preclusive power through which the President controls the Executive Branch." *Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518, at *3 (D.C. Cir. Mar. 10, 2025) (quoting *Trump*, 603 U.S. at 608-09). That "is a serious, concrete harm." *Harris v. Bessent*, No. 25-5057, 2025 WL 980278, at *19 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring), *vacated on reconsideration en banc*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025).

Plaintiffs respond that the government cannot suffer harm from an injunction that merely requires that "governmental agencies abide by the federal laws that govern their existence." Opp. at 41 (citation omitted). But the relief Plaintiffs seek would compel the President to retain the services of principal officers whom the President no longer believes should be entrusted with the exercise of executive power. This is a far cry from merely prohibiting a purportedly unlawful practice.

Court orders reinstating fired executive officers create serious practical problems as well. Reinstatement orders can "lead to the utmost confusion in the management of executive affairs." *White v. Berry*, 171 U.S. 366, 378 (1898). In this way, leaving the President and Senate uncertain about

whether and when they may install new officers to succeed Plaintiffs undermines "the steady administration of the laws" that Article II seeks to secure. *Seila Law*, 591 U.S. at 223.

###   C.  Plaintiffs Are Not Entitled to a Declaratory Judgment that Would Amount to Reinstatement.

The equitable principles that preclude reinstatement also preclude declaratory relief—such as a declaration that the President's removal of Plaintiffs was void and without legal effect—that would achieve Plaintiffs' aim of reinstatement through other means. Defs.' Mem. at 25-26. Plaintiffs respond (Opp. at 32-33) that the availability of declaratory relief is subject to equitable limitations only "with respect to ongoing state criminal prosecutions, to avoid a *res judicata* effect on state court proceedings akin to an injunction." But the Supreme Court in *Samuels v. Mackell*, 401 U.S. 66, 70, 73 (1971), did not purport to limit the general principle that declaratory relief is subject to equitable limitations to that narrow context, and the D.C. Circuit has subsequently recognized in both the removal context and other matters that the availability of a declaratory judgment is governed by equitable principles. *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *44 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting) ("Declaratory relief is governed by 'the same equitable principles relevant to the propriety of an injunction.'"), *vacated on reconsideration en banc*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025); *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 696 (D.C. Cir. 2015) ("non-exclusive list of 'factors relevant to the propriety of granting a declaratory judgment'" include "whether other remedies are available," "the convenience of the parties," "the equity of the conduct of the declaratory judgment plaintiff" and "public importance of the question to be decided"). Accordingly, Plaintiffs may not obtain by declaratory judgment what they cannot obtain by injunction.

###   D.  Plaintiffs Are Not Entitled to a Writ of Mandamus.

Nor have Plaintiffs established any entitlement to mandamus: they lack a clear right to relief, no defendant has a clear duty to act, there are other adequate remedies, and they have not established the existence of a ministerial duty. Defs.' Mem. at 26-27.

Plaintiffs respond (Opp. at 42-43) by citing dated authorities for the proposition that mandamus can be an available remedy for removal. But while the Supreme Court has approved the use of mandamus to try the title to judicial or local offices, plaintiffs have identified no precedent for using mandamus to reinstate a principal executive officer removed by the President. *See Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 256 (1839) (court clerk); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 167 (1803) (justice of the peace in the District of Columbia); *see also Kalbfus v. Siddons*, 42 App. D.C. 310, 319 (D.C. Cir. 1914) (assistant assessor for the District of Columbia). Nor does there exist any support for the proposition that mandamus may issue against the President, which it must here as the President alone can appoint and remove Commissioners. Indeed, *Swan*, 100 F.3d at 978, acknowledged that the D.C. Circuit has "never attempted . . . to order the President to perform a ministerial duty."

In any event, the mere suggestion that mandamus *can* be an available remedy for unlawfully removed officials does not mean that Plaintiffs here are entitled to such relief. Under current D.C. Circuit precedent, mandamus will "will issue 'only where the duty to be performed is ministerial'" and the right "clear and indisputable." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quotation marks omitted). Plaintiffs' right to relief is, at a minimum, unclear. *See supra* pp. 1-19. And the President's constitutional appointment authority is not ministerial. *Cf. Marbury*, 5 U.S. (1 Cranch) at 151-52 (contrasting the power of appointment with the "ministerial" "requisites to be performed by the secretary" for delivery of the commission).

Finally, Plaintiffs do not dispute (Opp. at 44) that the availability of mandamus must account for equitable considerations. Those considerations weigh heavily against relief here. *Supra* 22-24.

## CONCLUSION

For these reasons, the Court should grant Defendants' cross-motion for summary judgment, deny Plaintiffs' motions for summary judgment, and enter judgment in favor of Defendants.

Dated: May 12, 2025                              Respectfully submitted,


                                                 YAAKOV ROTH
                                                 *Acting Assistant Attorney General*

                                                 CHRISTOPHER R. HALL
                                                 *Assistant Branch Director*

                                                 EMILY HALL
                                                 *Counsel to the Acting Assistant Attorney General*

                                                 /s/ *Alexander W. Resar*
                                                 ALEXANDER W. RESAR
                                                 *Trial Attorney*
                                                 U.S. Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street, NW
                                                 Washington, DC 20530
                                                 Telephone: (202) 616-8188
                                                 Email: alexander.w.resar@usdoj.gov

                                                 *Counsel for Defendants*